UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TRACY BOLWELL, | : CIVIL ACTION NO. 302CV01001AWT |
| Plaintiff, | : |
| vs. | : |
| DURAMED PHARMACEUTICALS, INC., and BARR LABORATORIES INC., | : |
| Defendants. | : JUNE 24, 2005 |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANTS DURAMED PHARMACEUTICALS, INC'S. AND BARR LABORATORIES, INC'S MOTION FOR SUMMARY JUDGMENT DATED JUNE 6, 2005

I.   **Summary**

Defendants have moved for summary judgment on the basis that Plaintiff did not commence her lawsuit within the applicable three-year statute of limitations.

The motion must be denied because material facts, as to when the statute of limitations began to run, are genuinely in dispute in that;

1. Under the undisputed standard, a Plaintiff must know (or reasonably should have known) the (causal) connection between her injury and its cause before the statute of limitations begins to run and;

**ORAL ARGUMENT REQUESTED**

1

2. Evidence demonstrates that Plaintiff filed suit within three-years of the date she knew (or reasonably should have known) of such a causal connection and;

3. To hold otherwise would require finding that Plaintiff (a high-school graduate) knew (or should have known) the causal connection between PPA and stroke *before*; (i) her team of doctors at Yale University (some of whom were then in the process of trying to establish whether such a link existed), (ii) the pharmaceutical industry (who at the time insisted that PPA was safe and effective and did not cause hemorrhagic stroke) and (iii) the FDA.

## II. Background

### A. Procedural History

On June 21, 2002, Tracy Bolwell, f/k/a Tracy Kupferschmid ("Ms. Bolwell") filed a products liability action against the defendants, Duramed Pharmaceuticals, Inc. and Barr Laboratories, Inc. ("Defendants") in the United States District Court District of Connecticut. On or about August 27, 2002 Ms. Bolwell's action was transferred the Multi-District Litigation styled *In re Phenylpropanolamine Products Liability Litigation* ("MDL") located in the United States District Court for the Western District of Washington. On March 21, 2005, a suggestion of remand was issued and a formal Order of Remand followed on April 28, 2005. This Court re-claimed jurisdiction over this matter on or about May 31, 2005.

### B. Statement of Facts

On January 21, 1997 Ms. Bolwell suffered a hemorrhagic stroke. (*See* Tracy Bolwell's June 11, 2003 deposition ("Bolwell Depo.") at p. 64 Exhibit 1). She was 26 years old and the mother of a one year-old son. On the days preceding January 21, Ms. Bolwell suffered from a head-cold and as a result, was prescribed the Defendants' product, a cough and cold compound containing phenylpropanolamine ("PPA"). (Bolwell Depo. at pp. 64-69). After retrieving her prescription from the pharmacy, Ms. Bolwell ingested her first dose of PPA at approximately 9 am. (Bolwell Depo. at pp. 70-74, 79).

Later that same day (January 21, 1997), Ms. Bolwell ingested her second dose of PPA and approximately one hour later began vomiting and experiencing acute pain in her head. (Bolwell Depo. at pp. 80-81). Ms. Bolwell could not walk and had trouble moving her neck. (Bolwell Depo. at pp. 80-81). She was rushed to Vassar Brothers Hospital ("Vassar") in Poughkeepsie, New York. (Bolwell Depo. at pp. 82-83), where a CT Scan and MRI revealed a 4 cm right basal ganglia hemorrhage. (*See* Yale New Haven Hospital Discharge Summary dated March 27, 1997 ("Discharge Summary"), Exhibit 2).

