UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TRACY BOLWELL, | : CIVIL ACTION NO: 302CV01001AWT |
| Plaintiff, | : |
| vs. | : |
| DURAMED PHARMACEUTICALS, INC., BARR LABORATORIES, INC., | : |
| Defendants. | : |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS DURAMED PHARMACEUTICALS, INC. AND BARR LABORATORIES, INC. FOR RELIEF FROM ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)(6) OR IN THE ALTERNATIVE MOTION FOR RECONSIDERATION**

Defendants Duramed Pharmaceuticals, Inc., and Barr Laboratories, Inc., by and through counsel, hereby move this Court for relief from the Court's Order denying their Motion for Summary Judgment, or in the alternative, for reconsideration of the Court's ruling on defendants' Motion for Summary Judgment, and in support thereof would show the Court as follows:

I.  INTRODUCTION

Plaintiff Tracy Bolwell's Complaint alleges that plaintiff suffered a hemorrhagic stroke on January 21, 1997, as a result of her alleged use of a cough/cold/allergy decongestant medication containing phenylpropanolamine HC, also known as PPA. Plaintiff alleges the PPA-containing medication at issue was manufactured by defendant Duramed Pharmaceuticals, Inc. Plaintiff filed her claims for product liability and violations of the Connecticut Unfair Trade Practices Action ("CUTPA") on June 11, 2002.

After this matter was remanded from the PPA MDL Court in the Western District of Washington, defendants filed their Motion for Summary Judgment on all of plaintiff's claims on June 6, 2005. On July 7, 2005, the Court issued a ruling granting summary judgment on plaintiff's claims for violations of the CUTPA, but denied summary judgment on plaintiff's product liability claim. Although the Court did not issue an opinion, plaintiff's Memorandum in Opposition to defendants' Motion for Summary Judgment argued that the statute of limitations was tolled by the discovery rule. Plaintiff argued that although her treating physician specifically told her on or about February 6, 1997, that her stoke may have been caused by her use of a PPA-containing product, plaintiff could not have reasonably discovered that PPA "caused" her injury as of that date, such that the statute of limitations began running on her claims, because causation was not definitively proven at that time.[1]

The Court properly held that the three-year statute of limitations in Connecticut General Statute § 52-577a(a) applies to plaintiff's product liability claim. However, the Court's conclusion that plaintiff's product liability claim was not time barred because causation was not definitively proven was based on plaintiff's misinterpretation of the standard of causation necessary to trigger the statute of limitations. Since the Court's July 7, 2005, ruling, the identical argument raised by plaintiff in opposition to defendants' request for summary judgment has been addressed and rejected in a persuasive Massachusetts case nearly identical to the case at bar. Based on the decision

---

[1] The element of causation still has not been proven in this case, and defendants maintain that plaintiff will not be able to establish that her alleged use of a PPA-containing product caused her stroke. However, defendants' position on the issue of causation is irrelevant to whether plaintiff was on notice of an actionable harm under Connecticut law as of February 6, 1997, such that the statute of limitations began to run on her product liability. The overwhelming evidence, including plaintiff's own testimony, establishes that she was.

of the Superior Court of Massachusetts in *Murphy v. Novartis Consumer Health, Inc.*, 19 Mass L. Rptr. 690, 2005 WL 2319157 (Mass. Super.), defendants respectfully request the Court grant defendants relief from its Order denying their Motion for Summary Judgment or reconsider its ruling on defendants' Motion for Summary Judgment on plaintiff's product liability claim. A copy of the decision in *Murphy* is attached as Exhibit A.

## II.   STATEMENT OF FACTS

### A.   Defendants' Motion For Summary Judgment

After this matter was remanded from the PPA MDL Court in the Western District of Washington, defendants filed their Motion for Summary Judgment on all of plaintiff's claims on June 6, 2005. Defendants argued that plaintiff's product liability claim is prohibited by the three year statute of limitations. Connecticut General Statute § 52-577a(a) states:

> No product liability claim as defined in section 52-572m shall be brought but within three years from the date when the injury, death or property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered. . .

Defendants' argument for summary judgment on statute of limitations grounds was premised on plaintiff's own testimony admitting that she was aware that PPA was a potential cause of her stroke as early as 1997. Sometime between January 21, 1997, and February 6, 1997, plaintiff's treating physician, Dr. Dana Liefer, told plaintiff that her stroke may have been caused by her use of PPA.

> Q.   When is the first time that you heard of PPA or phenylpropanolamine?
>
> A.   The first time I heard of it was at the hospital. Dr. Leifer, after they did all my tests, the brain biopsy came back normal he said there was a chance it could've been a study that they were doing and he explained the whole thing to me. That may have been the cause of it.

3

> Q. When you said he explained those [sic] whole thing to you, what exactly?
>
> A. He was doing a study on young women and stroke in relation to decongestants and over-the-counter medication.
>
> Q. He told you that while you were still in the hospital?
>
> A. When I was leaving. All my testing and they couldn't come up with anything else. He said that may have been the cause of it.

