## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **TRACY BOLWELL,** | : | **CIVIL ACTION NO: 302CV01001AWT** |
| | : | |
| **Plaintiff,** | : | **JUDGE ALVIN W. THOMPSON** |
| | : | |
| **vs.** | : | **MAG. JUDGE DONNA F. MARTINEZ** |
| | : | |
| **DURAMED   PHARMACEUTICALS,** | : | |
| **INC., BARR LABORATORIES, INC.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | **November 30, 2006** |

**MEMORANDUM OF DEFENDANTS DURAMED PHARMACEUTICALS, INC., AND BARR LABORATORIES, INC., IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF JAMES MORRISON OR IN THE ALTERNATIVE MOTION FOR LEAVE TO DESIGNATE AN EXPERT WITNESS**

## I.    INTRODUCTION

It is not difficult to fathom why plaintiff seeks to exclude the testimony of defendants' expert James Morrison. Eight months after her deadline for providing case specific expert reports (for the second time[1]), plaintiff apparently has realized she lacks the testimony necessary to satisfy her burden of proof – she does not have an expert who can testify regarding applicable industry standards and regulations of the federal Food and Drug Administration ("FDA"). As a result, she seeks to prevent defendants from introducing admissible expert testimony in their defense. In the alternative, plaintiff requests yet another opportunity to salvage her case by belatedly designating an expert to testify regarding industry standards and FDA regulations. However, plaintiff's motion should be denied.

---

[1] After initially designating her case specific experts and providing their Rule 26 reports, defendants filed a motion to strike those experts due to plaintiff's failure to comply with the requirements of Rule 26. Plaintiff conceded her Rule 26 expert reports did not comply with the requirements of the civil rules. This Court, in turn, provided plaintiff additional time to rectify the deficiencies and resubmit her case specific expert reports.

Plaintiff does not challenge Mr. Morrison's opinions under *Daubert*. She does not argue that his opinions are not reliable or that they are based on unreliable grounds. Rather, she argues Mr. Morrison seeks to offer legal opinions that she asserts usurp the role of the judge. In reality, Mr. Morrison will testify regarding facts related to the FDA's review of PPA and industry standards and regulations pertaining to the pharmaceutical industry – two issues directly relevant to the claims plaintiff asserts in this lawsuit.

Plaintiff also contends Mr. Morrison's opinions are speculative and misleading. Plaintiff's argument in that regard exemplifies why Mr. Morrison's testimony is necessary in this case: Plaintiff's argument reveals an inherent misunderstanding of the FDA regulatory process applicable to prescription drugs. In an attempt to provide improper testimony through the vehicle of her motion, plaintiff equates the prescription product at issue in this lawsuit with over-the-counter weight-loss products containing phenylpropanolamine ("PPA"). Yet, the two categories of drugs are regulated differently – an area clearly not within the "ken" of the average juror.

Plaintiff complains only about three statements made by Mr. Morrison[2]:

(1)    Duramed should not and could not have legally changed the labeling of its phenylpropanolamine hydrochloride and guaifenesin long acting product to warn of any potential for PPA to cause strokes or to suggest that it may cause strokes before Tracey Bolwell purchased and used the product.

(2)    The FDA requires that labeling for generic drug products must be the same as that of the innovator products they are copying, so in 1997 Duramed was constrained by the wording of the labeling of Entex LA by Dura Pharmaceuticals, Inc., the innovator's product.

(3)    At the time, the FDA had not yet determined that PPA was unsafe, nor was the Yale Study on which the FDA's 2000 recommendation to remove PPA from the market completed. In addition, the FDA did not find that adverse event reports (AERs) existed prior to 2000 provided a sound, scientific basis for adding warnings to PPA labeling regarding stroke.

---

[2] Defendants assume plaintiff does not take issue with the remainder of Mr. Morrison's report or testimony.

However, those statements are factual statements based upon **facts**, not speculation, concerning federal regulations of generic manufacturers and the FDA's review of PPA at the relevant time. Mr. Morrison's opinions relate directly to the warning that would be provided by a reasonable generic prescription drug manufacturer. That information is critical for the jury to determine whether, as plaintiff argues, defendants failed to warn plaintiff that the product she ingested could allegedly cause her injury.

