# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **TRACY BOLWELL,** | :**CIVIL ACTION 3:02:CV-01001 (AWT)** |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | : |
| **DURAMED PHARMACEUTICALS, INC.** | : |
| **BARR LABORATORIES, INC.** | : |
| **Defendants** | : **December 19, 2006** |

**REPLY TO MEMORANDUM OF DEFENDANTS DURAMED PHARMACEUTCIALS, INC., AND BARR LABORATORIES, INC., IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF JAMES MORRISON OR IN THE ALTERNATIVE MOTION FOR LEAVE TO DESIGNATE AN EXPERT WITNESS**

### I. Introduction

James Morrison should be excluded from testifying at trial because his testimony would be: (1) based on inadmissible legal conclusions; (2) irrelevant; (3) confusing to the jury; (4) hearsay; (5) unreliable in that he does not represent the Food and Drug Administration ("FDA") and does not have authority to speak on behalf of the FDA; (6) not based on any personal experience in dealing with safety issues related to PPA or the product at issue in this case; and (7) a veiled attempt to usurp the Court's authority to instruct the jury on the law.  In their Opposition to Plaintiff's Motion to Exclude, the Defendants reveal their true purpose for calling Mr. Morrison: to explain why they never filed an Abbreviated New Drug Application ("ANDA") with the FDA prior to marketing their PPA drug in interstate commerce.

3

II. <u>Instructing the Jury is within the Exclusive Province of the Court</u>

According to the Defendants, Mr. Morrison will explain:

"why FDA policy and regulations require generic drug labeling to be the 'same as' that of the reference listed drug ("RLD"). In addition, he will provide testimony as to why federal regulations do not allow the manufacturer of a generic pharmaceutical product to unilaterally change its labeling." *Defendants' Motion* at page 6

The jury doesn't need Mr. Morrison to interpret FDA regulations and explain how such regulations apply. The jury will have the wisdom and instruction of this Court to rely upon for this purpose. The Plaintiff believes that instructing the jury on the law – including whether or not a generic drug manufacturer has a duty to warn consumers about risks associated with the use of its product without first obtaining FDA approval to do so – is within the exclusive province of this Court. Advising a jury on the law is not within the permissible bounds of expert testimony.

To support their position, Defendants' contend that Mr. Morrison's proposed testimony will assist "…the trier of fact to understand the evidence or to determine a fact in issue." [citing *In re: Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531, 540 (D.C.N.Y. 2004). However, Defendants fail to identify what "fact" or facts they are referring to. At no point in the description of Mr. Morrison's background is there the suggestion that he worked on safety issues concerning phenylpropanolamine (PPA) – the specific ingredient contained in the Defendants' product that is at the center of this case. Yet, the Defendants claim that Mr. Morrison:

"…will also provide testimony regarding the FDA's review of PPA, its determination on the safety of PPA, and the rational [sic] underlying the approved marketing and sale of the PPA product at issue." Defendants' Motion at page 6.

Mr. Morrison is being presented as an "expert" witness in this case, not a fact-witness. He does not speak for the FDA and any testimony that he might offer will

4

constitute hearsay testimony as to what the responsible FDA officials did, didn't do, thought or otherwise considered concerning PPA. The FDA's own rules, 21 C.F.R. 20.1, specifically limit the testimony of current FDA employees so as to prevent misunderstandings about official policy. *See* Exhibit A attached hereto. Now that Mr. Morrison is retired from and no longer accountable to the FDA and, more importantly, since he now acts as a paid consultant to drug manufacturers, that risk of misunderstanding is even greater. Moreover, as to what the Defendants themselves did, or failed to do, with respect to regulatory compliance and the monitoring and investigation of safety issues concerning their PPA-containing products, Mr Morrision has no direct knowledge of those facts and therefore, at best, can only offer hearsay evidence.

### III. Defendants' True Purpose

The Defendants true purpose in offering Mr. Morrison's testimony to the jury may very well be to explain why they never filed an Abbreviated New Drug Application ("ANDA") with the FDA prior to marketing their PPA drug in interstate commerce.[1] Hoping to cast themselves as "reasonably prudent generic product manufacturer[s]," it appears that the Defendants, who marketed their drug without complying with the FDA requirement that they first file and obtain approval of an ANDA, seek to use Mr. Morrison to persuade the jury that despite this failure, Defendants should enjoy the benefits of certain presumed protections afforded to manufacturers whose drugs have been approved by the FDA. In evading the legal responsibility of complying with the FDA regulations, the Defendants escaped the burdens of the same rules and regulations from which they now hope to derive a benefit. Can this truly be the standard of conduct that the public should expect of a reasonably prudent manufacturer?

In marketing their PPA-containing drug in interstate commerce, the Defendants apparently relied on the FDA's policy on how it intended to exercise its enforcement discretion in dealing with manufacturers who failed to obtain a New Drug Application ("NDA") or ANDA prior to selling their products in interstate commerce. The FDA's

---

[1] If Defendants claim to have filed an ANDA for their PPA-containing drug at issue in this case, they have yet to produce it or any evidence that one was ever filed with the FDA.

