## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **TRACY BOLWELL,** | : | **CIVIL ACTION NO: 302CV01001AWT** |
| | : | |
| **Plaintiff,** | : | **JUDGE ALVIN W. THOMPSON** |
| | : | |
| **vs.** | : | **MAG. JUDGE DONNA F. MARTINEZ** |
| | : | |
| **DURAMED PHARMACEUTICALS,** | : | |
| **INC., BARR LABORATORIES, INC.,** | : | |
| | : | |
| **Defendants.** | : | **January 5, 2007** |
| | : | |

## DEFENDANTS DURAMED PHARMACEUTICALS, INC., AND BARR LABORATORIES, INC.'S MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S CASE SPECIFIC EXPERTS

---

### DAUBERT HEARING AND ORAL ARGUMENT REQUESTED

Defendants Duramed Pharmaceuticals, Inc., and Barr Laboratories, Inc., hereby move the Court to exclude the expert opinion testimony of plaintiff's designated case specific experts Stanley Tuhrim, M.D.; Jeanette Wasserstein, Ph.D.; and Gary Crakes, Ph.D.  Defendants move to preclude the testimony of those experts because their opinions are not competent evidence as they are not based on a reliable foundation.

This motion is supported by the accompanying memorandum of law and the Affidavit of Jeffrey D. Geoppinger and exhibits thereto, being filed simultaneously herewith.

Respectfully submitted,

/s/ Joseph P. Thomas
Joseph P. Thomas
CT Fed. Bar No. phv0382
Jennifer Hageman
CT Fed. Bar No. phv0937
Jeffrey D. Geoppinger
CT Fed. Bar No. phv0382
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, OH  45202-2409
(513) 698-5000
(513) 698-5001 FAX
jthomas@ulmer.com
jhageman@ulmer.com
jgeoppinger@ulmer.com


Thomas H. Winslow
The Law Office of Thomas H. Winslow, LLC
321 Main Street
Farmington, CT  06032-2976
(860) 678-4425
(860) 678-4427 FAX

**Counsel for Defendants**
**Duramed Pharmaceuticals, Inc., and**
**Barr Laboratories, Inc.**

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **TRACY BOLWELL,** | : | **CIVIL ACTION NO: 302CV01001AWT** |
| | : | |
| **Plaintiff,** | : | **JUDGE ALVIN W. THOMPSON** |
| | : | |
| **vs.** | : | **MAG. JUDGE DONNA F. MARTINEZ** |
| | : | |
| **DURAMED PHARMACEUTICALS,** | : | |
| **INC., BARR LABORATORIES, INC.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | **January 5, 2007** |

---

### MEMORANDUM IN SUPPORT OF DEFENDANTS DURAMED PHARMACEUTICALS, INC., AND BARR LABORATORIES, INC.'S MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S CASE SPECIFIC EXPERTS

---

### DAUBERT HEARING AND ORAL ARGUMENT REQUESTED

<u>**TABLE OF CONTENTS**</u>

I.     PLAINTIFF'S CLAIMS ..................................................................................1

II.    STATEMENT OF FACTS ...........................................................................1

    A.    PLAINTIFF TRACY BOLWELL AND HER MEDICAL HISTORY.................1

    B.    PLAINTIFF TRACY BOLWELL'S USE OF PPA/G ....................................3

    C.    PLAINTIFF TRACY BOWELL'S STROKE AND HOSPITALIZATION ...........4

    D.    PLAINTIFF TRACY BOLWELL'S WORK HISTORY ..................................7

    E.    THE PRODUCT AT ISSUE IN THIS CASE................................................8

    F.    Intracerebral Hemorrhage and Risk Factors ..................................9

    G.    PLAINTIFF'S EXPERT WITNESSES .......................................................9

        1.    Stanley Tuhrim, M.D...............................................................9

        2.    Jeanette Wasserstein, Ph.D. ...................................................12

        3.    Gary Crakes, Ph.D...................................................................14

III.   LAW AND ANALYSIS ...........................................................................16

    A.    THE STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY.............16

        1.    The Court's Gatekeeping Function.........................................16

        2.    General and Specific Causation ..............................................19

    B.    THE SPECIFIC CAUSATION OPINIONS OF DR. TUHRIM MUST BE
        EXCLUDED .......................................................................................22

        1.    Temporal Relationship Does Not Establish Causation ........23

        2.    Dr. Tuhrim Did Not Conduct a Complete and Reliable
            Differential Diagnosis .............................................................24

    C.    THE SPECIFIC CAUSATION OPINIONS OF DR. WASSERSTEIN MUST BE
        EXCLUDED .......................................................................................27

        1.    Dr. Wasserstein Did Not Use a Reliable Methodology in
            Formulating Her Opinions .....................................................27

        2.    Dr. Wasserstein Opinions Are Not Helpful to the Jury .......29

    **D.**      THE SPECIFIC CAUSATION OPINIONS OF DR. CRAKES MUST BE EXCLUDED ................................................................31

**IV.**      **CONCLUSION** ................................................................33

# TABLE OF AUTHORITIES

**CASES**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002)..............................17, 18

*Andrews v. Metro North Commuter Railroad Co.*, 882 F.2d 705 (2d Cir. 1989).........................30

*Bellis v. The Tokio Marine and Fire Ins. Co.*, 2006 U.S. Dist. LEXIS 10296 .............................30

*Brown v. Southeastern Pa. Transp. Auth. (In re Paoli R.R. Yard PCB Litig.),*
    35 F.3d 717, 743 (3d Cir. 1994) ................................................................................................19

*Claar v. Burlington N. R.R.,*
    29 F.3d 499 (9th Cir. 1994) ......................................................................................................21

*Daubert v. Merrell Dow Pharms., Inc.,*
    43 F.3d 1311 (9th Cir. 1995) ....................................................................................................17

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993) ...........................17, 18, 19

*General Elec. Co. v. Joiner,*
    522 U.S. 136 (1997)............................................................................................................17, 27

*Hall v. Baxter Healthcare Corp.,*
    947 F. Supp. 1387 (D. Or. 1996) ..............................................................................................19

*Heller v. Shaw Indus., Inc.,*
    167 F.3d 146 (3d Cir. 1999) ...............................................................................................18, 22

*In re TMI Litig.,*
    193 F.3d 613 (3d Cir. 1999) ......................................................................................................18

*Nimely v. City of New York,*
    414 F.3d 381 (2d Cir. 2005) ...............................................................................................17, 20

*Perkins v. Original Medsystems, Inc.,*
    299 F. Supp. 2d 45 (D. Conn. 2004)............................................................................19, 20, 22

*Persinger v. Norfolk & W.R. Co.*, 920 F.2d 1185 (4th Cir. 1990) ................................................30

*Primavera Familienstifung v. Askin,*
    130 F. Supp. 2d 450 (S.D.N.Y. 2001) ......................................................................................30

*Rider v. Sandoz Pharmaceuticals Corp.,*
    295 F.3d 1194 (11th Cir. 2002) ................................................................................................22

*Ruggiero v. Warner-Lambert Company*,
  424 F.3d 249 (2d Cir. 2005) ........................................................................18, 19

*Schmaltz v. Norfolk & Western Ry. Co.*,
  878 F. Supp. 1119 (N.D. Ill. 1995) ...........................................................22

*Siharath v. Sandoz Pharmaceuticals Corp.*, 131 F. Supp. 1347 (N.D. Ga. 2001) .......................22

*Willis v. Amerada Hess Corp.*,
  379 F.3d 32 (2d Cir. 2004) ........................................................................21, 27

*Zenith Radio Corp. v. Matushita Electric Industrial*, 505 F. Supp. 1313 (E.D. Pa. 1980) ..........30

*Zuchowicz v. United States*,
  870 F. Supp. 15, (D. Conn. 1994)...............................................................33

**OTHER AUTHORITIES**

7 Wigmore. § 1923, at 21 ...........................................................................29

**RULES**

Fed. R. Evid. 104(a).......................................................................................17

Federal Rule of Evidence 403........................................................................17

*Rule 702 of the Federal Rules of Evidence in Sound; It Should Not Be Amended,* 138 F.R.D. 631,
  632 (1991)................................................................................................17, 18

## I.    PLAINTIFF'S CLAIMS

Plaintiff alleges that she suffered a hemorrhagic stroke on January 21, 1997, as a result of her alleged use of a cough/cold/allergy decongestant prescription medication containing phenylpropanolamine HC, also known as PPA, manufactured by defendant Duramed Pharmaceuticals, Inc.  (*See generally* Plaintiff's Complaint ("Complaint"), attached as Exhibit 1.)  According to plaintiff, defendants are liable for manufacturing a defective PPA-containing product with inadequate labeling that failed to warn of dangers posed by the use of the product. (*Id.*)  Plaintiff's Complaint asserts claims for strict liability pursuant to Connecticut's Product Liability Act, Connecticut General Statutes § 52-572m *et seq.*, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA") pursuant to Connecticut General Statutes § 42-110a *et seq.*  (*See* Complaint, ¶¶ 19, 30, Ex. 1.)  Plaintiff also seeks punitive damages under Connecticut General Statutes § 52-240.  (*See id.*, p. 18.)  Plaintiff's claim for violation of the CUTPA has been dismissed.

