FILED
Jun 11  2 04 PH '02

UNITED STATES DISTRICT COURT,
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TRACY BOLWELL | CIVIL ACTION NO.: |
| Plaintiff | CML No.: Unassigned |
| VS. | |
| DURAMED PHARMACEUTICALS, INC.<br>BARR LABORATORIES, INC. | 302CV01001AWT |
| Defendants | JUNE 11, 2002 |

## Complaint

### Facts Common to All Counts

1. At all times relevant, including January 21, 1997, the Plaintiff, Tracy Bolwell, was a citizen of the State of Connecticut.

2 (a). At all times relevant, including January 21, 1997, the defendant, Duramed Pharmaceuticals, Inc. was a corporation and existing under the laws of the State of New York with a principal place of business located in the State of New York. The defendant has produced, manufactured sold and/or distributed prescription drug products containing the ingredient PPA with the reasonable expectation that such products would be used or consumed in the State of Connecticut, which products were so used or consumed in the State of Connecticut, and has committed the tortuous acts set forth below in the State of Connecticut.

EXHIBIT 1

2 (b). At all times relevant, including January 21, 1997, the defendant, Barr Laboratories, Inc. was a corporation organized and existing under the laws of the State of New York with a principal place of business located in the State of New York. The defendant Barr Laboratories, Inc. has produced, manufactured, sold and/or distributed over-the-counter drugs containing the ingredient PPA with the reasonable expectation that such products would be used or consumed in the State of Connecticut, which products were so used or consumed in the State of Connecticut, and has committed the tortuous acts set forth below in the State of Connecticut.

3. The matter in controversy exceeds the sum of $75,000.00 exclusive of interests and costs. This courts jurisdiction is founded on 28 U.S.C. Section 1332.

4. The defendants at all relevant times transacted business in the State of Connecticut, or so conducted itself as to subject itself to this Court's jurisdiction.

Count 1 – CGS 52-572m et seq. - Product Liability as to the Defendant Duramed.

1-4. Paragraphs 1 through 4 are incorporated herein.

5. At all times relevant, Guifenesin was a prescription cough/cold/allergy medication that contained phenylpropanolamine HCl (hereinafter "PPA") and was available for purchase by consumers, through a prescription.

6. Prior to January 21, 1997, the Plaintiff Tracy Bolwell was provided a prescription for the drug known as Guifenesin with PPA.

7. On or about January 20, 1997, the Plaintiff Tracy Bolwell ingested the recommended dosage of Guifenesin with PPA for its intended and indicated use, in the manner intended, in the manner recommended, and in a manner foreseeable by and to the Defendant.

2

8. On or about January 21, 1997, the Plaintiff Tracy Bolwell suffered a hemorrhagic stroke.

9. PPA is a sympathomimetic amine that is similar in structure and function to amphetamine and ephedrine. When ingested by humans, PPA acts as a vaso-constrictor and increases arterial blood pressure. Upon information and belief, "[I]n 1984, Americans probably consumed 5 billion doses of PPA, 75 percent contributed by cough/cold products."

10. At all times relevant, PPA was an active ingredient used in the formulation and manufacture of appetite suppressants and cold/cough/allergy medications.

11. On or about November 3, 2000, the United States Food and Drug Administration (hereinafter "FDA") notified manufacturers of OTC appetite suppressants and cold/cough/allergy medications of the following:

   a. "Earlier this year, FDA received a report entitled 'Phenylpropanolamine & Risk of Hemorrhagic Stroke: Final Report of the Hemorrhagic Stroke Project' from scientists at Yale University School of Medicine. [hereinafter the "Yale Study"]. This report, ...states that the data suggest that phenylpropanolamine increases the risk for hemorrhagic stroke."

   b. "[The FDA's] Nonprescription Drugs Advisory Committee (NDAC) determined that there is an association between...[PPA] and hemorrhagic stroke and recommended that ...[PPA] not be considered generally recognized as safe for OTC use as a nasal decongestant or for weight control."

   c. "[The] FDA intends to initiate rulemaking to classify...[PPA] as nonmongraph (not generally recognized as safe and effective) for OTC use."

