UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

TRACY BOLWELL,

Plaintiff,

-against-

DURAMED PHARMACEUTICALS, INC. & BARR LABORATORIES, INC.,

Defendants.

---

Pertains to Civil Action
Case No. 3:02-CV1001 (AWT)

- 0 -

The deposition of MARK KUPFERSCHMID, taken before Sadie Herbert, Court Reporter and Notary Public, at the offices of Early, Ludwick, Sweeney & Strauss, 265 Church Street, New Haven, Connecticut, on the 7th day of June, 2006, beginning at the hour of 3:00 p.m.

- 0 -

TAMMY G. LOY, CVR-CM

Certified Court Reporter

1500 East College Way

Suite A-378

Mount Vernon, WA 98273

(360)941-5800

EXHIBIT
F
Blumberg No. 5119

Page 2

APPEARANCES:

EARLY, LUDWICK, SWEENEY & STRAUSS
265 Church Street
PO Box 1866
New Haven, Connecticut 06508-1866
On behalf of the Plaintiff;
BY: BRIAN P. KENNEY, ESQ.

ULMER, BERNE, LLP.
600 Vine Street
Suite 2800
Cincinnati, Ohio 45202-2409
On behalf of the Defendants;
BY: JEFFREY D. GEOPPINGER, ESQ.

ALSO PRESENT:
DENA JAMES, Early, Ludwick, Sweeney & Strauss

Page 3

WITNESS INDEX

WITNESS: MARK KUPFERSCHMID

BY MR. GEOPPINGER............................PAGE 5

EXHIBIT INDEX

| DEFENDANT | | IDN |
|---|---|---|
| 1 | Notice of Deposition, 4 pages | 84 |
| 2 | Physician's notes, 3 pages | 84 |
| 3 | Physician's handwritten notes | 91 |
| 4 | Discharge Summary, 2 pages | 95 |
| 5 | Vassar Brothers medical record | 97 |

Page 4

STIPULATIONS

It is stipulated and agreed that all objections, except as to the form of the question, shall be reserved to the time of the trial.

It is further stipulated and agreed that the witness' deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

Page 5

MARK KUPFERSCHMID,
(first duly sworn by the Notary Public, was examined and testified as follows:)

BY MR. GEOPPINGER:

Q. Good afternoon, Mr. Kupferschmid. Am I pronouncing that right?

A. Close enough.

Q. Do you mind if I call you Mark?

A. Just call me Mark, that is fine.

Q. Mark, my name is Jeff Geoppinger, I represent the defendants in this case, Duramed Pharmaceuticals and Barr Laboratories. We are here to take your deposition in the case of Tracy Bolwell-Frenette against my clients.

Before we get started, I just want to give you a few ground rules.

Let me ask you first, have you ever had a deposition taken before?

A. Twice.

Q. So you have some understanding of how this proceeding is going to work?

A. Pretty much, I mean, it might be a little different because I know the auto industry has a little more flexibility with talking and things of that nature.

789157db-8709-44a4-9fad-a2f12eaccb07

Q. You may have alluded to this, what were the circumstances under which you met?
A. She used to see me every now and again. I actually was living in Florida then, would fly back and forth. Like, who is the guy showing up in the coffee shop running the place for a couple weeks at a clip and then leaving again, basically that's the way it went.
Q. What were you doing living in Florida at that time?
A. What was I doing?
Q. Yes.
A. I was running a restaurant down there.
Q. What restaurant did you run there?
A. Cuisine Management. Under their umbrella, we did catering, a whole bunch of stuff.
I originally went down there to open up a pizzeria with a friend of a friend. He asked me to come down and help out. It was called The Pizza Factory. That's what got me down to Naples, that area.
Q. How long were you in Florida?
A. I lived there for about 4 or 5 years.
Q. Were you living in Florida when Tracy and you were married?
A. No.

