# EXPERT REPORT OF JAMES MORRISON

1.    I have been retained by defendants Duramed Pharmaceuticals, Inc., and Barr Laboratories, Inc., to render expert opinions in this matter. I have been a consultant and expert in drug regulatory matters for three years. Before that I held a variety of positions with the U.S. Food and Drug Administration (FDA) for thirty-seven years, including senior management positions, all dealing with the regulation of drugs. My training and experience are listed in my resumé (attached as Appendix A), along with a list of all publications that I have authored or co-authored within the preceding ten years and a list of all cases in which I testified or was deposed in the past four years. My fee for consultation, preparation, deposition and testimony is $440 per hour or $4000 per day for work outside the Washington, DC/Baltimore, MD area.

2.    In addition to my resumé, there is some relevant background experience that I would like to note. As a compliance officer in the Bureau of Drugs, I made recommendations and decisions regarding the new drug status of products, and reviewed and recommended action on proposed legal actions against drug products, firms and individuals on drug regulatory issues, including new drug charges. As Director, Regulatory Affairs Staff in the FDA's Bureau of Drugs, I co-chaired a standing committee that reviewed and recommended action on Drug Efficacy Study Implementation (DESI) drugs and issues. I also designed a program to address the status of thousands of unapproved marketed drugs. As Deputy Director, Office of Drug Standards, I was the FDA's primary contact and negotiator with the Congress in drafting the Hatch-Waxman Amendments of

EXHIBIT

N

Blumberg No. 5119

1984, which enabled the marketing of generic versions of drugs first approved after 1962. I chaired the committee that drafted the FDA's regulations implementing that law and edited those regulations. I also chaired a committee charged with investigating reported therapeutic failures of generic drug products. As Special Assistant to the Bureau Director and later as Ombudsman and Senior Advisor to the Director of the Center for Drug Evaluation and Research (CDER), I participated in and chaired committees charged with evaluating adverse event reports, investigating and recommending action on various products that posed potential health threats, including methapyrilene, a nonprescription ingredient in cold medicines.

3.      The attached Appendix B lists all documents I relied on in formulating my opinions, in addition to my education, knowledge and experience.

SUMMARY OF OPINIONS

4.      In this report, I opine that Duramed should not and could not have legally changed the labeling of its phenylpropanolamine hydrochloride (PPA) and guaifenesin long acting product to warn of any potential for PPA to cause strokes or to suggest that it may cause strokes before Tracey Bolwell purchased and used the product on January 27, 1997. The FDA requires that labeling for generic drug products must be the same as that of the innovator products they are copying, so in 1997 Duramed was constrained by the wording of the labeling of Entex LA by Dura Pharmaceuticals, Inc., the innovator's product. In addition, I opine that at that time the FDA had not yet determined that PPA was unsafe, nor was the Yale study on which the FDA's 2000 recommendation to remove PPA from the market completed. In addition, the FDA did not find that adverse event reports (AERs) that

existed prior to 2000 provided a sound, scientific basis for adding warnings to PPA labeling regarding stroke.

## STATEMENT OF OPINIONS

### *History of FDA's New Drug Approval Process*

5.    To understand the marketing history of the product in this case, a generic version of an extended release prescription cold medicine containing PPA and guaifenesin, it is important to discuss briefly the history of the FDA's requirements for the marketing of drug products.

6.    In 1938, the first provisions in the Federal Food Drug and Cosmetic Act (FDCA) requiring preclearance of drug products prior to marketing were enacted. That regulatory system required manufacturers of new drugs to submit data to the FDA demonstrating that the product was safe. If the FDA did not object within sixty days, the product was deemed to have "permitted" status and could be marketed. Products that were already on the market before 1938 were "grandfathered" and could remain on the market without any data being submitted to the FDA. In addition, products that were similar to those that had gone through the FDA vetting process between 1938 and 1962 were deemed by the FDA to be "not new drugs" and could be marketed without submitting anything to the agency. As I recall, by 1984, about six thousand such prescription drug products were not the subject of approved New Drug Applications (NDAs) or Abbreviated NDAs (ANDAs) but were permitted by the FDA to be marketed under some grandfather or similar bases, according to information compiled by the FDA in response to a request from a House Oversight Subcommittee. From the FDA's National Drug Code Directory, I estimate that at least fifteen hundred such drug products are still on the market.

3

7.    Further, most OTC drug products have never gone through the FDA new drug approval process. Those OTC drug products number in the tens of thousands. Most of those OTC drug products are marketed in accordance with OTC drug monographs, which I will discuss later.

8.    In 1976, the FDA issued a Compliance Policy Guide (CPG) titled "Marketed New Drugs Without Approved NDAs or ANDAs" (later revised several times, in 1981, 1984, 1987, 1995 and 2003). This guide, in its revised form, describes how the FDA will decide whether to take action against products that are on the market but which do not have approved NDAs or ANDAs. The CPG dealt with how the agency would prioritize its activities in bringing the thousands of products into the new drug system. In essence, the CPG stated that the FDA would seek either to bring these prescription drug products into the new drug system or to remove them from the market if they presented the potential for unreasonable safety risks, they lacked evidence of effectiveness, or they were a health fraud. While there have been a few health fraud cases brought by the FDA, most of the activity with these drug products has been in the area of the first priority, safety.

