```
              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT

             CIVIL ACTION No:   3:02CV01001AWT


TRACY BOLWELL,                           :

        Plaintiff                        :

        -v-                              :

DURAMED PHARMACEUTICALS, INC.,           :
et al.,                                  :

        Defendants                       :
```

                              - 0 -

     The deposition of **JEANETTE WASSERSTEIN, PH.D.**, taken before Barbara Bennett-Calkins, Court Reporter and Notary Public in and for the State of New York, at the law offices of Bingham McCutchen LLP, 399 Park Avenue, New York, New York, on the 13th day of June, 2006, beginning at the hour of 10:25 a.m.

                              - 0 -


**TAMMY G. LOY, CVR-CM**
Certified Court Reporter
1500 East College Way
Suite A-378
Mount Vernon, WA  98273
(360)941-5800

EXHIBIT W

**Page 26**

1  So it's just about proper backup as
2  much as possible of the information that one would
3  ordinarily rely on interview for. Although even in
4  clinical ones, sometimes we request records for
5  diagnosis of ADD, especially. It's required that
6  you get records when possible.
7  Q. Tell me how the process works.
8  A. Generally, I was just going to say, and I
9  like records when I can get them, because previous
10  records, I always ask for them.
11  Q. And I am not limiting this to this
12  particular case, but generally when you have someone
13  come in, and I keep referring to the forensic
14  assessments, and if it's the same for both, that's
15  fine, but do you typically interview the patient
16  first, read the records first, conduct the tests
17  first, do interviews; if you could walk me through
18  the process that you undergo.
19  A. In the best of all possible worlds, I
20  prefer to interview the patients, review the
21  records, do the testing.
22     In the real world, that sequence is
23  not always the case. I mean, these things do
24  stand alone and can be done independently. So,
25  sometimes if somebody is coming in from out-of-town

**Page 27**

1  and the records aren't here yet, and they didn't
2  fill out the history form ahead of time, I may start
3  to do the testing and arrange to do the interview at
4  a later point.
5     But it's best to do, at minimum, the
6  interview before, because then you really have a
7  clearer idea of what you're looking for and you
8  might fine-tune the assessment a bit differently.
9  Q. And Tracy Frenette's or Tracy Bolwell's
10  case, do you recall the order that you did the
11  assessment?
12  A. I think it was -- certainly the interview,
13  and then the testing and the records were somewhere
14  in there.
15     I requested additional records. I
16  know I wanted school records. I know I wanted some
17  medical records. I mean, I don't remember which
18  ones I asked for, but along the way, more records
19  came in.
20  Q. And you understand that sometimes if I
21  refer to Tracy Bolwell, that's the same patient you
22  saw?
23  A. Yes, yes.
24  Q. Other than Tracy Frenette's?
25  A. Yes, the Tracy with many names.

**Page 28**

1  Q. Just so we are clear. We have been
2  referring to her in this litigation as Bolwell, so I
3  am not even sure what her current name is?
4     MR. MENEO: Tracy.
5     MS. HAGEMAN: Tracy. That works.
6     THE WITNESS: We are sure about that.
7     THE ATTORNEY:
8  Q. The interview that you did with Tracy,
9  what did that interview entail, to begin with, how
10  long typically are your interviews?
11  A. They tend to be about an hour and a half,
12  two hours, during which I start with what happened
13  and what are your problems now.
14     Well, first of all, what are your
15  problems now, as you know them. And then, what
16  happened, as best they can recall. And then, you
17  know, what happened in hospital? What happened in
18  the lab? What happened when you returned to normal
19  life?
20     And I basically walk them through all
21  of that. Then I look at my history form, because I
22  send a history form before they come for them to
23  fill out. And I go through the history form with
24  them.
25     And that may bring more symptoms to

**Page 29**

1  the fore, because my history form has a whole
2  symptom checklist. And then we'll talk about those
3  symptoms. And then the history, I go through the
4  sequence in the history form, which is development
5  and birth, development, early childhood, family,
6  whatever. It just helps me be very structured and
7  sure to hit all the same background bases with
8  everyone.
9  Q. In Tracy's case, did you interview anyone
10  else?
11  A. I believe I spoke to her mother by phone,
12  or maybe I just read the mother's deposition, I
13  don't recall. In my notes that I looked at, I
14  didn't see anything except notes from my interview
15  with her. Maybe I tried to speak to her mother and
16  didn't get through, I don't remember. I know I
17  wanted to, but maybe I just ended up relying on the
18  deposition, but I think I may have spoken to her.
19  Q. If you had spoken to her by phone, would
20  you typically have notes of that conversation?
21  A. One would hope, typically I would, but
22  sometimes -- hold on, you know, there are notes
23  here, and it may be a matter of identification of
24  who the source was.
25  Q. Well, if you just hold on for one second,

