UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CASE NO. 3:02-CV1001 (AWT)


TRACY BOLWELL,                          :

      Plaintiff                        :

    -v-                                  :

DURAMED PHARMACEUTICALS, INC.
and BARR LABORATORIES, INC.,            :

      Defendants                       :


- 0 -


      The deposition of **GARY CRAKES**, taken before
Sadie Herbert, Court Reporter and Notary Public, at the
offices of Early, Ludwick, Sweeney & Strauss, 265
Church Street, New Haven, Connecticut, on the 6th day
of July, 2006, beginning at the hour of 9:00 a.m.

- 0 -


**TAMMY G. LOY, CVR-CM**
**Certified Court Reporter**
**1500 East College Way**
**Suite A-378**
**Mount Vernon, WA  98273**
**(360)941-5800**

EXHIBIT

Y

Blumberg No. 5119

## Gary Crakes

### Page 14

1. of Law Firm Concentration on Lawyers' Salaries"; could
2. you tell me what that is about.
3. A.  It was an assessment of the effect of the number of
4. attorneys, for instance, per capita in any community
5. on compensation.
6. Q.  What kind of compensation, the level of compensation?
7. A.  The level of compensation, the concentration of
8. attorneys in those areas.  The greater the degree of
9. concentration tended to result in lower compensation.
10. Q.  In the next one from October '98, "Are Baseball
11. Players Overpaid?  An Analysis of Major League
12. Baseball Salaries"; what is that about?
13. A.  It was simply an analysis based on data from the Major
14. League Baseball Players Association.  It was an
15. analysis of the median earnings of baseball players
16. rather than the mean earnings.  Medians tend to be
17. less effected by extreme values, suggesting that
18. perhaps the rates of increase were not as great as had
19. been presented in the media.
20. Q.  Was that your conclusion?
21. A.  Yes.
22. Q.  Do you recall what the median average was?
23. A.  I don't recall what the median earnings were in 1998,
24. no.  And I have not updated the study at this time.

### Page 15

1. Q.  How long have you worked as an expert witness?
2. A.  About 25 years.
3. Q.  How much of your practice, separate and apart from
4. your work as a professor, is as an expert witness?
5. A.  My consulting activities are entirely as an expert
6. providing appraisals of economic loss for matters in
7. litigation.  That is in addition to my university
8. employment.
9. Q.  As a consultant, do you provide any consulting
10. services other than in the context of litigation?
11. A.  No.
12. Q.  How much do you earn a year as an expert witness?
13. A.  I would say approximately 60 to 70 percent of my
14. earnings are from my work as a consultant for matters
15. in litigation.
16. Q.  And the other percentage is from your work as a
17. professor?
18. A.  Yes.
19. Q.  Can you tell me what the dollar figure is of your
20. earnings.
21. A.  The gross earnings before expenses would be in the
22. neighborhood of 350 to 400,000 dollars.
23. Q.  What side do you work for primarily, if any?
24. A.  I would say, if I had to approximate, 75 to 80 percent

### Page 16

1. of the matters in which I am retained are for
2. attorneys representing plaintiffs; 20 to 25 for those
3. representing defendants.
4. Q.  Are they all personal injury cases or do you do
5. different types of litigation?
6. A.  I don't do litigation, but I provide appraisals of
7. economic loss for personal injury, wrongful death,
8. employment cases, occasionally a divorce matter, as
9. well as I believe they are sometimes called wrongful
10. birth cases.
11. Q.  Could you approximate how many cases a year you work
12. on.
13. A.  If I were to approximate, I would say 80 to 90.
14. Q.  And how many times have you testified in a deposition
15. before?
16. A.  Over the last 25 years, again an approximation, I
17. would say in the neighborhood of 400 times.
18. Q.  Have you testified in product liability cases such as
19. this before?
20. A.  I --
21.         MR. KENNEY:  Objection to form.
22.         THE WITNESS:  I may have.  I am not always
23. fully aware of what the circumstances are
24. associated with the litigation itself, only the

