## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **TRACY BOLWELL,** | : | **CIVIL ACTION NO: 302CV01001AWT** |
| | : | |
| **Plaintiff,** | : | **JUDGE ALVIN W. THOMPSON** |
| | : | |
| **vs.** | : | **MAG. JUDGE DONNA F. MARTINEZ** |
| | : | |
| **DURAMED PHARMACEUTICALS, INC., BARR LABORATORIES, INC.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | **January 19, 2007** |

**MEMORANDUM OF DEFENDANTS DURAMED PHARMACEUTICALS, INC., AND BARR LABORATORIES, INC., IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO LIMIT THE SCOPE OF TESTIMONY OF DEFENANTS' EXPERT LOUISE MCCULLOUGH, M.D.**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF FACTS ................................................................................ 2

      A.    Plaintiff's Claims ................................................................................ 2

      B.    Dr. McCullough and Her Testimony ................................................. 2

III.    LAW AND ARGUMENT .................................................................................. 4

      A.    Dr. McCullough Is Qualified to Offer the Opinions She Has Expressed ............ 4

           1.    Gynecological and Obstetrical Issues ...................................... 4

           2.    The Association Between PPA and Hemorrhagic Stroke ........................ 6

      B.    Dr. McCullough's Opinions Do Satisfy *Daubert's* "Fit" Test ............................ 12

           1.    Ms. Bolwell's Medical History ................................................ 12

           2.    Dr. McCullough's Reliance on Studies Demonstrating that Women in the Postpartum Period Are at an Increased Risk for Stroke. ................ 15

IV.    CONCLUSION ................................................................................................. 19

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)...................................................................................................4

Domingo v. T.K.,
    289 F.3d 600, 606 ...................................................................................................15

*In Re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) .....................................................................................4

*McCullock v. H.B. Fuller Co.*,
    61 F.3d 1038 (2d Cir. 1995) ...................................................................................14

*Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003) ...................................................................................4

*Pugliano v. U.S.*,
    315 F. Supp. 2d 197, 199 (D. Conn. 2004).............................................................15

*Thomas v. Newton Int'l Enters.*,
    42 F.3d 1266 (9th Cir. 1994) ..................................................................................4

*Zuchowicz v. United States*,
    140 F.3d 381 (2d. Cir. 1998) ..............................................................................9, 10

*Zuchowicz v. United States*,
    870 F. Supp. 15 (D. Conn. 1994) *aff'd* 140 F.3d 381 (2d Cir. 1998) .......................9

**Statutes**

Fed. R. Evid. 702 ...........................................................................................................3

## I.    INTRODUCTION

Lacking the requisite expert testimony to rebut the opinions proffered by Dr. McCullough, plaintiff instead attempts to challenge the qualifications of a well-respected neurologist, who specializes in strokes and their causes in women, in an effort to preclude the introduction of that testimony.  Yet, plaintiff's challenge misses the mark.

Plaintiff confuses facts with opinions and complains that Dr. McCullough's failure to verbatim quote her medical records somehow renders her unqualified to offer opinions. However, plaintiff's disagreement with Dr. McCullough recitation of facts does not make Dr. McCullough unqualified to offer expert opinions.

Nor is the failure of an expert to have conducted primary research on the substance at issue grounds for exclusion of the expert based on a purported lack of qualifications.  An expert is qualified to offer testimony by their knowledge, skill, experience, training, or education. Those qualifications may come in any number of forms.  Original research on the substance at issue may or may not be a part of those qualifications, but is not a prerequisite to admissibility.

Plaintiff also attempts to remedy her lack of expert rebuttal testimony by offering her own "expert" challenge to Dr. McCullough's opinions.  Plaintiff attempts to exclude testimony unfavorable to her case by challenging Dr. McCullough's conclusions, including her testimony about plaintiff's increased risk for stroke due to her miscarriage.  However, plaintiff's predictable disagreements with Dr. McCullough's conclusions are not reasons to exclude Dr. McCullough's testimony as unreliable.  Plaintiff must demonstrate that the methodology Dr. McCullough used in formulating her opinions is unreliable in order to exclude her conclusions.  Plaintiff has not even challenged her methodology.  As such, plaintiff's motion must be denied.

## II.    STATEMENT OF FACTS

### A.    Plaintiff's Claims

Plaintiff alleges that she suffered a hemorrhagic stroke on January 21, 1997, as a result of her alleged use of a cough/cold/allergy decongestant prescription medication containing phenylpropanolamine HC, also known as PPA, manufactured by defendant Duramed Pharmaceuticals, Inc.  (*See generally* Plaintiff's Complaint ("Complaint").)  According to plaintiff, defendants are liable for manufacturing a defective PPA-containing product with inadequate labeling that failed to warn of dangers posed by the use of the product.  (*See id.*)  Plaintiff's Complaint asserts claims for strict liability pursuant to Connecticut's Product Liability Act, Connecticut General Statutes § 52-572m *et seq.*, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA") pursuant to Connecticut General Statutes § 42-110a *et seq.*  (*See id.*, ¶¶ 19, 30.)  Plaintiff also seeks punitive damages under Connecticut General Statutes § 52-240.  (*See id.*, p. 18.)  Plaintiff's claim for violation of the CUTPA has been dismissed.