Ms. Bolwell spent 5 days at Vassar and was transferred to Yale New Haven Hospital ("Yale"), New Haven, Connecticut. (*See* Discharge Summary). Ms. Bolwell was admitted at Yale on January 27, 1997 and discharged from in-patient care on February 6, 1997. *Id*. While at Yale, Ms. Bolwell's doctors performed a right frontal craniotomy, leptomeningeal and brain biopsies. (*See* Yale Operative Report dated February 3, 1997 ("Operative Report")

Exhibit 3). Ms. Bolwell's post-operative diagnosis was a spontaneous right intracerebral hemorrhage of unknown etiology. (*See* Operative Report). While at Yale, Ms. Bolwell received extensive physical and occupational therapy. (*See* Yale Social Work Evaluation dated January 27, 1997, Exhibit 4). On February 6, 1997, Ms. Bolwell was discharged to her home with garbled speech, (Bolwell Depo. at p. 95), where family members cared for her. (Bolwell Depo. at pp. 97-98). While at home, and with the assistance of family members, Ms. Bolwell continued with physical and occupational therapies two to three times per week for approximately three months. (Bolwell Depo. at pp. 97-99). After her discharge Ms. Bolwell also became depressed and was treated for depression. (Bolwell Depo. at pp. 99-100).

Today, Ms. Bolwell suffers from memory loss. (Bolwell Depo. at p. 108). She also suffers from increased fatigue. (Bolwell Depo. at p. 111). Additionally, Bolwell's employment has been adversely affected by her memory and her difficulties with handwriting. (Bolwell Depo. at p. 114).

### C. The PPA Industry and the Yale Study

Phenylpropanolamine ("PPA"), although it was never deemed "safe and effective" by the FDA,[1] was used as a nasal decongestant and appetite suppressant until November 6, 2000--when the FDA mandated its withdrawal from the market.

---

[1] PPA's use pre-dated the enactment of The Food, Drug and Cosmetic Act in 1938 and was therefore "grandfathered" onto the list of products and compounds allowed into US commerce.

4

Dating back to the 1980s, the PPA industry regularly spoke with a unified voice, through the Consumer Healthcare Products Association ("CHPA"). The PPA industry, through CHPA, has consistently, uniformly and publicly asserted that PPA is a safe and effective nasal decongestant. In fact, as late as May, September and October of 2000 – (*as late as three years after Ms. Bolwell's stroke*) – the industry continued to claim that PPA was safe and effective and did not cause hemorrhagic stroke. (*See* Exhibits 5, 6 and 7). "The Hemorrhagic Stroke Project did not establish a causal relationship between PPA use and hemorrhagic stroke." (*See* Comments on Hemorrhagic Stroke Project by CHPA, by letter to the FDA dated May 24, 2000, p. 2, ¶ 1, Exhibit 5).

In 1992, in an attempt to demonstrate the safety of PPA, the PPA industry, with the consent of the FDA, commissioned an epidemiological study formally known as the Hemorrhagic Stroke Project (HSP). The lead investigators of the HSP were two Yale University doctors—Dr. Lawrence Brass and Dr. Ralph Horwitz. The HSP, which is commonly referred to as the "Yale Study" was conducted over a period of approximately five years.

The Yale Study concluded that "substantial evidence [exists] that PPA is associated with increased risk for hemorrhagic stroke. Causation is one explanation for that association, especially since neither chance nor bias is a likely explanation for the findings." (*See* Letter from HSP Investigators to the FDA dated September 19, 2000, p. 2, ¶ 1, Exhibit 9). Though

5

the results of the Yale Study were reported to the PPA industry in October, 1999[2], the final report wasn't delivered to the FDA until May, 2000. Unfortunately, it wasn't until November 6, 2000 that the FDA publicly announced it was withdrawing PPA from the market. Prior to November 6, 2000 neither the FDA nor the PPA industry issued any form of consumer alert or added any warning to the PPA-containing products notifying consumers (the public) of the association between PPA and stroke.

### III.  Law and Argument

#### A.  Standard for Summary Judgment

A motion for summary judgment is appropriate only when the "pleadings, affidavits and any other proof submitted show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Suarez v. Dickmont Plastics Corp.*, 229 Conn. 99, 105, 639 A.2d 507 (1994). "The party seeking summary judgment has the burden of showing the absence of *any* genuine issue as to *all* material facts . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of *a* genuine issue of material fact. . . ." *United Service Automobile Ass'n v. Marburg*, 46 Conn. App. 99, 103, 698 A.2d 914 (1997) (emphasis added) (citations omitted).