(*See* Deposition of Tracy Bolwell, pp. 72-73, attached as Exhibit B.)

In *Gnazzo v. G.D. Searle & Co.*, 973 F.2d 136, 138 (2d. Cir. 1992), the Second Circuit held that, under § 52-577a(a), the statute of limitations for strict product liability claims commences when the plaintiff discovers or should discover, through the use of reasonable care, that he or she has suffered an actionable harm and that defendants' conduct is a potential cause of that harm. Therefore, defendants moved for summary judgment based on plaintiff's knowledge that PPA potentially caused her stroke over five years prior to filing her claims.

In response, plaintiff filed a Memorandum in Opposition to defendants' Motion for Summary Judgment and argued that the discovery rule tolled the statute of limitations on her product liability claim. Specifically, plaintiff argued that the three year statute of limitations did not begin running on her claim when her treating physician told her that her stroke may have been caused by PPA because causation was not definitively established at that time.[2]

---

[2] The element of causation still has not been proven in this case, and defendants maintain that plaintiff will not be able to establish that her alleged use of a PPA-containing product caused her stroke. However, defendants' position on the issue of causation is irrelevant to whether plaintiff was on notice of an actionable harm under Connecticut law as of February 6, 1997, such that the statute of limitations began to run on her product liability. The overwhelming evidence, including plaintiff's own testimony, establishes that she was.

Defendants filed a Reply arguing that plaintiff misinterpreted the standard of causation necessary to trigger the running of the statute of limitations. Pursuant to Connecticut case law, such as *Gnazzo*, a plaintiff need not definitively know that her injury was caused by defendants' product before the statute of limitations on her claim begins to run. She only needs to have discovered, through use of reasonable care, facts which support an allegation that the product caused the injury for the statute of limitations to begin running. If proof of definitive causation is required to trigger the statute of limitations, the statute of limitations in a product liability suit would not begin to run until the plaintiff established causation at trial.

**B.   The Court's Order On Defendants' Motion For Summary Judgment**

On July 7, 2005, the Court issued a ruling granting summary judgment on plaintiff's claims for violations of the CUTPA, but denied summary judgment on plaintiff's product liability claim. The Order did not state the grounds for the denial of defendants' request for summary judgment on plaintiff's product liability claim.

**C.   *Murphy v. Novartis Consumer Health, Inc.***

On October 27, 2005, counsel for defendants became aware of the decision issued by the Massachusetts Superior Court in *Murphy v. Novartis Consumer Health, Inc.*, 19 Mass L. Rptr. 690, 2005 WL 2319157 (Mass. Super.). The facts in *Murphy* are nearly identical to the facts of the case at bar. That case also involves a ruling on a Motion for Summary Judgment addressing a statute of limitations and a discovery rule similar to the law applicable in Connecticut governing this case.

In *Murphy*, plaintiff Helene Murphy ("Murphy") sued Novartis Consumer Health, Inc. ("Novartis"), a manufacturer of a PPA-containing product, alleging that she suffered

5

a hemorrhagic stroke as a result of her one day use of Novartis' PPA-containing product. *See Murphy* at *1. Murphy had ingested the PPA-containing product on August 28, 1993, and suffered a hemorrhagic stroke that same day. *Id*. While at the hospital, Murphy advised her treating physicians that she had ingested PPA prior to her stroke. *Id*. However, unlike plaintiff Tracy Bolwell, none of Murphy's treating physicians or anyone else told her at the time of her stroke that her injury may have been caused by her use of PPA. *Id*. at *1, 3. Murphy filed her suit on March 9, 2001. *Id*. at *1.

Novartis moved for summary judgment on plaintiff's negligence and breach of warranty claims based on the three year statute of limitations applicable to those claims. *Id*. Plaintiff opposed Novartis' motion and claimed the discovery rule tolled the statute of limitations. *Id*. at *2. Plaintiff claimed she did not have knowledge in 1993 that PPA may have caused her stroke because her physician told her he did not know the cause of the stroke. *Id*. at *3. Plaintiff claims she did not have any knowledge of a potential connection between PPA and her stroke until 2001. *Id*. at *2.

The Court denied defendants' request for summary judgment. The Court held that the discovery rule applied and there was a genuine issue of material fact concerning what representations were made to plaintiff at the time of her stroke by her treating physician regarding the cause of her injury and whether plaintiff's treating physician provided her with sufficient knowledge regarding the potential casual connection between her use of PPA and her stroke to trigger the statute of limitations. *Id*. at *4. In coming to this conclusion, the Court stated:

> It is very important, when determining whether Murphy had notice of the likely cause of her injury, to know what she was told by her doctor. A patient with an entirely justifiable lack of knowledge about complicated medical issues, would still seemingly be on notice of some relation

6

between a stroke and an over-the-counter allergy medicine if she was so informed by her doctor. . . . Under the discovery rule, representations made to Murphy by her doctor about the cause of her bleed are of material importance to the determination of when the statute of limitations was triggered. Since the parties do not agree on this fact, this case is not resolvable by summary judgment.