Plaintiff would have the jury make that determination without any knowledge of the regulations applicable to the product at issue, the facts related to the FDA's review and investigation of PPA at the relevant time, or any opinion about how a reasonable generic drug manufacturer would act under the applicable regulations and facts. In fact, plaintiff would have the Court and the jury believe that the federal regulations permit a generic drug manufacturer to change the warning label as it pleases and, therefore, defendants should have warned about the injury at issue. However, plaintiff's argument ignores the existence of the FDA, its position on PPA and generic drug labeling, and how the FDA and its position relate to a reasonable manufacturer's duty to warn.

Plaintiff's motion, in large part, is simply an effort by plaintiff to provide the expert testimony, through motion practice, she lacks due to her failure to designate an expert on the issue of warnings, as is required under the applicable law. Plaintiff's contention that for defendants to rely on the determinations of the FDA regarding PPA in making decisions about their labeling "would turn the entire drug regulatory process on its head," again displays plaintiff's inherent misunderstanding of the regulatory process and ignores the FDA's position on the mandatory nature of its regulations applicable to warnings. Plaintiff was required to designate an expert to offer testimony on this matter. She did not. Now she cannot excuse her

3

failure to designate an expert through her counsel's attempt to exclude defendants' expert's testimony.

## II.    STATEMENT OF FACTS

### A.    Plaintiff's Claims

Plaintiff Tracy Bolwell's Complaint alleges that she suffered a hemorrhagic stroke on January 21, 1997, as a result of her alleged use of a cough/cold/allergy decongestant prescription medication containing phenylpropanolamine HC, also known as PPA. Plaintiff alleges the PPA-containing medication at issue was manufactured by defendant Duramed Pharmaceuticals, Inc. (*See generally* Complaint.) According to plaintiff, defendants are liable for manufacturing a defective PPA-containing product with inadequate labeling that failed to warn of dangers posed by the use of the product. (*Id.*) As a result, industry and regulatory standards applicable to the manufacture and labeling of generic pharmaceuticals are relevant and applicable in this case.[3]

### B.    Mr. Morrison and His Testimony

James Morrison received his bachelors degree from the University of California at Los Angeles in 1965. (*See* Exhibit A to Expert Report of James Morrison ("Morrison's Report"), attached as Exhibit 1.) Following completion of his undergraduate education, he began working in various positions for the FDA as a chemist and later a regulatory officer. He was appointed Chief of the Over-the Counter Compliance Branch, Division of Drug Labeling Compliance, and Bureau of Drugs. (*Id.*) In 1976, he was appointed Special Assistant to the Director of the Bureau of Drugs, and in 1982 he became the Director of Regulatory Affairs in the Bureau of Drugs. (*Id.*) As Director of Regulatory Affairs, Mr. Morrison actively participated in and

---

[3]Plaintiff's motion in limine to exclude the testimony of James Morrison evidences plaintiff's misunderstanding of the class of product at issue in this case. Plaintiff's motion repeatedly refers to regulations governing over-the-counter products containing PPA and attaches as exhibits documents regarding the over-the-counter medication Dexatrim. The product at issue in this case is a prescription pharmaceutical product, which plaintiff received from her treating physician. It is not an over-the-counter product.

initiated Bureau actions in the area of regulatory affairs. (*Id.*) He reviewed and recommended action on proposed enforcement actions against drug products, firms, and individuals. (*Id.*) He also served as co-chair of a standing FDA committee that reviewed and recommended action on DESI drugs and issues related to those drugs. (*Id.*)

In 1983, Mr. Morrison became the Deputy Director of the Office of Drug Standards in the FDA's Center for Drug Evaluation and Research. (*Id.*) He was promoted to Acting Director of that office in 1990 and served as Director until 1994. (*Id.*) As Deputy Director of the Office of Drug Standards, Mr. Morrison directed the activities of the division responsible for determining the safety and effectiveness of nonprescription and generic prescription drugs. (*Id.*) He also was the FDA's primary negotiator with Congress during the drafting of the Hatch-Waxman Act of 1984 – legislation applicable to generic pharmaceutical products, including the product at issue in this case. (*Id.*)