Compliance Policy Guide (CPG) governing the exercise of its enforcement discretion is found in CPG Section 440.100 (CPG 7132c.02), a copy of which is attached hereto as Exhibit B. While limited resources made it impossible for the FDA to prosecute manufacturers, such as the Defendants, who failed to file an ANDA, this policy guide makes it clear that:

> "The new drug approval and OTC drug monograph processes play an essential role in ensuring that all drugs are both safe and effective for their intended uses. Manufacturers of drugs that lack required approval, including those that are not marketed with an OTC monograph, have not provided FDA with evidence demonstrating that their products are safe and effective, and so we have an interest in taking steps to either encourage the manufacturers of these products to obtain the required evidence and comply with the approval provisions of the Federal Food, Drug and Cosmetic Act (the Act) or remove their products from the market.....illegally marketed drugs must obtain FDA approval." CPG 440.100, at Section II A [emphasis added].

Despite the Defendants' failure to comply with FDA requirements, they now seek, through Mr. Morrison's testimony, to persuade the jury that they should be afforded whatever perceived comfort and protection they believe may be available under FDA regulations. **The hubris of wanting the "benefit without the burden" is obvious.** But again, this is a matter to be resolved by the court and not the jury.

IV. The Issues are Legal, not Factual

The issues about which the Defendants offer Mr. Morrison's testimony are legal issues to be decided by the Court, not the jury. These issues include:

1. the extent to which a generic drug manufacturer, under state law, has a duty to warn of safety risks associated with the use of its products;
2. the extent to which a generic drug manufacturer has a duty to warn of safety risks associated with the use of its product without obtaining prior FDA approval to do so;

3. the extent to which a generic drug manufacturer has a duty to monitor safety issues associated with the use of its products;

4. the extent, if any, to which a generic drug manufacturer who failed to file an ANDA for its product, as required by FDA regulations, can claim any benefit from those regulations;

The Defendants have now also introduced a new legal issue into the mix:

5. what impact, if any, the 2006 preamble to the FDA's recently issued new labeling regulations has on this case based on an injury and conduct that occurred in 1997.

Each of these issues is a legal one – framed, argued and resolved by courts through motion practice - not by the juries through the introduction of "expert" testimony. Issues of FDA statutory interpretation are for the court, not for the jury, to resolve. Indeed, the federal appellate cases encourage courts to be even more stringent, not less stringent, than regulators when interpreting public health laws like the Food Drug & Cosmetic Act, *see U.S. v 484 Bags, More or Less, of Coffee*, 423 F.2d 839 (5th Cir., 1970)(courts may tighten a safety tolerance but should not loosen it through interpretation).

### V. The 2006 Preamble

The Defendants assert that "the opinions that Mr. Morrison offers reflect the FDA's position on the matter." Defendants' Memorandum at Page 13. The Defendants then cite the FDA's recently published Preamble to its new "Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products" Final Rule. Putting aside (a) the legal effect, if any, of this never-before published Preamble[2]; and (b) whether a manufacturer of an illegal drug is afforded the presumed protection of such language, the overriding legal issue is whether an FDA pronouncement, made in 2006, is applicable to an event and conduct that occurred in 1997. In the recent case *Perry v. Novartis,* __F.Supp.2d__ 2006 WL 2979388 (October 16, 2006) (a copy of which

---

[2] "The Preamble is not a binding portion of the regulations but is instead an advisory opinion. *See* 21 C.F.R Section 10.85(d)(1)…" Perry v. Novartis, __F.Supp.2d__ 2006 WL 2979388 at Page 4 (E.D. Pa).

7

is attached hereto as <u>Exhibit C</u>), the Court began its analysis of the Preamble with the following:

> "It is by no means clear what effect an advisory opinion issued in 2006 could have on the obligations to which Novartis was subject in 2003. If, as the FDA contends in the Preamble, the statement represents merely an application of existing preemption principles," 71 Fed. Reg at 3934, then it produces no change in Novartis' rights or obligations and should not affect our analysis. If, on the other hand, the Preamble represents a change of policy, whether or not it has the force of law, we cannot apply it to this case. The FDA cannot retroactively absolve Novartis of a duty it may have owed the [Plaintiffs] in 2003." *Id.* at page 4.

The impact of the preamble, if any, takes on even less significance in this case. The context of the final rule to which the preamble was attached was the labeling of lawfully marketed drugs. Even if one assumes that the dubious legal assertions embodied in the preamble had weight for such drugs, they can have no weight for drugs, such as the Defendants' drug in this case, that were illegally on the market pending only the exercise of enforcement discretion by the FDA.