## II.    STATEMENT OF FACTS

### A.    PLAINTIFF TRACY BOLWELL AND HER MEDICAL HISTORY

Tracy L. Bolwell ("Ms. Bolwell") was born June 3, 1971.  (*See* Plaintiff's Fact Sheet ("Fact Sheet"), p. 4, attached as Exhibit A to Affidavit of Jeffrey D. Geoppinger[1].)  As a child, Ms. Bolwell suffered from allergies and mild asthma.  (*See* Deposition of Dianne Bannon ("Bannon Dep."), pp. 30, 34, attached as Exhibit B.)  She saw an allergy specialist and treated her condition with an inhaler for approximately three to four years.  (*See id*.)

Around the age of 15, Ms. Bolwell began to smoke cigarettes and has smoked at least one pack of cigarettes per day continuously since that time.  (*See* Deposition of Tracy Bolwell

---

[1]Hereinafter references to exhibits, unless specifically noted otherwise, are to the exhibits attached to the Affidavit of Jeffrey D. Geoppinger, filed simultaneously herewith .

("Bolwell Dep."), p. 51, attached as Exhibit C.)  Ms. Bolwell admits that at the time of her stroke

she was a regular smoker and was smoking on the day of her stroke.  (*See id.*, p. 53.)  The

hospital records from her admission on the day of her stroke note she was smoking three packs

of cigarettes per day at that time.  (*See* Vassar Brothers Hospital ("Vassar") Records, Bates No.

11BOL00025, attached as Exhibit D.)  Ms. Bolwell continued smoking following her stroke,

despite her doctors' warnings to quit and despite her knowledge that smoking is associated with

stroke.  (*See* Bolwell Dep., pp. 52-54.)  In fact, Ms. Bolwell continues to smoke to this day.  (*See*

Deposition of Corey Frenette ("Frenette Dep."), p. 33, attached as Exhibit E.)[2]

Ms. Bolwell also has a history of alcohol use.  In the years preceding her stroke,

Ms. Bolwell indicated she consumed between one and ten alcoholic beverages each week.  (*See*

Fact Sheet, p. 13.)  At the time of her injury, she allegedly was consuming one to five drinks a

week on average.  (*See id.*, p. 14.)

In 1994, Ms. Bolwell married Mark Kupferschmid.  (*See* Deposition of Mark

Kupferschmid ("Kupferschmid Dep."), p. 23, attached as Exhibit F.)  A year later, Ms. Bolwell

became pregnant, and on December 24, 1995, she gave birth to her son Ryan.  (*See* Northern

Duchess Hospital ("ND Hospital") Record, Bates No. 3BOL00026, attached as Exhibit G.)

During her pregnancy with Ryan, Ms. Bolwell complained of "headaches every day."  (*See*

Northern Duchess OBGYN Associates ("ND OBGYN") Record, Bates No. 6TRACY00019,

attached as Exhibit H.)  Those headaches continued throughout her pregnancy.  (*See* ND

OBGYN, Bates No. 6TRACY00018.)  She also reported suffering from visual disturbances.

(*See id.*)

Ms. Bolwell became pregnant a second time in the fall of 1996.  (*See id.*, Bates No.

6TRACY00004.)  On November 10, 1996, Ms. Bolwell was seen in the emergency room at

---

[2]Ms. Bolwell and Mark Kupferschmid were divorced in 1998.  Ms. Bolwell re-married Corey Frenette on

Northern Duchess Hospital.  (*See id.*, Bates No. 6TRACY00004.)  She complained of cramping

for several days with heavy bleeding.  (*See id.*, Bates No. 6TRACY00002-4.)  She was

diagnosed as having experienced a spontaneous miscarriage.  (*See id.*)  She subsequently

complained of continued bleeding, and was diagnosed with endometritis, which is an

inflammation of the lining of the uterus.  (*See id.*, Bates No. 6TRACY00004.)  She was placed

on doxycycline.  (*See id.*)  She also was noted to have some retained products of conception that

were removed by forceps on November 13, 1996.  (*See id.*, Bates No. 6TRACY00002.)  Her

medical records document that Ms. Bolwell continued to complain of abnormal menstrual cycles

and spotting as late as December 30, 1996, indicative that she continued to experience hormonal

issues associated with the failed pregnancy.  (*See id.*, Bates No. 6TRACY00005.)

### B.    PLAINTIFF TRACY BOLWELL'S USE OF PPA/G

On January 21, 1997, Ms. Bolwell suffered from a "really bad head cold" and congestion.

She had been experiencing symptoms for several days prior to January 21, 1997.  (*See* Bolwell

Dep., p. 66.)  To treat her condition, Ms. Bolwell attempted to see her primary care physician,

Dr. Pedevillano.  (*See id.*)  However, Dr. Pedevillano was unavailable, so Ms. Bolwell went to

Dr. Gaetano Cavallaro.  (*See id.*)  She had never treated with Dr. Cavallaro before.  (*See id.*, p.

65.)  Ms. Bolwell saw Dr. Cavallaro late in the morning or early in the afternoon on January 21,

1997.  (*See id.*, pp. 64-65.)  Dr. Cavallaro prescribed Ms. Bolwell two antibiotics and Entex LA,

a decongestant containing phenylpropanolamine and guaifenesin.  (*See* CVS Pharmacy ("CVS")

Record, Bates No. 15TRACY00001, attached as Exhibit I.)  However, Dr. Cavallaro did not

discuss with Ms. Bolwell the medications he prescribed.  (*See* Bolwell Dep., pp. 70-71.)

---

July 4, 2001.

Ms. Bolwell filled her prescriptions immediately after her appointment. (*See id.*, p. 70.) The prescription for Entex LA was filled with a generic version of the product manufactured by Duramed, referred to as PPA/G. (*See* CVS Record, Bates No. 15TRACY00001.)

Ms. Bolwell took one pill of the PPA/G product shortly before 3:00 p.m., on January 21, 1997. (*See* Bolwell Dep., pp. 76-77.) At 9:00 p.m., that evening, Ms. Bolwell took a second dose of PPA/G and lay down in bed. (*See id.*, p. 78.)

### C.    PLAINTIFF TRACY BOWELL'S STROKE AND HOSPITALIZATION

At approximately 10:00 p.m., on January 21, 1997, Ms. Bolwell began experiencing a severe headache and began vomiting. (*See id.*, pp. 80-81.) Her mother, Diane Bannon, called, and Ms. Bolwell asked her to come over. (*See id.*, p. 82.) Shortly thereafter, Ms. Bolwell's husband returned home from work. (*See id.*, p. 83.) He found her knocking over lamps in the house because the light was bothering her eyes. (*See* Kupferschmid Dep., p. 69.) As soon as Ms. Bannon arrived to watch Ryan, Ms. Bolwell and her husband left for the hospital. (*See* Bolwell Dep., p. 83.)

Ms. Bolwell arrived at the Vassar Brothers Regional Hospital emergency room at approximately 10:30 p.m., on the evening of January 21, 1997. (*See* Vassar Record, Bates No. 11BOL00005.) On arrival, she complained of severe headache, nausea, and vomiting. (*See id.*, Bates No. 11BOL00025.) Admission records from Vassar Brothers Hospital noted that Ms. Bolwell was taking PPA/G prior to admission, as well as Naldecon, Biaxin, and Neomycin. (*See id.*) Naldecon is an expectorant that contained PPA. Ms. Bolwell's records indicate that she took it "every four hours as needed." (*See id.*, Bates No. 11BOL00053.) Those records also note that Ms. Bolwell smoked three packs of cigarettes a day at that time. (*See id.*, Bates No. 11BOL00025.) A CT scan of Ms. Bolwell's head was taken shortly after arrival, and she was

4

diagnosed with an intracerebral hemorrhage in the right basal ganglia with mild mass effect. (*See id*., Bates No. 11BOL00037.)

On January 22, 1997, Ms. Bolwell was admitted to Vassar Brothers Hospital intensive care unit with a principle diagnosis of intracerebral hemorrhage and secondary diagnosis of vasculitis, tobacco use, and asthma. (*See id*., Bates No. 11BOL00004.) At 3:30 a.m., she complained of a headache, but by 12:15 p.m., she was noted to be "awake, alert, [and] cooperative." (*See id*., Bates No. 11BOL00109.) She was able to recognize and name family members. (*See id*.) On January 23, 1997, Ms. Bolwell was able to lift her arm and leg. (*See id*., Bates No. 11BOL00029.) By the next day, she was walking with minimal assistance, and her physician noted she had made an "incredible recovery" from her stroke. (*See id*., Bates No. 11BOL00030.) There is no mention in Ms. Bolwell's medical records of a period of incapacity or a lack of memory.