3

    d.    "[The] FDA also intends to take action to remove...[PPA] from prescription drug products."

    e.    "[The] FDA plans to issue a Public Health Advisory on ...[PPA] to alert consumers and health professionals about the report."

    f.    "[The] FDA also believes that, as an interim measure to protect the public health, you should voluntarily discontinue marketing any drug products containing...[PPA]."

12. Upon information and belief, on or about September 26, 2000 and again on or about September 27, 2000, FDA analysts completed two separate reviews of the Yale Study and concluded as follows:

    a.    "It is clear in this FDA reviewers' experience that it is one of the best planned, conducted, and most thoroughly analyzed studies reviewed in the last ten years."

    b.    "Positive associations between PPA use and hemorrhagic stroke were shown in all study objectives...The strength of the associations was strengthened by the strong association found in the subset of patients with no history of hypertension. The associations suggest that PPA use is a risk factor independent of hypertension history."

    c.    "The Yale study was a well-designed case-control study with prospectively defined endpoints and appropriate statistical analyses...We consider the association with hemorrhagic stroke for cough/cold remedies as important as that for use of PPA as an appetite suppressant. FDA continues to receive spontaneous reports of hemorrhagic stroke with high-dose PPA cough/cold remedies in recent years."

4

    d.    "We conclude that high-dose PPA cough/cold remedies are associated with an increased risk of hemorrhagic stroke...In light of the potential for high dose exposure from use of any of the PPA-containing cough/cold remedies, we recommend that PPA-containing cough/cold remedies should no longer be available as over-the-counter products."

13. On or about November 6, 2000, the FDA issued a public health advisory concerning PPA in which the FDA announced:

    a.    "[The] FDA is taking steps to remove...[PPA] from all drug products..."

    b.    "[The] NDAC determined that there is an association between...[PPA] and hemorrhagic stroke and recommended that...[PPA] not be considered safe for over-the-counter use."

    c.    "[The] FDA does not consider the conditions for which...[PPA] is used (over-the-counter or by prescription) as justifying the risk of this serious event [hemorrhagic stroke]."

14. Upon information and belief, the Yale Study began in 1994 and was completed during 1999.

15. Upon information and belief, on or about May 10, 2000, the final report detailing the Yale Study was delivered to the FDA.

16. At all times relevant, the Guifenesin with PPA Defendant knew or should have known that ingestion of PPA, the active ingredient in their product Guifenesin with PPA:

    a.    is/was associated with an increased risk of hemorrhagic stroke;

5

  b.  can/did cause and/or induce hemorrhagic stroke;

  c.  is/was related to and associated with severe life-threatening complications and side effects including vasospasm, arythmia, vaso-constriction, severe elevation in blood pressure and hemorrhagic stroke.

17. At all times relevant, the Defendant was and/or should have been aware of spontaneous reports of hemorrhagic stroke suffered by persons after ingestion of PPA-containing products.

18. At all times relevant, the Defendant failed to include any warning about hemorrhagic stroke on, and/or with, and/or in, packages of their PPA-containing products.

19. The Defendant is liable and legally responsible for Plaintiff Tracy Bolwell's injuries, damages and increased health risks pursuant to the Connecticut Product Liability Act ("CPLA"), Connecticut General Statutes Section 52-572m *et seq.*, in one or more of the following ways, in that:

  a.  Guifenesin with PPA, containing the active ingredient PPA, was a defective product, thereby subjecting Plaintiff to an unreasonable risk of injury

  b.  Guifenesin with PPA, containing the active ingredient PPA, was an unreasonably dangerous product, thereby subjecting Plaintiff to an unreasonable risk of injury.

  c.  The Defendant failed to timely and adequately warn Plaintiff of the dangers and risks associated with the use of Guifenesin with PPA, containing the active ingredient PPA, thereby subjecting her to an unreasonable risk of injury.

  d.  The Defendant objectively designed its product in that it contained PPA, which causes hemorrhagic stroke; and

6

    e.    The Defendant misrepresented to consumers generally and plaintiff specifically that Guifenesin with PPA was safe and effective, when in fact defendant knew or should have known that its product was dangerous, defective and unreasonably dangerous.