Q. Do you recall when you were married, Tracy and yourself?
A. '94, I guess, '94, '93; '93 or '94.
Q. And you had returned from Florida prior to your wedding?
A. Yeah.
Q. Where were you and Tracy living when you got married?
A. I want to say that we were already in the house. I believe we were. I am not positive. I cannot really remember that, but I think we were already in the house.
Q. Would that be the house on Camelot --
A. On Camelot, yes, but that's a tough one. I want to say that's where we were.
Q. I understand it was quite some time --
A. It was a whole lifetime ago it seems. I will do the best I can to remember.
Q. I appreciate that.
Did you live together before you were married?
A. Yes.
Q. Do you recall how long you lived together before you were married?
A. I don't. I would probably say a year, maybe somewhere in that area.

Q. At the time you were married, was Tracy a smoker?
A. Yes.
Q. Do you recall where you got married?
A. In Cold Spring. I want to say "Colony Manor" is the name of it. I don't remember the name of it, something like that.
Q. Where is that located?
A. Cold Spring, New York.
Q. You had one child; is that correct?
A. Right.
Q. What is your child's name?
A. Ryan.
Q. You have no other children with Tracy?
A. No.
Q. Does Tracy have any other children?
A. No, at least not to my knowledge.
Q. Do you recall how long you were married?
A. Maybe, 2 plus years, somewhere around there.
Q. Can you tell me, why did you get divorced?
A. A different person after everything that she went through, honestly. She didn't know she even had a son for six months let alone a man she had been sleeping with for four years. So honestly, we didn't have much in common any more.

We tried; we went to counseling. It didn't work out. She decided she didn't want to keep trying any more, and I was pretty much on board with that. It was a long drawn out year after her illness, so...
Q. Prior to what she went through; what do you mean what she went through; what are you referring to?
A. Referring to the stroke or whatever they diagnosed that as; her time at New Haven Hospital?
Q. Prior to her stroke, did you have any marital difficulties?
A. No, not really, the usual bicker back and forth, but nothing that I think would drive us to the point where we went.
Q. Had she ever threatened divorce prior to her stroke?
A. No.
Q. Had that ever been discussed?
A. No.
Q. Had there ever been any domestic violence calls prior to the stroke?
A. Domestic violence, no.
Q. You said you went through some counseling; is that correct?
A. Yes.
Q. When did that occur?

A. I don't. I am trying to think if there was a local place that we would use up in -- so I would probably say one of the supermarkets or something like that.
Q. I can check her records.
Do you know the doctor who prescribed it?
A. I don't.
Q. If I mentioned a doctor "Cavarrano" or "Cavalarro," does that ring a bell?
A. The name sounds familiar.
Q. Is that a doctor you ever saw?
A. "Cavalarro," it rings a bell. I don't really remember, honestly.
Q. Is it your recollection that she received the prescription for the medication at issue on the day she had the stroke?
A. Yes.
Q. Do you know how many doses of the medication at issue she took before she had the stroke?
A. I don't. I want to say one, I do, but I don't know if that is fact.
Q. At some point in time, did you have discussions with her about all of this; do you recall?
A. With her, probably not. I brought the bottle. You know, I looked at the bottle. They asked me what she

was taking. So obviously, I told them what she had been taking.
Q. Do you know if she took anything with the medication at issue in this case?
A. With it?
Q. Yes.
A. No, I have no idea.
Q. Do you know where she took it?
A. I am assuming she took it at home.
Q. You weren't at home when she took the medication at issue?
A. I was not home at the time.
Q. Do you know if there was anybody there to witness her take the medication at issue?
A. Just Ryan.
Q. Your son who was a year old at the time?
A. Yeah.
Q. Do you know if she took any other medication on the day of her stroke other than the product at issue?
A. I don't.
Q. On the day of Tracy's stroke, did you go to work?
A. Yes.
Q. So it is safe to assume it was probably a weekday that it occurred?

A. Yes.
Q. Do you recall what day of the week it was?
A. No.
Q. On that day, do you recall what time you went to work?
A. I'd say early in the morning, probably in the 6 o'clock hour.
Q. Did you see Tracy before you left for work that morning?
A. Yes, of course.
Q. Was she up out of bed at that time?
A. I don't know. I saw her.
Q. You saw her in one capacity or another?
A. We talked. She used to make me an english muffin in the morning. So you know -- I know she wasn't feeling well.
Q. That was my next question. Do you recall anything about how she was feeling that morning?
A. She was sick; she was definitely sick.
Q. After you had left for work, did you see -- well, when was the next time you saw her that day?
A. The next time I saw her that day was coming home from work.
Q. Did you talk to her during the interim, do you recall?
A. I don't recall.