9.    In 1962, the FDCA was amended to require a manufacturer of a new drug product to apply to the FDA for permission to market the product. In addition to safety information, data demonstrating the effectiveness of the product based on scientifically sound, clinical studies had to be submitted to the FDA.[1] The FDA had to approve the new drug application (NDA) before marketing could begin. The 1962 amendments also required the FDA to evaluate all drug products marketed between 1938 and 1962 for effectiveness. The FDA's program to conduct this retrospective review was called the Drug Efficacy Study Implementation Program (DESI).

---

[1] 21 U.S.C. 355(b)

10.    The DESI process entailed a review for effectiveness of the some four thousand named products that had previously been reviewed only for safety.  This review was based on effectiveness data submitted by the manufacturers to panels of experts from the National Academy of Sciences/National Research Council.  As drugs were found to be effective under DESI, the FDA needed a mechanism to deal with the ten or more marketed products that were similar to each of the named DESI drug products.  In 1968, the FDA withdrew the "not new drug" status of these similar products[2] and began publishing in the Federal Register DESI Notices, setting forth the specific requirements for products identical or similar to the effective DESI drugs.  Manufacturers of these identical or similar products described in the DESI Notices could then rely on the finding of safety and effectiveness of the DESI products to submit to the FDA what was called an abbreviated new drug application (ANDA) for their products, which in some cases had to be reformulated to meet the DESI specifications.  The ANDA contained information on the ingredients used in the product, how the product was manufactured, what controls were used to assure stability, quality and purity, and, beginning in the late 1970's, data to show the product delivered the active ingredient to the same extent and at the same rate as the DESI named product it was copying.  For some DESI drugs, especially those whose ingredients were also marketed in nonprescription products, including products containing PPA, FDA's evaluation of the effectiveness of these prescription drug products were deferred to a comprehensive review of nonprescription or Over-the-Counter (OTC) drugs.

***The OTC Drug Review***

11.    Beginning in 1972, the FDA established a system similar to DESI for nonprescription drugs.  Most OTC drugs had been on the market for a long time and had

---

[2] 21 CFR 310.100

never been evaluated for safety or effectiveness. As with DESI, expert panels were convened to evaluate the OTC drugs for effectiveness and also for safety. From that evaluation, monographs which set conditions for the marketing of drug products containing active ingredients found to be generally recognized as safe and effective for OTC use were prepared and published. These monographs specify which ingredients at what dosages can be in OTC drugs, what they can be offered to treat, how they should be dosed and used, and what warnings should appear on the labels. In 1976, the expert panel reviewing cough and cold drugs found phenylpropanolamine (PPA) to be generally recognized as safe and effective for OTC use.[3] Later, an expert panel reviewing weight reduction OTC drug products found PPA to be generally recognized as safe and effective for weight loss.[4] However, in 1985, the FDA determined that more information would be required to determine that PPA was generally recognized as safe for OTC use.[5] The FDA's stated concern that prompted it to not follow the expert panels' recommendations on PPA and to require more information was study results and reports of blood pressure elevation caused by PPA. The OTC review entails lengthy procedures, and it is not yet finished for all OTC drugs to date.

***FDA's New Drug Approval Process***

14.   Section 505 of the FDCA requires that most prescription and new nonprescription drug products must be approved by the FDA before they can be marketed in the US. For active drug ingredients, combinations, routes of administration or dosage forms that have not previously been approved, the FDA requires that a New Drug Application (NDA) be submitted by the sponsor and be approved by the FDA before they

---

[3] 41 FR 38400, September 9, 1976.
[4] 47 FR 8484, February 26, 1982.
[5] 50 FR 2221, January 15, 1985.

6

can be marketed. The sponsor of such a drug product must show that the product is both safe and effective when used in accordance with its proposed labeling.[6]

*Generic Drugs and Labeling*

13.    Once a new prescription drug product has been approved, and usually after patent or other exclusive marketing periods have expired, generic versions of that product can be approved by the FDA for marketing through an Abbreviated New Drug Application (ANDA) process. The requirements for the ANDA process are less onerous than for full NDA's, because the safety and effectiveness of the active ingredients do not need to be reproved. The ANDA requirements are spelled out in Section 505(j) of the Act and in FDA regulations (21 CFR 314).

14.    In general, data required for an ANDA include: chemistry (stability, quality testing procedures, characterization of ingredients, etc.), manufacturing (types of equipment used, mixing times, batch records, reprocessing procedures, etc.), and studies to show the generic and brand name products are available in the body to the same extent and at the same rate. The FDA regulations[7] require that the labeling for the generic drug be identical to that of the brand name drug except for different names of the product and manufacturer and certain specified differences that are not relevant to this case. There is no provision in the regulations for changes in warning statements in generic drug labeling. Any changes by a generic drug manufacturer to its product's labeled warning, contraindication, precaution or adverse reaction statements would violate the regulations and would be inconsistent with the concept of generic drugs.

---

[6] The term 'labeling' used throughout this document is used in the regulatory context of all printed, written, graphic or electronic material distributed with or intended by the manufacturer or seller to be seen by the prescriber or user of the product, including advertising for the product.
[7] 21 CFR 314.94(a)(8)(iv).