## Page 62

1  was taking college courses beginning in 1989 to
2  1991?
3      A.  She said she worked always.  Do I know
4  with certainty? No.  But according to her report,
5  she worked while she was in school.  Were there some
6  semesters when she didn't work, I don't know.
7          But what I do see here is that in
8  those other, and that is why I was drawing attention
9  to it, and you're right, she's having trouble with
10 algebra all along for sure.
11         But the difference between this
12 semester and the previous semester is that the
13 previous semesters she also took many other courses,
14 and passed most of them.  Whereas this semester she
15 took only this course, which is what one advises
16 people when they are having trouble.  An adviser
17 told her probably to do that, advise them to take as
18 little in the other courses as possible, so that you
19 can focus on it.  And apparently she still failed
20 even with the reduction.
21         So, yeah, that could be an argument
22 that she wasn't functioning as well, even when she
23 cleaned her plate and left only one course to focus
24 on, she couldn't pass it.
25     Q.  Even though she was perfectly capable of

## Page 63

1  passing other classes at the same time, in the past,
2  pre-stroke?
3      A.  But pre-stroke she couldn't pass algebra.
4      Q.  And post-stroke, she couldn't pass
5  algebra?
6      A.  I know, but pre-stroke she was taking
7  algebra along with many other courses.
8          MR. MENEO:  Objection, keep referring
9  to algebra; one is beginning algebra, one is
10 intermediate algebra, they are two different
11 courses.
12         THE WITNESS:  I know, that is a point
13 too, that is an excellent point.  Previously she had
14 been taking intermediate algebra along with many
15 other courses and failed.  Now some adviser has
16 probably told her, you've got to take an earlier
17 level of algebra and take nothing else but algebra,
18 and she still failed.
19         THE ATTORNEY:
20     Q.  Did you review the college transcripts
21 prior to writing the report in this matter?
22     A.  No, I don't think I did, I asked for the
23 records.  It took a look long time to get them, I
24 had already written the report.  I looked at the
25 records afterwards and thought there was no need to

## Page 64

1  change my opinion.
2      Q.  In your interview with Tracy, I believe
3  she had indicated to you, let me find it in the
4  report, I believe she indicated to you that she had
5  received B's and C's in college?
6      A.  Yes, I think so.
7      Q.  After obtaining her college transcript, do
8  you concur with that assessment of her grades?
9      A.  She has more B's and C's than she has
10 anything else.  She also has two D's and problems
11 with algebra.
12         So B's and C's are still the mode of
13 grades, but the range is a little bit wider than she
14 said.  But that is consistent with what people do,
15 they speak it broad strokes when you get a history.
16     Q.  Would having the college transcript of
17 Tracy's grades prior to issuing your report, would
18 that have changed your determination as to what
19 Tracy's premorbid condition was?
20     A.  No, I said that she was average/high
21 average, and this is entirely consistent still.
22     Q.  College transcripts of B's, C's, D's and
23 is F's is average to high average in your opinion?
24     A.  Yup, that's the way it plays out in life.
25         MS. HAGEMAN:  We are going to mark as

## Page 65

1  Exhibit 7 Tracy's high school transcripts.
2          (Exhibit 7, Tracy's high school
3  transcripts, is marked for identification at this
4  time.)
5          THE ATTORNEY:
6      Q.  Doctor, I am handing you Exhibit Number 7?
7      A.  Yes.
8      Q.  Do you recognize that as Tracy's high
9  school transcripts?
10     A.  Yes, I do.
11     Q.  And did you have those transcripts prior
12 to issuing your opinion in this matter?
13     A.  No, again, this is part of the records
14 that came later.
15     Q.  And in your interview with Tracy, she
16 indicated to you that she was, I believe an
17 above-average student in high school receiving A's
18 and B's?
19     A.  Yes, she did.
20     Q.  In reviewing her high school transcript,
21 do you concur with that assessment?
22     A.  It's a slight inflation.  Her overall GPA
23 was 81.2 which is an 82 which is a low B.  So her
24 overall average is in the B's.  She did hit a couple
25 of A's here and there, but she's mainly a B student

Page 66

1  with A's and C's on either side, and that's what her
2  GPA reflects.
3      Q.  And if you had had these reports prior to
4  you issuing your opinion in this matter, would they
5  have changed your assessment of her premorbid
6  condition?
7      A.  B average is still consistent with average
8  to high average.
9      Q.  So is that a no?
10     A.  It wouldn't have changed anything.
11     Q.  Would a college question the reliability
12 of Tracy's recounting of her premorbid condition?
13     A.  No, everybody does this.  They speak
14 modes.  Everybody is an A/B student, that's the way
15 people recall, you know, okay students are A/B
16 students.  Weaker students are B, you know, C/B
17 students.
18         I mean, this is just normal, people
19 kind of speak very grossly, which is why the best
20 inference that we can make is a gross inference,
21 average/high average.  I am not saying 108, 106, I
22 am saying in the average to high average range.
23         And in part the high average came
24 from things like her performance on the hold test,
25 the best performance that she had high averages in