### Page 17

1. request for me to perform an appraisal of
2. economic loss.
3. Q.  We discussed this earlier, but you say you had heard
4. of what the product was at issue in this case;
5. correct?
6. A.  To clarify, I was aware that it involved some type of
7. pharmaceutical or drug.  I don't recall the name of it
8. or the details associated with it.
9. Q.  The name of the active ingredient is
10. phenylpropanolamine, otherwise known as PPA; to your
11. knowledge, have you ever testified in another case
12. involving that drug?
13. A.  Not to my knowledge, not to my recollection.  As I
14. have indicated, quite often I don't know the
15. circumstances associated with the litigation itself.
16. Q.  You say you have testified in a court before; correct?
17. A.  Yes, I have.
18. Q.  Can you approximate how many times you have testified
19. at trial?
20. A.  Again, if I had to approximate over the last 25 years,
21. I would say 250 to 300 times.
22. Q.  Is the majority of your practice in this area or do
23. you do a national practice?
24. A.  It's mostly in the tri-state area.  Occasionally, I am

1e194de3-75c0-407c-b63a-0aa0c603d63b

Gary Crakes

## Page 34

1  A.  I believe it was called the plaintiff's fact sheet.
2      I was also provided with some neuropsychological
3      evaluations.
4  Q.  Is that the evaluation by Dr. Wasserstein?
5  A.  If I could just have a moment.
6      MR. KENNEY:  Please.
7      THE WITNESS:  There was a letter or report
8      from a Dr. Tuhrim, T-U-H-R-I-M, and a report from
9      a Dr. Wasserstein, W-A-S-S-E-R-S-T-E-I-N,
10     transcript of Ms. Bolwell's deposition, and the
11     plaintiff's fact sheet.
12 Q.  So I have got Ms. Bolwell's deposition, the facts
13     sheet, a report from Dr. Tuhrim and a report from
14     Dr. Wasserstein; was there anything else you reviewed?
15 A.  I was also provided with -- again, if I could just
16     have a moment...
17 Q.  Certainly.
18 A.  With some information orally in response to some
19     questions that I had for Attorney Meneo.
20 Q.  What was that information?
21 A.  I inquired as to the date of injury of Tracy Bolwell,
22     her race, the date of birth of her husband and child.
23     I inquired as to whether or not any income tax returns
24     were available.  I inquired as to assumptions

## Page 35

1      concerning unimpaired earnings and impaired earnings
2      as well as whether or not values for the ongoing costs
3      of care or household services should be included in my
4      analysis.
5  Q.  Were you provided with assumptions by attorney Meneo
6      regarding Ms. Bolwell's impaired earnings?
7  A.  Yes, I was.
8  Q.  What were those assumptions that you were asked to
9      make?
10 A.  That I should employ an estimate with a 25 percent
11     reduction in her earning capacity and an alternative
12     estimate with a 50 percent reduction in her earning
13     capacity.
14 Q.  Those assumptions were based solely upon Mr. Meneo's
15     request; is that correct?
16 A.  That is correct.
17 Q.  They weren't based upon any other evaluation of her
18     earning capacity by a third party; correct?
19     MR. KENNEY:  Objection to form.
20     THE WITNESS:  I wouldn't know.  I know it
21     was something told to me by Attorney Meneo.
22 Q.  He didn't provide you with any source for that
23     information; is that correct?
24 A.  Not that I recall.

## Page 36

1  Q.  You said you asked whether any income tax returns were
2      available; is that correct?
3  A.  That's correct.
4  Q.  Were you ever provided with any income tax returns for
5      Tracy Bolwell?
6  A.  No.
7  Q.  Have you ever reviewed any income tax returns for
8      Tracy Bolwell?
9  A.  No.
10 Q.  Did you review any medical records for Tracy Bolwell?
11 A.  Other than the reports that I referred to that were
12     provided to me, no.
13 Q.  And those reports were Dr. Tuhrim's report and
14     Dr. Wasserstein's report?
15 A.  Yes.
16 Q.  Did you review any educational records?
17 A.  No.
18 Q.  How about any employment records?
19 A.  No.
20 Q.  What was the significance of -- strike that.
21     You reviewed the reports of Dr. Tuhrim and
22     Dr. Wasserstein; is that correct?
23 A.  I read them at the time I received them.
24 Q.  Are they relevant to your evaluation in this case?