### B.    Dr. McCullough and Her Testimony

Dr. McCullough is board certified in neurology and vascular neurology.  She received her bachelor's degree in psychology from the University of Connecticut in 1989, a master's degree in experimental psychology from the University of Connecticut in 1991, and a Ph.D. in neuroscience from the University of Connecticut in 1992.  (*See* Exhibit A to Expert Report of Louise McCullough, M.D. ("McCullough's Report"), attached as Exhibit A to Plaintiff's Motion to Exclude.)  Dr. McCullough subsequently obtained a medical degree from the University of Connecticut in 1996.  (*See id.*)  She then completed an internship in medicine, a residency in neurology, and a postdoctoral fellowship in cerebral vascular disease at Johns Hopkins Hospital.  (*See id.*)  She joined the faculty of Johns Hopkins as an assistant professor in the department of neurology, stroke division, for two year before accepting her current appointments as the

2

Director of Stroke Research at the University of Connecticut Health Center and Harford Hospital. (*See id.*)

In her clinical practice, Dr. McCullough routinely evaluates patients with cerebral vascular disease. (*See* McCullough Report, p. 1.) During her years of practice, she has examined and managed hundreds of stroke patients. (*See id.*)

In addition to her clinical practice, Dr. McCullough is active in clinical trials for the acute treatment and prevention of stroke. (*See id.*) Her primary research interest is in stroke and vascular disease, including gender differences in stroke. (*See id.*) She has published several articles on risk factors and treatment of stroke in women, including *Stroke in the Female: Role of Biological Sex and Estrogen* and *Gender Differences in Stroke Pathobiology: Therapeutic Implications in Acute Stroke: Bench to Bedside*. (*See* Exhibit A to McCullough Report.) Dr. McCullough also manages an active basic science laboratory funded by the National Institute of Health. (*See* McCullough Report, p.1.)

Dr. McCullough will offer testimony to assist the trier of fact in understanding the gaps in the evidence relied upon by plaintiff's experts to conclude that PPA is generally associated with hemorrhagic stroke. Additionally, Dr. McCullough will offer testimony regarding the risk factors for hemorrhagic stroke, and the application of those risk factors to the plaintiff in this matter. Dr. McCullough will testify, as permitted by the Pretrial Order issued by the PPA MDL Court in accordance with the opinions expressed by the experts designated by the Defendants' Steering Committee ("DSC") in the PPA MDL that there is no reliable scientific evidence that PPA cough/cold products are associated with the development of hemorrhagic stroke. Dr. McCullough will specifically address the primary study relied upon by plaintiff's experts for evidence of causation, the Hemorrhagic Stroke Project ("HSP"), and provide testimony

regarding the flaws and limitation of that study.  She also will identify and explain the various

potential causes for Ms. Bolwell's hemorrhagic stroke, including postpartum stroke, cigarette

smoking, alcohol use, and benign angiopathy of the central nervous system ("BACNS").

## III.    LAW AND ARGUMENT

### A.    Dr. McCullough Is Qualified to Offer the Opinions She Has Expressed

Plaintiff's argument to preclude Dr. McCullough from offering certain opinions on the

theory that she is unqualified to do so is without authority or merit.

Federal Rule of Evidence 702 serves as the starting point for the evaluation of expert

testimony.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  Rule 702

requires that a testifying expert be "qualified as an expert by knowledge, skill, experience,

training, or education."  Fed. R. Evid. 702.  "Rule 702 contemplates a broad conception of expert

qualifications."  *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994).

Qualification requires "that the witness possess specialized expertise."  *Schneider v. Fried*, 320

F.3d 396, 405 (3d Cir. 2003).  That requirement has been interpreted liberally, allowing for a

broad range of knowledge, skills, and training to qualify an expert as such.  *See In Re Paoli R.R.

Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).  "The advisory committee notes emphasize

that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of

qualified expert."  *See Thomas*, 42 F.3d at 1269 (citations omitted).

### 1.    Gynecological and Obstetrical Issues

Plaintiff seeks to preclude Dr. McCullough from offering "opinions" regarding

"plaintiff's gynecological condition at the time of, and during the weeks prior to, her

hemorrhagic stroke."  (Plaintiff's Motion to Exclude, pp. 5-6.)  As plaintiff does not identify

what "opinions" she is asking this Court to preclude Dr. McCullough from offering, one must

presume plaintiff wishes to exclude the introduction of evidence regarding her miscarriage and events related thereto. Plaintiff's request on this topic confuses "opinions" with "facts."