---

[2] Despite the endorsement of the Yale Study by several FDA epidemiologists who reviewed it and its protocol, the PPA industry continued to proclaim that PPA was safe and effective and did not cause hemorrhagic stroke. Incredibly, although it had designed the Yale Study protocol and hand-picked the pre-eminent Yale professors who conducted the Yale Study, the PPA industry claimed that it was flawed, the researchers biased and the results inconclusive. (*See* Exhibits 5, 6 and 7).

6

"In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist." *Nolan v. Borkowski*, 206 Conn. 495, 500, 538 A.2d 1031 (1988).

Summary judgment is only appropriate on the statute of limitation grounds when the "material facts concerning the statute of limitations [are] not in dispute…" *Burns v. Hartford Hospital*, 192 Conn. 451, 452, 472 A.2d. 1257 (1984). "Thus, while a statute of limitations defense lends itself to proof required by Rule 56 and therefore may be asserted successfully on a motion for summary judgment, the court will refuse to grant summary judgment for the defendant if there is an issue of fact as to when the limitations period began." *BellSouth Telecomm., Inc. v. W.R. Grace & Co.* 77 F.3d 603, 609 (2d. Cir. 1996) (internal quotations omitted).

### B. Tracy Bolwell's Product Liability Claims Are Timely As They Were Filed Within Three Years Of The Date They Accrued

Defendants assert that Ms. Bolwell's product liability claims are barred by the three-year statute of limitations mandated by Connecticut General Statute § 52-577a (a). While § 52-577a (a) applies to such claims, Defendant's assertion is based on a misunderstanding as to when the statute of limitations period began to run and therefore fails. Since Ms. Bolwell did not discover (and reasonably could not have discovered) the causal connection between her injury and Defendants' product (PPA) until late in 2000, her claims did not accrue until such time. Therefore, Ms. Bolwell's complaint, dated June 11, 2002, is timely.

Numerous recent cases establish when the statute of limitations begins to run in Connecticut products-liability actions:

"In Connecticut, a cause of action accrues when a plaintiff suffers actionable harm." *Champagne v. Raybestos-Manhattan*, 212 Conn. 509, 562 A.2d. 1100 (1989). **"Actionable harm occurs '**[t]he statute of limitations for strict product liability claims commences when the plaintiff discovers or should discover, through the exercise of reasonable care, that he or she has **been injured** suffered an actionable harm and that the defendant's conduct **caused such injury** is a potential cause of that harm.'"[3] *Gnazzo v. G.D. Searle & Co.*, 973 F.2d 136, 138 (2d. Cir. 1992) (citing *Champagne* at 1107).

In other words, "[a] claim is first sustained or discovered, so as to trigger the running of the statute of limitations, at the point when the plaintiff first could have successfully maintained an action." *Dennis v. ICL, Inc.*, 957 F.Supp. 376, 379 (D.Conn. 1997), citing *BellSouth Telecomm., Inc. v. W.R. Grace & Co.* 77 F.3d 603 (2d. Cir. 1996) (internal quotations omitted).

> [A] plaintiff is able successfully to maintain an action when: (1) the defendant has acted in a tortious manner; (2) the plaintiff has sustained actual injury as a result of the defendant's actions; and (3) the plaintiff *knows of the causal connection* between the defendant's tortious conduct and the resulting injury to the plaintiff.

---

[3] While Defendants' Motion for Summary Judgment references *Gnazzo*, their summation of the *Gnazzo* Court's holding (quoted within the single-quotes and struck-out, as necessary) materially misrepresents that Court's true holding (in bold above). "Caused" and "potential cause" are not synonymous. Indeed, here, the distinction is dispositive.

*Id.* at 379 (emphasis added).