*Id.* at *4.

In its opinion, the Court also discussed the meaning of causation for the purposes of the discovery rule. The Court held that "[i]f cause were defined in its strictest sense, a cause of action would never accrue for purposes of the statue until cause, when at issue, had been resolved at trial." *Id.* at *3 (quoting *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 199 (1st Cir. 1983).). "Such a definition would entirely defeat the purposes of a statute of limitations in this class of cases, and we know of no court which has gone so far." *Id.*

### III.  LAW AND ARGUMENT

#### A.  Standard for Relief From Judgment Pursuant to Rule 60(b)(6)

Rule 60(b)(6) of the Federal Rules of Civil Procedure states, "[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from final judgment, order, or proceeding for the following reasons: . . . (6) any other reason justifying relief from the operation of the judgment." Rule 60(b)(6) has been described as "a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by [other means under Rule 60(b)]," which in a proper case, is to be "liberally applied." *United States v. Cirami*, 563 F.2d 26, 32 (2d. Cir. 1977) (*quoting* 7 Moore's Federal Practice, § 60.27(2) (2d ed.rev. 1975)). A proper case is one in which "extreme hardship" will be imposed on a party if relief from judgment is not granted. See *Id.* (*citing Ackermann v. United States*, 340 U.S. 193, 199 (1950)).

### B. Standard for Motion for Reconsideration

A Motion for Reconsideration should be considered when the moving party can point to controlling decisions or data that the Court overlooked--matters, in other words, that might reasonably be expected to alter the conclusion reached by the Court. *See Shader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995). There are three grounds for granting a motion for reconsideration: (1) an intervening change in the controlling law; (2) the availability of newly discovered evidence; and (3) the need to correct clear error or prevent manifest injustice. *See Virgin Atl. Airways, Ltd. V. National Mediation Board*, 956 F.2d 1245, 1255 (2d Cir. 1992).

### C. The Court Should Grant Relief From Its Order on Defendants' Motion For Summary Judgment or Reconsider Its Ruling Because The Decision In *Murphy* Could Reasonably Alter the Conclusion Reached by the Court

Although *Murphy* is not controlling law, the decision of the Superior Court of Massachusetts is persuasive authority. *See Carothers v. Radwilowicz*, 1991 WL 107969 (Conn. Super.) (attached as Exhibit C). Further, the *Murphy* decision may reasonably be expected to alter the conclusion reached by the Court on defendants' argument regarding the statute of limitations and discovery rule applicable to plaintiff's claims. As such, relief pursuant to Rule 60(b)(6) is appropriate to spare defendants the hardship of defending plaintiff's untimely claim.

The law applied by the Massachusetts Superior Court in *Murphy* regarding the statute of limitations and the discovery rule is nearly identical to the Connecticut law applicable in this case. In *Murphy*, as in this case, the Court applied a three year statute of limitations. The Court also applied a discovery rule to plaintiff's claims. Pursuant to Massachusetts discovery rule, plaintiff's causes of action accrued, for the purposes of

statute of limitations analysis, when plaintiff had "(1) knowledge or sufficient notice that she was harmed and (2) knowledge of sufficient notice of what the cause of harm was." *See Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 208 (1990). This standard is similar to the discovery rule in Connecticut. *See Gnazzo v. G.D. Searle & Co.*, 973 F.2d 136, 138 (2d. Cir. 1992) (In Connecticut, a cause of action accrues when plaintiff discovers or should discover, through exercise of reasonable care, that he or she has been injured and that defendant's conduct caused such injury).

Based on its interpretation of a similar statute of limitations and discovery rule, the Court in *Murphy* held that information received from a treating physician as to the potential cause of the injury will trigger the statute of limitations.

> It is very important, when determining whether Murphy had notice of the likely cause of her injury, to know what she was told by her doctor. A patient with an entirely justifiable lack of knowledge about complicated medical issues, would still seemingly be on notice of some relation between a stroke and an over-the-counter allergy medicine if she was so informed by her doctor. . . . Under the discovery rule, representations made to Murphy by her doctor about the cause of her bleed are of material importance to the determination of when the statute of limitations was triggered.

If Murphy's treating physician had told her PPA possibly caused her injury at the time of her stroke, the statute of limitations on her claims would have begun to run. The Court did not require the treating physician to be absolutely sure that the product was the cause of the injury. A possibility was enough. Further, the only reason defendant's request for summary judgment was denied in *Murphy* was because the parties disagreed about the representations made to Murphy about PPA as a potential cause of her injury.