In 1995, Mr. Morrison became an Ombudsman and Senior Advisor in the Center for Drug Evaluation and Research. (*Id.*) In that position, he counseled the pharmaceutical industry and other non-governmental entities on CDER processes and policies. (*Id.*)

In 2003, following his tenure at the FDA, Mr. Morrison became an independent consultant providing consultation and training in the field of drug regulation and interaction with the FDA. (*Id.*) Mr. Morrison was retained by defendants to testify regarding pharmaceutical industry customs and practices, the interaction between the FDA and industry, the FDA's review of PPA prior to January 1997, and defendant Duramed's conduct with respect to the labeling of its generic pharmaceutical product containing PPA and guaifenesin, the product at issue. Mr. Morrison was not retained to, and does not intend to, offer opinions directed to legal

conclusions. Rather, he will explain the FDA's regulations and how they are interpreted and applied on a day-to-day basis.

Specifically, Mr. Morrison will offer testimony to assist the trier of fact in understanding FDA regulations and expectations of the pharmaceutical industry on a variety of issues, including changing the labeling of a generic pharmaceutical product. He also will provide testimony regarding the FDA's review of PPA, its determination on the safety of PPA, and the rational underlying the approved marketing and sale of the PPA product at issue. He will testify as to why FDA policy and regulations require generic drug labeling to be the "same as" that of the reference listed drug ("RLD"). In addition, he will provide testimony as to why federal regulations do not allow the manufacturer of a generic pharmaceutical product to unilaterally change its labeling.

Mr. Morrison's education, training, and experience provide reliable bases for his testimony as to whether defendants deviated from what one would expect from a reasonably prudent generic manufacturer in like or similar circumstances. Mr. Morrison has extensive real-life experience in how industry and the FDA interact and how the FDA handles labeling issues, including some of the very issues debated in this lawsuit. He has extensive real-life experience and knowledge of the FDA regulatory process and industry practice. His testimony not only will help the trier of fact in determining relevant issues in the lawsuit, but also his testimony is necessary for the trier of fact to understand those issues.

## III.    LAW AND ARGUMENT

### A.    Admissibility of Expert Testimony

Federal Rule of Evidence 702 serves as the starting point for the evaluation of expert

testimony.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  Rule 702

provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or education may
> testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702.  The purpose and scope of a *Daubert* challenge is to assess the expert's

methodology and reasoning – not the expert's conclusions.  In fact, in *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), in discussing the trial court's gatekeeping function

in determining the admissibility of expert testimony, the United States Supreme Court noted that

the "focus, of course, must be solely on principles and methodology, not on the conclusions that

they generate." *Id.* at 595.

Here, plaintiff does not challenge the principles or methodology underlying

Mr. Morrison's proposed testimony, but rather challenges his conclusions.  That challenge is not

a proper challenge, and, as a result, on that basis alone, plaintiff's motion should be denied.

### B.    Mr. Morrison's Testimony Is Relevant and Admissible

It is well-recognized that one of the fundamental requirements of Rule 702 is that the

proposed testimony "assists the trier of fact to understand the evidence or to determine a fact in

issue." *See In re: Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (D.C.N.Y. 2004).  The

"helpfulness requirement is 'akin to the relevance requirement of Rule 401, which is applicable

to all proffered evidence[,] [but] . . . goes beyond mere relevance . . . because it also requires

expert testimony to have a valid connection to the pertinent inquiry." *Id. quoting* Jack B.

7

Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 702.03[1] (Joseph M. McLaughlin ed., 2d ed. 1997).

In this case, FDA regulations applicable to manufacturers of generic drugs, the interplay between the FDA and the generic pharmaceutical industry, the history of FDA regulation of PPA, and the FDA's findings regarding the safety and efficacy of PPA over the course of thirty plus years are all pivotal issues that "have a valid connection to the pertinent inquiry." The jury cannot understand and evaluate whether Duramed failed to warn plaintiff of an alleged risk of hemorrhagic stroke without the benefit of specialized knowledge regarding federal regulations applicable to the language of generic pharmaceutical manufacturer's warning labels, the FDA position on the sale of generic pharmaceutical products containing PPA, and how those two issues impact the propriety of whether Duramed could change its labeling to warn about the injury at issue.