As with the other legal issues involved in this case, it is the Court that must determine what the law is and instruct the jury accordingly so the jury can then proceed with its fact-finding obligation. It is not the responsibility of the Defendants' expert to lecture the jury, through his unbridled, layman's legal opinions, as to what the law is.  As the Second Circuit stated in *Marx & Co, Inc. v Diners' Club, Inc. et.al.* 550 F.2d 505 (2nd Cir. 1977),:

> "It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge. As Professor Wigmore has observed, expert testimony on law is excluded because "the tribunal does not need the witness' judgment…[T]he judge (or the jury as instructed by the judge) can determine equally well…" The special legal knowledge of the judge makes the witness' testimony superfluous. VII Wigmore on Evidence s 1952, at 81."   *Marx* 550 F.2d 505, 509-510.

8

VI. <u>Duty to Warn</u>

In the arena of marketing prescription drugs to the U.S. public, the duty to warn transcends the label – manufacturers have not only duties to warn imposed under state tort law, they are encouraged to communicate directly with prescribing doctors and other healthcare professionals when new information about risks or adverse effects becomes available. *See* 44. Fed. Reg/ 37434, 37447 (June 26, 1979) authorizing the use of so-called "Dear Doctor" letters. Defendants chose to ignore the breadth of this duty.

In support of their contention that a generic manufacturer cannot change a label without first obtaining FDA approval, the Defendants reference an Amicus Brief filed by the FDA in *Colacicco v. Apotex, Inc.* Case No. 05-CV-05500-MMB (E.D. Pa 2005). However, since they reference only a brief, the Defendants apparently are unaware that, in 2006, the U.S.D.C for the Eastern District of Pennsylvania did offer its view regarding a prescription drug manufacturer's duty to warn:

> "Manufacturers must update product labeling when new information becomes available. In particular, "[t]he labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. Section 201.57(e) (2003).
>
> In general, once the drug and its labeling are approved, a manufacturer must seek FDA approval before making any changes to its label and packaging. *Id.* Section 314.70(b). Some changes are permissible without prior approval, so long as the manufacturer notifies the FDA when the change is made. In particular, the regulations allow changes to labeling to "add or strengthen a contraindication, warning, precaution or adverse reaction. *Id.* Section 314.70(c)(2)(iii). [footnote omitted] If any such change is made, "[t]he applicant shall promptly revise all promotional labeling and drug advertising to make it consistent with any change in the labeling. [footnote omitted] *Id.* Section 314.70(c). "this particular regulation was promulgated precisely to allow drug-

9

makers to strengthen label warnings when evidence of new side effects are [sic] discovered." *Witczak v Pfizer, Inc.* 377 F.Supp.2d 726, 729 (D.Minn. 2005).

The FDCA [Food, Drug and Cosmetic Act] also directly limits changes to a drug's labeling, stating that any "false or misleading" statement in the labeling will render the drug misbranded, making distribution of the drug unlawful. *See* 21 U.S.C. 352(a).

Any restrictions that the FDA may place on drug labeling do not prohibit manufacturers from disseminating evidence of a danger by other means. When it originally promulgated these regulations, the agency made clear that:

These labeling requirements do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful effects associated with the use of a drug are discovered. The addition to labeling and advertising of additional warnings, as well as contraindications, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g. "Dear Doctor" letters containing such information) is not prohibited by these regulations. 44. Fed. Reg/ 37434, 37447 (June 26, 1979)

Indeed, the FDA has promulgated particular regulations guiding the dissemination of information to health care professionals, *see* 21 C.F.R. Section 200.5, making it clear that it expects such communication to take place."

*Perry v. Novartis,* __F.Supp.2d__ 2006 WL 2979388 (October 16, 2006) at pages 2-3 [emphasis added]. As this case makes clear, a drug manufacturer's obligation to warn transcends label changes and extends to a duty to communicate notices of safety issues directly to doctors and other health care professionals. *See also Weiss v. Fujisawa Pharmaceutical Co. et. al,* Slip Copy 2006 WL 3422688 (E.D. Ky), adopting the principles set forth in *Perry v.* Novartis. However, just as is the case with all legal issues, the court – not the Defendants' expert - will determine what the law is, i.e. what is the Defendants' obligation to warn, and instruct the jury accordingly so it, the jury, can determine if the Defendants breached that duty by failing to warn of the risk of hemorrhagic stroke associated with the use of PPA.

VII. <u>Plaintiff's Expert</u>

10

The Defendants make much ado about the Plaintiff's failure to disclose an expert on FDA practice. To the contrary, the Plaintiff adopted all of the experts disclosed by PPA MDL Plaintiffs, including the expert Dr. James Parker. What the Plaintiff did not do, and what, in the alternative she requests if Mr. Morrison is allowed to provide his legal opinions to the jury, is the opportunity to call a witness who will similarly offer his/her legal opinions about the issues involved in this case.

## VIII. Conclusion

For all of the reason set forth herein, the Plaintiff respectfully urges this court to exclude the testimony of James Morrison.

December 19, 2006

s/Ron Michael Meneo, Esq.

Ron Michael Meneo, Esq.
Federal Bar # CT 06279

Early, Ludwick & Sweeney, LLC
265 Church Street – 11th Floor
New Haven, Connecticut 06510
203-777-7799
203-785-1671 (fax)
rmichael@elslaw.com
Counsel for the Plaintiff
    Tracy Bolwell