Despite Ms. Bolwell quick recovery, her physicians continued to examine her to determine if there was an underlying condition which caused her stroke. On January 27, 1997, Ms. Bolwell underwent an angiogram. (*See id*., Bates No. 11BOL00033-34.) The procedure is a study of the blood vessels in the brain using a catheter. Ms. Bolwell's angiogram demonstrated multiple areas of narrowing and beading in the blood vessels in her brain. (*See id*.) Her physicians noted that the finding "are consistent and suggestive [of] vasculitis of indeterminate etiology," a condition associated with stroke.[3] (*See id*.)

Following her angiogram, Ms. Bolwell was transferred to Yale New Haven Hospital ("Yale") at the request of her family "where treatment for ongoing vasculitis would be initiated." (*See id*., Bates No. 11BOL00020.) On admission to Yale, Ms. Bolwell was described as alert and oriented. (*See* Yale New Haven Hospital ("Yale") Record, Bates No. 5BOL00061, attached

---

[3]Vasculitis is a condition in which the blood vessels are inflamed.

as Exhibit J.)  She was able to comprehend and answer questions appropriately.  (*See id.*)  Her

admission records indicate that she had a cerebral hemorrhage six days previously, and recovered

well.  (*See id.*, Bates No. 5BOL00063-64.)

At Yale, Ms. Bolwell's physicians reviewed the finding from her angiogram, and

recommended a brain biopsy to definitively determine if she had vasculitis.  (*See id.*, Bates No.

5BOL00075.)  That biopsy was performed on February 3, 1997, and the results were negative.

(*See id.*, Bates No. 5BOL00039.)

Ms. Bolwell's physicians at Yale also considered her use of PPA/G as a potential cause

of her stroke.  On January 31, 1997, Ms. Bolwell reported to Dr. Lynch that she was taking a

decongestant medication immediately before her initial headache developed.  (*See id.*, Bates No.

5BOL00093.)  Mark Kupferschmid reported that the medication was PPA/G.  (*See id.*)

Dr. Lynch noted in Ms. Bolwell's records that phenylpropanolamine has been reported to cause

intracerebral hemorrhage and drug-induced vasculitis.  (*See id.*)  He also noted that PPA/G

should be considered as an etiology for her stroke, after other causes are ruled out.  (*See id.*)

At her deposition, Ms. Bolwell clearly recalled a conversation she had while in the

hospital with her treating neurologist, Dr. Dana Leifer, shortly after her stroke during which he

identified PPA/G as a possible cause of her stroke.  (*See* Bolwell Dep., pp. 72-73, 117-18.)

Plaintiff's recollection of the time and substance of that conversation with Dr. Leifer is

consistent with her medical records.  Plaintiff was discharged from Yale on February 6, 1997.  In

her discharge summary, one of the primary diagnoses is "[c]entral nervous system vasculitis

possibly secondary to decongestant use."  (*See* Yale Record, Bates No. 5BOL00061.)

After her treatment at Yale was concluded, Ms. Bolwell continued to follow-up with

Dr. Leifer.  She saw him on March 10, 1997, and at that visit she was cleared to resume driving.

(*See id.*, Bates Nos. 5BOL00002-3.)  Dr. Leifer also examined her on April 24, 1998, and noted

that her physical examination had returned to normal six months after her stroke, with the exception of fine left finger movements.  (*See* North Shore Hospital ("North Shore") Records, Bates No. 4TRACY00002-4, attached as Exhibit K.)  He reassured her that her radiology films did not show any new lesion, and he recommended that she quit smoking and drinking.  (*See id.*)  Despite her stroke and Dr. Leifer's advice, Ms. Bolwell continues to smoke and drink.  (*See* Frenette Dep., p. 33.)

### D.    PLAINTIFF TRACY BOLWELL'S WORK HISTORY

After high school, Ms. Bolwell attended Duchess County Community College for a year and a half.  (*See* Bolwell Dep., p. 18.)  She majored in business, but did not perform well in school.  (*See id.*, p. 19.)  She eventually withdrew from college in the spring of 1991.

In 1994, Ms. Bolwell took a job at Prudential Securities as a sales assistant and wire operator.  (*See id.*, p. 26.)  She worked for Prudential Securities until December 1995, when she left to have her son.  (*See id.*)

Following the birth of her son, she did not return to work.  (*See id.*, p. 27.)  Rather, Ms. Bolwell claims she operated a day care business out of her home.  (*See id.*)  She allegedly was operating that business at the time of her stroke on January 21, 1997.  (*See id.*)  However, Ms. Bolwell cannot recall the identities of any of her clients, or how much she charged to care for the children she looked after.  (*See id.*)  Further, in records filed with the United States Bankruptcy Court on December 5, 1996, Ms. Bolwell swore to the Court that she did not receive any income from any source in 1996.  (*See* United States Bankruptcy Court for the Southern District of New York Records, Bates Nos. A-BOLWELL 00043-48, attached as Exhibit L.)

After her stroke, Ms. Bolwell claims she was unable to resume her alleged daycare business and did not return to work for a year.  (*See* Bolwell Dep., p. 27.)  She eventually returned to Prudential Securities to work in the same capacity as she had prior to the birth of her

son. (*See id.*, p. 28.) She worked at Prudential for less than a year, and then left to take a job as

a sales assistant at Deutsche Bank. (*See id.*) She earned $30,000 a year in her job at Deutsche

Bank. (*See id.*, p. 25.)    After a year and a half, Ms. Bolwell left Deutsche Bank and took a

position as a sales assistant at Advest because she was offered more money. (*See id.*, pp. 24-25.)

At Advest she earned approximately $40,000 per year. (*See id.*, p. 23.) She worked at Advest

for a year before she was laid off. (*See id.*) Following Advest, Ms. Bolwell worked in various

temporary positions as a receptionist until she was hired by Argent Mortgage as a customer

service representative in March 2003. (*See id.*, pp. 21-22.) Ms. Bolwell eventually was

promoted to account manager, and in 2005, she earned $134,959.64 at Argent. (*See*

Ms. Bolwell's 2005 W-2, attached as Exhibit M.) She remains employed there to this day.

E.    THE PRODUCT AT ISSUE IN THIS CASE

The product at issue in this case is a generic cough/cold/allergy decongestant prescription

medication containing phenylpropanolamine HC and guaifenesin, referred to as PPA/G.

Defendant Duramed began manufacturing and selling PPA/G in 1987. Prescription and non-

prescription products containing PPA had been on the market for decades by 1987, and the FDA

permitted the products to be sold without an approved application. (*See* Report, dated July 25,

2006, of James Morrison ("Morrison Report"), pp. 9-12, attached as Exhibit N.) On February

17, 1987, Duramed received a letter from FDA acknowledging Duramed's manufacture and sale

of PPA/G and permitting its continued sale. (*See id.*, p. 15.) FDA's permission was based on its

determination that the composition and labelling of Duramed's PPA/G product was identical to

Entex LA, the innovator's PPA-containing product. (*See id.*) Duramed continued to

manufacture its PPA/G product until December 1999, when it discontinued the product. Over a

year after Duramed's discontinuation of PPA/G, the FDA recommended the withdrawal of all

PPA-containing products from the market. (*See id.*) FDA's recommendation was based upon

the results of a study on over-the-counter cough/cold and weight loss PPA-containing products known as the Yale Study.  (*See id.*)  Since its release, the validity of the Yale Study has been roundly criticized in the medical community and by the courts.

### F.    INTRACEREBRAL HEMORRHAGE AND RISK FACTORS

An intracerebral hemorrhage ("ICH") is a type of stoke that occurs when a blood vessel within the brain substance ruptures causing bleeding to occur within the brain.  (*See* PPA MDL Report, dated September 20, 2002, of Stanley Tuhrim, M.D. ("Tuhrim MDL Report"), pp. 3-4, attached as Exhibit O.)  Symptoms of ICH may be accompanied by the rapid onset of abnormalities and a decreased level of consciousness.  (*See id.*)  Risk factors for ICH include chronic elevated blood pressure, smoking, family history, age, clotting/bleeding disorders, postpartum period, and vasculitis.  (*See* Deposition of Stanley Tuhrim, M.D., in PPA MDL ("Tuhrim MDL Dep."), pp. 98-100, 119, attached as Exhibit P; *see also* Report, dated August 8, 2006, of Louise McCullough, M.D. ("McCullough Report"), pp. 5-6, attached as Exhibit Q.)

One subset of vasculitis is benign angiopathy of the central nervous system (BACNS), which is a vasospastic disorder.  BACNS is diagnosed on angiogram, and it is characterized by onset of headache, focal or multifocal neurological deficits, and evidence of vasoconstriction on angiography.  (*See* McCullough Report, pp. 5-6.)  BACNS is more common in women and may occur during the post-partum period.  (*See id.*, pp. 6, 12.)  The prognosis for BACNS is good, with most patients having little residual disability.  (*See id.*, p. 6.)