20. The Defendant is a "product seller" as defined in Section 52-572m(a) of the Connecticut General Statutes.

21. As a direct and proximate result of the Defendant's violations of Section 52-572m et.seq., the Plaintiff Tracy Bolwell has sustained the following injuries and losses, some or all of which may be permanent in nature:

   a) loss of memory;
   b) blurred vision

all of which have caused the Plaintiffs to suffer great pain, anxiety, mental anguish and emotional distress.

22. As a further direct and proximate result of the Defendant's conduct and the resulting injuries to the Plaintiff Tracy Bolwell, the Plaintiff has expended and will continue to expend money for medical, hospital, and related care.

23. As a direct and proximate result of the Defendant's conduct and the resulting injuries to the Plaintiff Tracy Bolwell, the Plaintiff has sustained and will continue to sustain economic loss, including lost wages and a loss of future earning capacity.

Count 2 – CGS 52-572m et seq. - Product Liability as to the Defendant Barr Laboratories, Inc.

1-4. Paragraphs 1 through 4 are incorporated herein.

5. At all times relevant, Guifenesin was a prescription cough/cold/allergy medication that contained phenylpropanolamine HCl (hereinafter "PPA") and was available for purchase by consumers, through a prescription.

6. Prior to January 21, 1997, the Plaintiff Tracy Bolwell was provided a prescription for the drug known as Guifenesin with PPA.

7. On or about January 20, 1997, the Plaintiff Tracy Bolwell ingested the recommended dosage of Guifenesin with PPA for its intended and indicated use, in the manner intended, in the manner recommended, and in a manner foreseeable by and to the Defendant.

8. On or about January 21, 1997, the Plaintiff Tracy Bolwell suffered a hemorrhagic stroke.

9. PPA is a sympathomimetic amine that is similar in structure and function to amphetamine and ephedrine. When ingested by humans, PPA acts as a vaso-constrictor and increases arterial blood pressure. Upon information and belief, "[I]n 1984, Americans probably consumed 5 billion doses of PPA, 75 percent contributed by cough/cold products."

10. At all times relevant, PPA was an active ingredient used in the formulation and manufacture of appetite suppressants and cold/cough/allergy medications.

11. On or about November 3, 2000, the United States Food and Drug Administration (hereinafter "FDA") notified manufacturers of OTC appetite suppressants and cold/cough/allergy medications of the following:

8

a. "Earlier this year, FDA received a report entitled 'Phenylpropanolamine & Risk of Hemorrhagic Stroke: Final Report of the Hemorrhagic Stroke Project' from scientists at Yale University School of Medicine. [hereinafter the "Yale Study"]. This report, ...states that the data suggest that phenylpropanolamine increases the risk for hemorrhagic stroke."

b. "[The FDA's] Nonprescription Drugs Advisory Committee (NDAC) determined that there is an association between...[PPA] and hemorrhagic stroke and recommended that ...[PPA] not be considered generally recognized as safe for OTC use as a nasal decongestant or for weight control."

c. "[The] FDA intends to initiate rulemaking to classify...[PPA] as nonmongraph (not generally recognized as safe and effective) for OTC use."

d. "[The] FDA also intends to take action to remove...[PPA] from prescription drug products."

e. "[The] FDA plans to issue a Public Health Advisory on ...[PPA] to alert consumers and health professionals about the report."

f. "[The] FDA also believes that, as an interim measure to protect the public health, you should voluntarily discontinue marketing any drug products containing...[PPA]."

12. Upon information and belief, on or about September 26, 2000 and again on or about September 27, 2000, FDA analysts completed two separate reviews of the Yale Study and concluded as follows:

a. "It is clear in this FDA reviewers' experience that it is one of the best planned, conducted, and most thoroughly analyzed studies reviewed in the last ten years."