Q. Do you know anything about her visit to the doctor that day to get the prescription medication at issue in this case?
A. Not really, no.
Q. Do you know anything else she did that day prior to her stroke other than going to the doctor?
A. No, not really.
Q. What time did you return home from work that day, do you recall?
A. I would probably say in the vicinity of the 5 or 6 o'clock range, somewhere around there I would say.
Q. Do you recall what you were doing, what your job was at that time?
A. That was at Drake Bakeries.
Q. What happened when you returned home?
A. I got home and walked in the house, knew something was wrong. She was knocking over lamps, which is something that always sticks in my mind because she said the light was bothering her eyes really bad.
Q. What did you do?
A. I called my in-laws and said get on down here and threw her in the car and drove to Vassar Brothers Hospital.
Q. Did you go right to the hospital or was there a period

word assume. It's on the sheet, you know, so...
Q. But at some point in time, you did report -- you recall reporting to some of Tracy's health care providers regarding medications she had taken; is that correct?
A. Yes.
Q. My point is that when somebody wrote spouse here, this isn't something someone made up; you were involved in her care and providing medication --
A. Absolutely. I am sure there was a point I brought in all her medications. Whether these were the medications or not, I have no idea.
Q. Do you know where any medications you may have brought into the hospital are today?
A. No.
Q. You don't have any in your possession?
A. My possession, no.
Q. Have you ever seen a doctor by the name of Dr. Pedevillano?
A. Pedevillano?
Q. Yes.
A. In Poughkeepsie, yes. He was their family doctor, and I went to him a few times.
Q. Did you ever accompany Tracy to any appointments she

had with Dr. Pedevillano?
A. I would probably say over the course of our marriage, yes.
Q. Do you have any specific recollection of any of those appointments?
A. No.
Q. Other than speaking with Tracy, did you speak with anyone else about your deposition here today, before coming here?
A. No. (Pause.) Let me correct that, I spoke to my brother about it. No legal thing, just what are you going there for. That was it. Nothing as far as what to say or what to do. It was a lot more than I thought it was going to be; I will tell you that. My head is spinning.
Q. Have you ever had your son genetically tested for any brain conditions --
A. No.
Q. -- or any genetic-type testings whatsoever?
A. No.
MR. GEOPPINGER: Let's go off the record for a moment.
(A discussion was held off the record.)
BY MR. GEOPPINGER:

Q. Mark, we are back on the record. I just have a few very short questions for you.
Did Tracy ever make any reports of domestic abuse to any authorities?
A. Not to my knowledge.
Q. The person you were in a relationship with following your separation agreement from Tracy, what was her name?
A. I have no idea.
Q. It was not your present wife, Angela?
A. Oh, no, the list was long and distinguishing. I have no idea.
Q. Do you have any agreement with Tracy to share any proceeds she may receive from this lawsuit?
A. No.
MR. GEOPPINGER: That is all the questions I have. Thank you.
Do you have anything?
MR. KENNEY: I have nothing at this time, no. Thank you.
(Whereupon, the examination of MARK KUPFERSCHMID in the above-entitled matter concluded at 5:46 p.m.)
* * * * *

STATE OF )
ss.
COUNTY OF )

I, MARK KUPFERSCHMID, have read the foregoing record of my testimony taken at the time and place noted in the heading hereof, and do hereby acknowledge it to be a true and accurate transcript of same.

______________________________
MARK KUPFERSCHMID

DATED: __________________

Sworn to before me this ________
day of ________________, 20____

______________________________
Notary Public

789157db-8709-44a4-9fad-a2f12eaccb07

CERTIFICATION

I, SADIE L. HERBERT, Shorthand Reporter and Notary Public in and for the State of New York, do hereby CERTIFY that the foregoing record taken by me at the date and place noted in the heading hereof is a true and accurate transcript of same, to the best of my ability and belief.

______________________________

SADIE L. HERBERT

Dated: June 7, 2006

789157db-8709-44a4-9fad-a2f12eaccb07