15.    Generic drugs are intended to be less costly copies of brand name drugs. They can be less expensive, because the generic manufacturers do not need to invest large sums in the development of new drugs or in the demonstration of their safety and effectiveness, because the innovator has already established their safety and effectiveness through clinical studies. According to a recent estimate, it costs a drug company over $800 million to bring a new drug from identification, synthesis, through animal and clinical testing, the FDA review process and to market.[8] Because of the large investment in research by innovator drug companies, they have staffs of scientists, including those devoted to monitoring experience with the drug after it is marketed, in addition to large marketing staffs that have the capability of directly interacting with prescribing physicians and pharmacists. Generic drug manufacturers, on the other hand, have relatively small scientific staffs and usually very small marketing departments who do not routinely contact physicians or pharmacists directly.

16.    These differences in the resources of innovator and generic drug companies are well recognized by the Congress and the FDA. Therefore, the regulatory requirements by the FDA for generic drug marketers are substantially less than for innovator companies. For example, NDA holders are required to submit periodic reports to the FDA that analyze adverse event reports (AERs) received for the drug and that update world-wide literature reports of adverse experiences with the drug. Generic drug manufacturers, on the other hand, are required to submit only AERs received for their specific generic drug products. Thus, although both innovator and generic drug companies are required to report serious and unexpected adverse events, most of the burden of reporting and analyzing such adverse

---

[8] A. DiMasi, R.W. Hansen, and H.G. Grabowski, "The Price of Innovation: New Estimates of Drug Development Costs," *Journal of Health Economics* 22 (2003): 151-185.

8

event reports naturally falls to innovator firms. Because most of these reports occur during the period when the innovator's product is the only one marketed, most adverse event reports are evaluated, investigated and reported to the FDA by the innovator. It would be unreasonable to expect generic companies to each shoulder the burden of analyzing all adverse event reports, regardless of whose product is involved, for all the drugs they make. This is true for a variety of reasons.    First, most reports come to the brand name manufacturer or directly to the FDA.   Second, after a drug is eligible for generic competition (after patents have expired), there is usually sufficient marketing experience with the drug so that the discovery of unexpected, serious adverse events associated with the product is rare.   Third, since many generic drug companies market over a hundred products, it would be unreasonable to expect them to perform exhaustive epidemiological evaluations on each drug.   Therefore, FDA guidance provides that each application holder is responsible for receiving, evaluating and reporting only the products covered by that specific application.[9]   In addition, marketers of drug products that are not the subject of approved NDAs and ANDAs are also responsible for sending to the FDA reports of unexpected, serious adverse events relating to their products.   In the current matter, I reviewed AERs in Duramed's files and noted no AERs for strokes related to its product prior to 1997.

***Drug Products Marketed without Approved Applications***

          17.      As I discussed in the *History of the FDA's New Drug Approval Process* (paragraph 6, above), there are hundreds or even thousands of drug products that are on the market in the United States without FDA approved applications.   Among them were some

---

[9] Draft Guidance for Industry: Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines. March 2001.

products containing PPA. There are a variety of reasons the FDA may permit such products to be marketed. Among these reasons are the following:

18.    Grandfather status:  Both the Food Drug and Cosmetic Act of 1938 and its amendments of 1962 contained clauses which grandfathered existing products meeting certain criteria. The FDA does not formally grant grandfather status. It is something that can be claimed by manufacturers of drugs, and the appropriateness of such a status is determined on a case-by-case basis.

19.    General recognition:  Another reason that a manufacturer may market a drug without FDA approval is that it is generally recognized as safe and effective. The definition of "new drug" in the Act[10] affirms that a drug product does not require approval if, when it was initially marketed, it was generally recognized as safe and effective by experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs.[11]

20.    DESI and OTC deferred drugs:  The 1962 amendments to the Act gave the FDA authority to review for effectiveness all drugs that had undergone a safety review and been permitted[12] on the market by the agency between 1938 and 1962. The FDA performed the mandated review in what was called the Drug Efficacy Study Implementation (DESI). While only the 4000 drug products with deemed approved applications (named DESI drugs) were reviewed for effectiveness, for each of these products, there were, on average, more than ten "identical, similar or related" products on the market. These products were not covered by any applications, but they were included in

---

[10] U.S.C.A. 321(p)(2).
[11] U.S.C.A. 321(p)(1).
[12] The 1938 Act did not entail "approval" of drugs by the FDA. Instead, applicants submitted safety data on proposed drug products, and if the FDA did not disapprove the application within 60 days, the product was deemed approved, and "permitted" on the market.

the DESI process as it was implemented. For named DESI products found to be effective and those determined to be identical, similar or related to them, the FDA provided for a new approval under an Abbreviated New Drug Application (basically the same ANDA that exists now under the Hatch-Waxman Amendment). The review of some DESI named drugs was deferred, for example, to the comprehensive OTC review process, which began in 1972 and is still ongoing today. Some products that were identical, similar or related to the DESI deferred products are still on the market without approval, pending a final determination by the FDA.