Page 67

1  my own measures, and that is rather impressive,
2  frankly I was extremely impressed at how functional
3  she was, given the degree of deficits that she had.
4      Q.  So in your opinion Tracy Bolwell is
5  highly-functioning?
6      A.  No, that is not my opinion, I was just
7  impressed at how functional she was, given the depth
8  of her dysfunction.
9      Q.  Knowing what you know about Tracy, based
10 on your interviews with her and the testing that you
11 did of her, what would you anticipate to be Tracy's
12 normal functioning today?
13     A.  Today?
14     Q.  Her level of functioning?
15     A.  You mean what would I have anticipated?
16 People with her degree of dysfunction can sometimes
17 be totally incapacitated and unable to hold a job,
18 unable to run a household, I have seen that.
19     Q.  Do you have any information about the
20 level of income that Tracy, I don't know if
21 currently making, but at least made in 2005, just
22 last year?
23     A.  No idea.  I would imagine somewhere in the
24 lower middle class.
25         MS. HAGEMAN:  Would you please mark

Page 68

1  this as Exhibit 8?
2         (Exhibit 8, Tracy's W-2, is marked
3  for identification at this time.)
4      Q.  Doctor, I am showing you what was marked
5  as Exhibit 8, which is a copy of Tracy's W-2 wage
6  statement from last year.  Can you identify for me
7  please how much income she made last year?
8      A.  I am having trouble identifying it.  They
9  withheld 26 thousand, but her income is 13, can you
10 show me?
11     Q.  If you look under Box 1, it says wages,
12 tips and other compensation?
13     A.  121, good for her.
14     Q.  And in Box 5, which is the Medicare, wages
15 and tips, 100 and almost $35,000 a year; does that
16 at all change your assessment to Tracy's level of
17 functioning?
18     A.  I, no, my numbers, people really differ in
19 terms of what they do with their deficits, this is
20 impressive.  I found her to be a very impressive
21 young woman.
22     Q.  On your report which we have marked as
23 Exhibit 2, I believe, under Procedures Used, on the
24 second page, we have talked about your review of
25 records, your interview of clients and the

Page 69

1  comprehensive neuropsychological assessment that you
2  do.  And then a little bit further down the page,
3  you've got the records that you reviewed in this
4  case, is this the complete list of records you
5  reviewed in this case?
6      A.  Well, it didn't have --
7      Q.  At the time of the report?
8      A.  As far as I recall, I would list
9  everything that I have.
10     Q.  And we have mentioned the high school and
11 college transcripts that you have received since
12 drafting this report?
13     A.  Yes.
14     Q.  Are there any other records that you have
15 reviewed relating to Tracy Bolwell that you have
16 reviewed that should be included on this list?
17     A.  Is the deposition of the mother in there?
18     Q.  No.
19     A.  That should be in there.
20     Q.  Did you review the deposition of Tracy?
21     A.  No, I don't have it.
22     Q.  Is that something that you would like to
23 see, typically?
24     A.  It's not necessary, I would not base it on
25 my own deposition, but I like to look at it when

Page 130

STATE OF NEW YORK )
                  ss.
COUNTY OF ALBANY  )

I, Jeanette Wasserstein, have read the foregoing record of my testimony taken at the time and place noted in the heading hereof, and I do hereby acknowledge it to be a true and accurate transcript of same.

_____
JEANETTE WASSERSTEIN, Ph.D.

DATED: _____

Sworn to before me this _____
day of _____, 20____

_____
         Notary Public

Page 131

STATE OF NEW YORK
                  ss:
COUNTY OF ALBANY

I, Barbara Bennett-Calkins, Shorthand Reporter and Notary Public duly and qualified in and for the State of New York do hereby certify that the foregoing transcript is a true and correct transcript of my original stenographic notes to the best of my ability.

_____
      BARBARA BENNETT-CALKINS

Page 132

INDEX

| Witness: | Page: |
|---|---|
| JEANETTE WASSERSTEIN | 4 |
| Examination by: | |
| MS. HAGEMAN | 4 |

EXHIBITS

| No. | Description: | Page: |
|---|---|---|
| 1 | Notice of Deposition Duces Tecum | 5 |
| 2 | Dr. Wasserstein's report | 9 |
| 3 | Dr. Wasserstein's CV | 11 |
| 4 | Adult Neuropsychological History | 30 |
| 5 | Handwritten record of Dr. Soles | 53 |
| 6 | Dutchess Community College grade report | 59 |
| 7 | Tracy's High School transcripts | 65 |
| 8 | Tracy's W-2 | 68 |
| 9 | Vassar Brother's Hospital record | 73 |
| 10 | North Shore University Hospital record | 76 |
| 11 | MMPI | 124 |

Page 133

ERRATA SHEET

Page #    Line    CHANGE    From:    To