## Page 37

1  A.  No, I relied on the assumptions that I referred to.
2  Q.  Other than Tracy Bolwell's deposition transcript, did
3      you review any others?
4  A.  Any other deposition transcripts?
5  Q.  Yes.
6  A.  No, I did not.
7  Q.  You didn't review Diane Banning or Charles Banning or
8      Dr. Pedevillano's deposition; is that correct?
9  A.  That's correct.
10 Q.  You didn't review the deposition of her ex-husband or
11     her present husband; is that correct?
12 A.  That is correct.
13 Q.  Would those deposition transcripts be important to
14     your evaluation in this case?
15 A.  Not that I am aware of.
16 Q.  Well, if you read those deposition transcripts and
17     there was certain -- is there a potential that there
18     would be information provided that would change your
19     evaluation?
20     MR. KENNEY:  Objection to form.
21     THE WITNESS:  Not that I am aware of.
22 Q.  From Ms. Bolwell's deposition, did you rely upon that
23     in preparing your report?
24 A.  I believe there was some background information in her

## Gary Crakes

### Page 46

1  the earning capacity of a female of Tracy Bolwell's
2  age and assumed levels of educational attainment.
3  Q.  Is that included, attached to your report?
4  A.  There is a reference to it in my report.  There is a
5  copy of the cover page of the original document and
6  the specific values are provided in my notes with my
7  calculation for economic loss.
8  Q.  Other than that, is there any other similar data that
9  you relied upon?
10 A.  I relied on data for the calculation of life
11 expectancy based on the Vital Statistics of the United
12 States.  I relied on the federal and state income tax
13 rates for the calculation of tax liability.  And I
14 relied on data from the US Chamber of Commerce for
15 fringe benefit calculations.
16 Q.  Is that the usual type of data you would rely upon in
17 cases such as this?
18 A.  It does vary from case to case depending upon the
19 elements of inclusion in the analysis.  But in this
20 matter, those were the primary reference documents on
21 which I relied.
22 Q.  What do you know about Tracy Bolwell's educational
23 history?
24 A.  It is my understanding that she had completed one to

### Page 47

1  one and a half years of community college.
2  Q.  She had a high school degree; is that correct?
3  A.  That was my understanding, yes.
4  Q.  Where did you obtain that information?
5  A.  Some of it I believe was in the deposition transcript,
6  the plaintiff's fact sheet, that is where I obtained
7  that information.
8  Q.  Do you know what kind of student she was in community
9  college?
10 A.  No.
11 Q.  You don't know how much money she made in 1996;
12 correct?
13 A.  No, I do not.
14 Q.  You don't know how much she made in 1997?
15 A.  No.
16 Q.  Or how much she made in '98?
17 A.  No.
18 Q.  Or '99?
19 A.  No.
20 Q.  Or any year from '99 to the present; correct?
21 A.  That is correct.  I was provided with information
22 recently concerning her approximate current annual
23 earnings level.
24 Q.  When were you provided with that information?

### Page 48

1  A.  Sometime within the last few weeks.  If I could just
2  consult my notes for a moment...
3  Q.  Sure, please do.
4  A.  June 21st of 2006.
5  Q.  What information were you provided regarding her
6  earnings?
7  A.  That her current annual earnings level is
8  approximately $100,000.
9  Q.  And that was, you say, current, was that for the year
10 2005?
11 A.  I believe that was the reference that was made, yes.
12 Q.  Have you seen any documentation regarding that?
13 A.  No.
14 Q.  You didn't have that information before you prepared
15 your report in this case; correct?
16 A.  That's correct.
17 Q.  Do you have any understanding of any physical
18 limitations Ms. Bolwell may or may not have as a
19 result of her stroke?
20 A.  I don't, no.
21 Q.  Do you know anything about her physical condition at
22 present?
23 A.  No.
24 Q.  That information is not relevant to your opinions; is