It is a fact that Ms. Bolwell suffered a miscarriage nine weeks prior to her hemorrhagic stroke. (*See* Northern Duchess OBGYN Ass. Records, Bates Nos. 6TRACY00002-4, attached as Exhibit H to Affidavit of Jeffrey D. Geoppinger filed January 5, 2007.) It is a fact Ms. Bolwell subsequently complained of continued bleeding, and was diagnosed with endometritis after her miscarriage. (*See id.*, Bates No. 6TRACY00004.) It is a fact Ms. Bolwell was noted to have some retained products of conception that were removed by forceps on November 13, 1996. (*See id.*, Bates No. 6TRACY00002.) It is a fact Ms. Bolwell continued to complain of abnormal menstrual cycles and spotting as late as December 30, 1996. (*See id.*, Bates No. 6TRACY00005.) It is a fact that the physical manifestations experienced by Ms. Bolwell following her miscarriage were indicative that she continued to experience hormonal issues associated with the failed pregnancy. (*See id.*)

Whether or not Dr. McCullough is an obstetrician is irrelevant to her understanding of those facts. What those facts support is Dr. McCullough's testimony that an alternative potential cause of Ms. Bolwell's stroke was her miscarriage. As a neurologist specializing in stroke, Dr. McCullough clearly is qualified to provide testimony that a woman's risk for suffering a stroke is at an all-time high during postpartum periods.

Unable to rebut that testimony, plaintiff resorts to the ruse of arguing qualifications in an attempt to keep the jury from learning of that risk. However, plaintiff's inability to rebut that testimony does not constitute grounds for excluding Dr. McCullough's testimony that Ms. Bolwell's miscarriage carried with it a risk of stroke.

Plaintiff's request must be denied.

## 2.    The Association Between PPA and Hemorrhagic Stroke

Next, plaintiff argues Dr. McCullough is unqualified to offer opinions "as to whether or not PPA can cause hemorrhagic stroke." (Plaintiff's Motion to Exclude, p. 6.) That argument ignores the proceedings that occurred before Judge Rothstein in the PPA MDL, the Pretrial Order issued by Judge Rothstein upon remand of this case to this Court, and applicable law.

The admissibility of expert testimony regarding general causation was litigated and ruled upon by Judge Rothstein in the PPA MDL. Judge Rothstein issued a *Daubert* opinion on defendants' motions to exclude plaintiffs' expert witness testimony on issues of general causation on June 18, 2003. (*See* Order Granting in Part and Denying in Part MDL Defendants' Motion to Preclude Plaintiffs' Experts As to General Causation ("*Daubert* Opinion"), attached as Exhibit 1.) In pertinent part, she ruled that plaintiffs' experts were permitted to testify that the use of PPA-containing cough/cold products is associated with the occurrence of hemorrhagic strokes in men and women. (*See id*.) In her ruling, she recognized that plaintiffs' general causation experts based their opinions on the HSP, biological plausibility, animal studies, human clinical studies, case reports and case series, and medical textbooks. (*See id*., p. 11.)

In response to the opinions of plaintiffs' general causation experts, the DSC designated rebuttal experts. Defendants' general causation experts opined that there is insufficient reliable scientific evidence to demonstrate that PPA is associated with hemorrhagic stroke. Defendants' experts arrived at their conclusion after reviewing the world's medical literature on PPA, including the HSP. Several of defendants' experts identified and criticized the flaws in the HSP and opined that it did not provide sufficiently reliable evidence to conclude that PPA is

associated with hemorrhagic stroke.  The opinions of defendants' general causation experts were not challenged in the PPA MDL, and as such, all their opinions are admissible in this litigation. [1]

While the PPA MDL was the primary forum for the disclosure of general causation expert witnesses and their opinions, the parties, through a stipulated order signed by Judge Rothstein, agreed to the disclosure of additional experts on issues of general causation following remand to the transferor courts.  That stipulated order was included in the Pretrial Order issued by Judge Rothstein on May 18, 2005, in this case.  In that Pretrial Order, Judge Rothstein stated:

> Under the process established by the MDL Court, experts were disclosed by certain members of the PSC and by defendants.  Individual plaintiffs could then adopt those expert disclosures or disclose their own experts.  If a plaintiff adopted the experts disclosed by certain members of the PSC with respect to any issues of widespread applicability, that plaintiff may nevertheless later designate different experts to testify at trial on the same issues provided: (1) the later-designated experts rely upon the same or substantially the same evidence, opinions and/or theories relied upon by the PSC expert(s) adopted by that plaintiff; and (2) such opinions, evidence and/or theories have not been previously determined by the MDL to be scientifically unreliable or otherwise inadmissible.  **Similarly, a defendant may later designate expert(s) different from the generic experts(s) disclosed by defendants to testify at trial on the same issues provided that the later designated expert(s) rely upon the same or substantially the same evidence, opinions, and/or theories relied upon by defendants' previously disclosed generic experts**.