Despite the PPA industry's assertions--as late as September, 2000—that no causal connection existed between PPA and stroke, Defendants, aware of the third-prong of the above rubric, now assert that Ms. Bolwell 'knew of the causal connection' between her injury and PPA shortly after her stroke but, for some reason, neglected to file suit until "nearly $5^{1/2}$ years after [her stoke]." Defendants fail to recognize the more plausible and indeed correct scenario; that Ms. Bolwell did not become aware of the causal connection between her stroke and PPA until later. Indeed, Defendants, claim that Ms. Bolwell discovered, or reasonably should have discovered, not only that she was injured, but also that the Defendant's product caused such injury the very day she was discharged from the hospital after her stroke (in February 1997). In fact, Ms Bolwell, only discovered (and only reasonably could have discovered) the causal connection between her stroke and PPA in late 2000—once the FDA had publicly announced the withdrawal of PPA from the market.

Defendants base their claim solely on the fact that Ms. Bolwell recalled a comment by her treating physician, Dr. Leifer, made while she was being discharged from the hospital. Dr, Leifer told Ms. Bolwell of a yet-to-be-concluded study, the Yale Study that was *attempting* to determine *if* there was a link between PPA and stroke in otherwise healthy young-women. Even though such a comment inherently demonstrates that no link then existed between PPA and stroke, Defendants maintain that it somehow infused Ms. Bolwell

with knowledge of a causal connection between PPA and her stroke, a knowledge that even Dr. Leifer did not posses—thus the *very* reason for the on-going Yale Study.

The irony of Defendants' claim is apparently lost on them. Ms. Bolwell was told by Dr. Leifer in February 1997 that no cause for her stroke could be conclusively identified. She was also told that while *no link* then existed between PPA and stroke--a study was underway to try to establish *if* such a link existed. In bringing this motion, Defendants would charge Ms. Bolwell (a high-school graduate) with greater knowledge about the causal connection between PPA and stroke than; (i) her team of doctors at Yale University (some of whom were in the process of trying to establish the existence of just such a link), (ii) the pharmaceutical industry (who at the time insisted that PPA was safe and effective and did not cause hemorrhagic stroke) and (iii) the FDA.

Stated simply; it was impossible (and would have been unreasonable) for Ms. Bolwell to know of the causal connection between PPA and stroke in 1997 because no one had that knowledge to give her.

The absence of Ms. Bolwell's knowledge in 1997 as to the causal connection between PPA and her stroke is demonstrated in both her deposition testimony and that of her mother, Diane Bannon.

Ms. Bolwell testified as follows:

> Q: We touched on this briefly this morning or earlier today. You said that Dr. Leifer mentioned to you when you were in the hospital that your

10

prescription medication may have played a role in your stroke; is that correct?

A: Correct.

Q: That was sometime in the couple of weeks following your stroke?

A: Yes.

Q: So, that would have been January or February 1997?

A: Probably February. But it wasn't until I saw it on the TV that I actually believed that it could've because when I left the hospital, I didn't know what caused it. I was living every day like I was going to die the next because he couldn't give me a concise answer as what caused it.

...

Q: When you say you didn't believe [Dr. Leifer], is there a reason why you didn't believe him?

Mr. Luzzi: Objection to form. You can answer.

A: He had no proof of anything and they did a brain biopsy and said it was normal and I didn't understand how something, I could be normal and have that happen to me when I was only 25 years old. I would have rather him say I have vasculitis and gone on with it.

Q: You say you would have rather he just told you you had vasculitis. Why is that?

A: Because at least I would have known what it was. Up until two years ago, I thought I was going to die.

Q: What happened two years ago to change your –

A: I saw it on the TV[;] PPA. My friends started calling me and saying are you watching this and that's when I decided to call the lawyer. I finally took a deep breath and said I am not going to die tomorrow.