In this case, there is no dispute. Plaintiff admits she was told by Dr. Liefer that PPA was a potential cause of her stroke when she was in the hospital in 1997. Therefore, plaintiff discovered that defendant's PPA-product at issue was a potential cause of her

9

harm in 1997. This knowledge would be sufficient to trigger the running of the statute of limitations in *Murphy*, and should be enough to trigger the similar statute of limitations on plaintiff's similar claim subject to a similar discovery rule in the case at bar. As the statute should have been triggered, plaintiff's claims in this case are barred because she did not file suit until over five years after she discovered that defendant's product was a potential cause of her stroke.

Moreover, the holding in *Murphy* also is influential because it addressed and rejected the identical argument plaintiff raised in opposition to defendants' request for summary judgment. As in this case, the issue in *Murphy* concerned the level of notice of causation a plaintiff must receive before the statute of limitations is triggered. In *Murphy*, the Court recognized that the level of causation for triggering the statute of limitations is not the same as the level of causation necessary for proof at trial. Citing First Circuit authority interpreting the discovery rule, the Court stated "[i]f cause were defined in its strictest sense, a cause of action would never accrue for purposes of the statue until cause, when at issue, had been resolved at trial." *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 199 (1st Cir. 1983). The Court then recognized that a state of limitations "would be all but destroyed by a strict casual notice requirement" and applied a lesser standard of causation. *Id*. The Court held that the notice of a "likely" cause is enough to start the statute running.

In this case, plaintiff proffered the exact same argument on the definition of causation rejected by the court in *Murphy*. Plaintiff argued that she could not have known PPA "caused" her injury, such that the statute of limitations began running, because causation has not been definitively proven. Indeed, plaintiff relies on the fact

that she has a high school education and defendants' anticipated challenge to the issue of causation at trial to support her argument. Thus, plaintiff's own justifications demonstrate her misconstruction of the law.

As recognized in *Murphy*, a strict interpretation of causation with respect to the statute of limitations and discovery rule would render the statute of limitations moot. If plaintiff had to have conclusive knowledge that her injury was caused by the product at issue to trigger the statute of limitations, no statute of limitations would begin running until the trial was concluded. That result is absurd, and it was specifically rejected in *Murphy* and its progeny. To the extent it has formed the Court's basis for denying defendants' request for summary judgment in this matter, defendants request that the Court reconsider its decision and, like *Murphy*, reject that interpretation of causation. To hold otherwise would constitute clear error and impose manifest injustice and hardship on defendants by requiring them to defend against an untimely claim.

## IV. CONCLUSION

For the foregoing reasons, defendants respectfully requests this Court reconsider its Order denying defendants' request for summary judgment on plaintiff's product liability claims pursuant to Connecticut's Product Liability Act, CGS 52-572m *et seq.*, and dismiss plaintiff's product liability claim as barred by the statute of limitations.

Respectfully Submitted,

Thomas H. Winslow
The Law Office of Thomas H. Winslow, LLC
321 Main Street
Farmington, CT  06032-2976
(860) 678-4425
(860) 678-4427 FAX

Joseph P. Thomas
Ohio Bar No: 0040379
Jeffrey D. Geoppinger
Ohio Bar No: 0073908
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202-2409
(513) 698-5000
(513) 698-5001 FAX
jthomas@ulmer.com
jgeoppinger@ulmer.com

**Counsel for Defendants**
**Duramed Pharmaceuticals, Inc., and**
**Barr Laboratories, Inc.**

12

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via U.S. mail on the 15th day of November, 2005 on:

Ron Michael Meneo, Esq.
Early, Ludwick & Sweeney, L.L.C.
265 Church Street, 11th Floor
P.O. Box 1866
New Haven, CT  06508-1866

**Attorneys for Plaintiffs**

343674.1
11/15/2005 2:46 PM

Westlaw.

Not Reported in N.E.2d                                                                 Page 1

Not Reported in N.E.2d, 19 Mass.L.Rptr. 690, 2005 WL 2319157 (Mass.Super.)

**(Cite as: 2005 WL 2319157 (Mass.Super.))**

Superior Court of Massachusetts.
Helene K. MURPHY
v.
NOVARTIS CONSUMER HEALTH, INC. and
Medi-Rite Pharmacy, Inc.
**No. 01-1702-A.**

Aug. 10, 2005.

*MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

PETER M. LAURIAT, Justice.

*1 Helene K. Murphy ("Murphy"), filed this action against Novartis Consumer Health, Inc., ("Novartis") and Medi-Rite Pharmacy ("Medi-Rite") on March 9, 2001, alleging claims of negligence, breach of warranty, and violation of G.L. c. 93A, arising from a stroke she suffered on August 28, 1993. Murphy contends that her stroke was caused by a drug, phenylpropanolamine (PPA), contained in Tavist-D, which she had taken for the first time on August 28,1993. Tavist-D was developed and manufactured by Novartis and distributed by Medi-Rite. Novartis and Medi-Rite (collectively "the defendants") have now moved for summary judgment on the ground that the applicable statutes of limitation, three years for negligence and breach of warranty, and four years for violation of c. 93A, have expired. For the following reasons, the defendants' summary judgment motion is denied.