Plaintiff would like the jury to decide this case in a vacuum without evidence of the regulatory framework governing the labeling and warnings of generic pharmaceutical products. Indeed, plaintiff's motion claims that the jury can be educated on the regulatory framework governing generic pharmaceutical products and the FDA's interpretation and application of those regulations simply by looking at some unidentified "FDA public records." Notwithstanding the ridiculousness of that statement, plaintiff does not identify what those records are. Plaintiff references alleged correspondence from an FDA official to the Nonprescription Drug Manufacturers Association about "unresolved safety issues concerning PPA for OTC use." However, that letter does not address generic prescription pharmaceutical products.

The jury must be told about the regulatory framework within which pharmaceutical companies operate when labeling generic pharmaceutical products and the practical, real-life

considerations that impact labeling decisions. The jury should be told why generic

pharmaceutical manufacturers must have labeling identical to that of the reference listed drug.

The jury should be told about the customs and practices of the generic pharmaceutical industry.

The jury should know about the FDA's history with PPA, not the truncated version plaintiff

misrepresents in her motion.

The jury will not know about those technical, specialized issues when the trial begins.

Plaintiff apparently would like the jury to remain ignorant about those issues as she opted not to

identify anyone who can address them. However, the law expressly authorizes the type of

testimony Mr. Morrison will give.

### C.    Mr. Morrison Is Not Drawing Legal Conclusions

At its core, plaintiff's fundamental issue with Mr. Morrison's testimony is that he is a

regulatory expert well-versed in FDA regulatory matters. As a result, plaintiff describes

Mr. Morrison's testimony as "legal conclusions" in an attempt to convince this Court that he

should not be permitted to testify. However, that an expert's opinions may involve the law,

statutes, or regulations, does not render those opinions "legal opinions" or "legal conclusions."

Indeed, courts throughout the country recognize the propriety for experts to testify regarding

FDA regulations. *See, e.g., In re: Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 548-49

(D.C.N.Y. 2004) (recognizing that expert's testimony stating factual conclusion on an ultimate

issue to be decided by the jury is permissible but disallowing expert testimony on FDA standards

and regulations due to experts' lack of knowledge); *Bouchard v. American Home Prods.*, 2002

U.S. Dist LEXIS 27517, *12-14 (D.C. Ohio 2002) (recognizing qualified expert could provide

testimony on FDA regulatory and labeling issues and holding "[w]ithout a solid underpinning in

FDA regulations, [expert] appears ill-equipped to offer expert testimony concerning the

sufficiency of information used to comply with those regulations") (copy attached as Exhibit 2); *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062, 1090 (D.C. Kan. 2002) (finding expert qualified to opine as to FDA regulations); *In re: Diet Drugs Prods. Liab. Litig.*, 2001 U.S. Dist. LEXIS 1174 (D.C. Pa. 2001) (evaluating qualifications of experts to testify as to "pertinent issues" in litigation as to "obligations of a pharmaceutical company in testing, surveying and labeling medications" and FDA regulations pertinent thereto) (copy attached as Exhibit 3); *In re: Diet Drugs Prods. Liab. Litig.*, 2000 U.S. Dist. LEXIS 9037, *35-36 (D.C. Pa. 2000) (evaluating experts' qualifications to testify regarding "the requirements of the federal regulations regarding labeling and warning for FDA approved drugs") (copy attached as Exhibit 4).

In *In re: Diet Drugs Prods. Liab. Litig.*, 2001 U.S. Dist. LEXIS 1174 (D.C. Pa. 2001), the court analyzed the proffered testimony of various experts. One expert had been employed by the FDA in the Division of Endocrine and Metabolic Drug Products. "In that capacity, he reviewed drugs for safety and efficacy, applied FDA regulations regarding labeling, postmarketing surveillance and approval of drugs; and participated to some extent in the drafting of those regulations." *Id.* at *14. In addressing *Daubert* motions to exclude his testimony, the court found his experience qualified him to opine as to "how information should be communicated to the FDA and what information should be reflected in labels, as mandated by applicable regulations." *Id.* at *56-57. The court also held that the expert was "clearly qualified to testify as to what reasonable FDA officials" would do with certain information. *Id.* at * 58-59.