### G.    PLAINTIFF'S EXPERT WITNESSES

#### 1.    Stanley Tuhrim, M.D.

Stanley Tuhrim, M.D., is a neurologist and professor in the Department of Neurology at Mount Sinai School of Medicine in New York. (*See* Report, dated February 27, 2006, of Stanley Tuhrim, M.D. ("Tuhrim Report"), p. 1, attached as Exhibit R.)  Dr. Tuhrim was retained in this

case to give a case specific opinion as to whether PPA caused Ms. Bolwell's hemorrhagic stroke on January 21, 1997.  To that end, he produced a report dated February 27, 2006, which concludes "to a reasonable degree of medical certainty, [Ms. Bolwell] suffered an intracerebral hemorrhage as a direct result of her exposure to PPA." (*See* Tuhrim Report, p. 2.)  Although Dr. Tuhrim has never met or examined Ms. Bolwell, he opines PPA was the "major contributor to her stroke" or the "sole cause of her stroke."  (*See* Deposition of Stanley Tuhrim, M.D. ("Tuhrim Dep."), p. 36, attached as Exhibit S.)  His opinion is based solely upon his review of Ms. Bolwell's deposition and her medical records.  (*See id.*)  Dr. Tuhrim claims his opinion is supported by the temporal proximity of Ms. Bolwell's stroke to her alleged ingestion of PPA and the absence of other potential causes of intracerebral hemorrhage in her medical record.  (*See* Tuhrim Report, p. 3.)

However, the only alternative causes of hemorrhage specifically ruled out by Dr. Tuhrim in his report are vascular malformation and bleeding disorder.  (*See id.*)  He ruled out vascular malformation as a cause based upon his review of the reports of the results of the radiology studies done on Ms. Bolwell.  (*See id.*)  Dr. Tuhrim did not review those films and admits he cannot definitively state that Ms. Bolwell did not have a vascular malformation prior to her stroke.  (*See* Tuhrim Dep., p. 65.)  In fact, in an article published by Dr. Tuhrim in *The New England Journal of Medicine*, Dr. Tuhrim indicates that a vascular anomaly may not be visible on an initial angiography due to the presence of the hematoma.  *See* Qureshi, A., M.D.; Tuhrim, S., M.D., et al., "Spontaneous Intracerebral Hemorrhage*,*" *New Eng. J. of Med.*, Vol. 344, No. 19, p. 1456, May 10, 2001, Exhibit T.

Dr. Tuhrim did not review the medical records relating to Ms. Bolwell's November 1996 miscarriage.  In fact, at the time of his deposition, Dr. Tuhrim was unaware that Ms. Bolwell had miscarried ten weeks prior to her stroke.  (*See* Tuhrim Dep., p. 61.)  Dr. Tuhrim did not consider

Ms. Bolwell's miscarriage as a potential cause for Ms. Bolwell's stroke. (*See id.*) Instead, without knowing that Ms. Bolwell continued to experience physical symptoms indicative of continued post-partum hormonal issues associated with the failed pregnancy through the time shortly before her stroke, he blithely dismissed Ms. Bolwell's miscarriage as a potential cause stating it was too remote in time to consider. (*See id.*, p. 61-62.)

Nor did Dr. Tuhrim consider benign angiopathy of the central nervous system (BACNS), a condition which may occur during the post-partum period, as a potential cause. In fact, Dr. Tuhrim admitted he is unfamiliar with BACNS. (*See id.,* pp. 52, 59.)

Another potential cause of Ms. Bolwell's stroke blithely dismissed by Dr. Tuhrim is her significant history of smoking cigarettes, even though he acknowledged smoking "has been associated with an increased risk of cerebral hemorrhage" and he admitted he did not know how much Ms. Bolwell smoked. (*See id.*, pp. 39-41.) Dr. Tuhrim testified he dismissed smoking as a cause or contributing factor to Ms. Bolwell's stroke because he believes the scientific evidence of an association between cigarette smoking and cerebral hemorrhage is "quite weak." (*See id.*, p. 39.) Yet, during his deposition regarding general causation in the MDL proceedings, when asked to identify risk factors for intracerebral hemorrhage, Dr. Tuhrim listed smoking. (*See* Tuhrim MDL Dep., p. 99.) At that time, he did not qualify his testimony that smoking was a risk factor with any indication that he considered the scientific evidence to be "quite weak."

Dr. Tuhrim's case-specific report incorporates and adopts the opinions in his general causation report he prepared on behalf of plaintiffs in the PPA MDL. (*See* Tuhrim Report, p. 1.) In his MDL report, Dr. Tuhrim identifies three potential mechanisms by which he believes PPA may cause hemorrhagic stroke: (1) an acute rise in blood pressure; (2) vasospasm of the blood vessels; or (3) direct damage to the blood vessels in the form of angiitis. (*See* Tuhrim MDL Report, pp. 9-10.) However, during his MDL deposition, he testified he could not identify the

11

mechanism by which PPA purportedly causes stroke. (*See* Tuhrim MDL Dep., pp. 115-16.) In fact, Dr. Tuhrim testified:

> I don't believe that any of the hypothesized mechanisms for the way in which PPA causes stroke have been satisfactorily proven.

(*Id.*, p. 116.)

Similarly, when asked to state which of the three mechanisms caused Ms. Bolwell's stroke **in this case**, Dr. Tuhrim could not say.

> Q:    What is the mechanism by which in your opinion PPA caused Tracy Bolwell's stroke?
>
> A:    I don't actually have an opinion as to what causes intracerebral hemorrhage as it relates to PPA ingestion.

(*See* Tuhrim Dep., pp. 41-42.) Dr. Tuhrim admitted that he does not have an opinion as to how PPA allegedly causes a hemorrhagic stroke "in all cases, or even any specific case." (*See id.*, p. 43.)

According to Dr. Tuhrim, temporal relationship between the ingestion of PPA and a hemorrhagic stroke is all that is needed to establish specific causation: "It is my opinion that any individual who suffers a hemorrhagic stroke in temporal proximity to ingestion of PPA can be considered to have had a PPA related hemorrhage." (*See* Tuhrim MDL Report, p. 16.)

### 2.    Jeanette Wasserstein, Ph.D.

Dr. Wasserstein is a neuropsychologist. (*See* Curriculum Vitae of Jeanette Wasserstein, Ph.D, attached as Exhibit U.) She is currently an assistant clinical professor in the Department of Psychiatry at the Mount Sinai School of Medicine and adjunct faculty at Queens College, City University of New York. (*See id.*)

Dr. Wasserstein was retained to conduct an evaluation of Ms. Bolwell's cognitive, adaptive, and emotional functioning and to offer an opinion as to neuropsychological damages Ms. Bolwell allegedly suffered as a result of her stroke. Relying on an interview and a battery of

subjective tests administered to Ms. Bolwell, Dr. Wasserstein concludes that Ms. Bolwell's stroke has caused personality changes, subtle global loss of cognitive ability, discrete neurocognitive and motor deficits, mild organic personality disorder, and chronic adjustment reaction disorder with depression and anxiety. (*See* Report, dated October 25, 2003, of Jeanette Wasserstein, Ph.D. ("Wasserstein Report"), p. 9, attached as Exhibit V.)

Importantly, Dr. Wasserstein's opinion is premised upon her estimate of Ms. Bolwell's pre-stroke level of cognitive functioning. In order to arrive at that estimate, Dr. Wasserstein relied exclusively on Ms. Bolwell's highest individual subtest performance on the battery of neuropsychological tests administered to Ms. Bolwell six years after her stroke. (*See id.*) Dr. Wasserstein did not take into account historical information regarding Ms. Bolwell's academic performance which demonstrates that she was an average student. (*See* Deposition of Jeanette Wasserstein, Ph.D. ("Wasserstein Dep."), pp. 63-65, attached as Exhibit W.) Dr. Wasserstein also did not consider plaintiff's occupational history prior to her stroke, and she did not interview any witnesses who knew Ms. Bolwell prior to her stroke. (*See id.*, pp. 29, 68-69.)

Relying only on the results of tests she administered six years after Ms. Bolwell's stroke and Ms. Bolwell's self-reporting, Dr. Wasserstein estimated plaintiff's pre-stroke level of functioning to be "high average." (*See id.*, p. 66.) Starting from that baseline, Dr. Wassserstein concluded that Ms. Bolwell's average performance on the various tests indicates that she has suffered cognitive damage. (*See* Wasserstein Report, pp. 9-10.) Dr. Wasserstein also opines that, based on plaintiff's self-reporting of symptoms of depression, plaintiff has reactive emotional issues as a result of her stroke. (*See id.*)

In contrast to Dr. Wasserstein's evaluation of plaintiff's cognitive and emotional condition as of October 25, 2003, plaintiff's current husband, Corey Frenette, reports that plaintiff has not received any psychological or psychiatric counseling since he met her in 2001.

(*See* Frenette Dep., p. 37.)  Furthermore, plaintiff has not been diagnosed or treated for depression during the time she has known and been married to Mr. Frenette, nor have her physical or cognitive conditions changed during that time.  (*See id*., p. 40.)  Further, plaintiff's occupational history since her stroke and her 2005 income of $134,959.64 contradict Dr. Wasserstein's evaluation.