9

b. "Positive associations between PPA use and hemorrhagic stroke were shown in all study objectives...The strength of the associations was strengthened by the strong association found in the subset of patients with no history of hypertension. The associations suggest that PPA use is a risk factor independent of hypertension history."

c. "The Yale study was a well-designed case-control study with prospectively defined endpoints and appropriate statistical analyses...We consider the association with hemorrhagic stroke for cough/cold remedies as important as that for use of PPA as an appetite suppressant. FDA continues to receive spontaneous reports of hemorrhagic stroke with high-dose PPA cough/cold remedies in recent years."

d. "We conclude that high-dose PPA cough/cold remedies are associated with an increased risk of hemorrhagic stroke...In light of the potential for high dose exposure from use of *any* of the PPA-containing cough/cold remedies, we recommend that PPA-containing cough/cold remedies should no longer be available as over-the-counter products."

13. On or about November 6, 2000, the FDA issued a public health advisory concerning PPA in which the FDA announced:

   a. "[The] FDA is taking steps to remove...[PPA] from all drug products..."

   b. "[The] NDAC determined that there is an association between...[PPA] and hemorrhagic stroke and recommended that...[PPA] not be considered safe for over-the-counter use."

   c. "[The] FDA does not consider the conditions for which...[PPA] is used (over-the-counter or by prescription), as justifying the risk of this serious event [hemorrhagic stroke]."

14. Upon information and belief, the Yale Study began in 1994 and was completed during 1999.

15. Upon information and belief, on or about May 10, 2000, the final report detailing the Yale Study was delivered to the FDA.

16. At all times relevant, the Defendant knew or should have known that ingestion of PPA, the active ingredient in their product Guifenesin with PPA:

   a. is/was associated with an increased risk of hemorrhagic stroke;

   b. can/did cause and/or induce hemorrhagic stroke;

   c. is/was related to and associated with severe life-threatening complications and side effects including vasospasm,

11

arythmia, vaso-constriction, severe elevation in blood pressure and hemorrhagic stroke.

17. At all times relevant, the Defendant was and/or should have been aware of spontaneous reports of hemorrhagic stroke suffered by persons after ingestion of PPA-containing products.

18. At all times relevant, the Defendant failed to include any warning about hemorrhagic stroke on, and/or with, and/or in, packages of their PPA-containing products.

19. The Defendant is liable and legally responsible for Plaintiff Tracy Bolwell's injuries, damages and increased health risks pursuant to the Connecticut Product Liability Act ("CPLA"), Connecticut General Statutes Section 52-572m et seq., in one or more of the following ways, in that:

   a. Guifenesin with PPA, containing the active ingredient PPA, was a defective product, thereby subjecting Plaintiff to an unreasonable risk of injury

   b. Guifenesin with PPA, containing the active ingredient PPA, was an unreasonably dangerous product, thereby subjecting Plaintiff to an unreasonable risk of injury.

   c. The Defendant failed to timely and adequately warn Plaintiff Tracy Bolwell of the dangers and risks associated with the use of Guifenesin with PPA, containing the active ingredient PPA, thereby subjecting her to an unreasonable risk of injury.

   d. The Defendant objectively designed its product in that it contained PPA, which causes hemorrhagic stroke; and

   e. The Defendant misrepresented to consumers generally and plaintiff specifically that Guifenesin with PPA was safe and effective, when in fact defendant knew or should have known

12

that its product was dangerous, defective and unreasonably dangerous.

20. The Defendant is a "product seller" as defined in Section 52-572m(a) of the Connecticut General Statutes.

21. As a direct and proximate result of the Defendant's violations of Section 52-572m et.seq., the Plaintiff Tracy Bolwell has sustained the following injuries and losses, some or all of which may be permanent in nature:

   a) loss of memory; and
   b) blurred vision

all of which have caused the Plaintiffs to suffer great pain, anxiety, mental anguish and emotional distress.