21.    In some cases, the FDA simply did not make a decision on the status of a drug because the agency did not have sufficient information to do so. While the FDA was considering the status of such products, it permitted their continued marketing. PPA belonged in this category until 2000. The FDA is required by the Administrative Procedures Act and by the federal courts to avoid being arbitrary and capricious in its regulation of drugs. Therefore, the agency takes great pains to regulate drugs as classes and not to take action against one type of product while leaving a very similar product unaffected. In cases such as PPA, which was present in prescription and nonprescription products as a nasal decongestant or weight loss ingredient and in varying dosages, the FDA takes action only when it believes there is substantial, scientific data to support a regulatory action. It is noteworthy that in 1982, when the FDA was still evaluating the safety of PPA, it approved an NDA for Tavist-D, which contained PPA. In 1996, the FDA approved another NDA for Tavist-D. This indicates that the FDA was not so concerned about the safety of PPA that it could not reaffirm the safety and effectiveness of PPA products at those times. It was not until 2000, after PPA had been on the market for decades, that the

FDA felt there was sufficient evidence to make a regulatory decision recommending withdrawal of PPA products from the market.

***PPA Product Manufacturers' Responsibility for Revising Labeling to Add Warnings***

22.    For several decades the FDA was aware of a number of AERs, some involving elevated blood pressure and strokes, associated with the use of PPA containing products. However, the existence of AERs does not constitute a sound scientific basis for determining a cause-and-effect relationship between the events and a drug. Drug companies, especially manufacturers of generic drug products, look to the FDA to make determinations about what changes, if any, to the labeling of drug products should be made. The FDA regards drug labeling as an essential part of the safe use of drugs, and it does not permit companies to change the labeling of drug products, especially generic drug products, without its concurrence. If drug companies were given license to change product labeling in response to isolated reports of adverse events associated with multi-source products, serious confusion would result, and FDA's role as the primary drug regulator in the US would be undermined. Further, if companies added warnings or otherwise made labeling changes based on anecdotal information contained in AERs, the additional labeling statements, not based on sound scientific information, would expand the length of drug labeling and dilute the effect of warnings that are appropriately in the labeling. It is useful to discuss in greater detail the adverse event monitoring system used by the FDA, the role of drug manufacturers in it, and the problems associated with drawing conclusions from the data in the system.

***The FDA's System for Monitoring Adverse Event Reports***

23.    The FDA maintains a system whereby consumers and health professionals

12

may report adverse events they have experienced or seen first-hand. The FDA receives approximately 300,000 such reports annually. That system is called MedWatch, and its database is called AERS. For drug and biological products, reports to the system are voluntary. Although most major drug regulatory agencies around the world use such systems, these spontaneous reporting systems have known limitations, including those described below:

24.     <u>Variable reporting rates</u>:  Because reporting is voluntary, there are varying degrees of reporting of adverse events. The reporting varies because of a number of factors, including: whether the consumer or health professional notes an association between the adverse event and the use of the product, and whether there are disincentives or incentives for health professionals and consumers to submit reports.

25.     Whether an adverse event is recognized as associated with a product depends in part on whether the health professional or consumer expects that such a reaction would be likely to occur. That expectation is strongly influenced by history and publicity. For example, the thalidomide disaster in Europe in the early 1960's was caused by mothers taking a newly approved drug, thalidomide, which was used to treat morning sickness. As a result, thousands of babies in Europe were born missing limbs. When I investigated a potential causation of limb reduction birth defects by the drug Bendectin, which was marketed in the 1970's for morning sickness, I was told by experts at the Centers for Disease Control[13] that there was a several-fold increased reporting rate of such defects associated with drugs because of the past association between limb defects and thalidomide. This is consistent with my training and experience in analyzing adverse event reporting. Similarly, when there are news stories that associate deaths and serious injuries

---

[13] Conference call from Dr. J. Richard Crout and me at the FDA to Dr. Oakley and others at CDC.

with a particular product, there is likely to be an increase in reports to the FDA of associations with similar products. The increase in reports is seen, regardless of whether the media stories attributing a causal link between the product and the death are accurate or not.

26.    Lack of numerator and denominator: Another weakness of the spontaneous reporting system is that the total number of actual adverse events associated with a product is not known, nor is the number of marketed units of the product that were used at the time of any given event known. This is especially true if sales of the product are increasing or decreasing rapidly. Thus, the raw number of adverse events reported for a product over time does not convey an accurate picture of what is happening with the product. For example, if reports are increasing over time, the increase might reflect increased sales of the product or an increasing health problem, or neither.

27.    Association is not the same as causation: Even if the number of units sold were known accurately and the number of actual adverse events were also known, there would still be the problem of determining whether the association is mere chance or whether it really demonstrates causality. This is particularly true with widely used products, such as PPA or adverse events that occur at a significant rate in nature, such as elevated blood pressure or strokes.

28.    Quality of data in the system: The AERS system suffers from a chronic problem of incomplete data submitted with reports. Accurate information on concomitant medication used by the patient, how much of the product was consumed and for how long may be missing. Sometimes the reporting physician does not know the complete information. When adverse event reports on drug products come to the FDA, the CDER

14

Drug Safety staff evaluates them as to their potential significance. If the report involves serious, unexpected events, a staff member reviews the report to determine if all needed data are included. If it is not complete, the staff member contacts the reporter to try to obtain the missing data. Even the follow-up calls may not elicit sufficiently complete information to make the report useful.