### Page 49

1  that correct?
2  A.  I am not qualified to make an assessment or
3  determination of those factors.  It certainly is
4  relevant from the standpoint of assumptions that I was
5  requested to make, but I am not qualified to make an
6  evaluation of those aspects.
7  Q.  You say it may be relevant to the assumptions you were
8  asked to make; you mean, it may be relevant to the
9  assumptions regarding the decreased level of income,
10 the 25 percent and the 50 percent assumptions; is that
11 correct?
12      MR. KENNEY:  Objection to form.
13      THE WITNESS:  That's correct.
14 Q.  Do you know of anyone who made an evaluation of
15 Ms. Bolwell that led to the assumptions that you were
16 asked to make, do you know who that person was?
17 A.  I do not know.
18      MR. KENNEY:  Objection, asked and answered.
19 Q.  For all you know, Mr. Meneo could have just pulled
20 those numbers off the top of his head; correct?
21      MR. KENNEY:  Objection.
22      THE WITNESS:  I don't know.
23      (Defendant's Exhibit 3 was marked for
24 identification.)

13 (Pages 46 to 49)

Gary Crakes

## Page 62

1  A.  That's correct.

2  Q.  The next sentence, doctor, reads, "Calculation of

3      future lifetime earnings based on median earnings of

4      females with some college from age 34.74 years results

5      in a value of $997,143." Did I read that correctly?

6  A.  Yes.

7  Q.  You calculated from age 34.74 years; correct?

8  A.  That's correct.

9  Q.  Why did you use that figure?

10  A.  Because that would be the age of Tracy Bolwell as of

11     the date of my report.

12  Q.  You didn't calculate from the date of her injury?

13  A.  I made no calculation of her loss of earning capacity

14     for the past time period; it is the future time period

15     only.

16  Q.  The future time period is from the date of your report

17     to the date of her retirement; correct?

18  A.  To age 65.

19  Q.  These calculations are based upon average persons;

20     correct?

21  A.  These are median annual earnings values that I have

22     relied on by gender, age, and level of educational

23     attainment.

24  Q.  They don't have anything to do with Tracy Bolwell's

## Page 63

1      earnings prior to 34.74 years?

2  A.  No, they do not.

3  Q.  If we wanted to get a true -- strike that.

4          If we wanted to get the most accurate estimation

5      of her lost future earnings, wouldn't it be ideal to

6      use information regarding her prior earnings to come

7      to that calculation?

8  A.  Not necessarily, no.

9  Q.  Why not?

10  A.  Because under some circumstances individuals may not

11     be, at the age that she had obtained at the time of

12     her injury, may not at 25 years of age have actually

13     found the type of employment that they will pursue for

14     the balance of their lifetime. So looking at her

15     actual earnings record prior to her injury may not be

16     a measure of her earning capacity.

17  Q.  So you are saying her earning capacity may actually be

18     more. For instance, in Tracy Bolwell's case, prior to

19     age 25 she was making 'x' amount of dollars; you are

20     saying her earning capacity may have been more than

21     the 'x' amount of dollars?

22          MR. KENNEY: Objection to form.

23          THE WITNESS: I don't know what she was

## Page 64

1      earning specifically prior to her injury. What I

2      am indicating is that at a relatively young age,

3      the actual earnings of an individual may not be

4      an accurate measure of what their capacity would

5      be over their lifetime.

6  Q.  So instead you used the average earnings of similar

7      sex persons with similar education level; correct?

8  A.  To clarify, the median earnings.

9  Q.  The median earnings of similar sex people with similar

10     education levels; correct?

11  A.  By gender, age, and level of educational attainment,

12     yes.

13  Q.  The next sentence reads, "With the assumption that the

14     future average annual rate of growth of earnings will

15     be equal to the discount rate, this figure is properly

16     interpreted as a discounted value and appears as the

17     first entry to summary Exhibit I." Did I read that

18     accurately?

19  A.  Yes.

20  Q.  Can you explain to me what that means.

21  A.  Yes, any values that we are estimating over the future

22     time period must be discounted or reduced to present

23     value, basically because of the ability of money to

24     earn interest.