(Amended Final MDL Pretrial Order ("Pretrial Order"), p. 9.) (emphasis added)

Judge Rothstein's Pretrial Order acknowledges the inconvenience and inability of general causation experts designated in the PPA MDL to be available to appear for trials all over the country in transferor courts after remand.  Therefore, she permitted both plaintiffs and defendants to retain additional experts to offer testimony consistent with that offered by the

---

[1] Defendants adopted the opinions of the following general causation experts designated on behalf of defendants in the PPA MDL for use in this matter: (1) Gerald A. Faich, M.D., M.P.H; (2) Wolfgang Kuschinsky, M.D.; (3) Richard F. Lockey, M.D.; (4) Mark T. Nelson, Ph.D.; (5) Howard W. Ory, M.D., M.Sc.; (6) Ralph L. Sacco, M.D., M.S.; (7) James J. Schlesselman, Ph.D.; (8) Lynda F. Voigt, Ph.D.; (9) Bryce Weir, M.D.; (10)Philip A. Wolf, M.D.; (11) Gregory W. Albers, M.D.; (12) Janet R. Daling, Ph.D.; (13) Charles H. Hennekens, M.D.; (14) Brian B. Hoffman, M.D.; (15) Leo Nelson Hopkins, M.D.;(16) Phillip C. Jobe, Ph.D.; (17) David W. Stewart, Ph.D.

general causation experts designated in the MDL, so long as those experts relied on the same or

substantially the same information relied upon by the general causation experts previously

designated and accepted by the PPA MDL Court.  (*See id*.)

Pursuant to Judge Rothstein's Pretrial Order, defendants appropriately designated

Dr. McCullough, who like the general causation experts designated by defendants in the PPA

MDL, will testify that:

(1)    There is insufficient scientific evidence to conclude that PPA is associated
with hemorrhagic stroke;

(2)    there is no reliable data to support the proposed mechanisms by which
PPA allegedly causes hemorrhagic stroke;

(3)    case studies and reports suggesting a possible association between the use
of PPA and hemorrhagic stroke are inadequate to prove causation;

(4)    there are numerous flaws in the HSP and it does not prove a casual link
between PPA and hemorrhagic stroke; and

(5)    studies on other compounds are not relevant to PPA and do not provide
reliable evidence upon which to base inferences regarding the effect of PPA in
humans.

Before offering those opinions Dr. McCullough reviewed, analyzed, and relied on the

same information relied on by defendants' general causation experts in the PPA MDL.  Like

those experts, Dr. McCullough reviewed the world's medical literature relevant to the association

between PPA and stroke, including the HSP.  Additionally, she had the benefit of reviewing the

expert reports and deposition testimony of ALL general causation experts designated in the PPA

MDL on behalf of both parties before formulating her opinion.  Her reliance on the opinions

offered by those experts was specifically contemplated and accepted by Judge Rothstein in the

Pretrial Order when she stated that a defendants are permitted to designate an additional expert

on the issue of general causation after remand "provided that the later designated expert(s) rely

upon the same or substantially the same evidence, **opinions and/or theories** relied upon by defendants' previously disclosed generic experts." (*Id.*) (emphasis added)

Dr. McCullough's education, training, research, and clinical experience as a board certified neurologist with a Ph.D. in neuroscience thoroughly qualifies her to review and evaluate the relevant literature, including the HSP, and the testimony of the general causation experts and offer opinions regarding the insufficiency of the scientific evidence to support any conclusion that PPA is associated with hemorrhagic stroke. It is disingenuous for plaintiff to contend otherwise.

Plaintiff's narrow criticisms that Dr. McCullough is not qualified to offer those opinions because she has not conducted original research on PPA or treated any patients who suffered a stroke from taking PPA simply do not provide a basis for disqualifying Dr. McCullough. Indeed, this Court previously has recognized that physicians, who are not toxicologists and who have not conducted original research on a product at issue in a toxic tort case, are nonetheless qualified to offer opinions as to whether the substance at issue is associated with the injury at issue. *See Zuchowicz v. United States*, 870 F. Supp. 15 (D. Conn. 1994) *aff'd* 140 F.3d 381 (2d Cir. 1998).