11

> Q: What was different that you saw on the TV as opposed to what Dr. Leifer told you?
>
> A: Nothing was proven. You saw it on the TV that PPA is causing strokes and I kind of believed it that that had to be what happened to me obviously. There was no other explanation. I mean after all the tests they gave me that day in the hospital, I was like you can't come up with anything, you know.
>
> ...
>
> Q: Between the time that Dr. Leifer told you that there was a possible connection when you were still in the hospital and [the] time that you saw the television program, did you have any thoughts about the connection between PPA and your stroke? In other words, did you do any investigation on your own?
>
> A: No.
>
> Q: So, during that time period, you just weren't sure what it was that caused your stroke?
>
> A: Correct.

Tracy Bolwell's June 11, 2003 deposition at pp. 117-118, 119-121 and 126 (Exhibit 1).

Ms. Bolwell's mother, Diane Bannon, testified as follows:

> Q: While Tracy was at Yale, did Dr. Leifer or any of the other doctors give you any possible explanations for her stroke?
>
> A: No. There—they were doing some studies, but they hadn't come up with any conclusive explanation.
>
> ...

> Q: Tracy testified that Dr. Leifer told her, when she was in the hospital at Yale, that PPA may have been the cause of her stroke. Were you present for any of those conversations?
>
> A: No, I was not.
>
> Q: Do you remember Tracy or anyone ever telling you that Dr. Leifer said that PPA may have been the cause of her stroke?
>
> A: To tell you the truth, my—what I recall is a couple of—a year, maybe a year or two later, one day she called me on the phone, she said ma, there's something on TV that PPA —which, at that point, I didn't even know what that was, was taken off the market, and a lot of over-the-counter drugs, and that —she said, maybe that was the cause of my stroke.

Diane Bannon's September 10, 2003 deposition at pp. 84-86 (Exhibit 8).

### C. <u>Issues of Material Fact</u>

As the above demonstrates, there are genuine disputes as to when Ms. Bolwell; (i) discovered, (ii) reasonably should have discovered and (iii) could have discovered the causal connection between PPA and her stroke and thus when the limitation period began to run in this case. Therefore, summary judgment must be denied.

As stated by this Court previously, "[t]he question of when a cause of action accrues, so as to start a statute of limitation running, is ordinarily a question of fact for a trier; consequently, a court cannot grant summary judgment for a defendant if there is a genuine dispute as to when the limitation period began." *West Haven School Dist. v. Owens-Corning Fiberglass*, 721 F.Supp. 1547, 1556 (D.Conn.1988).

Defendants' Motion for Summary Judgment relies heavily on cases that are either not-helpful in resolving the issue now before the Court (*Gnazzo* and *Dennis*) or are actually consistent with Plaintiff's position (*Durrett*). In *Gnazzo* and *Dennis* the causal connection between the Plaintiff's injury and the Defendant's product was widely known and supported by scientific evidence at the time of Plaintiff's injury (not the case here). Indeed, in *Gnazzo Dennis* the Plaintiffs explicitly admitted making the causal connections between their injuries and the respective Defendant's products. Clearly, this is not the situation here.

Defendants rely on (their misconstruction of) the *Gnazzo* case to support their Motion (see footnote 3 above). However, *Gnazzo*, even properly construed, is easily distinguished from the instant case. The Plaintiff in *Gnazzo*, an IUD user, experienced trouble getting pregnant in 1981 and around that time read and heard that IUDs were harmful yet, only brought suit after learning, in 1989, that she was rendered infertile by her use of IUDs.

In *Gnazzo*, it was established that the Plaintiff *knew* IUDs caused harm as early as 1981 (based on what she read and heard). In other words, the Plaintiff, in 1981, had made the causal connection between IUDs and reproductive difficulties. In this case however, Ms. Bolwell had not made (and could not have made) a similar causal connection between PPA and stroke in 1997.

In affirming the District Court's finding for Defendants on their Motion for Summary Judgment, the U.S. Court of Appeals, Second Circuit, focused its analysis on the Plaintiff's earlier "injury" (her difficulty getting pregnant) and its effect (when combined with what she

14

read and heard) of putting the Plaintiff on notice as to an actionable harm. In other words, the Court focused its analysis on the injury prong of the 3-part test described infra, not on the causal connection prong (as is in issue here).