*BACKGROUND*
The undisputed material facts and the disputed material facts viewed in the light most favorable to Murphy, as revealed by the summary judgment record, are as follows. On the night of August 28, 1993, Murphy experienced a bleed in her brain, resulting in a diagnosis of subarachnoid hemorrhage (SAH), a form of hemorrhagic stroke. According to Murphy, earlier that evening she took a 75 mg tablet of Tavist-D for relief from seasonal allergies. She then went to sleep and awakened three hours later with what she described as an excruciating headache. Murphy sought treatment at Harrington Memorial Hospital, where she reported her ingestion of Tavist-D to the intake personnel and treating providers in the Emergency Room. Later in the night of August 28, Murphy was transferred from Harrington Memorial Hospital to the University of Massachusetts Medical Center in Worcester ("UMMC"). Murphy's husband remembers his wife telling every person at the hospital involved with her intake that she had taken Tavist-D. On August 30, 1993, Dr. Jamie Baisden, the chief neurology resident, described to the Murphys that she had a bleed, but neither Mr. nor Mrs. Murphy can remember any other specifics of their conversation with Dr. Baisden. On September 2, 1993, Murphy sought treatment from Dr. Christopher Ogilvy, a neurosurgeon at Massachusetts General Hospital (MGH), who admitted her to the hospital for a period of five days.

Dr. Ogilvy, when speaking to Murphy about the possible cause of her hemorrhage, mentioned that he thought that she might have suffered an "AVM," which is a leak in a pre-existing malformed blood vessel in her brain. Although Dr. Ogilvy offered the AVM as a possible cause of Murphy's stroke, he never stated that the bleed was in fact from an AVM. [FN1] Murphy understood that Dr. Ogilvy was trying to determine precisely what caused her hemorrhagic stroke. [FN2] Murphy had numerous conversations with her doctors regarding why she suffered a hemorrhage. [FN3] From February 1994 to 2001, Murphy was seen on a regular basis by Dr. Paula Ravin, a neurologist at UMMC, who maintained notes of Murphy's visits throughout this time. Dr. Ravin was not asked to diagnosis Murphy, but rather, provided treatment for the injuries she sustained as a result of her hemorrhagic stroke. Dr. Ravin's notes which covered sixteen visits with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in N.E.2d                                                                                                Page 2
Not Reported in N.E.2d, 19 Mass.L.Rptr. 690, 2005 WL 2319157 (Mass.Super.)
**(Cite as: 2005 WL 2319157 (Mass.Super.))**

Murphy between 1994 and 2001, contain no indication that Murphy ever inquired as to the possible cause of her bleed.

> FN1. Defendants contend that Dr. Ogilvy and Murphy discussed that her hemorrhage did in fact take the form of a leak of a pre-existing malformation, referred to as an AVM.

> FN2. Defendants contend that not only did Murphy know that Dr. Ogilvy was looking for the cause of her stroke, but also that Murphy never discussed with Dr. Ogivly why the bleed happened.

> FN3. Defendants contend that Murphy never inquired of Dr. Ogilvy, or any other physician as to the cause of the leak.

*2 Murphy first became aware of information linking PPA to hemorrhagic stroke in 2001. On October 5, 2001, Dr. Ravin's notes reflect a conversation with Murphy regarding the possible connection between her SAH and the Tavist-D she took on the day of her stroke.

### PROCEDURAL HISTORY

Murphy filed this action against the defendants on March 9, 2001, alleging negligence, breach of warranty, and violation of G.L. c. 93A. On May 21, 2001, the defendants moved to dismiss the Complaint pursuant to Mass.R.Civ.P. Rule 12(b)(6), on the ground that Murphy had failed to state a claim upon which relief could be granted because the complaint revealed that the action was filed beyond the expiration of the applicable statutes of limitation. Murphy thereupon amended her complaint to include an allegation that the statutes of limitation were tolled under the discovery rule. The defendants now seek summary judgment attacking Murphy's assertion that accrual of her causes of action were tolled by the discovery rule.

### DISCUSSION

Summary judgment will be granted where there are no genuine issues as to any material fact, and where the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56(c); *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422 (1983); *Community Nat'l Bank v. Dawes,* 369 Mass. 550, 553 (1976). The court views the facts in the light most favorable to the non-moving party. *Williams v. Hartman,* 413 Mass. 398, 401 (1992). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue "even if he were to have no burden on an issue if the case were to go to trail." *Pederson v. Time, Inc.,* 404 Mass. 14, 17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party's case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 809 (1991); *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991).