That FDA matters and pharmaceutical industry standards are the crux of the issues in this case is beyond dispute. As a result, Mr. Morrison undoubtedly can testify as to what reasonable FDA officials would do in certain circumstances and what a reasonable pharmaceutical company would do in certain circumstances.

10

The cases cited by plaintiff do not hold differently.  Plaintiff cites *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977) as support for her contention that Mr. Morrison's opinions are inadmissible legal opinions.  However, in *Marx*, the Second Circuit specifically stated that

> Friedman was qualified as an expert in securities regulation, and therefore was competent to explain to the jury the step-by-step practices ordinarily followed by lawyers and corporations in shepherding a registration statement through the SEC. . . . . Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry.  *See* VII Wigmore on Evidence § 1949, at 66 (3d ed. 1940).

*Marx*, 550 F.2d at 508-9.  *See also Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) (noting expert could not opine as to whether "T [had] capacity to make a will," as it would constitute legal opinion, but could opine as to whether "T [had] sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution").

Here, Mr. Morrison's testimony is no different than the testimony the Second Circuit in *Marx* noted was admissible.  His testimony concerns "the ordinary practices of those engaged in the [pharmaceutical industry]" and "is admissible . . . to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry."

### D.    Mr. Morrison's Testimony Is Not Speculative or Misleading

Furthermore, Mr. Morrison is not wrong when he says that the FDA labeling requirements precluded generic companies from warning about unsubstantiated risks (in this case hemorrhagic stroke).  According to plaintiff, Mr. Morrison's opinions are "merely speculative and misleading testimony, based on hearsay and presumed knowledge of FDA inside

information." (Plaintiff's Memo, p. 8.) Yet, in attempting to support her contention, plaintiff acknowledges that "[a]t the time the plaintiff ingested the defendants' PPA-containing product and suffered her stroke, PPA as a weight control product was categorized as a "Category III" drug which means that there was insufficient data to support a determination by the FDA that PPA was either safe or unsafe. Because of its concern over the safety of PPA, the FDA formally extended this Category III status to include PPA-containing nasal decongestant products as well." (Plaintiff's Memo, p. 8.) By plaintiff's own admission, Mr. Morrison's opinion that "at the time the FDA had not yet determined that PPA was unsafe" is a fact.

Then plaintiff criticizes that Mr. Morrison "either inadvertently or intentionally ignored the fact that, in 1994, the FDA allowed the manufacturer of the PPA-containing appetite suppressant Dexatrim to add a warning to its label . . . ." (Plaintiff's Memo, p. 8[4].) What plaintiff apparently fails to understand is that Dexatrim is an over-the-counter weight-loss product and not a prescription product. In 1994, the FDA had not yet published a monograph for PPA-containing products – either for weight control or for cough and cold. As a result, under the regulations, until a monograph was published, manufacturers of OTC products were permitted to continue marketing their products. However, the product at issue in this lawsuit was not an OTC product and it was not a weight-loss product. It was a generic prescription product for cough and cold indications and was required to comply with the applicable regulations which do not permit deviation in product labeling from that of its reference-listed drug – all facts Mr. Morrison can explain.

---

[4]Although plaintiff attaches a letter dated May 24, 1994, from Thompson Medical Company, Inc., to the FDA involving a purported intention to alter the warnings on its labeling for Dexatrim, there is no indication of what, if any, action the FDA took in response, and whether Thompson Medical ever changed the Dexatrim labeling. Plaintiff also attaches an entry for Dexatrim which plaintiff purports to be from the PDR, however, there is no identification of that document and it does not contain any indication as to the source of that document.

In reality, the opinions Mr. Morrison offers reflect the FDA's position on the matter.