### 3.    Gary Crakes, Ph.D.

Dr. Crakes is currently a professor of economics at Southern Connecticut State University.  (*See* Curriculum Vitae of Gary Crakes, Ph.D, attached as Exhibit X.)  In addition to teaching, he has worked as an expert witness providing appraisals of economic loss for matters in litigation for approximately 25 years.  (*See* Deposition of Gary Crakes, Ph.D. ("Crakes Dep."), p. 15, attached as Exhibit Y.)  He earns $350,000 to $400,000 per year as an expert witness.  (*See id*.)

Dr. Crakes was retained to provide an opinion regarding Ms. Bolwell's loss of future earnings from the date of his report, March 10, 2006, to the end of her work life expectancy. (*See generally* Report, dated March 10, 2006, of Gary Crakes, Ph.D. ("Crakes Report"), attached as Exhibit Z.)  That period totals 30.26 years.  (*See* Crakes Dep., p. 62.)  Based on the information provided to him by plaintiff's counsel, Dr. Crakes valued Ms. Bolwell's economic loss to fall in the range of $205,000 - $553,000.  (*See* Crakes Report, pp. 6-7.)

To formulate his opinions, Dr. Crakes performed various calculations.  First, using Department of Labor and Department of Commerce data, he calculated the future lifetime earnings of a typical female with some college education from age 34.74 to the age of retirement. (*See generally* Crakes Report.)  He opined that such a person would earn $997,143 over that time.  (*See id.*)  He then used the same data to calculate the future lifetime earnings of a typical

female with a bachelor's degree from age 34.74 to the age of retirement. (*See id.*) He opined that such a person would earn $1,358,159 over that period of time. (*See id.*)

Dr. Crakes then calculated the median amount a female with some college education and a 50% disability would earn from age 34.74 to the age of retirement, taking into account taxes, the discount rate, and the value of fringe benefits. (*See id.*) Subtracting that amount from the amount he calculated for a non-disabled female with some college education, he opines the economic loss that would be experienced by his fictitious disabled female would be $421,718. (*See id.*)  Using the same method, he calculated that the economic loss of the same fictitious female with some college if she was 25% disabled would be $205,061. (*See id.*)

Finally, Dr. Crakes calculated the median amount a fictitious female with a bachelor's degree and a 50% disability would earn from age 34.74 to the age of retirement, taking into account taxes, the discount rate, and the value of fringe benefits. (*See id.*) As he did with a female with only some college, he subtracts the figure from the amount he calculated for a non-disabled female with a bachelor's degree to opine the economic loss that would be experienced by his fictitious 50% disabled female would be $552,545. The economic loss he calculated for the female with a bachelor's degree who is 25% disabled was $271,519. (*See id.*)

Dr. Crakes then applied those calculations to Ms. Bolwell and opined that if she had some college and a 50% disability, she has an economic loss of $421,718. (*See id.*) If she had a college degree and a 50% disability, she has an economic loss of $552, 545. (*See id.*) If she had some college and a 25% disability, she has an economic loss of $205,061. (*See id.*)  Finally, if she had a college degree and a 25% disability, she has an economic loss of $271,519. (*See id.*)

Although he claims to do so, Dr. Crakes does not offer any opinion specific to Ms. Bolwell's alleged lost future income. The opinions offered by Dr. Crakes are for the median earnings of fictitious females with or without college degrees and with either a 25% or 50%

15

disability.  Dr. Crakes' calculations and opinions do not take into account any information about Ms. Bolwell, other than her age and the fact she is female.  (*See* Crakes Dep., p. 41.)[4]  Dr. Crakes admitted at deposition that he did not review or rely upon Ms. Bolwell's educational records, employment records, or tax returns in formulating his opinions.  (*See id.*, p. 36.)  Dr. Crakes also admitted that he did not consider Ms. Bolwell's earnings either before or after her stroke, including her earnings of $134,959.64 in 2005, in determining she has suffered a loss in future earnings.  (*See id.*, pp. 47-48.)

Further, most egregiously, Dr. Crakes admitted that, for the purposes of formulating his opinions, he simply assumed that Ms. Bolwell is either 50% disabled or 25% disabled at the direction of plaintiff's counsel who told him to use those levels of impairment.  (*See id.*, p. 35.)  Dr. Crakes made no independent evaluation of Ms. Bolwell's level of impairment, and repeatedly admitted he is not qualified to do so.  (*See id.*, pp. 48-49.)  He also admitted he did not review or rely upon any third party evaluation of Ms. Bolwell's level of impairment, and he could not produce any objective evidence demonstrating that Ms. Bolwell was impaired at all.  (*See id.*, pp. 49, 91-92.)  He simply performed calculations based on direction from plaintiff's counsel.

## III.    LAW AND ANALYSIS

### A.    THE STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

#### 1.    The Court's Gatekeeping Function

Federal Rule of Evidence 702, which governs the admissibility of expert and other scientific or technical expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify

---

[4]Dr. Crakes claims to have accounted for her level of educational attainment, but then he offers opinions on the lost earning capacity of a female with a bachelor's degree.  Plaintiff has never obtained a bachelor's degree.

thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The rule requires a court to act as a gatekeeper as to such testimony. The proponent of expert testimony has the burden of proving admissibility under Rule 702. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993), *citing* Fed. R. Evid. 104(a).

Federal Rule of Evidence 403, which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, also underscores the importance of the court's role as gatekeeper, as explained by the Second Circuit Court of Appeals:

> Indeed, the Supreme Court, echoed by members of our own court, has noted the uniquely important role that *Rule 403* has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations. *See, e.g., Daubert,* 509 U.S. at 595 ('Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of the risk, the judge in weighing possible prejudice against probative force under *Rule 403* of the present rules exercises more control over experts than over lay witnesses.' *quoting* Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence in Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)).

*Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

A proffered expert may not simply self-validate the reliability of his or her testimony. As the United States Supreme Court observed, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *See also Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("[T]he party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology"). It is critical, to warrant admissibility, that an expert's analysis be reliable at every step. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Further, conclusions and

17

methodology are not distinct from one another, and the opinions proffered must follow from the available data. *Ruggiero v. Warner-Lambert Company*, 424 F.3d 249, 255 (2d Cir. 2005) *citing to Joiner*, 522 U.S. at 146 ("[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered"). Exclusion of testimony that fails to meet the criteria is required. *Amorgianos*, 303 F.3d at 266 (holding "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.") If a plaintiff fails to provide sufficient validation of an expert's methodology and reasoning, a court cannot make the findings required by Rule 702, and the expert's testimony should be excluded. *In re TMI Litig.*, 193 F.3d 613, 665-66, 687 (3d Cir. 1999).

Rule 702 requires that "[t]he subject of an expert's testimony must be 'scientific . . . .'" In *Daubert*, the Supreme Court explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science" and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589-90. A court considering proposed expert testimony "must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. Thus, under *Daubert*, an expert's opinion must be scientifically reliable and relevant to the issues in the case, i.e., it must "fit" the facts at issue.

*Daubert* requires trial courts to act as "gatekeepers," excluding expert evidence that does not meet the standards of reliability and relevance. Both the expert's methodology and conclusions must be scrutinized to ensure reliability before consideration by a jury. The court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999).

Even if plaintiffs established that their experts' testimony is based on generally accepted scientific methods, this Court still may exclude such testimony if it is irrelevant to, or does not "fit," the issues in this case. *Daubert*, 509 U.S. at 591; s*ee also Brown v. Southeastern Pa. Transp. Auth. (In re Paoli R.R. Yard PCB Litig.)*, 35 F.3d 717, 743 (3d Cir. 1994) (hereinafter "*Paoli II*") ("[E]ven if the expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of the case"). The *Paoli II* Court defined "fit" as the "proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Id.* "Expert testimony that does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Perkins v. Original Medsystems, Inc*., 299 F. Supp. 2d 45, 52 (D. Conn. 2004).

## 2.    General and Specific Causation

"Causation in toxic tort cases has two components, general and specific, and the plaintiff must establish both in order to prevail." *In re: Rezulin Products Liability Litigation*, 369 F. Supp. 2d 398, 401-02 (S.D.N.Y. 2005). General causation is the proposition that the substance at issue is capable of causing the alleged injury at any time, while specific causation is the proposition that the substance at issue caused the alleged injury in the instance under review. *Id.* at 251, n.1.

Establishing specific causation by use of a differential diagnosis employs a process of elimination to identify a most likely cause of an injury from a list of possible causes. *See, e.g., Ruggiero,* 424 F.3d at 254, *citing with approval Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1413 (D. Or. 1996). A differential diagnosis assumes that general causation has been *proven* for the list of possible causes it eliminates. *Id.* Where an expert employs a differential diagnosis to 'rule out' other potential causes for the injury at issue, he must use scientific methodology to 'rule in' the suspected cause. *Id.*

However, the diagnosis must be *reliable* in order to withstand exclusion under Rule 702. Reliability, within the meaning of Rule 702, requires a sufficiently rigorous analytical connection between the methodology and the expert's conclusions. *Nimely*, 414 F.3d at 396.