22. As a further direct and proximate result of the Defendant's conduct and the resulting injuries to the Plaintiff, Tracy Bolwell, the Plaintiff has expended and will continue to expend money for medical, hospital, and related care.

23. As a direct and proximate result of the Defendant's conduct and the resulting injuries to the Plaintiff Tracy Bolwell, the Plaintiff has sustained and will continue to sustain economic loss, including lost wages and a loss of future earning capacity.

13

### Count 3 – CGS 52-240b – Punitive Damages - as to the Defendant, Duramed

1-23. Each of the allegations set forth above in Count 1 as Nos. 1 through 23 inclusive are incorporated herein by reference and re-alleged as if fully set forth herein.

24. The Defendant's violations of CPLA, Connecticut General Statutes Section 52-572m et.seq. were committed with reckless disregard for the safety of the Plaintiff as a product user, and as a direct and proximate consequence of this reckless disregard, the Plaintiff is entitled to punitive damages.

### Count 4 – CGS 52-240b – Punitive Damages – as to the Guifenesin with PPA Defendant, Barr Laboratories, Inc.

1-23. Each of the allegations set forth above in Count 1 as Nos. 1 through 23 inclusive are incorporated herein by reference and re-alleged as if fully set forth herein.

24. The Defendant's violations of CPLA, Connecticut General Statutes Section 52-572m et.seq. were committed with reckless disregard for the safety of the Plaintiff as a product user, and as a direct and proximate consequence of this reckless disregard, the Plaintiff is entitled to punitive damages.

### Count 5 –, CGS 42-110a et.seq. Connecticut Unfair Trade Practices Act "CUTPA" – as to the Defendant, Duramed

1-23. Each of the allegations set forth above in Count 1 as Nos. 1 through 23 inclusive are incorporated herein by reference and re-alleged as if fully set forth herein.

24. At all times relevant, the Defendant knew or should have known about case reports in peer-reviewed medical and scientific journals and other literature establishing a meaningful clinical/medical association between PPA and risk of hemorrhagic stroke.

25. At all times relevant, the Defendant knew or should have known of numerous adverse event reports on file with FDA reporting an association between PPA and cerebrovascular accidents ("CVA"s) including hemorrhagic stroke.

26. At all times relevant, the Defendant was, or should have been, aware of adverse product experience reports ("PER"s), included in their own internal safety surveillance database, establishing an association between its PPA-containing products and cerebrovascular accidents including hemorrhagic strokes.

27. At all times relevant, the Defendant had actual knowledge that formulating Guifenesin with PPA made Guifenesin unreasonably dangerous and with that knowledge continued, directly and/or indirectly, to manufacture, distribute, package, label, market, advertise, promote and sell to the unsuspecting general public.

28. At all times relevant, the Defendant, directly and indirectly, manufactured, distributed, packaged, labeled, marketed, advertised, promoted and/or sold PPA-containing Guifenesin with reckless indifference toward the safety of the foreseeable consumer, including the Plaintiff, Tracy Bolwell.

29. At all times relevant, the Defendant engaged in unfair and deceptive conduct and trade practices by directly and indirectly manufacturing, distributing, packaging, labeling, marketing, advertising, promoting and/or selling PPA-containing Guifenesin in violation of Section 21a-93 of the Connecticut General Statutes (the Connecticut Food, Drug and Cosmetic Act) by failing to warn consumers that PPA, was associated with an increased risk of hemorrhagic stroke.

30. The Guifenesin Defendant, engaged in unfair and/or deceptive acts or trade practices by directly and/or indirectly manufacturing, distributing, packaging, labeling, marketing, advertising, promoting and/or selling Guifenesin with PPA the unsuspecting Plaintiff and an unsuspecting public in violation of CGS 42a-110 et.seq.

31. As a result of the unfair and deceptive acts and trade practices of the Defendant, the Plaintiff is entitled to punitive damages and attorneys' fees pursuant to section 42a-110g(a) of the Connecticut General Statutes.