29.    Because of these factors, spontaneous reporting systems such as FDA's MedWatch are viewed primarily as tools to flag potential problems with drugs and other medical products and to generate hypotheses for further study. It would be extremely unusual and unscientific for the FDA to take regulatory action against a product based solely on AERS data. I cannot recall a single case in which the agency took regulatory action (including the requirement of new label warnings) based on adverse event reports alone. To make a sound regulatory decision relating to the safety of an ingredient or product, the FDA typically looks for information from clinical or epidemiological studies. In the case of PPA, the FDA did not believe the information it had, including AERs, was sufficient,[14] and in 1991 it met with drug industry representatives to plan an epidemiological study of PPA. That study was not completed until 2000. It was on the basis of the data from that study that the FDA announced in a Public Health Advisory dated November 6, 2000 that it was recommending that PPA be removed from all drug products for all uses.

30.    In 1987 Duramed received a letter from the FDA acknowledging the marketing of its generic extended release PPA and guaifenesin product and permitting its continued marketing. That FDA permission was based on Duramed's product and labeling being identical to those of the innovator's product, Entex LA, that was marketed before

---

[14] See 66 FR 42667, August 14, 2001.

15

1984. In the absence of a change in the innovator's labeling or of the FDA reaching an adverse decision on PPA's safety, there would be no reason for Duramed to change its labeling, nor would there be a regulatory basis for it doing so. Until 2000, well after Ms. Bolwell's stroke that precipitated the current case, it would have been impossible for any PPA drug manufacturer to make an informed decision about proposing to the FDA that its labeling should be changed to warn against the possibility of hemorrhagic stroke with the use of its PPA product. Moreover, in my opinion, the FDA if asked by Duramed would not have permitted Duramed to change the labeling for its PPA containing products to warn about stroke as a possible side effect. I conclude that to make any premature changes to the labeling of Duramed's PPA product would have been illegal and scientifically unsound, and a reasonably prudent PPA product manufacturer would not have made such a change.

Dated ___7/25/06___    Signed _____
                                    James C. Morrison

BERYL D. LITTLE
NOTARY PUBLIC FOR
HOWARD COUNTY, MARYLAND
COMM. EXPIRES 6/11/07

**EXHIBIT A: Resumé of James Morrison**

James C. Morrison

5166 Durham Road West
Columbia, MD 21044
Phone: 301.596.5550
e-mail: j.morrison24@verizon.net

## EMPLOYMENT EXPERIENCE:

2003 - present        Independent consultant and trainer in all
aspects of                      drug regulation, especially in
establishing and                        maintaining
effective working relations with the FDA.

1995 – 2003        Ombudsman and Senior Advisor
Center for Drug Evaluation and Research
Food and Drug Administration
SES/Level 2

- Advised Center Director on issues and potential solutions concerning relations with the industry, public and health care professionals; emerging problems within the Center, including the need for new or changes to existing procedures and on intercenter jurisdiction.

- Handled complaints, appeals, and counseled regulated industry and other external parties on full array of CDER processes and policies, and counseled CDER employees on job related problems.

- Proactively promoted improved communication between the industry, health professions, public and CDER through informal meetings with industry, training of reviewers, publications and speeches.

- Developed CDER position and spoke for Center Director on issues involving intercenter jurisdiction.

- Represented CDER on the FDA Leadership Development Committee and other high level agency groups.

1994 -1995          Deputy Director for Program Management
                    Office of Drug Evaluation I
                    Center for Drug Evaluation and Research
                    SES/Level 2

- Managed program activities and operations of the largest office in the Center for Drug Evaluation and Research responsible for reviewing new drug applications prior to marketing.

- Helped successfully implement Prescription Drug User Fee Act goals.

- Advised Office Director on emerging management problems and recommended solutions.

- Served as executive secretary for the Medical Policy Coordinating Committee.


1990 -1994          Acting Director
                    Office of Drug Standards
                    Center for Drug Evaluation and Research
                    SES/Level 2

- Directed the activities of divisions responsible for regulation of prescription drug advertising and promotion practices, and the safety and effectiveness of nonprescription drugs.

- Performed all management functions, including strategic planning, resource allocation, budget control, and all personnel actions.

- Planned and implemented the reorganization of the division that regulates drug advertising, greatly expanding its capabilities and resources.


1983 -1990          Deputy Director
                    Office of Drug Standards
                    Center for Drug Evaluation and Research
                    SES/Level 2

- Directed the activities of five divisions responsible for regulation of prescription drug advertising and promotion practices, determining the safety and effectiveness of nonprescription and generic prescription drugs, determining pharmacokinetic characteristics and bioequivalence of drugs.

- Performed management functions, including strategic planning, resource allocation, budget control, and all personnel actions.

- Worked with Department of Health and Human Services and Congressional staffs on the enactment and implementation of major legislation, testified at Congressional hearings, and prepared testimony.

- Served as spokesman for programs, made speeches, wrote and edited agency press releases, published journal articles and edited articles for publication, and served as ombudsman, receiving and handling complaints from regulated industry.