## Page 65

1          There are two factors to consider when looking at

2      earnings over a future time period. One is that we

3      typically expect earnings to grow over time. And

4      alternatively, we need to reduce those future values

5      to present value. I don't know specifically over the

6      course of the next 30 years what the earnings growth

7      rates will be every year in the future, nor do I know

8      what interest rates will be. But looking at the two

9      on a comparative basis over a historical time period

10     of the post-World War II era, I can make an assumption

11     as to how the two will relate to one another.

12          And my assumption in this matter for someone of

13     Tracy Bolwell's age is that on average the rate of

14     growth and earnings would be equal to the discount

15     rate. The rate by which earnings will grow will be

16     approximately equal to the rate by which they need to

17     be reduced to present value. In some years, one may

18     exceed the other; but on average, the two will be

19     equal over time.

20  Q.  Can you explain for me, what is the concept of the

21     discount rate?

22  A.  A discount rate is an interest rate used to reduce the

23     present value. If you are expecting to receive a

24     value at some point in the future, that value has a

Gary Crakes

## Page 90

1      THE WITNESS: I am not qualified to make
2    that determination.
3  Q.  Well, I think -- would you come to testify at trial in
4    this case?
5  A.  It is my understanding that if there was a trial in
6    this matter, I would testify based upon the analysis
7    that I performed.
8  Q.  I guess the answer -- you are telling me that those
9    facts that I have just related to you have no
10    relevance to your opinion in this matter because you
11    are going to assume that she is however impaired you
12    are asked to assume she is regardless of what the
13    facts are; correct?
14  A.  I am not making any assessment of what the facts are
15    or are not. My abilities and qualifications would not
16    permit me to make an assessment of her degree of
17    impairment whatever those facts happen to be, and I am
18    not going to make that assessment.
19  Q.  If someone asks you to assume that she is impaired and
20    you read her deposition, are you qualified to read her
21    deposition and make an assessment that she is not
22    impaired if someone asks you to assume she is?
23      MR. KENNEY: Objection to the form.
24      THE WITNESS: I am not qualified to make

## Page 91

1    that --
2      MR. KENNEY: It is outside of the scope of
3    his --
4  BY MR. GEOPPINGER:
5  Q.  Has that ever happened?
6  A.  Has what ever happened?
7  Q.  Has anyone ever asked you or said doctor, please give
8    me a calculation of someone who is 25 percent impaired
9    and then provided you with a deposition, you read the
10    deposition, and thought she is not impaired at all and
11    I am not going to provide a calculation?
12  A.  Again, I am not qualified to make an assessment of
13    someone's degree of impairment.
14  Q.  So that has never happened in a case?
15  A.  Not that I recall, no.
16  Q.  So that testimony in that deposition is not relevant
17    to the percentage of impairment you are going to apply
18    because the percentage of impairment you are going to
19    apply is based upon an assumption; correct?
20  A.  Assumption or other information.
21  Q.  What other information?
22  A.  If there is any type of assessment provided by someone
23    who has expertise in that area.
24  Q.  Would other information perhaps include the witness'

## Page 92

1    own testimony?
2  A.  Again, I am not qualified to make an assessment of the
3    individual's particular circumstances. If there was
4    an appraisal or assessment provided by an expert in
5    that area, I certainly would review it and rely on it
6    as appropriate.
7  Q.  But that is not the case here; is that correct?
8  A.  That is my understanding.
9      (Defendant's Exhibit 4 was marked for
10    identification.)
11  Q.  Doctor, I have handed you what has been marked as
12    Defendant's Exhibit 4. Do you recognize this
13    document?
14  A.  Yes.
15  Q.  Can you tell me what it is.
16  A.  It is a copy of notes that I made and questions that I
17    identified upon my initial review of the materials
18    provided to me in this matter.
19  Q.  Is this your handwriting?
20  A.  Yes, it is.
21  Q.  Over on the left-hand corner, doctor, it is kind of
22    cutoff; it is down near the bottom of the page. I
23    believe it says, "future loss only"; is that correct?
24  A.  Yes.