In *Zuchowicz*, plaintiff identified Yale pulmonologist Richard Matthay, M.D., as an expert to testify as to the cause of plaintiff's primary pulmonary hypertension (PPH). *See Zuchowicz*, 870 F. Supp. at 18. Dr. Matthay testified that the decedent's PPH more likely than not was caused by her ingestion of the drug Danocrine. *See Zuchowicz v. United States*, 140 F.3d 381, 385 (2d. Cir. 1998). His opinion was based on his "careful review of [the] medical literature concerning Danocrine and pulmonary hypertension, and plaintiff's medical records and medical history." *See Zuchowicz*, 870 F. Supp. at 20. Although Dr. Matthay had not conducted original research on Danocrine and had not diagnosed other patients as having Danocrine

induced PPH, the Court denied defendant's motion to exclude his testimony and held that

Dr. Matthey "clearly possesses expert scientific knowledge in this field." *Id.* at 18. The district

court's decision was upheld by the Second Circuit Court of Appeals which found that "disputes

as to the strength of [an expert's] credentials, . . . go to the weight, not the admissibility of his

testimony." *Zuchowicz v. United States*, 140 F.3d at 387.

Dr. McCullough is a board-certified neurologist with a Ph.D. in neuroscience specializing

in research and treatment of stroke in women. Like Dr. Matthey in *Zuchowicz*, Dr. McCullough

has carefully reviewed the medical literature on PPA and hemorrhagic stroke, as well as

plaintiff's medical records and medical history. That review, coupled with Dr. McCullough's

education, training, and experience, provide reliable bases for her testimony. She is eminently

qualified and prepared to render her opinion that there is insufficient scientific evidence to

conclude that the use of PPA is associated with hemorrhagic stroke. While the fact that she has

not conducted original research on PPA may provide plaintiff with fodder for cross-examination,

it does not make Dr. McCullough unqualified to render her opinions.

Judge Rothstein's ruling in the PPA MDL also recognized that experts do not have to

make a career out of studying PPA before offering an opinion as to whether or not it is associated

with hemorrhagic stroke. In her *Daubert* opinion regarding plaintiffs' general causation experts,

Judge Rothstein recognized that while some of those experts based their opinions, in part, on

independent PPA-related research, the majority of plaintiffs' general causation experts

formulated their opinions for the purposes of the litigation and premised upon "their clinical

experience and training, review of the documents and literature, and/or studies and publications

on stroke and other toxic substances." (*Daubert* Opinion, p. 20, footnote 12.)  Indeed, plaintiff in

this case has adopted the opinions of several of those experts for use on her behalf in this matter.[2]

Like plaintiffs' general causation experts, Dr. McCullough applied her education, clinical

experience and training to her review of the relevant medical literature, and studies and

publications on stroke and substances associated with hemorrhagic stroke to formulate her

opinions.  Her clinical experience in diagnosing and treating stroke patients, as well as her

research experience in the causes of stroke constitutes a solid base upon which to premise her

opinion that PPA is not associated with hemorrhagic stroke.  If experts were held to be

unqualified solely because they had not conducted original research on the pharmaceutical

product at issue, few experts would qualify to testify on behalf of plaintiffs or defendants in this

type of litigation.  The requisite knowledge, skill, experience, training, or education to offer

expert testimony may come in any number of forms.  Original research on PPA may or may not

be a part of the expert's knowledge, skill, experience, training, or education.  However, as

recognized by the law of this jurisdiction and Judge Rothstein, conducting original research on

PPA is not a prerequisite to finding an expert qualified to offer expert opinions.

Finally, plaintiff's argument that Dr. McCullough is unqualified as an expert because she

has not diagnosed a patient as having suffered a stroke from the use of PPA and does not include

PPA in her differential diagnosis is nonsensical.  In order for a physician to consider and include

ingestion of a drug in a differential diagnosis, there must exist reliable scientific evidence that it

is capable of causing the condition at issue.  As a result, in order for Dr. McCullough to diagnose

a patient with a PPA-induced stroke, it would have to be part of her differential diagnosis.  Yet,

---

[2] Plaintiff has adopted as general causation experts Stanley Tuhrim, M.D., Jerome Avorn, M.D., and Steven Kittner, M.D.  In her *Daubert* Opinion, Judge Rothstein noted that none of those experts conducted any original research on PPA that they used to support their general causation opinions.

Dr. McCullough's opinion is that the scientific evidence does not support the conclusion that PPA, taken in recommended doses, is associated with the development of hemorrhagic stroke.

If Dr. McCullough had diagnosed a patient with a PPA-induced hemorrhagic stroke, as plaintiff contends she must have to be qualified to offer her opinion, how could she testify that in her opinion there is not sufficient scientific evidence to establish that PPA causes hemorrhagic stroke? Plaintiff's argument is circular and unavailing.