Defendants also refer the Court to *Durrett v. Leading Edge Products, Inc.*, 965 F.Supp. 280 (D. Conn 1997). However, *Durrett's* holding is actually consistent with Ms. Bolwell's position that her cause of action only accrued in late 2000, once she made (or reasonably should have made) the causal connection between defendants' product and her injury.

In *Durrett,* a products-liability case implicating keyboard use with Carpal Tunnel Syndrome, the Court recognized that injury alone is not sufficient to trigger the statute of limitations but rather that Plaintiffs must also discover (or reasonably should have discovered) that their injury is caused by a Defendant's product. In finding for the Plaintiff, the Court rejected Defendants' respective arguments as to when Plaintiff's injury first accrued (and when the statute of limitations began to run).

> Leading Edge contends that the plaintiff's injury was discovered in November 1990, when the plaintiff first sought medical treatment for the pain he was experiencing in his wrist. Gateway contends that the plaintiff's injury was discovered on or before November 19, 1991, the date when he was diagnosed as suffering from tenosynovitis. The plaintiff does not dispute that he sought medical treatment for his wrist pain in November 1990, or that he was diagnosed with tenosynovitis on November 19, 1991. The plaintiff contends, however, that he did not discover his injury, within the meaning of the statute, until January 10, 1992, when he first learned of the causal relationship between his use of keyboard equipment and his tenosynovitis.

15

*Durrett* at 283.

...

> In this case, the undisputed facts show that the plaintiff did not learn of the causal connection between his use of the defendants' keyboard equipment and his injury of tenosynovitis until January 10, 1992. It was only then that the plaintiff discovered his legal injury, or actionable harm, and the three year limitations period was triggered.

*Durrett* at 285.

Unfortunately, the *Durrett* decision does not disclose how the Plaintiff discovered the causal connection between his condition and the Defendants' product nor did the parties address the issue of "whether the plaintiff should have known, through the exercise of reasonable care, of any causal relationship at an earlier date." *Durrett* at 282.

Finally, Defendants claim that *Dennis v. ICL, Inc.*, 957 F.Supp. 376 (D. Conn. 1997) "is directly on point." *Dennis,* however, is not on-point since its analysis focuses on the same issue as *Gnazzo*--the injury prong rather than the causal connection prong. Unlike the instant case, *Dennis* involved a Plaintiff that admitted (in 1991) to making the causal connection between her injury (pain in her fingers) and defendant's product (a cash register). The Court held that because the causal connection had been made between *an* injury and its cause, the Plaintiff could not bring a claim in 1994 after her injury developed into the more serious condition of Carpal Tunnel Syndrome.

As demonstrated by the above evidence and given the above precedent; there remains a genuine issue of material fact as to when Ms. Bolwell made (or reasonably could have made) the causal connection between PPA and her stroke, therefore, summary judgment must be denied.

### V.    Conclusion:

For the foregoing reasons, the Plaintiff respectfully requests that the Defendants' motion for summary judgment be denied.

Respectfully submitted,

By /s/ Edward H. Burke
Edward H. Burke, Esq.
Federal Bar No. CT25209
Ron Michael Meneo, Esq.
Federal Bar No. CT06279
Michael J. Luzzi, Esq.
Federal Bar No. CT12518
Early, Ludwick & Sweeney, LLC
One Century Tower, 11th Floor
265 Church St., PO Box 1866
New Haven, CT  06508-1866
203-777-7799
203-785-1671(fax)

**Counsel for Plaintiff**

## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed this 24th day of June, 2005 to all counsel listed below.

Joseph P. Thomas, Esq.
Jeffery D. Geoppinger, Esq.
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202-2409
**Counsel for Defendant**

Thomas H. Winslow, Esq.
The Law Offices of Thomas H. Winslow, LLC
321 Main Street
Farmington, CT 06032-2976
**Local-Counsel for Defendant**

_____
Edward H. Burke, Esq.