Claims of negligence and breach of warranty must be commenced within three years after the cause of action accrues. G.L. c. 260, § 2A; G.L. c. 106, § 2-318. Chapter 93A claims must be brought within four years after the cause of action accrues. G.L. c. 260, § 5A. Generally, a cause of action accrues when the plaintiff is injured. *Riley v. Presnell,* 409 Mass. 239, 243 (1991). However, under the discovery rule, a cause of action accrues, for purposes of statute of limitation analysis, when a plaintiff has "(1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was." *Bowen v. Eli Lilly & Co.,* 408 Mass. 204, 208 (1990). For Murphy, and for the plaintiff in *Bowen,* "the plaintiff was always well aware that she had sustained substantial physical harm."

*3 The question therefore is whether Murphy was "sufficiently on notice as to the cause of her physical harm." *Id.* at 207. Applying Massachusetts law, the United States Court of Appeals for the First Circuit addressed the question of what level of notice, about causation a plaintiff must receive before the statute of limitations is triggered. See *Fidler v. Eastman Kodak Co.,* 714 F.2d 192, 199 (1st Cir.1983). In reaching its decision, the First Circuit noted the difficulties inherent in determining

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                                Page 3
Not Reported in N.E.2d, 19 Mass.L.Rptr. 690, 2005 WL 2319157 (Mass.Super.)
**(Cite as: 2005 WL 2319157 (Mass.Super.))**

sufficient notice of causation, when the existence of causation would likely be vehemently contested at trial. "Defining how much notice of cause is enough notice is inherently problematic where, as here, establishment of actual causation is itself an issue to be resolved at trial on the merits. If cause were defined in its strictest sense, a cause of action would never accrue for purposes of the statute until cause, when at issue, had been resolved at trial. See *Dawson v. Eli Lilly Co.,* 543 F.Supp. 1330, 1334 (D.D.C.1982). Such a definition would entirely defeat the purposes of a statute of limitations in this class of cases, and we know of no court which has gone so far." *Fidler,* 714 F.2d at 198.

Recognizing that the statute of limitations would be all but destroyed by a strict causal notice requirement, the court set a lesser standard. It concluded "that under Massachusetts law notice of likely cause is ordinarily enough to start the statute running." *Fidler,* 714 F.2d at 199. This court must determine whether the defendants have established that they are entitled to judgment as a matter of law because the undisputed facts show that Murphy had notice of the likely cause of her injury.

The parties dispute several facts in their Statements of Undisputed Facts required by Superior Court Rule 9A. Of the disputed facts, one is particularly material to the statute of limitations analysis because it sheds light on whether Murphy was on notice of the cause of her injury. *Zimmerman v. Kent,* 31 Mass.App.Ct. 72, 78 (1991) (defining materiality as "whether a reasonable man would attach importance [to the fact at issue] in determining his choice of action in the transaction at issue"). The defendants contend that the summary judgment record lacks evidence showing that Murphy inquired of any of her doctors as to the possible cause of her bleed, and that such a lack of inquiry on the issue of causation precludes Murphy's invocation of the discovery rule. Murphy disputes this assertion, and offers deposition testimony of her husband, Kevin Murphy, and an affidavit she executed after her January 13, 2003 deposition. The deposition testimony of Kevin Murphy does not strongly support either party's contentions because Mr. Murphy testified that he did not remember discussions about the cause of his wife's injury. *K. Murphy Dep.,* 48:15-49:9; Bliss Aff. Ex. 13. However, in Murphy's post deposition affidavit, she states that "my husband and I met with another treating neurosurgeon, Dr. Chris Ogilvy, and we also discussed what he thought could have happened to cause my hemorrhage. It was my understanding from that meeting that, as with my doctors at UMMC, he wasn't sure what caused my bleed." H. Murphy Aff. ¶ 7, Bliss Aff. Ex. 14.

*4 It is very important, when determining whether Murphy had notice of the likely cause of her injury, to know what she was told by her doctor. A patient with an entirely justifiable lack of knowledge about complicated medical issues, would still seemingly be on notice of some relation between a stroke and an over-the-counter allergy medicine if she was so informed by her doctor. The defendants note that if Dr. Ogilvy was not on notice, then PPA must not have caused the bleed. This is simply not the case. That Dr. Ogilvy was unaware of some connection between PPA and Murphy's bleed merely emphasizes the unlikeliness that Murphy would have been on notice of any causal connection between PPA and her injury. Under the discovery rule, representations made to Murphy by her doctor about the cause of her bleed are of material importance to the determination of when the statute of limitations was triggered. Since the parties do not agree on this fact, this case is not resolvable by summary judgment. Moreover, even if Murphy had never discussed causation with any of her doctors, the "question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact." *Riley v. Presnell,* 409 Mass. 239, 240 (1991).