Earlier this year, the FDA issued a Final Rule relating to the format and content of

pharmaceutical labeling. In the preamble to that rule, the FDA specifically stated:

> Another misunderstanding of the act encouraged by State law actions is that FDA labeling requirements represent a minimum safety standard. According to many courts, State law serves as an appropriate source of supplementary safety regulation for drugs by encouraging or requiring manufacturers to disseminate risk information beyond that required by FDA under the act. (*See, e.g., Brochu v. Ortho Pharm. Corp.,* 642 F.2d 652 (1st Cir. 1981); *Salmon v. Parke-Davis and Co.,* 520 F.2d 1259 (4th Cir. 1975); *Caraker v. Sandoz Pharm Corp.,* 172 F. Supp. 2d 1018 (S.D. Ill. 2001); *Mazur v. Merck & Co, Inc.,* 742 F. Supp. 239 (E.D. Pa. 1990); *In re Tetracycline Cases,* 747 F. Supp. 543 (W.D. Mo. 1989). In fact, FDA interprets the act to establish both a "floor" and a "ceiling," such that additional disclosures of risk information can expose a manufacturer to liability under the act if the additional statement is unsubstantiated or otherwise false or misleading. Given the comprehensiveness of FDA regulation of drug safety, effectiveness, and labeling under the act, additional requirements for the disclosure of risk information are not necessarily more protective of patients. Instead, they can erode and disrupt the careful and truthful representation of benefits and risks that prescribers need to make appropriate judgments about drug use.

71 Fed. Reg. 3922 (2006), Department of Health and Human Services, Food and Drug

Administration, "Requirements on Content and Format of Labeling for Human Prescription Drug

and Biological Products," Final Rule. In its preamble, the FDA explicitly stated its regulations

regarding labeling and warnings on pharmaceutical products were preemptive of state-law

failure-to-warn claims. *Id.* at 3934 ("FDA believes that under existing preemption principles,

FDA approval of labeling under the act, whether it be in the old or new format, preempts

conflicting or contrary State law").

Similarly, Mr. Morrison's opinion that FDA regulations do not permit generic drug

manufacturers to unilaterally change their labeling is consistent with the FDA's announced

position on the issue. In an amicus brief the FDA was invited to file by the United States District

Court for the Eastern District of Pennsylvania in *Colacicco v. Apotex, Inc.*, Case No. 05-CV-05500-MMB, the FDA stated unequivocally:

> For a generic drug manufacturer, there is no statutory or regulatory provision permitting the manufacturer to make a labeling change to its generic drug without prior FDA approval. To the contrary, a generic manufacturer is required to conform to the approved labeling for the listed drug. *See* 21 C.F.R. § 314.150(b)(10); *see also* 57 Fed. Reg. 17,950, 17,961 (1992). If a generic drug manufacturer believes that new safety information should be added to the label for the drug, the manufacturer must contact FDA with "adequate supporting information." 57 Fed. Reg. at 17,961. The FDA will consider this information and will make a determination whether the labeling for both the generic drug *and* the innovator drug should be revised. *Id.*

FDA Amicus Brief, *Colacicco v. Apotex, Inc.*, p. 6, copy attached as Exhibit 5.

Mr. Morrison is merely opining about whether Duramed acted as a reasonably prudent generic product manufacturer based on the FDA's interpretation of the statute it was charged with implementing and enforcing. Given Mr. Morrison's tenure at the FDA, which included the time period during which the FDA was reviewing the scientific data related to PPA, he is eminently qualified to render the opinions he offers. It is for the jury to assign what weight it will to Mr. Morrison's testimony. In the end analysis, plaintiff simply has offered no basis for excluding Mr. Morrison's testimony and her motion should be denied.

### E.    The *Foster* Decision Is Not Relevant or Dispositive

In her motion to exclude, plaintiff references the Fourth Circuit Court of Appeals decision in *Foster v. American Home Products,* 29 F.3d 165, 169 (4th Cir. 1994). However, that decision is irrelevant to the issues in this matter. The issue of whether a generic drug manufacturer has the ability to unilaterally change its labeling was not before the court in *Foster,* and any commentary from the Court regarding that ability is gratuitous at best. Furthermore, the FDA's pronouncement on the issue should be given deference, especially as the issue was not before the court.