"A reliable differential diagnosis typically, although not invariably, is performed after 'physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests,' and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until one cannot be ruled out or determining which of those that cannot be excluded is most likely." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999) (citations omitted); *see also Perkins*, 299 F. Supp. 2d at 61. In other words, a reliable differential diagnosis must *"rule in"* the suspected cause of an injury (*e.g.,* PPA) and must *"rule out"* other causes to determine which of the remaining explanations is the most likely cause.

The reliability of an expert opinion based upon differential diagnosis depends upon the expert's treatment of other causes. As stated by the Fourth Circuit:

> [A] "differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation." (Citation omitted.) Thus, if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony."

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) *quoting Westberry*, 178 F.3d at 265-266. This standard for differential diagnosis was accepted in *Perkin*s:

> [D]ifferential diagnosis requires the expert to 'take serious account of other potential causes' of the condition . . . [T]he expert is required to employ either standard diagnostic techniques to eliminate obvious alternative causes or, if the defendant suffers some likely alternative cause of the plaintiff's condition, the expert is required to offer a reasonable explanation why he or she still believes that the defendant's action or product was a substantial factor in bring about the plaintiff's condition.

*Perkins*, 299 F. Supp. 2d at 61 (citations omitted).

For example, in *Willis v. Amerada Hess Corp.*, 379 F.3d 32, 50 (2d Cir. 2004), the

Second Circuit affirmed the exclusion of the opinion of an expert who admitted that smoking and

alcohol use are risks factor for cancer, the injury at issue, but who failed to account for those risk

factors in concluding that decedent's cancer was caused by exposure to toxic chemicals.  The

court held that "Dr. Bidanset's failure to account for decedent's smoking habit and alcohol

consumption as a possible causes of decedent's [cancer], strongly indicate that Dr. Bidanset's

conclusions were not grounded in reliable scientific methods, as required by *Daubert*."  *Id.*

Similarly, in *Claar v. Burlington N. R.R.*, 29 F.3d 499 (9th Cir. 1994), the court excluded

the causation opinions of experts who failed to perform a reliable differential diagnosis that

eliminated the most obvious causes of plaintiff's alleged injuries.  In *Claar*, plaintiffs brought an

action alleging they were injured by exposure to toxic chemicals.  *Id.* at 500.  Affirming the order

of summary judgment for defendant, the court found that plaintiffs' experts concluded that the

plaintiffs' injuries were caused by exposure to toxic chemicals, but they neglected to investigate

whatsoever any other alternative causes of plaintiffs' injuries.  *Id.* at 502.  For example, one

expert concluded that the chemicals caused one plaintiff to suffer from dyscalculia (bad at

arithmetic) and spelling dyspraxia (bad at spelling).  *Id.*  However, the expert never reviewed the

plaintiff's school records, which indicated that he had those problems when he was a child.  *Id.*

The failure to investigate obvious alternative causes rendered the opinion unreliable.  *Id.*

A reliable differential diagnosis is to be distinguished from clinical methodology used by

doctors, which methodology was succinctly explained by the court in *Siharath v. Sandoz*

*Pharmaceuticals Corp.*, when rejecting proffered testimony of medical experts that the drug

Parlodel caused strokes:

> As Defendant's expert . . . explained at the Daubert hearing, doctors every day
> seek to determine cause of injury and illness and make patients healthier.  In their
> eternal quest for "the answer," however, doctors sometimes believe that they have
> found a cause when they have not necessarily done so.  ***Doctors in their day-to-***

21

*day practices stumble upon coincidental occurrences and random events and often follow human nature, which is to confuse association and causation.* They are programmed by human nature and the rigors and necessities of their clinical practices to conclude that temporal association equals causation, or at least that it provides an adequate proxy in the chaotic and sometimes inconclusive world of medicine. This shortcut aids doctors in their clinical practices because their most important objective day-to-day is to help their patients and "first, do no harm," as their Hippocratic oath requires. Consequently, "[t]hey make a leap of faith. And then in retrospect they build a bridge constructed of other anecdotal evidence, in some cases totally unrelated about heart attacks in older men and things like that and animal data, a bridge to help them lead others across the chasm." (Transcript of Daubert hearing, p. 429.) The Court does not question [plaintiff's expert's] honest conviction that Parlodel causes stroke or think that he is deliberately peddling "junk science." The Court also does not question that the methodology [plaintiff's expert] discussed at the Daubert hearing serves him well every day in the clinical practice. . . . *Unfortunately, his clinical impression is not the sort of scientific methodology that Daubert demands.*

*Siharath v. Sandoz Pharmaceuticals Corp.*, 131 F. Supp. 1347, 1372 (N.D. Ga. 2001) (emphasis

added) *aff'd Rider v. Sandoz Pharmaceuticals Corp.*, 295 F.3d 1194 (11th Cir. 2002).

Finally, "it is well settled that a causation opinion based solely on a temporal relationship

is not derived from the scientific method and is, therefore, insufficient to satisfy the requirements

of [Rule] 702." *Schmaltz v. Norfolk & Western Ry. Co.*, 878 F. Supp. 1119, 1122 (N.D. Ill.

1995). While temporal relationship may be part of a differential diagnosis in a toxic tort case, it

cannot be the sole basis for a causation opinion in the absence of a reliable differential diagnosis.

*See Perkins*, 299 F. Supp. 2d at 61, *citing Heller*, 167 F.3d at 158 (noting that "when the

temporal relationship is strong **and is part of a standardized differential diagnosis**, it would

fulfill many of the Daubert factors") (emphasis added).

### B.    THE SPECIFIC CAUSATION OPINIONS OF DR. TUHRIM MUST BE EXCLUDED

Dr. Tuhrim's opinions are not based on the objective facts and data. As a result, they are

not based on medically-accepted principles and are neither reliable nor admissible to prove

specific causation in this case.

### 1.    Temporal Relationship Does Not Establish Causation

The lynchpin of Dr. Tuhrim's specific causation opinion is temporal relationship. Despite lip service to selected portions of Ms. Bolwell's medical record, a reading of Dr. Tuhrim's report shows that he concludes Ms. Bolwell's stroke was caused by her use of PPA/G based solely on her testimony that she took two pills of PPA/G the day of her stroke. Dr. Tuhrim admitted as much in his PPA MDL report, incorporated in this case, when he stated "it is my opinion that any individual who suffers a hemorrhagic stroke in temporal proximity to ingestion of PPA can be considered to have had a PPA related hemorrhage." (*See* Tuhrim MDL Report, p. 16.) Yet, Dr. Tuhrim admitted that temporal relationship alone is not enough to establish causation.

> Q:    Would you agree with me that the mere fact that someone ingested PPA, and in temporal proximity to the ingestion had a stroke, that you can't automatically say that PPA caused the stroke?

> A:    Yes, I would agree with that.

(*See* Tuhrim Dep., p. 68.)

Further, Dr. Tuhrim attempts to offer his causation opinion based solely on temporal relationship while admitting he has no knowledge regarding the pharmacology of PPA directly relevant to the issue of causation. Dr. Tuhrim admits he does not know how long it takes PPA to become active in the body, how long it remains active after ingestion, or how long it takes to eliminate PPA from the body. (*See* Tuhrim Dep., pp. 34-35.) As such, he cannot state that PPA was even present and active in plaintiff when the stroke occurred.

Dr. Tuhrim also admits he does not have any idea of the mechanism by which PPA may cause intracerebral hemorrhage. In the end, Dr. Tuhrim's opinion is no more than a baseless conclusion that because plaintiff claims she took PPA the day of her event, it must have caused her stroke. Such conclusory opinion without foundation is not reliable or admissible.

## 2.  Dr. Tuhrim Did Not Conduct a Complete and Reliable Differential Diagnosis

Dr. Tuhrim relies predominantly on temporal relationship to support his specific causation opinion to mask his failure to perform a complete differential diagnosis.  In order for Dr. Tuhrim's specific causation opinion to be admissible, he is required to conduct a differential diagnosis to rule out other potential causes for plaintiff's stroke.

In this case, Dr. Tuhrim did not consider other potential causes for plaintiff's stroke; even though he agrees it is important to do so in formulating a specific causation opinion.  (*See* Tuhrim Dep., p. 35.)

First and foremost, Dr. Tuhrim had no knowledge of plaintiff's miscarriage on November 10, 1996, ten weeks before her stroke.  It is well-accepted that a woman is at the highest risk of stroke in the postpartum period.  When asked whether he considered plaintiff's miscarriage in performing his differential diagnosis, Dr. Tuhrim had to admit he did not.  Nonetheless, he attempted to rule it out during the course of his deposition, without reference to records, based upon his determination that it was too remote in time to have been the cause.

However, had Dr. Tuhrim reviewed all Ms. Bolwell's medical records, he would have learned that she retained the products of conception for several days after her miscarriage and experienced continued hormonal issues through December 30, 1996.  Dr. Tuhrim would have learned that Ms. Bolwell's stroke was not as remote in time to her postpartum period as he glibly declared at deposition.  But, because Dr. Tuhrim did not review all Ms. Bolwell's records, he could not, and did not, evaluate her miscarriage and relevant subsequent medical events.