Count 6 –, CGS 42-110a et.seq. Connecticut Unfair Trade Practices Act "CUTPA" – as to the Dendant, Barr Laboratories, Inc.

1-23. Each of the allegations set forth above in Count 1 as Nos. 1 through 23 inclusive are incorporated herein by reference and re-alleged as if fully set forth herein.

24. At all times relevant, the Defendant knew or should have known about case reports in peer-reviewed medical and scientific journals and other literature establishing a meaningful clinical/medical association between PPA and risk of hemorrhagic stroke.

25. At all times relevant, the Defendant knew or should have known of numerous adverse event reports on file with FDA reporting an association between PPA and cerebrovascular accidents ("CVA"s) including hemorrhagic stroke.

26. At all times relevant, the Defendant was, or should have been, aware of adverse product experience reports ("PER"s), included in their own internal safety surveillance database, establishing an association between its PPA-containing products and cerebrovascular accidents including hemorrhagic strokes.

16

27. At all times relevant, the Defendant had actual knowledge that formulating Guifenesin with PPA made Guifenesin unreasonably dangerous and with that knowledge continued, directly and/or indirectly, to manufacture, distribute, package, label, market, advertise, promote and sell to the unsuspecting general public.

28. At all times relevant, the Defendant, directly and indirectly, manufactured, distributed, packaged, labeled, marketed, advertised, promoted and/or sold PPA-containing Guifenesin with reckless indifference toward the safety of the foreseeable consumer, including the Plaintiff, Tracy Bolwell.

29. At all times relevant, the Defendant engaged in unfair and deceptive conduct and trade practices by directly and indirectly manufacturing, distributing, packaging, labeling, marketing, advertising, promoting and/or selling PPA-containing Guifenesin in violation of Section 21a-93 of the Connecticut General Statutes (the Connecticut Food, Drug and Cosmetic Act) by failing to warn consumers that PPA, was associated with an increased risk of hemorrhagic stroke.

30. The Guifenesin Defendant, engaged in unfair and/or deceptive acts or trade practices by directly and/or indirectly manufacturing, distributing, packaging, labeling, marketing, advertising, promoting and/or selling Guifenesin with PPA the unsuspecting Plaintiff and an unsuspecting public in violation of CGS 42a-110 et.seq.

31. As a result of the unfair and deceptive acts and trade practices of the Defendant, the Plaintiff is entitled to punitive damages and attorneys' fees pursuant to section 42a-110g(a) of the Connecticut General Statutes.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TRACY BOLWELL                                CIVIL ACTION NO.:

        Plaintiff                          CML No.: Unassigned

VS.

DURAMED PHARMACEUTICALS, INC.
BARR LABORATORIES, INC.

        Defendants                         JUNE 11, 2002

WHEREFORE, the plaintiff, Tracy Bolwell claims as against the defendant:

1. On the First Count and Second Count:

    a)    Full, fair and just money damages;
    b)    Punitive Damages;

2. On the Third Count and Fourth Count

    a)    Full, fair and just money damages;
    b)    Punitive damages and exemplary damages pursuant to Connecticut General Statutes § 52-240;

3. On the Fifth Count and Sixth Count

    a)    Full, fair and just money damages

    b)    Punitive damages and Attorneys' Fees pursuant to Connecticut General §42-110 et. seq.;

4. On All Counts:

    a)    Costs of this action; and,

    b)    All such additional relief that this Court deems appropriate.

5. Such other and further relief to which plaintiff is entitled.

Plaintiff claims a trial by jury as to all issues so triable.

THE PLAINTIFF

BY: _____
Michael J. Luzzi, Esquire
Early, Ludwick & Sweeney, L.L.C.
265 Church Street, 11th Floor
P.O. Box 1866
New Haven, CT 06508-1866
Telephone No: (203) 777-7799
Federal Bar No: CT 12518

Q/mikel/pleading/bolwellcomplaint