- Instrumental in the introduction of computers to all divisions in the office and in their use to improve effectiveness of operations. Served on the IT Policy Committee for the Center for Drug Evaluation and Research.

- Member of or chaired Center and Agency groups, including the FDA Management Development Committee, the Therapeutic Inequivalence Action Coordinating Committee, the Bioequivalence Hearing and Task Force, and the Drug Efficacy Study Implementation Committee.

- Agency expert on drug industry pricing and marketing practices, serving on staff to HHS Pharmaceutical Reimbursement Board, providing expert input on the quality of drugs and their regulatory status for the Maximum Allowable Cost Program. Participated in recommendations for establishing reimbursement rates for prescription drugs.

1982 -1983          Director, Regulatory Affairs
                    Bureau of Drugs
                    Food and Drug Administration
                    GM-15

- Directed the staff responsible for writing all drug rules and regulations. Also actively participated in or led Bureau actions in the area of regulatory affairs. Such activities included developing requirements for medical foods and responding to the Tylenol tampering poisonings by publishing standards for tamper resistant packaging.

1976 -1982          Special Assistant to the Director
                    Bureau of Drugs
                    GM-14

- Staff assistant to the Bureau Director and Deputy Director, specializing in regulatory issues.

- Coordinated Agency and Bureau regulatory activities, included chairing task forces on the market withdrawal of products and participating in the Commissioner's task forces on the new drug approval process and on vitamins and minerals.

1974 -1976            Chief, OTC Compliance Branch
                     Division of Drug Labeling Compliance
                     Bureau of Drugs
                     GS-14

- Responsible for regulatory activities relating to non-prescription drug products. Planned, coordinated and directed field enforcement activities related to OTC drugs. Provided advice to agency and industry.

1965 -1974  Various positions in FDA in the Los Angeles District Office and at headquarters as chemist and regulatory officer, levels GS-5 to GS-13.

EDUCATION:

University of California at Los Angeles (B.S./1965)
University of Maryland Law School (attended 1974-1976, 58 semester units)

AWARDS:

1976 -American Jurisprudence Award (Criminal Law, U. of Md.)
1979 -Commissioner's Special Citation
1980 -Commendable Service Award
1981 -Cash award
1983 -EEO Citation
1985 -Award of Merit (2)
1986 -Public Health Service Special Recognition Award
1988 -Group Recognition Award
1988 -SES Bonus
1989 -Group Recognition Award
1990 -Inclusion of name and likeness in poster and on mural in

HHS

Public headquarters' lobbies commemorating centennial of the

Health Service
1994 –Group Recognition Award
1996 -SES Bonus
1997 -SES Bonus
1998 -SES Bonus
1999 -SES Bonus
2000 -SES Bonus
2000 -Taught segment of workshop that won W. Edwards Deming
Award for outstanding training
2003 – Distinguished Career Service Award

SELECTED SPEECHES, SEMINARS, TEACHING:

Co-chair, Legal Times Seminar, "Abbreviated New Drug Applications,"
Washington DC, 1985
Association of State Food and Drug Officials Annual Conference "Patent Term
Law"
        Madison, WI, 1985
Droite et Pharmacie Symposium on ANDA/Patent Term Restoration, Paris,
France,        1985
Annual Meeting -Regulatory Affairs Professional Society, "Patent Restoration",
        Washington DC, 1985
Drug Information Association Seminar, "Perspectives on the Drug Price
Competition
        and Patent Term Restoration Act of 1984" Hilton Head Island, SC, 1985
Arnold Schwartz Memorial Symposium, "Potential Effects on New Drug
Regulations in
        the U.S. and Overseas", Long Island University, 1985
Food and Drug Law Institute, "Exclusivity Marketing Rights: Petitions to Delay
or Deny
        ANDA Approvals", Washington DC, 1986
National Association of Pharmaceutical Manufacturers Update meeting,
"Anti-Generic
        Campaign",    Washington, DC, 1986
Food and Drug Law Institute Seminar, "Exclusive Marketing Rights",
Washington, DC,
        1986
Session co-chair, FDA Informal Hearing, "Bioequivalence of Oral Drug
Products",
        Washington, DC, 1986
Food and Drug Law Institute Educational Conference, "Current Issues Before
FDA",
        Washington, DC, 1986

Food and Drug Law Institute Educational Conference, "Waxman-Hatch Update",
    Washington DC 1987

Radio talk show "Mid Morning" WBCL Ft. Wayne, Ind. Pharmacy issues, generic drugs
    and the FDA drug approval process. Host: Char Binkley, 1988

Food and Drug Law Institute Educational Conference, "Generic Drug Regulations",
    Washington, DC, 1989

International Industrial Pharmacy Conference, "Therapeutic Inequivalence
    Reports", Austin, TX, 1989

Congressional Hearings/testimony: Six total, including Rep. Waxman on drug prices (2),
    Sen. Hatch, Rep. Waxman on implementation of Hatch-Waxman
    Amendments, and Rep. Dingell on oversight of generic drugs, 1985-1989

Industrial Biotechnology Association, "Promotion in a Scientific/Educational Context",
    Washington, DC, 1991

Quarterly "CDER's New Reviewers Workshop" on industry interactions, 1996-2002

Food and Drug Law Institute Pharmaceutical Update, "Role of the CDER Ombudsman",
    Washington, DC, 1996