## Page 93

1  Q.  Why did you write that?
2  A.  Because that was information that was provided to me,
3    that I was being requested to make the calculation
4    only of the future loss of Tracy Bolwell.
5  Q.  And that future loss is from 34.74 to 65; correct?
6  A.  That's correct.
7  Q.  No assessment of past lost wages; correct?
8  A.  That's correct.
9  Q.  Any reason you did not do that in particular?
10  A.  I don't recall.
11  Q.  Is it just because you were not asked to do that?
12  A.  I believe the request was made just for the future
13    loss.
14  Q.  Do you recall if there was any other information
15    provided of why you weren't being asked for an
16    assessment of that or...
17  A.  I don't recall.
18  Q.  If you go down below that to the very bottom of the
19    page, the left side, it looks like there is a no
20    written and a check mark and a question mark,
21    household -- I can't read that; can you read that for
22    me.
23  A.  Household services.
24  Q.  Thank you.

# Gary Crakes

1  BY MR. GEOPPINGER:

2  Q. Does this information change your opinion in any way?

3  A. No, not based on the assumptions I was requested to

4     make.

5  Q. Does the fact that the evidence in the case doesn't

6     appear to support any of the assumptions you made give

7     you any concern?

8         MR. KENNEY: Objection. First of all, what

9     evidence are you referring to? There is no

10    evidence at this point.

11 Q. Doctor, the evidence I am referring to, to refresh

12    your recollection, is Exhibit 5 in front of you as

13    well as Tracy Bolwell's school history, as well as her

14    ability to return to the same job that she had prior

15    to her stroke after her stroke; given all those

16    considerations, does that give you any concern that

17    the assumptions that you were asked to make are not

18    supported by the evidence in this case?

19        MR. KENNEY: Objection.

20        THE WITNESS: No, not based on the

21    assumptions that I was requested to make and that

22    my analysis is based on the future time period

23    only.

24 Q. So you are telling me that you don't make any

1     evaluations of the assumptions, you just take them at

2     their word and apply those --

3         MR. KENNEY: Objection. Don't answer that

4     question. The witness has answered that on

5     several occasions. I am going to instruct the

6     witness not to answer the question.

7         MR. GEOPPINGER: I will rephrase it a

8     different way.

9  BY MR. GEOPPINGER:

10 Q. Doctor, have you made any evaluation of the

11    assumptions you were asked to make, an independent

12    evaluation of the assumptions you were asked to make

13    in this case?

14        MR. KENNEY: Objection. Again, he is not

15    qualified to make an assessment as he has

16    testified on numerous occasions.

17        MR. GEOPPINGER: Okay, you can repeat that

18    answer.

19        THE WITNESS: I am not qualified to make

20    that determination.

21 BY MR. GEOPPINGER:

22 Q. And you haven't made that determination in this case;

23    correct?

24 A. That's right.

1         MR. GEOPPINGER: That's all the questions I

2     have. Thank you very much for your time, doctor.

3         (Whereupon, the examination of GARY CRAKES

4     in the above-entitled matter concluded at

5     11:08 a.m.)

6         *   *   *   *   *

7  STATE OF          )

                        ss.

8  COUNTY OF         )

9

10        I, GARY CRAKES, have read the foregoing

11    record of my testimony taken at the time and

12    place noted in the heading hereof, and I do

13    hereby acknowledge it to be a true and accurate

14    transcript of same.

15

16    _____

17        GARY CRAKES

18 DATED: _____

19

20 Sworn to before me this _____

21 day of _____, 20_____

22

23    _____

24 Notary Public

1     C E R T I F I C A T I O N

2

3         I, SADIE L. HERBERT, Shorthand Reporter and

4     Notary Public in and for the State of New York,

5     do hereby CERTIFY that the foregoing record taken

6     by me at the date and place noted in the heading

7     hereof is a true and accurate transcript of same,

8     to the best of my ability and belief.

9

10    _____

11        SADIE L. HERBERT

12

13 Dated: July 6, 2006