In light of Judge Rothstein's Pretrial Order and Dr. McCullough's eminent qualifications and thorough consideration and analysis of the same scientific evidence relied on by the general causation experts designated the PPA MDL, there is no question she is capable of and permitted to offer her opinions. Plaintiff's motion to exclude her testimony should be denied.

### B.    Dr. McCullough's Opinions Do Satisfy *Daubert's* "Fit" Test

Plaintiff also seeks to exclude Dr. McCullough's opinion that plaintiff's miscarriage put her at an increased risk for stroke on the grounds that it, according to plaintiff, does not "fit" the facts of the case. First, plaintiff contends Dr. McCullough failed to take into account the entirety of Ms. Bolwell's medical history and portrayed information in a manner that "distorts the facts and conveys a false picture of [Ms. Bolwell's] medical history during the months preceding her ICH." (Plaintiff's Motion to Exclude, p. 12.) Then plaintiff asserts Dr. McCullough uses that allegedly "false" picture of Ms. Bolwell's medical history to "fit" her into studies that support Dr. McCullough's opinions that women are at a higher risk for stroke postpartum. (*See id.*, p. 17.) Both assertions lack merit and must be rejected.

### 1.    Ms. Bolwell's Medical History

Plaintiff challenges Dr. McCullough's reading of plaintiff's medical records and quibbles with Dr. McCullough's recitation of that information in her report. For example, plaintiff takes issue with Dr. McCullough's characterization of plaintiff's irregular periods following her

miscarriage as "abnormal cycles."  Plaintiff cites to a medical record that states "irregular periods are not unusual after abortion, endometritis" (*See id*., p. 15), to argue there is no evidence to suggest Ms. Bolwell's "spotting" was "abnormal."  However, the fact that it is not "unusual" to have irregular menstrual cycles and "spotting" occur following an abortion and infection like endometritis does not mean it is not "abnormal" from the viewpoint of normal menstrual cycles.

Similarly, plaintiff complains that Dr. McCullough failed to state in her report that plaintiff's endometritis was documented as resolved by November 19, 1996.  (*See id.*, p. 13.) Yet, plaintiff does not state the relevance of her complaint.  Dr. McCullough noted that Ms. Bolwell developed endometritis following her miscarriage – that is a fact plaintiff does not dispute.  If plaintiff's complaint is that the scientific literature which supports the conclusion that there is an association between infection in the "postpartum period" and hemorrhagic stroke is somehow not relevant to Ms. Bolwell, it was incumbent upon her to designate an expert to explain why that might be the case.  Plaintiff did not do so.  She cannot now, through her counsel, challenge the relevance.

While plaintiff takes great pains to detail her complaints with Dr. McCullough's recitation of her medical record, plaintiff never explains how any of those criticisms render Dr. McCullough's opinions inadmissible.  Indeed, by quibbling with Dr. McCullough's summary of plaintiff's medical condition following her miscarriage, plaintiff has implicitly recognized that her miscarriage and her subsequent medical condition is directly relevant to whether she was at an increased risk of hemorrhagic stroke as of January 21, 1997.

It is well-accepted, and plaintiff does not dispute, that a woman is at the highest risk of stroke in the postpartum period.  A reliable differential diagnosis which attempts to evaluate the cause of an injury must consider all risk factors.  The information in plaintiff's medical records

documenting her miscarriage and demonstrating that she retained the products of conception for several days after her miscarriage and experienced continued hormonal issues through December 30, 1996, reasonably led Dr. McCullough to reliably conclude that plaintiff's miscarriage placed her at increased risk of hemorrhagic stroke as of January 21, 1997. As such, Dr. McCullough's opinion regarding the potential role of plaintiff's miscarriage in her stroke certainly "fits" the fact of this case

Plaintiff's complaints concerning Dr. McCullough's reading and rendition of plaintiff's medical history are red herrings because challenges to Dr. McCullough's conclusion (i.e. plaintiff was at risk for stroke due to her postpartum condition as of January 21, 1997) is the proper subject of rebuttal expert testimony and cross-examination, not a *Daubert* challenge. *See McCullock v. H.B. Fuller Co*., 61 F.3d 1038, 1044 (2d Cir. 1995) (noting disputes as to the details in the application of a differential diagnosis, as opposed to not conducting a reliable one at all, go to the weigh, not admissibility, of expert witness testimony.)

In reality, plaintiff's motion is simply an effort by plaintiff and her counsel to provide the expert testimony, through motion practice, plaintiff lacks due to her own neurologist expert's failure to address the issue of her postpartum condition, albeit because he had no knowledge of it in the first instance. Plaintiff does not have an expert witness to opine that Dr. McCullough's consideration of plaintiff's miscarriage as a risk factor for her stroke is improper, so plaintiff attempts to do it herself through her motion. However, motion practice is not a proper forum for the presentation of expert testimony. Such disclosure is governed by Rule 26. Plaintiff simply has not provided the Court with any reason to exclude Dr. McCullough's testimony other than her non-expert disagreement with Dr. McCullough's opinions.