### *ORDER*
For the foregoing reasons, the defendants' Motion for Summary Judgment is **DENIED.**

Not Reported in N.E.2d, 19 Mass.L.Rptr. 690, 2005 WL 2319157 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70

BOLWELL
1
2  A. No.
3  Q. You had your prescription filled
4  at CVS that day; is that correct?
5  A. Yes.
6  Q. That was the CVS on South Road
7  in Peekskill?
8  A. Yes.
9  Q. Do you remember what time you
10 went to the doctor that day?
11 A. It was late morning, early
12 afternoon.
13 Q. Did you go to have the
14 prescription filled immediately after your
15 doctor's appointment?
16 A. Yes.
17 Q. Did anyone go with you to your
18 doctor's appointment?
19 A. My son.
20    MS. COOK: Off the record.
21    (Whereupon, an off-the-record
22    discussion was held.)
23 Q. What did the doctor tell you
24 when you went to see him on January 21,
25 1997?

71

BOLWELL
1
2  A. What did he tell me?
3  Q. Yes.
4  A. I don't remember actually what
5  he told me. He didn't really tell me much
6  of anything. He just gave me my
7  prescriptions and he had given me
8  antibiotic, also.
9  Q. At the same time that he
10 prescribed --
11 A. Yes.
12 Q. So, he prescribed two
13 medications to you on January 21, 1997?
14 A. Yes.
15 Q. The only thing you remember him
16 telling you was that you had a head cold?
17 A. Yes.
18 Q. Do you remember how long your
19 doctor's visit lasted?
20 A. No.
21 Q. You don't remember anything that
22 he told you about either of the medications
23 that he prescribed to you?
24    MR. LUZZI: Objection to form.
25 A. I don't believe he told me

72

BOLWELL
1
2  anything.
3  Q. Did he give you any dosing
4  instructions about any of the medications he
5  prescribed to you on January 21, 1997?
6  A. No.
7  Q. So, other than writing the
8  prescription, he didn't tell you anything
9  about either of the medications?
10 A. No.
11    MR. LUZZI: Objection to the
12    form. You can answer.
13 A. No.
14 Q. Did you know at the time that
15 one of your medications contained PPA or
16 phenylpropanolamine?
17 A. No.
18 Q. When is the first time that you
19 heard of PPA or phenylpropanolamine?
20 A. The first time I heard of it was
21 at the hospital. Dr. Leifer, after they did
22 all my tests, the brain biopsy came back
23 normal he said there was a chance it
24 could've been a study that they were doing
25 on PPA and he explained the whole thing to

73

BOLWELL
1
2  me. That may have been the cause of it.
3  Q. When you say he explained those
4  whole thing to you, what exactly?
5  A. He was doing a study on young
6  women and stroke in relation to
7  decongestants and over-the-counter
8  medication.
9  Q. He told you that while you were
10 still in the hospital?
11 A. When I was leaving. All my
12 testing and they couldn't come up with
13 anything else. He said that may have been
14 the cause of it.
15 Q. When I say study, do you know,
16 was it the Jell Memorial Project (phonetic)?
17 A. Yes.
18 Q. Is that the first time you ever
19 heard of PPA or phenylpropanolamine?
20 A. Yes.
21 Q. When you got your prescription
22 filled on January 21, 1997, did you talk to
23 the pharmacist at all about either of your
24 prescriptions?
25 A. No.

19 (Pages 70 to 73)

**Westlaw.**

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 107969 (Conn.Super.), 4 Conn. L. Rptr. 136

**(Cite as: 1991 WL 107969 (Conn.Super.))**

Page 1

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut, Judicial District of Hartford-New Britain, at Hartford.
Leslie CAROTHERS, Comm. of Environmental Protection
v.
Joseph R. RADWILOWICZ, et al.
**No. 37 32 66.**

June 6, 1991.

*MEMORANDUM OF DECISION*

STENGEL, Judge.

I

*1 The plaintiff, Leslie Carothers, the Commissioner of Environmental Protection, sues the defendants, Joseph and Judith Radwilowicz, in a one-count amended complaint seeking enforcement of an order issued by the plaintiff to the defendants on March 6, 1981. The complaint alleges that the defendants failed to obtain engineering approval on the adequacy of a dam they own in Granby, Connecticut. The plaintiff seeks injunctive relief and statutory penalties and costs. The defendants answered and asserted four special defenses: estoppel, laches, the statute of limitations and due process violations.

The plaintiff moves to strike the first and second special defenses as being legally insufficient and has filed a supporting memorandum of law. The defendant filed an opposing memorandum.

II

A party may contest in the motion to strike "the legal sufficiency of ... any special defense." Conn.Practice Bk. § 152(5) (1978, rev'd to 1990).

The motion "admits all facts well pleaded; it does not admit legal conclusion or the truth or accuracy of opinions stated in the pleadings." *Mingachos v. CBS,* 196 Conn. 91, 108 (1985).

A. *Estoppel*

Under our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury.... In addition, estoppel against a public agency is limited and may be invoked: (1) only with great caution; (2) only when the action in question has been induced by an agent having authority in such matters; and (3) only when special circumstances make it highly inequitable or oppressive not to estop the agency.