In *Foster*, the plaintiffs sued American Home Products/Wyeth Ayerst ("Wyeth"), the manufacturer of the brand name (RLD) prescription drug Phenergan. Plaintiffs sought to recover for the death of their daughter, whose prescription for Phenergan had been filled with its generic equivalent, promethazine syrup plain. *Id.* at 167. The manufacturer of the generic version ingested by the decedent was My-K Laboratories, which plaintiffs voluntarily dismissed from the suit with prejudice. *Id.* Plaintiffs argued that Wyeth could be held liable for negligent misrepresentation based on the federal regulatory scheme governing generic drug manufacturing and sales.

In the course of its discussion, the Fourth Circuit reviewed the regulatory framework involving generic pharmaceuticals and noted repeatedly, that the "generic manufacturer must use the same labeling as the previously approved equivalent drug." *Id.* at 169-70. Yet, the court ultimately stated, citing to 21 C.F.R. § 314.70, that the generic manufacturer could alter a drug's labeling without prior FDA approval. *Foster*, 29 F.3d at 169-70. Those opposing statements reveal an internal inconsistency in the court's opinion. In fact, those opposing statements and the internal inconsistency in the *Foster* Court's opinion, along with the FDA's position, highlights the need for testimony such as that to be offered by Mr. Morrison.

F.    **Plaintiff Should Not Be Permitted to Belatedly Name Another Expert**

Plaintiff alternatively requests that if this Court should permit Mr. Morrison to testify that she be permitted an opportunity to "call an additional expert witness to offer testimony and opinions on the same issues and matters as those encompassed in Mr. Morrison's expert report." (Plaintiff's Memo, p. 10.) Plaintiff should not be permitted to name additional experts at this stage of the litigation.

Plaintiff already has had two opportunities to provide expert reports. Her first disclosure failed to comply with the applicable civil rules and upon defendants' motion to strike those reports, this Court provided plaintiff an opportunity to submit reports that complied with the rules. Now, eight months after her deadline to provide expert reports, and weeks after receiving Mr. Morrison's report, plaintiff asks to name another expert. Plaintiff filed this lawsuit and is aware of her burden in proving her claims. As such, plaintiff should not have been surprised, and indeed, does not claim to be surprised, by Mr. Morrison's report. As the case currently is postured, *Daubert* motions are due to be filed by the end of December. Plaintiff simply should not be permitted to name another expert at this late date.

## IV.    CONCLUSION

There is no question that Mr. Morrison is eminently qualified to render opinions regarding standards applicable in the pharmaceutical industry, as well as the regulations that govern that industry. Applicable law permits the fact-finder to consider industry and regulatory standards applicable in the pharmaceutical industry, two areas that are not within the ken of a lay juror. Accordingly, plaintiff's motion to exclude his testimony must be denied.

Plaintiff's request to name an additional expert also should be denied.

Respectfully submitted,


/s/ Jeffrey D. Geoppinger
Thomas H. Winslow
The Law Office of Thomas H. Winslow, LLC
321 Main Street
Farmington, CT  06032-2976
(860) 678-4425
(860) 678-4427 FAX

Joseph P. Thomas
CT Fed. Bar No. phv0382
Jennifer Hageman
CT Fed. Bar No. phv0937
Jeffrey D. Geoppinger
CT Fed. Bar No. phv0382
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, OH  45202-2409
(513) 698-5000
(513) 698-5001 FAX
jthomas@ulmer.com
jhageman@ulmer.com
jgeoppinger@ulmer.com

**Counsel for Defendants**
**Duramed Pharmaceuticals, Inc., and**
**Barr Laboratories, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served via the Court's electronic filing system and facsimile, Federal Express, and/or U.S. mail on the 30th day of November, 2006 on:

Ron Michael Meneo, Esq.
Brian P. Kenney, Esq.
Early, Ludwick & Sweeney, L.L.C.
265 Church Street, 11th Floor
P.O. Box 1866
New Haven, CT  06508-1866

**Attorneys for Plaintiff**

/s/ Jeffrey D. Geoppinger _____