While Dr. Tuhrim's methodology of ruling out alternative causes in a matter of seconds without reviewing relevant medical records may be agreeable to him, that method of differential diagnosis is not reliable under the law.  If Dr. Tuhrim had performed a reliable differential diagnosis he would have reviewed all Ms. Bolwell's medical records, including the records

relating to her miscarriage.  His admitted ignorance of and failure to consider the miscarriage and its aftermath in formulating his opinion renders his alleged differential diagnosis unreliable.

Dr. Tuhrim also did not consider benign angiopathy of the central nervous system (BACNS), a condition which may occur during the post-partum period, as a potential cause.  His failure to consider BACNS is twofold:  First, Dr. Tuhrim's lack of knowledge of Ms. Bolwell's pregnancy and miscarriage that occurred shortly before her stroke; and second, his admitted unfamiliarity with BACNS.  (*See* Tuhrim Dep., pp. 52, 59)  As a witness who purports to offer expert testimony on the issue of causation, it was incumbent upon Dr. Tuhrim to identify all potential causes of Ms. Bolwell's stroke, which by his own admission, he did not do.

Although aware that Ms. Bolwell had a history of smoking, Dr. Tuhrim conveniently ignored that history in concluding that Ms. Bolwell's alleged ingestion of PPA caused her stroke.  Dr. Tuhrim's report notes that Ms. Bolwell smoked "at least a pack of cigarettes daily," but makes no effort to explain how he ruled out her excessive smoking as the cause of the stroke.  Nor does Dr. Tuhrim explain why he chose to assume Ms. Bolwell smoked "at least a pack a day" when the hospital admission records indicate she was smoking "three packs a day."

At deposition, Dr. Tuhrim attempted to correct his omission by discounting smoking as an alternative cause.  While acknowledging that there is an association between smoking and intracerebral hemorrhage, Dr. Tuhrim claimed he ruled out smoking as the cause of Ms. Bolwell's stroke because the association, according to him, is "quite weak."  However, during his MDL deposition, Dr. Tuhrim stated unequivocally, without qualification, that smoking was a risk factor for strokes, including intracerebral hemorrhages.  In fact, he stated that "[c]igarette smoking is a risk factor for a lot of things.  You really shouldn't do it."  (Tuhrim MDL Dep., p. 80.)

25

Ironically, Dr. Tuhrim claims, for purposes of his specific causation opinion in this case, that because the majority of evidence of an association between smoking and intracerebral hemorrhage is contained in case reports, it is not reliable enough for him to consider smoking as a risk factor for stroke. Yet, Dr. Tuhrim relies heavily on case reports of stroke associated with PPA and other sympathomimetic compounds to conclude that PPA can cause hemorrhagic stroke generally in his PPA MDL report, incorporated in this case,. (*See* Tuhrim MDL Report, pp. 8-12.)

Dr. Tuhrim's hypocrisy apparently has no bounds. He relies on case reports when they suit his purposes (to claim PPA is associated with hemorrhagic stroke), and dismisses them when they do not (to rule out smoking as the cause of Ms. Bolwell's stroke). That methodology is not only inconsistent, but also unreliable. Dr. Tuhrim's failure to specifically evaluate Ms. Bolwell's significant history of smoking, including how much she smoked, whether she smoked the day of her stroke, and whether her years of smoking played a role in her stroke renders his differential diagnosis inherently unreliable.

Dr. Tuhrim similarly fails to consider Ms. Bolwell's alcohol consumption as a potential cause of her stroke. His stated reason for not considering alcohol consumption was "because [he] didn't see any reference to that in any of the documents that [he] reviewed." (Tuhrim Dep., p. 41.) Again, Dr. Tuhrim ignores evidence that Ms. Bolwell drank alcohol on a regular basis. He also ignores his own publication which lists alcohol consumption as a risk factor for intracerebral hemorrhage. *See* Qureshi, A., M.D.; Tuhrim, S., M.D., et al., "Spontaneous Intracerebral Hemorrhage," *New Eng. J. of Med*., Vol. 344, No. 19, May 10, 2001, Ex. T.

Dr. Tuhrim's failure to consider Ms. Bolwell's risk factors for stroke strongly undermines the reliability of his alleged differential diagnosis. "[A] 'differential diagnosis that fails to take serious account of other potential causes [is] so lacking that it cannot provide a reliable basis for

an opinion on causation.'" *Cooper,* 259 F.3d at 202 *quoting Westberry*, 178 F.3d at 265-266; *see also Paoli II*, 35 F.3d at 758 n. 27. As was true of the expert in *Willis*, Dr. Tuhrim admits Ms. Bolwell had other risk factors for stroke, but fails to account for those factors. *See Willis*, 379 F.3d 32 (2d Cir. 2004). As was true of the expert in *Willis*, Dr. Tuhrim should be precluded from offering testimony in this matter.

Throughout his opinion, Dr. Tuhrim ignores the relevant objective facts. It is axiomatic that to ignore pertinent medical history in rendering expert opinions relating to specific causation is not sound methodology. It is necessary to review, analyze, and evaluate the totality of the evidence, and not pick and choose those pieces that are favorable to the conclusion one wishes to render and those that are not. In this instance, Dr. Tuhrim did exactly that by ignoring evidence of potential alternative causation and not considering it. An opinion based on a pick-and-choose methodology is not reliable and not admissible. Here, Dr. Tuhrim's opinions are connected to the existing data only by his *ipse dixit*. Where the gap between the data and the opinion proffered is too great, as it is here, it must be excluded. *See Joiner*, 522 U.S. at 146.

**C.    THE SPECIFIC CAUSATION OPINIONS OF DR. WASSERSTEIN MUST BE EXCLUDED**

**1.    Dr. Wasserstein Did Not Use a Reliable Methodology in Formulating Her Opinions**

Dr. Wasserstein attempts to offer an opinion regarding Ms. Bolwell's level of cognitive functioning post-stroke. To reach her opinion, Dr. Wasserstein interviewed Ms. Bolwell and conducted a battery of neuropsychological testing. Based on the results of those tests, Dr. Wasserstein concluded that Ms. Bolwell's cognitive functioning has been adversely affected by her stroke. However, as with plaintiff's other case specific experts, Dr. Wasserstein's opinions are unreliable because they are founded on unsupported assumptions about Ms. Bolwell

and her pre-stroke level of cognitive functioning rather than a reliable methodology which considers the relevant objective evidence in the case.

In order for Dr. Wasserstein to offer an opinion as to the effects of Ms. Bolwell's stroke on her cognitive functioning, Dr. Wasserstein first had to estimate Ms. Bolwell's pre-stroke level of functioning. The most reliable method for performing that estimate, according to Dr. Wasserstein, is by evaluating historical information concerning Ms. Bolwell's pre-stroke level of functioning in combination with Ms. Bolwell's performance on post-stroke testing. (*See* Wasserstein Dep., pp. 39-40.) Historical information regarding Ms. Bolwell's pre-stroke level of cognitive functioning may be derived from multiple sources, including school records, employment records, spouses, and family members. (*See id.*) Dr. Wasserstein acknowledged that when she does a forensic evaluation for the purposes of litigation she prefers to review objective evidence of pre-injury levels of functioning before attempting to evaluate whether a patient has been cognitively impaired by an event. (*See id.*, pp. 24-26)

While Dr. Wasserstein acknowledges the value of a methodology that considers objective historical evidence before estimating a pre-stroke level of functioning for the purposes of issuing an opinion for litigation, she did not practice what she preaches in this case. Dr. Wasserstein did not review any objective evidence of Ms. Bolwell's pre-stroke level of functioning before issuing her opinion. She did not review any of Ms. Bolwell's academic or employment records. She did not interview anyone concerning Ms. Bolwell and her pre-stroke condition, including Ms. Bolwell's mother or her ex-husband. Instead, Dr. Wasserstein conducted only an interview with Ms. Bolwell and performed some limited neuropsychological tests to determine that Ms. Bolwell's pre-stroke level of cognitive functioning was "high average." Moreover, Dr. Wasserstein was comfortable with her estimate despite her admission that a patient's self-reporting is inherently unreliable and that Ms. Bolwell had a tendency to inflate her estimation of

her pre-stroke level of cognitive ability in her interview.   (*See* Wasserstein Dep., pp. 64-65.) Dr. Wasserstein claims her "best performance" method of evaluating pre-morbid function is acceptable and reliable in Ms. Bowell's case.