PERI Regulatory Annual Meeting, "Resolution of Scientific Disputes", Bethesda, MD,
    1997

Drug Information Association seminar on FDA/Industry Interface, Washington, DC,    1997

Food and Drug Law Institute, "Resolving Disputes with the FDA", Washington, DC,    1998

HHS Alternative Dispute Resolution Forum, Bethesda, MD, 1998

Food and Drug Law Institute, "Resolving Disputes with the FDA", Washington, DC,    1999

Medical Technology Symposium 2000, "Resolving FDA Jurisdictional Issues",
    Washington, DC, 2000

Consumer Healthcare Products Assn. Conference, "FDA Perspective on Agency and
    Industry Interactions", Bethesda, MD, 2000

Coalition of Federal Ombudsmen, "FDA's Ombuds Functions", Washington, DC, 2001

Regulatory Affairs Professional Society, "Dispute Resolution in CDER", Baltimore, MD,
    2001

Parenteral Drug Association, "Using the FDA as a Resource", Washington, DC, 2002

Food and Drug Law Institute, "How to Work with the FDA: Etiquette",

Washington, DC,    2003

SELECTED PUBLICATIONS:

Hutt, P., and Morrison, J., "The ANDA Review Process", Legal Times; 1985.
Rheinstein, P., and Morrison, J., "An FDA View of the ANDA/Patent Extension Law",
    Pharm. Exec.; 5:7, 44-8 (July 1985).
Morrison, J., "ANDAs and Patent Term Restoration", AFDO Quarterly Bul.; 49:4, 194-7
    (October 1985).
"FDA Speaks Out on Generic Drug Quality", NABP Newsletter;
April 1986.
Faich, G., Morrison, J., Dutra, E., and Hare, D., "Reassurance about Generic Drugs",
    New England J. of Med.; 316:22, 1473 (June 4, 1987).
Nightingale, S., and Morrison, J., "Generic Drugs and the Prescribing Physician", JAMA,
    258:9, 1200-04 (September 4, 1987).
Morrison, J., "Update on the Waxman-Hatch Amendment Implementation", FDC Law
    Journ.; 43:3, 553-57 (May 1988).
Morrison, J., "Overview of the Generic Drug Review Process and Regulations", FDC
    Law Journ.; 45:3, 219-22 (May 1990).
Morrison, J., "Food and Drug Administration: Role in Drug Regulation", Encyclopedia of
    Pharmaceutical Technology; vol. 6, 231-249 (1992). [Book chapter]
Morrison, J. "Ombudsman's Corner", News Along the Pike [CDER monthly newsletter
    posted on FDA Web site] 1995-2003
Morrison, J. "The Ombudsman's Role at the FDA", Tufts CSDD Newsletter (Feb. 1998).
Morrison, J. "Regulatory Corner: "Role of the CDER Ombudsman", Regulatory Affairs
    Focus, vol. 4 issue 4 (April 1999).
Morrison, J. "Role of the CDER Ombudsman", FDLI Update.
(Nov 1999).
Morrison, J. "From FDA's Perspective", How to Work With the FDA, Wayne Pines, ed.,
    FDLI, (2000, revised 2002). [Book chapter]

**EXHIBIT B – Materials Reviewed:**

Deposition of Tracy Bolwell

Expert Report of Dr. Faich

Duramed Documents

> (BLI 000608, BLI 000774, BLI 000766, BLI 00752, BLI 000746, BLI 000734, BLI 000722, BLI 000711, BLI 000704, BLI 000603, BLI 000571, BLI 000560, BLI 000667, BLI 000644, BLI 000621, BLI 000610, BLI 000623, BLI002550-BLI002561, BLI000443-BLI000558)

Robert Sherman M.D., *"Regulatory History of OTC Phenylpropanolamine Hydrochloride (PPA)"* www.fda.gov/ohrms/dockets/ac/00/slides/3647s1d

Center for Drug Evaluation and Research, *"Phenylpropanolamine (PPA) Information Page"*, http://www.fda.gov/cder/drug/infopage/ppa/default.htm

*"Establishment of a Monograph for OTC Cold, Cough, Allergy, Bronchodilator and Antiasthmatic Products,"* Federal Register, Vol. 41, No. 176, pp 38312-24, (September 9, 1976).

*"Weight Control Drug Products for Over-the-Counter Human Use; Establishment of a Monograph,"* Federal Register, Vol. 47, No. 39, pp 8466-84, (February 26, 1982).

*"Oral Health Care Drug Products for Human Use; Establishment of a Monograph"* (excerpt)  Federal Register, Vol. 47, No. 101, pp 22760, 22912-4, (excerpt), (May 25, 1982).

*"Cold, Cough, Allergy, Bronchodilator and Antiasthmatic Drug Products for Over-the-Counter Human Use; Tentative Final Monograph for OTC Bronchodilator Drug Products,"* (excerpt) Federal Register, Vol. 47, No. 207, pp 47520- 47528, (October 26, 1982).

*"Enforcement Action Under the New Drug Provisions of the Federal Food, Drug, and Cosmetic Act; Certain OTC Drug Products; Advisory Opinion,"* Federal Register, Vol. 48, No. 224, pp 52513-52514, (November 18, 1983).