**2.    Dr. McCullough's Reliance on Studies Demonstrating that Women in the Postpartum Period Are at an Increased Risk for Stroke.**

Finally, plaintiff attempts to exclude Dr. McCullough's opinions regarding her miscarriage and its relevance to her stroke by claiming that the studies Dr. McCullough relies upon for the proposition that women in the postpartum period are at an increased risk of stroke do not "fit" the facts of this case. Plaintiff does not contest that those studies show an increased risk of stroke in women following pregnancy. Rather, plaintiff claims that Dr. McCullough cannot rely on those published, peer-reviewed studies because the study participants were not identical to Ms. Bolwell. However, those contentions are distinctions without a difference.

The question addressed by the studies relied upon by Dr. McCullough was: Are women at higher risk for stroke during and following pregnancy. The conclusion of those studies was: Yes. Dr. McCullough properly relies upon those studies and Ms. Bolwell's medical history to opine that her miscarriage was a potential cause of her stroke.

Expert witnesses are not required to rely only on scientific studies in which the study population matches exactly with the plaintiff at issue. *See, e.g.*, *Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002) ("[S]tudies involving similar but not identical situations may be helpful, [so long as] an expert [] set[s] forth the steps used to reach the conclusion that the research is applicable.") Expert witnesses are allowed to extrapolate the data from one study to apply it to the facts of a particular case. *See Pugliano v. U.S.*, 315 F. Supp. 2d 197, 199 (D. Conn. 2004). That is an accepted practice, and one specifically acknowledged and permitted in this litigation.

The HSP, the study relied upon by all plaintiff's general causation experts, reported an association between the use of PPA and stroke in women ages 18-49. Plaintiff's general causation experts all used the HSP to opine that the use of PPA is associated with stroke in men and children, including men over the age of 49. Defendants challenged that methodology in the

15

MDL.  In her *Daubert* opinion, Judge Rothstein found that the lack of evidence in the HSP directly associating the use of PPA with stroke in men, children and individuals above the age of 49 was "not fatal under *Daubert*."  (*See Daubert* Opinion, p. 23.)  Judge Rothstein examined whether evidence of causation obtained through extrapolation supports the opinion that PPA can cause stroke in men and children. (*See id.*, p. 25)  She held that because plaintiffs' experts "clearly set forth the steps followed in extrapolating [the] evidence" their opinion that the HSP supported the association between the use of PPA and stroke in men and children was admissible.  (*See id.*, pp. 27-28)  "The court finds the . . . extrapolated evidence sufficiently reliable evidence upon which to base an expert opinion."  (*See id.*, p. 28)

That plaintiff was nine weeks post-miscarriage, while participants in the studies relied upon by Dr. McCullough were six weeks post-termination of their pregnancies is irrelevant.  It is reasonable to conclude, based upon the extrapolation of the data from the Kittner study, that the risk of stroke during the postpartum period persists beyond the time limits of the study.

In fact, a review of the studies shows that, contrary to plaintiff's claims, the studies support the proposition that women are at an increased risk of stroke, particularly intracerebral hemorrhage, after pregnancy for longer than six weeks.  The conclusion of the Kittner study is clear.  The authors "found that the postpartum state . . . was associated with an increased risk of cerebral infarction and, particularly, intracerebral hemorrhage."  (*See* Steven Kittner, *Pregnancy and the Risk of Stroke*, NEJM, Vol. 335: 768-74, Sept. 12, 1996 ("Kittner Study"), attached as Exhibit A to Affidavit of Jeffrey D. Geoppinger ("Geoppinger Aff."), attached as Exhibit 2.)  Kittner determined that a woman in the postpartum period is at a 23.8-fold increased risk for intracerebral hemorrhage.[3]  (*See id.*)  While the Kittner study design was limited to women who suffered strokes within six weeks after the completion or termination of pregnancy, there is no

---

[3]Dr. Kittner is general causation expert on behalf of plaintiff.

data in the study demonstrating that the 23.8-fold increased risk dissipates beginning week seven.  (*See id.*)

The James study also demonstrated a significant increased risk of intracerebral hemorrhage in women in the postpartum period.  (*See* Andra James, *Incidence and Risk Factors for Stroke in Pregnancy and the Puerperium*, American College of Obstetricians and Gynecologist, Vol. 106: 509-16 ("James Study"), attached as Exhibit B to Geoppinger Aff.)  The study found that women with pregnancy related postpartum infections, such as plaintiff, have a 25-fold increased risk of stroke.  (*See id.*)  Plaintiff attempts to discount that figure by distinguishing plaintiff's infection from the condition of the patients included in the James study. However, there is no support for plaintiff's claims in her motion that the patients in the James study all had either "major post-pregnancy infections" that required hospitalization or "fevers of unknown origin."