*Kimberly-Clark Corp. v. Dubno,* 204. 137, 148 (1987).

In their first amended special defense, the defendants allege that the plaintiff, through its agents and employees "intentionally deceived the defendants by constructively accepting and approving defendants' compliance with the March 6, 1981 Order.... The defendants reasonably complied and acted with due diligence in response to the plaintiff's 1981 Order, and the defendants not only were not notified of the true position of the plaintiffs with respect to the 1981 Order, but also lacked any reasonable means of acquiring that knowledge." They also allege that the plaintiff failed to "notify the defendants for a period of nine years" that they were not in compliance with the order.

The plaintiff argues that the defendants have not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT C

Not Reported in A.2d                                                                                                                      Page 2
Not Reported in A.2d, 1991 WL 107969 (Conn.Super.), 4 Conn. L. Rptr. 136
**(Cite as: 1991 WL 107969 (Conn.Super.))**

alleged facts sufficient to state a defense of estoppel as to a public agency.

It is found that the plaintiff is correct in that the defendants have not alleged facts that they changed their position in reliance upon facts communicated by an authorized agent, how they have been injured, and what special circumstances exist that would make it "highly inequitable or oppressive not to estop the agency." *Kimberly-Clark,* 204 Conn. at 148. It is therefore held that the motion to strike the first special defense is granted.

B. *Laches*

*2 "A party may ... be barred from seeking equitable relief by the defense of laches, which applies only if there has been an unreasonable, inexcusable and prejudicial delay in bringing suit." *Dunham v. Dunham,* 204 Conn. 303, 327 (1987). "[T]he delay in bringing suit must be 'unduly' prejudicial." *Cummings v. Tripp,* 204 Conn. 67, 88 (1987).

The plaintiff argues that laches may not be asserted against the state. The Supreme Court has held that laches cannot estop a zoning commission from enforcing its own laws. *Bianco v. Darien,* 157 Conn. 548, 556 (1969); *West Hartford v. Rechel,* 190 Conn. 114, 120 (1983). In *Dupuis v. Submarine Base Credit Union, Inc.,* 170 Conn. 344 (1976), the court said, "[t]his specific rule with respect to zoning authorities must be placed in context as one aspect of the larger rule ... that 'in general, estoppel may not be invoked against the government or a public agency functioning in its governmental capacity. 31 C.J.S., Estoppel, § 138.' ".

Relying on the zoning cases, several superior court decisions have held that the defense of laches may not be asserted against the state. *Burns v. Lehigh,* 4 CSCR 34 (November 21, 1988, Allen, J.); *State of Connecticut v. Stephen World of Wheels, Inc.,* 3 CSCR 374 (March 23, 1988, O'Neill, J.), and *State v. DeMilo & Co.,* 2 CSCR 880 (June 5, 1987, Ripley, J.).

In *State of Connecticut v. Stephen World of Wheels, Inc.,* supra, Judge O'Neill held, "Towns may not be prevented from enforcing their ordinances. *Wallingford v. Roberts,* 145 Conn. 682, 685. Such a rule applies at least equally to the sovereign state which brings this action." This court endorses said holding.

The plaintiff relies in support of its argument on *Bianco,* 17 Conn. at 548, and *Wallingford v. Roberts,* 145 Conn. 682 (1958), which both hold that zoning commissions cannot be estopped by laches from enforcing their laws. Additionally, the plaintiff relies on *Town of Westport v. Kellems Co.,* 15 Conn.Sup. 485 (C.P.1948), a zoning case in which the court said generally, "[l]aches does not bar the state or a municipality from enforcing governmental rights." *Id.,* at 491. In support, the court cited *Appeal of Phillips,* 113 Conn. 40 (1931), which involved the extent to which the plaintiff should be compensated for a taking of property by the city of Hartford when the plaintiff's building illegally exended past the building line and into the new street line. The *Phillips* court said,

[i]f, after the land has been taken, the city permits a part of a building to stand beyond the street line, it is a matter of grace and, unless its rights are lost by abandonment or otherwise, it may at any time thereafter remove or require the removal of that portion of the building without obligation to make further compensation to the owner.

*Appeal of Phillips,* 113 Conn. at 44-45. Plaintiff's Memorandum in support of Motion to Strike also cites out-of-state cases for its position and the court finds these authorities to be persuasive.

*3 The court concludes that based on the above cases, laches should not estop the Department of Environmental Protection from enforcing its laws because it is analogous to a zoning commission seeking to enforce its laws. *Bianco,* supra, at 556; *West Hartford,* supra at 120.

It is therefore held that the motion to strike the second special defense is also granted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 3

Not Reported in A.2d, 1991 WL 107969 (Conn.Super.), 4 Conn. L. Rptr. 136

**(Cite as: 1991 WL 107969 (Conn.Super.))**

Not Reported in A.2d, 1991 WL 107969 (Conn.Super.), 4 Conn. L. Rptr. 136

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.