However, the same text Dr. Wasserstein relies upon as support for the reliability of her "best performance" methodology in this case criticizes Dr. Wasserstein's tactics.  Lezak, in his textbook Neuropsychological Assessment, recognizes that a "best performance" methodology that relies solely upon post-injury test results may "systematically produce overestimates of premorbid ability" and "result in spurious estimates."  *See* M. Lezak, et al., Neuropsychological Assessment, 4th Ed., p. 99, attached as Exhibit AA.  Lezak states that when identifying a patient's "best performance," it is important that the clinician's estimate of premorbid function "take into account as much information as possible about the patient and not rely on test scores alone."  *Id.*

Given Dr. Wasserstein's failure to employ a reliable methodology to estimate Ms. Bolwell's pre-stroke level of functioning, her entire opinion is unreliable.  Without a reliable estimation of Ms. Bolwell's pre-stroke level of functioning, Dr. Wasserstein cannot opine that Ms. Bolwell has been impaired by her stroke.  Moreover, the objective evidence of Ms. Bowell's professional advancement and success since her stroke and her current level of income contradict Dr. Wasserstein's conclusion that Ms. Bolwell is now cognitively impaired.

### 2.    Dr. Wasserstein Opinions Are Not Helpful to the Jury

In addition, Dr. Wasserstein's opinions should be excluded as they will not assist the trier of fact in understanding the evidence or determining a fact in issue.  The test for use of expert testimony requires that the trier of fact be aided by the expert's testimony.  Wigmore articulated the test as "[o]n *this subject* can the jury receive from *this person* appreciable help?"  7 Wigmore. § 1923, at 21 (emphasis in the original).  In requiring that expert testimony be directed

to "scientific, technical or specialized knowledge," the court as gatekeeper ensures that expert

witnesses will not testify about "lay matters which a jury is capable of understanding and

deciding without the expert's help." *In re Rezulin*, 309 F. Supp. 2d at 541 (S.D.N.Y. 2004)

*citing Andrews v. Metro North Commuter Railroad Co*., 882 F.2d 705, 708 (2d Cir. 1989).

Experts should not be permitted to supplant the role of the jury in interpreting the

testimony and evidence. *See id*., *citing Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450

(S.D.N.Y. 2001). Rule 702 provides protections against the admission of opinions which would

merely tell the jury what result to reach. *See Hygh*, 961 F.2d at 363. Where the subject matter

upon which expert testimony is offered is wholly within the comprehension of the trier of fact,

expert testimony will not be helpful to the trier of fact and should be excluded. *See Andrews v.*

*Metro North Commuter Railroad Co*., 882 F.2d 705, 708 (2d Cir. 1989) (trial court erred in

permitting expert testimony that an icy train platform that was strewn with trash and dimly lit

was not a safe place); *Bellis v. The Tokio Marine and Fire Ins. Co.*, 2006 U.S. Dist. LEXIS

10296 (holding that plaintiff's experts' opinions were inadmissible because they were no

different from what jurors may find when presented with the same evidence), Ex. BB; *Persinger*

*v. Norfolk & W.R. Co*., 920 F.2d 1185, 1188 (4th Cir. 1990) (plaintiff's expert was improperly

permitted to testify concerning the application of an "industrial safety formula," as the testimony

"did no more than state the obvious," due to the fact that an average layperson knows that "it is

more difficult to lift objects from a seated position, especially when the lift is away from the

body rather than close"). The ultimate standard is always whether the expert brings a helpful

quality to the litigation which otherwise would be lacking. *See Zenith Radio Corp. v. Matushita*

*Electric Industrial*, 505 F. Supp. 1313 (E.D. Pa. 1980) ("[a]s defined by the Advisory

Committee, the helpfulness inquiry is whether the untrained layman would be qualified to

30

determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute").

Despite her use of neuropsychological tests to reach her conclusions, the subject matter of Dr. Wasserstein's opinions is wholly within the comprehension of the jury, and therefore her opinions are not properly the subject of expert testimony. The jury is capable of understanding from the evidence including the testimony of fact witnesses and Ms. Bolwell herself, the extent of Ms. Bolwell's impairment, if any. The jury does not require the results of Dr. Wasserstein's neuropsychological testing to evaluate Ms. Bolwell's current condition and whether she has been physically or cognitively impacted by her stroke.

Further, the jury will not be aided by Dr. Wasserstein's opinions formulated from her interview with Ms. Bolwell when Ms. Bolwell is available and will likely testify at trial. Indeed, given Dr. Wasserstein penchant to ignore the records and testimony that contradict her conclusion that Ms. Bolwell is impaired, admission of her expert opinions would be misleading to the jury. Such expert testimony is neither reliable nor helpful to the jury and should be excluded.

### D. THE SPECIFIC CAUSATION OPINIONS OF DR. CRAKES MUST BE EXCLUDED

Dr. Crakes' opinions regarding Ms. Bolwell's alleged lost future earnings are not reliable, nor are they relevant or helpful to the jury and would merely confuse and mislead. In sum, Dr. Crakes calculates how much purportedly typical females with or without a college degree will earn from the age of 34.74 to 65. He then assumes Ms. Bolwell is one of those two types of females and assumes that she is either 25% or 50% disabled, as instructed by plaintiff's counsel. He then discounts the future earning capacity of those two types of females by the assumed disability to determine a range of lost future earnings allegedly applicable to Ms. Bolwell.

It is eminently clear that Dr. Crakes' opinions are sheer speculation; devoid of any bases in relevant facts; and hence unreliable, irrelevant, and unhelpful to the trier of fact.  All his underlying data and opinions concern the future earnings of a fictitious female from age 34.74 to 65 with or without a college degree.  Dr. Crakes' figures and opinions are not related to Ms. Bolwell.  Indeed, Dr. Crakes admitted he did not even consider any objective information about Ms. Bolwell's level of education, academic performance, employment history, or income history when preparing his report.  Instead, at the direction of plaintiff's counsel, Dr. Crakes simply drafted a report about some theoretical female with a theoretical disability and a theoretical loss of earning capacity.

Dr. Crakes plainly admits that his entire basis for applying a 25% or 50% reduction to Ms. Bolwell's alleged future earnings is an assumption he was asked to make by Ms. Bolwell's attorney, Ron Meneo, about her level of disability.

> Q:    Were you provided with assumptions by attorney Meneo regarding Ms. Bowell's impaired earnings?
>
> A:    Yes, I was.
>
> Q:    What were those assumptions that you were asked to make?
>
> A:    That I should employ an estimate with a 25 percent reduction in her earning capacity and an alternative estimate with a 50 percent reduction in her earning capacity.
>
> Q:    Those assumptions were based solely upon Mr. Meneo's request, is that correct?
>
> A:    That is correct.
>
> Q:    They were not based upon any other evaluation of her earning capacity by a third party; correct?
>
> MR. KENNEY:    Objection to form.
>
> A:    I wouldn't know.  I know it was something told to me by Attorney Meneo.

> Q:    He didn't provide you with any source for that information, is that correct?
>
> A:    Not that I recall.

(*See* Crakes Dep., p. 35.)

While Dr. Crakes may be willing to follow plaintiff's counsel direction to assume Ms. Bolwell was impaired by her stroke and to assume levels of impairment, the Court cannot. Under Rule 703, the district court has discretion to determine whether an expert acted reasonably in making assumptions of fact upon which the expert bases his or her testimony. *See Zuchowicz v. United States*, 870 F. Supp. 15, 19 (D. Conn. 1994). Dr. Crakes' methodology, whereby he relies on assumptions he is asked to make by plaintiff's counsel in order to formulate his opinions, is not reasonable and does not qualify as reliable. As a result, the opinions and conclusions he reaches based on those assumptions are inadmissible.

Reliable expert testimony is based on objective evidence, not on "assumptions," much less baseless assumptions made at the direction of interested parties to the litigation. Because Dr. Crakes' opinions are not premised on any objective evidence demonstrating that Ms. Bolwell actually has any disability, he cannot reliably opine that her earnings are or will be impaired. If Dr. Crakes were permitted to offer his irrelevant opinions at trial, he would confuse the jury by providing purported "expert testimony" about the alleged lost earning capacity of a person unrelated to this litigation.

## IV.    CONCLUSION

For the foregoing reasons, defendants' motion to exclude the testimony of plaintiffs' expert witnesses must be granted.

Respectfully submitted,

/s/ Joseph P. Thomas
Joseph P. Thomas
CT Fed. Bar No. phv0382
Jennifer Hageman
CT Fed. Bar No. phv0937
Jeffrey D. Geoppinger
CT Fed. Bar No. phv0382
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, OH  45202-2409
(513) 698-5000
(513) 698-5001 FAX
jthomas@ulmer.com
jhageman@ulmer.com
jgeoppinger@ulmer.com

Thomas H. Winslow
The Law Office of Thomas H. Winslow, LLC
321 Main Street
Farmington, CT  06032-2976
(860) 678-4425
(860) 678-4427 FAX

**Counsel for Defendants**
**Duramed Pharmaceuticals, Inc., and**
**Barr Laboratories, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing was served electronically via the Court's

electronic filing system on January 5, 2007, upon the following:

Ron Michael Meneo, Esq.
Brian Kenney, Esq.
Early, Ludwick & Sweeney, L.L.C.
One Century Tower
265 Church Street, 11th Floor
P.O. Box 1866
New Haven, CT  06508-1866


/s/ Joseph P. Thomas