*"Enforcement Action Under the New Drug Provisions of the Federal Food, Drug, and Cosmetic Act; Certain OTC Drug Products; Advisory Opinion; Amendment,"* Federal Register, Vol. 49, No. 127, pp 26814-26815, (June 29, 1984).

Memorandum from Medical Officer, HFD-733/Center for Drug Evaluation and Research, to Director, Division of OTC Drug Evaluation, HFD-210 re *Epidemiologic Review of Phenylpropanolamine Safety Issues,* (April 30, 1991).

Memorandum from Medical Officer, HFD-733/Center for Drug Evaluation and Research, to Office Director, ODE I, HFD-100, re *Additional Analysis of Phenylpropanolamine (PPA) and Cerebral Hemorrhage,* (August 6, 1991).

Letter from Paul Botstein/Department of Health and Human Services to Steve Kittner, M.D., re *Participation in FDA's Review of Phenylpropanolamine (PPA)*, (June 22, 1992).

Memorandum of Meeting between Nonprescription Drug Manufacturers Association Members/Guests and FDA Representatives, (November 9, 1992).

*"Over-the-Counter Drug Products Containing Phenylpropanolamine; Required Labeling; Proposed Rule,"* Federal Register, Vol. 61, No. 31, pp 5912-5916, (February 14, 1996).

*"Over-the-Counter Human Drugs; Labeling Requirements; Final Rule,"* Federal Register, Vol. 64, No. 51, pp 13254-13302, (March 17, 1999).

*"Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use; Amendment of Final Monograph for OTC Antitussive Drug Products,"* Federal Register, Vol. 65, No. 148, pp 46864-8, (August 1, 2000).

Memorandum from Lois La Grenade, M.D., et al to Charles Ganey, M.D., Director, Food and Drug Administration, Center for Drug Evaluation and Research, re *"Review of study protocol, final study report and raw data regarding the incidence of hemorrhagic stroke associated with the use of phenylpropanolamine* (September 27, 2000).

Food and Drug Administration, Nonprescription Drugs Advisory Committee, *Meeting on Safety Issues of Phenylpropanolamine (PPA) in Over-the-Counter Drug Products*, (outline) (October 19, 2000).

Food and Drug Administration, Nonprescription Drugs Advisory Committee, *Meeting on Safety Issues of Phenylpropanolamine (PPA) in Over-the-Counter Drug Products*, (transcript) (October 19, 2000).

Center for Drug Evaluation and Research, *"Questions and Answers on the Safety of Phenylpropanolamine,"* www.fda.gov, (November 6, 2000).

Center for Drug Evaluation and Research, *"Food and Drug Administration Science Background Safety of Phenylpropanolamine,"* www.fda.gov, (November 6, 2000).

*"FDA Issues Public Health Warning on Phenylpropanolamine,"* FDA Talk Paper, www.fda.gov, (November 6, 2000).

Center for Drug Evaluation and Research, *"Public Health Advisory, Subject: Safety of Phenylpropanolamine,"* www.fda.gov, (November 6, 2000).

Michelle Meadows, *"FDA Issues Public Health Advisory on Phenylpropanolamine in Drug Products,"* FDA Consumer Magazine, Vol. 35, No. 1, p 9, (January-February 2001).

*"Phenylpropanolamine; Proposal to Withdraw Approval of New Drug Applications and Abbreviated New Drug Applications; Opportunity for a Hearing,"* Federal Register, Vol. 66, No. 157, pp 42665-42671, (August 14, 2001).

*"Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use; Partial Final Rule for Combination Drug Products Containing a Bronchodilator,"* Federal Register, Vol. 66, No. 188, pp 49276-8, (September 27, 2001).

Lettter from "Public Citizen" to FDA re *Withdrawal of PPA*, including comments on Steve Kittner, M.D.'s conclusion re Safety of Phenylpropanolamine, www.fda.gov, (October 12, 2001).

*"Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use; Final Monograph for Combination Drug Products,"* Federal Register, Vol. 67, No. 246, pp 78158-72, (December 23, 2001).

*"Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use; Proposed Amendment of Final Monograph for Over-the-Counter Nasal Decongestant Drug Products,"* Federal Register, Vol. 69, No. 147, pp 46119-22, (August 2, 2004).

*"Over-the-Counter (OTC) Human Drugs Which Are Generally Recognized as Safe and Effective and Not Misbranded,"* 21 CFR 330 (April 1, 2005).

*"Interpretative Statements re Warnings on Drugs and Devices for Over-the-Counter Sale – Purpose of Issuance"* 21 CFR 369.1 (April 1, 2005).

*"Interpretative Statements re Warnings on Drugs and Devices for Over-the-Counter Sale – Drugs; recommended warning and caution statements,"* 21 CFR 369.20, (April 1, 2005).

*"Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use; Proposed Amendment of the Tentative Final Monograph for Combination Drug Products,"* Federal Register, Vol. 70, No. 133, pp 40232-7, (July 13, 2005).

*"Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use; Proposed Amendment of Monograph for Over-the-Counter Bronchodilator Drug Products,* Federal Register, Vol. 70, No. 133, pp 40237-49, (July 13, 2005).