Plaintiff's argument that the studies relied upon by Dr. McCullough are inapplicable to this case because plaintiff had a miscarriage or because she did not have a fever or because she was not hospitalized for an infection are all red herrings.  None of those factors were end points of the studies relied on by Dr. McCullough.  For instance, Kittner was studying the risk of stroke in women in the postpartum after live births, still births, spontaneous abortions (miscarriage), or planned abortions.  While the study generally found that the risk of stroke was significantly increased in the postpartum period, the study was not designed to and did not attempt to determine which postpartum classifications were at greater risk of stroke.  Plaintiff's attempt to distinguish the study from this case on an endpoint that was not even considered does not make Dr. McCullough's reliance on the study inappropriate.[4]

---

[4]Plaintiff's argument is tantamount to defendants arguing that plaintiff cannot rely on the HSP as evidence that her hemorrhagic stroke was associated with her use of PPA because the product she ingested was a prescription

Further, none of plaintiff's experts have offered any testimony distinguishing plaintiff from the women studied in James or Kittner.  Nor have plaintiff's experts offered testimony that reliance upon those studies is improper.  That lack of testimony is the most likely reason plaintiff and her counsel attempt to challenge Dr. McCullough's reliance on the studies.  However, neither plaintiff nor her counsel are qualified to claim that Dr. McCullough's extrapolation from the six week studies is unreliable.  Neither is an expert witness in this case.  Plaintiff's attempt to offer expert testimony is improper, and does not provide the Court with grounds upon which to exclude Dr. McCullough's opinions.

Finally, plaintiff's arguments against Dr. McCullough demonstrate misunderstanding of the burden of proof.  Simply put, defendants do not have the burden of proof.  It is plaintiff's duty to produce qualified, relevant, and reliable expert testimony that her stroke was to a reasonable degree of medical certainty, more likely than not, the result of her alleged use of PPA.  Defendants then proffer experts, such as Dr. McCullough, to rebut plaintiff's experts' testimony.  However, defendants' experts are not required to opine that Ms. Bolwell's stroke either was or was not definitively caused by one of her other risk factors, such as her postpartum state or her smoking, in order to be admissible.

Defendants' experts need only raise possible alternative explanations for Ms. Bolwell's stroke for consideration by the jury.  As long as those potential alternative explanations are a product of the application of a reliable methodology (such as relying on peer-reviewed, published studies demonstrating a 23.8 fold increased risk of stroke in postpartum women in combination with a review of plaintiff's medical records demonstrating a recent miscarriage and continued hormonal issues), the conclusion is admissible.

---

product, and the HSP did not include any cases of women suffering a stroke after use of prescription PPA-containing product.

## IV.     CONCLUSION

There is no question that Dr. McCullough's extensive education, training, and experience as a neurologist specializing in the research and treatment of stroke, particularly in women, is qualified to render the opinions she has expressed.  Further, her conclusions, including her opinion that plaintiff was at an increased risk of hemorrhagic stroke due to her miscarriage and postpartum condition, are all premised on a reliable methodology.  Plaintiff's attempt to exclude Dr. McCullough's testimony regarding the relevance of plaintiff's miscarriage to her stroke is a desperate attempt to preclude testimony unfavorable to plaintiff's case for which plaintiff has no response.  Accordingly, plaintiff's motion to exclude Dr. McCullough's testimony must be denied in its entirety.

Respectfully submitted,


/s/ Jeffrey D. Geoppinger
Joseph P. Thomas
CT Fed. Bar No. phv0382
Jennifer Hageman
CT Fed. Bar No. phv0937
Jeffrey D. Geoppinger
CT Fed. Bar No. phv0382
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, OH  45202-2409
(513) 698-5000
(513) 698-5001 FAX
jthomas@ulmer.com
jhageman@ulmer.com
jgeoppinger@ulmer.com

Thomas H. Winslow
The Law Office of Thomas H. Winslow, LLC
321 Main Street
Farmington, CT  06032-2976
(860) 678-4425
(860) 678-4427 FAX

**Counsel for Defendants**
**Duramed Pharmaceuticals, Inc., and**
**Barr Laboratories, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served via the Court's electronic

filing system and facsimile, Federal Express, and/or U.S. mail on the 19th day of January, 2007

on:

Ron Michael Meneo, Esq.
Brian P. Kenney, Esq.
Early, Ludwick & Sweeney, L.L.C.
265 Church Street, 11th Floor
P.O. Box 1866
New Haven, CT  06508-1866

**Attorneys for Plaintiff**

/s/ Jeffrey D. Geoppinger