UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TRACY BOLWELL, | :CIVIL ACTION 3:02CV-01001 (AWT) |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| DURAMED PHARMACEUTICALS, INC. | : |
| BARR LABORATORIES, INC. | : |
| Defendants | : January 26, 2007 |

**PLAINTIFF'S REPLY TO DEFENDANTS' DURAMED PHARMACEUTICALS, INC. AND BARR LABORATORIES, INC.'S MOTION TO EXCLUDE THE TESTIMONY OF <u>PLAINTIFFS' CASE SPECIFIC EXPERTS</u>**

I.     Introduction

Under the standards embraced by the Supreme Court in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and the subsequent cases of *General Electric v. Joiner*, 522 U.S. 136 (1997) and *Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137 (1999), the trial court's gatekeeper role requires it to assess both the relevance and the reliability of scientific evidence. In conducting a full *Daubert* hearing and then ruling that the Plaintiffs' general causation experts could testify before the jury that, in their respective opinions, phenylpropanolamine ("PPA") can cause hemorrhagic stroke, Judge Rothstein, presiding over MDL 1407 *In re Phenlypropanolamine Litigation*, did just that. Judge Rothstein's June 18, 2003 Order is attached hereto as <u>Exhibit A.</u> (herein "Judge Rothstein's Order").

Though many of defense counsel's arguments are directed at and based upon its characterization of the Hemorrhagic Stroke Project ("HSP") study and its underlying methodology and execution as flawed and unreliable, Judge Rothstein considered all such arguments and concluded as follows:

"Defendants' ex post facto dissection of of the HSP fails to undermine its reliability...Upon close examination of the arguments and supporting evidence, the court finds the HSP's "flaws" (including any unknown to the FDA and/or NEJM [New England Journal of Medicine] either inaccurately identified as flaws or inconsequential to the reliability of the study as a whole. The HSP investigators utilized widely accepted and reliable scientific and epidemiological procedures in conducting this study....For all of these reasons, the court finds the HSP scientifically reliable evidence upon which to base expert opinion and, therefore, evidence that should not be excluded." <u>Judge Rothstein's Order at pages 15-18</u>.

Judge Rothstein's conclusions are especially relevant in this case since the Plaintiffs' use of the Defendants' PPA-containing product fits squarely within one of the findings of the HSP, i.e. a greater than three-fold increased risk of hemorrhagic stroke for a woman's "first dose use"[1] of a PPA-containing cough-cold product - odds ratio of 3.13 (p-value = 0.042).

Though defense counsel devotes considerable time and text assaulting the HSP, all of its arguments have been previously made, examined in detail, thoroughly considered and then specifically rejected by Judge Rothstein. Accordingly, the law of this case, as announced by Judge Rothstein, is as follows:

"The court finds expert testimony as to an association between PPA and hemorrhagic or ischemic stroke, in either gender and any age group, admissible." Judge Rothstein's Order at page 39.

II.     Defendants' Unfounded Attack on Dr. Tuhrim

Dr. Tuhrim, in arriving at his specific causation opinion in this case, use generally-accepted and reliable methodology, i.e. differential diagnosis, based upon sound and well-established, scientific principles and epidemiology. Though it is leveled at

---

[1] The HSP investigators defined "First Dose Use" as"...if the PPA use occurred on the index day before the focal time or on the preceding calendar day, with no other PPA use during the preceding two weeks." <u>Final Report of the Hemorrhagic Stroke Project</u> dated May 10, 2000, page 11.

methodology, defense counsel's criticism of Dr. Tuhrim is, in effect, a poorly-disguised argument as to the weight that should be given to his opinions.

Defendants' attack on Dr. Tuhrim misstates and mischaracterizes his testimony, seeks to obfuscate that testimony by employing semantic differences in the use of medical terminology and continues to misstate the Plaintiff's medical history concerning her unfortunate miscarriage that occurred over ten weeks prior to her intracerebral hemorrhage ("ICH")

    A.  Proving the Negative: Defendants' Reliance on the "Cryptic Malformation."

Defendants' counsel, for lack of any physical medical evidence and therefore plausible argument that Plaintiff Tracy Bolwell had a vascular malformation at the time of her ICH, assert that the Plaintiff's expert, Dr. Tuhrim:

"admits that he cannot definitively state that Ms. Bolwell did not have a vascular malformation prior to her stroke." Defendants' Motion at page 10.

Putting aside the fact that neither the Defendants' counsel nor their expert neurologist Dr. McCullough can point to any physical medical evidence that suggests Tracy had a pre-existing malformation at the time of her ICH[2] Dr. Tuhrim's exact testimony concerning this specious suggestion was as follows:

---

[2] In her deposition, Dr. McCullough agrees that Tracy had no malformation:
During her November 28, 2006, Dr. McCullough testified as follows:

    Q.  Now, Doctor, in reviewing Tracy's medical records, did you see any indication in those records that Tracy suffered from arteriovenous malformation?
    A.  No.
    Q.  Cavernous angioma?
    A.  No.
    Q.  Hypertension?
    A.  No.
    Q.  Cerebral venous thrombosis?
    A.  No.
    Q.  Toxemia of pregnancy?
    A.  No.
    Q.  So you saw none of those in her records?
    A.  No.

A. I was primarily concerned with whether she may have had a vascular anomaly preexisting that could have led to the intracerebral hemorrhage that she suffered. The report of the angiogram that was performed at I believe Yale New Haven Hospital – I am sorry the angiogram was actually performed prior to her being transferred to Yale, but was reviewed at Yale.

So the angiogram that was actually performed at Vassar Brothers hospital showed no evidence of preexisting anomaly such as an aneurism or a arterial venous malformation, but did show multiple areas of narrowing and beating in all the visualized arterial territories, particularly involving middle size distal branches. Tuhrim Deposition, at page 38, Lines 12-25.

\*     \*     \*     \*     \*     \*

Q. Did you do anything to rule out whether or not Ms. Bolwell had some type of underlying problem with her right basal ganglia prior to the stroke?

A. Did I?

Q. In forming your opinions in this case?

A. I mean I wasn't the treating physician, as we have already established, but I did review the record. And as we just discussed, she had a angiogram that was performed three days after this note was written, the purpose of which was to determine fi there was an underlying vascular anomaly, and none was demonstrated, only the multiple areas of narrowing and beading that we have been discussing.

Q. So by underlying problem, you interpret that to mean a vascular anomaly?

A. I assume that is what he's referring to. I don't know precisely what he had in mind when he wrote this note, obviously from what I previously testified to, I wouldn't necessarily agree with the incredible nature of the recovery. Tuhrim Deposition, at page 54, line 19 to page 55, line 13.

\*     \*     \*     \*     \*     \*

Q.  Is it possible that, we keep talking about whether or not she's had any vascular anomalies, that when she had the hemorrhage, the hemorrhage itself would have obliterated the vascular anomaly?

A.  That is a theory which is sometimes advanced to explain things which are otherwise unexplainable, but just like unicorns, it's impossible to either prove or disprove the existence of something in the past which no longer exists and which we have no evidence for ever having existed. Tuhrim Deposition, at page 54, line 22 to page 55, line 13.

Lacking any physical medical evidence to support their speculation that Tracy had a pre-existing malformation, Defendants' counsel attempts to support their position by arguing that Dr. Tuhrim's inability to prove a negative, i.e. that a pre-existing malformation did not exist, somehow means that (a) the malformation did exist; and (b) that Dr. Tuhrim's causation opinion is not based upon sound, reliable scientific principles. If, as the Defendants' counsel suggests by posing this argument, scientific integrity, validity and reliability were to depend on the ability to prove a negative, then no expert would be qualified to testify since no expert could do so. The Plaintiff respectfully urges this Court to reject such an absurd position.

B. <u>Slight of Hand – Using Illogical Argument and Semantics to Discredit Dr. Tuhrim</u>

In describing a "subset of vasculitis," Defendants' counsel and their expert neurologist, Dr. McCullough, prefer to use the medical term "benign angiopathy of the central nervous system (BACNS)" Defendants' Motion at page 9. Conveniently locking themselves into this preference, Defendants' counsel argues that Dr. Tuhrim is unfamiliar with BACNS and therefore (a) did not consider it as a possible cause of Tracy's ICH, and (b) his testimony is unreliable. The basis for this argument is contrary to the sworn testimony given by Dr. Tuhrim. It also distorts the use of the term BACNS in the context of the broader use of terminology among the medical community. Most importantly, Defendant's counsel and its expert conveniently ignore a crucial medical fact in this case: diagnostic testing conclusively ruled out vasculitis.

### 1. Brain Biopsy ruled out Vasculitis

Defendants' counsel acknowledges that Tracy's physicians at Yale determined that Tracy did not suffer from vasculitis:

"At Yale, Ms. Bolwell's physicians reviewed the finding from her angiogram, and recommended a brain biopsy to definitively determine if she had vasculitis. (See *id.*, Bates No. 5BOL00075.) That biopsy was performed on February 3, 1997, and the results were negative. (See *id.*, Bates No. 5BOL00039.) Defendants' Motion at page 6.

Despite this evidence and acknowledging it in its recitation of facts, Defendants' counsel proceeds to make the argument that Tracy in fact had a form of vasculitis. There's absolutely no indication of how Defendant's counsel bridges this glaring gap in fact and logic.

### 2. Using Semantics to Discredit Dr. Tuhrim

"Vasculitis" is a general term that refers to "inflammation of a blood vessel, caused by allergic reaction or systemic disease." <u>Dictionary of Medical Terms</u> Mikel A. Rothenberg, M.D. and Charles F. Chapman 4th Ed. According to The Johns Hopkins Vasculitis Center:

"Central Nervous System (CNS) Vasculitis has been called by other names including *isolated angitis* of the CNS ("IACNS"), emphasizing the confinement of the disease process to the brain and the spinal cord. Another name for this disorder has been *granulomatous angitis of the nervous system* ("GANS"), a name that draws attention to a pathological feature of the disease in some, but not all, cases. More recently, a preferred name for this form of vasculitis has been *primary angitis of the central nervous system* ("PACNS"). <u>Finally, recognition that a subgroup of patients appear to have milder disease courses has led to the designation of *benign angiopathy* (as opposed to angitis) *of the CNS* or "BACNS"</u> [emphasis added]. <u>The Johns Hopkins Vasculitis Center</u>, "Types of Vasculitis, Central Nervous System Vasculitis" http://vasculitis.med.jhu.edu (2007).

The use of the terminology "BACNS" by the Defendants' counsel and their insistence that Dr. Tuhrim use it in rendering his expert opinion in this case, does not change the fact that Dr. Tuhrim did consider the medical condition represented by BACNS in arriving at his conclusions. In his own words, Dr. Tuhrim addressed the use of terminology "BACNS" as follows:

> Q. And when we were talking about isolated vasculities of the Central Nervous System or primary angiitis of the Central Nervous System, are you aware that it's been reported in the literature that there are two subsets of patients falling into that one subset of patients having, for lack of a better phrasing, more severe results and one subset of patients experiencing relative benign results?
>
> A. I know that people have talked about more benign cases and more severe cases. I don't know that there are two clear cut categories that are well recognized. This is a fairly murky area in terms of the diagnosis and treatment of this entity that we are discussing.
>
> Q. In reviewing the records then that you were provided of Tracy Bolwell, I take it that you weren't able, and perhaps didn't attempt, to rule out whether or not Tracy Bolwell had the more benign form of primary angiitis?
>
> A. As I believe I have already stated, I don't believe that her clinical presentation and history are consistent with primary angiitis of the nervous system.
>
> Q. And why is that?
>
> A. Because primary angiitis of the nervous system typically presents in the projomol (phonetic) fashion with a period of weeks or months of headaches followed by some focal neurological deficits, in some instances, and cognitive derangements, and then, more typically ischemic rather than hemorrhagic stroke.
> Intracerebral hemorrhage following a severe, the onset of a severe headache, by a matter of minutes or hours, is not the clinical history that we associate with primary angiitis of the nervous system.

Q. And do you know if that holds true for the more benign form of primary angiitis?

A. Well, you keep referring to that more benign form of primary angiitis and I have already said a couple of times that I am not familiar with any specific categorizations of benign, I don't know what the other term would be, form. Tuhrim Deposition, at page 57, line 21 to page 59, line 9.

C. Smoking as a Risk Factor for ICH

At the time of her ICH, Tracy smoked cigarettes. She does not deny this fact. However, the quantity and frequency of her smoking – both at the time of her ICH and in the two years leading up to it – are disputed issues in this case. Putting aside those factual issues, whether or not smoking is a risk factor for the type of hemorrhagic stroke suffered by Tracy, namely an ICH, is an issue focused on by Defendants repeatedly in this case. When asked about it in his deposition, Dr. Tuhrim testified as follows:

Q. How is it that you ruled out smoking as a potential cause of Tracy Bolwell's stroke?

A. Smoking is not viewed as a cause of intracerebral hemorrhage. There have been a couple of reports that suggest some increased risk of intracerebral hemorrhage associated with cigarette smoking, but the preponderance of the epidemiologic data would suggest that that association, if it exists at all, is quite weak.
In our own data from the minorities risk factors and stroke study, there was no association whatsoever between either cigarette smoking or serum cotinine levels, serum cotinine being a marker of cigarette smoking and the occurrence of intracerebral hemorrhage.

Q. Have you seen reports that Tracy Bolwell smoked as much as three packs a day at the time of her stroke?

A. I don't recall the specifics of the reports. I know that she was stated as being a smoker with varying mentions of her – the quantity of her smoking. And I believe in my report I say that she smoked at least one pack a day.

> Q.  Would it matter to you if indeed she was smoking as much as three packs a day?
>
> A.  Well, I can tell you that smoking three packs a day is not good for your health, but it wouldn't change my opinion with regard to the relationship between cigarette smoking and intracerebral hemorrhage.
>
> Q.  Would you agree with me that the risk of intracerebral hemorrhage increases with an increased number of cigarettes smoked per day?
>
> A.  I am not aware of any evidence to that effect, at least in the majority of reports that have looked at the issue of cigarette smoking and intracerebral hemorrhage.
>
> Q.  But you do agree that cigarette smoking increases the risk of intracerebral hemorrhage?
>
> A.  No, I believe that what I stated is that the preponderance of the report suggests that there is no relationship, including our own data, but that there are some reports that suggest that there is a weak association between cigarette smoking and intracerebral hemorrhage. And by weak, I simply mean not a very high odds ratio, but in some instances at least an association. Tuhrim Deposition, at page 39, line 14 to page 41, line 6.

Once again Defendants' counsel ignores Dr. Tuhrim's testimony by arguing that "[a]lthough aware that Ms. Bolwell had a history of smoking, Dr. Tuhrim conveniently ignored that history in concluding that Ms. Bolwell's alleged ingestion of PPA caused her stroke." Defendants' Motion at page 25. It's clear that Dr. Tuhrim, in arriving at his opinion regarding the etiology of Tracy's ICH, considered both Tracey's smoking and the scientific literature concerning smoking and ICH.

### D. Tracy's November 8, 1996 Miscarriage

Tracy's medical records indicate, and the Defendants' own expert concurs, that Tracy suffered a miscarriage on November 8, 1996, over ten weeks prior to the date of her ICH.[3] Ignoring unequivocal, contemporaneous notes made by Tracy's gynecologist

---

[3] In her deposition, Dr. McCullough testified that
 During her November 28, 2006, in identifying the date of Tracy's miscarriage, Dr. McCullough testified as follows:

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

and instead relying on the speculative testimony of Dr. McCullough, who readily admits she is not a gynecologist and therefore not qualified to render an opinion on gynecological issues[4], Defendants' counsel makes the following statement:

"Her medical records document that Ms. Bolwell continued to complain of abnormal menstrual cycles and spotting as late as December 30, 1996, indicative that she continued to experience hormonal issues associated with the failed pregnancy."

This statement is false and unsupported by Tracy's medical record. The December 30, 1996 medical record states as follows:

"Patient called concerning spotting at 4 days post-period – was told that irregular periods are not unusual. P AB endometritis, patient to stay in touch; for any problems to call. AM." Northern Dutchess Obstetrics and Gynecology Associates, Medical Record 12/20/96. McCullough Deposition Exhibit 7.

Moreover, reliance on Dr. McCullough's Expert Report is completely misplaced. There is no scientific evidence to support Dr. McCullough's speculation that Tracy's ICH was somehow related to her miscarriage.[5]

In his deposition, Dr. Tuhrim addressed the issue this way:

---

> Q. So would you go by the record that we saw earlier?
> A. I actually would go by the ultrasound.
> Q. What was the date of the ultrasound?
> A. I believe it was 11/8.

[4] In her deposition, Dr. McCullough flatly states
During her November 28, 2006, Dr. McCullough testified as follows:

> Q. And what's the next conclusion?
> A. No signs of viability identified.
> Q. And what would that indicate to you as a physician?
> Ms. Hageman: Objection
>
> A. I'm not an obstetrician. I can only assume that she is a threatened abortion.

[5] None of the studies cited by Dr. McCullough in her Expert Report examined the relationship between ICH and miscarriage beyond six weeks post-miscarriage.

> Q. Were you able to rule out postpartum cerebral angiopathy as a potential cause or a potential risk factor for Ms. Bolwell's stroke?
>
> A. I don't believe that that was ever a consideration. When was the partum, as to say when did Ms. Bolwell give birth?
>
> Q. She had had a miscarriage approximately three months prior to her stroke.
>
> A. If that's the event that you're referring to, then there's no reason to think that that would in any way be related to the vasculopathy three months later.
>
> Q. Why is that?
>
> A. It's simply not associated.
>
> Q. Were you aware that she had been pregnant and miscarried?
>
> A. I don't recall. I would not have viewed a miscarriage three months prior to this event as being related. Tuhrim Deposition, at page 61, line 14 to page 62, line 6.

The argument of Defendants' counsel on this issue is itself based upon nothing more than pure speculation by Dr. McCullough – who admits she is not qualified to render an opinion of gynecological conditions[6] - and therefore inherently unreliable. It should be ignored by the Court.

### E. Tracy's Consumption of Alcohol

Once again, Defendant's counsel misstates the facts. According to Defendants' counsel:

> "Dr. Tuhrim similarly fails to consider Ms. Bolwell's alcohol consumption as a potential cause of her stroke." Defendants' Motion at page 26.

This is not true. Dr. Tuhrim did consider alcohol consumption:

> Q. Any other potential contributing factors you ruled out in reaching your opinion about the cause of Tracy Bolwell's stroke?

---

[6] See Footnote 3 above.

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

> A. Well, I was not able to identify any risk factors other than what I have discussed already. There are obviously other factors which may contribute to intracerebral hemorrhage, but none of them were present. For example, she had not had a large amount of alcohol to drink that day or the day before, or as far as I know, in general.
>
> Q. How to you think she did not have large amounts of alcohol to drink?
>
> A. I didn't see any reference to that in any of the documents that I reviewed. Tuhrim Deposition, at page 41, lines 7-20.

In fact, as this testimony indicates, he considered it in light of the scientific evidence as described in the New England Journal of Medicine article cited by Defendants' counsel:

> Excessive use of alcohol also increases the risk of intracerebral hemorrhage by impairing coagulation and directly affecting the integrity of cerebral vessels.[25,26] *New England Journal of Medicine* Vol. 344, 1450-1460, May 10, 2001.

To support its otherwise untenable position on this issue, Defendants' counsel conveniently ignores the use of the word "excessive." Nowhere in Tracy's medical history is her use of alcohol described as either "excessive" or "heavy," the latter term used by Dr. Tuhrim in describing his exclusion of alcohol as a potential cause of Tracy's ICH. Contrary to the assertions of Defendants' counsel, Dr. Tuhrim did consider and excluded alcohol use as a potential cause of Tracy's ICH.

*        *        *        *        *        *

In rendering his specific causation report in this case, Dr. Tuhrim' bases his opinions and testimony on documented facts, the results of diagnostic testing and the findings of the Plaintiff's treating physicians. Those opinions and testimony result from Dr. Tuhrim's use of sound and reliable methodology, consistently and reliably applied to those facts and findings.

In attempting to discredit Dr. Tuhrim's opinions and testimony, defense counsel has distorted documented medical evidence and has posited its own expert's speculative findings as "facts." The irony of using such tactics to claim that Dr. Tuhrim's

opinions and testimony are unreliable is readily apparent. The Plaintiff respectfully urges this Court to reject such tactics.

### III. Dr Wasserstein's Opinions and Testimony

Defendants' counsel argues that (1) Dr. Wasserstein's use of the "best performance" methodology is flawed; and (2) "the subject matter of Dr. Wasserstein's opinions is wholly within the comprehension of the jury and therefore her opinions are not properly the subject of expert testimony." Defendants' Motion at page 31.

In asserting its first argument, Defendants' counsel criticizes Dr. Wasserstein for basing her use of the "best performance" methodology on post-injury test results and for ignoring Tracy's pre-morbid functioning. This criticism is simply wrong. In her deposition, Dr. Wasserstein described her use of the "best performance" methodology as follows:

> Q. And is there one or two or three or whatever number of methods that are more, are considered in the field of neuropsychology more reliable than others?
>
> A. Absolutely not. There's heated debate about which measures are most reliable. Lezak, for example, who is one of the definitive textbooks, it uses the best performance measure. Whatever is the best performance in the person, whether it's a high school record, a subtest, a job they held in the past. Should be, according to her, considered the measure of premorbid functioning. Other people, you know, have very strict, no, no, no, you can only use the Beroni equation, there's no agreement on it.
>
> Q. In your mind is there one or two or three methods that are more reliable than others?
>
> A. I use the best performance method. The supposition under that being that if they did it, and it requires X to do it, then that means X was there. And it allows more flexibility in terms of what information one can use. I mean, it's sort of like wherever there's information that is meaningful can be used to predetermine, to infer backwards. And then of course the more

information that converges in the same manner, the more certain you are that your inference is reasonable…But if you make broad inferences about pre-morbid abilities, and if more data points to the same thing, you'll get consensus on that. But if you kind of narrow and stick to broad categories and if more than one data source points to the same thing, most people would agree with you. Wasserstein Deposition at page 40, Line 13 to page 42, Line 3.

As this testimony indicates, Dr. Wasserstein looked at how Tracy performed pre-morbidly and compared that to her post-stroke performance to arrive at her findings and opinion regarding Tracy's neuropsychological impairments.

Defense counsel's assertion that the subject matter of Dr. Wasserstein's opinions is within the comprehension of the jury, while certainly complimentary to any person who will have the privilege of serving on the jury in this case, ignores the very nature and subtle manifestations of cognitive deficits that result from serious brain injury. Whether this assertion is the product of zealous advocacy or indifference, its effect is to deny Tracy the opportunity to have the jury hear an expert's opinion of the non-physical damage inflicted on her by the Defendants' product. In this regard, Dr. Wasserstein's testimony "will assist the trier of fact to understand the evidence and to determine the extent of Tracy's neuropsychological injuries, clearly a fact in issue in this case.

Moreover, defense counsel's assertion that the subject matter of Dr. Wasserstein's opinions is within the comprehension of the jury is particularly suspect since the Defendants' identified their own neuropsychology expert – Michael Westerveld, Ph. D – to review records and assess the impact of Tracy's ICH on her neuropsychological condition. Presumably, the Defendants believe it necessary to retain Dr. Westerveld to testify before the jury in this case but, to the contrary, believe the Plaintiff is not entitled to do the same.

## IV. Dr. Crakes' opinion and Testimony

Defendants allege that Dr. Crakes' analysis regarding lost future earnings is not reliable, relevant or helpful to the jury. Defendants' Motion at page 31. As a preliminary matter, the Plaintiff notes that Dr. Crakes has expertise in economics and has been a professor of Economics at Southern Connecticut State University for twenty six years. Crakes Deposition, at page 12, lines 10-13. Likewise, he has experience performing appraisals of economic loss for twenty five years. Crakes Deposition, at page 13, lines 2. Dr. Crakes has provided expert trial testimony on economic loss approximately 250 to 300 times. Crakes Deposition, at page 17, lines 20-21. As such, Dr. Crakes has the commensurate knowledge and skill that is required by Rule 702.

Qualifications aside, Defendants argue that Dr. Crakes' figures and opinions are not related to Ms. Bolwell's level of education, academic performance, employment history, or income history. Defendants' Motion, at page 32. However, when counsel for the defendant asked Dr. Crakes whether it would be ideal to use Ms. Bolwell's information regarding her prior earnings to calculate her lost future earnings, Dr. Crakes answered "[n]ot necessarily, no" and then explained:

> Because under some circumstances individuals may not be, at the age that she had obtained at the time of her injury, may not be fully exercising their earning capacity, may not at 25 years of age have actually found the type of employment that they will pursue for the balance of their lifetime. So looking at her actual earnings record prior to her injury may not be a measure of her earning capacity.

Crakes Deposition, at page 63, lines 10-17. In fact, at the time of her stroke, Ms. Bolwell had not yet returned to full employment --apart from some daycare work-- on account of having recently given birth. Moreover, Ms. Bolwell's higher level of educational attainment was still an unknown as she had previously attended but not completed her degree at Duchess County Community College. Further, the only full time employment she had between leaving college and giving birth to her first child was at Prudential Securities where she worked as a sales assistant and wire operator from 1994 through 1995. In other words, at the time of her stroke at age 25, Tracy had not fully exercised her earning capacity. Therefore, in accessing Ms. Bolwell's lost future earnings, it was

more than reasonable to use median earnings figures based on gender, age, and level of educational attainment.

Defendants also argue that Dr. Crakes' assumption of 25% and 50% impairment in his analysis of Ms. Bolwell's lost future earnings is unreasonable and unreliable. Defendants' Motion, at page 33. Dr. Crakes' analysis reveals the following:

> If we assume unimpaired earnings as a female with some college and a reduction in her earning capacity of 25 percent, the total of economic loss is $205,061. If we assume unimpaired earnings again as a female with some college and a 50 percent reduction in her earning capacity, the total net discount of economic loss is $421,718.
>
> Alternatively, if we assume unimpaired earnings as a female with a bachelor's degree and a 25 percent reduction in her earning capacity, the total net discounted economic loss is $271,519. And finally, with unimpaired earnings as a female with a bachelor's degree and a 50 percent reduction in her earning capacity, the total net discounted economic loss is $552,545.

Crakes Deposition, at pages 75, line 19 to page 76, line 9. Dr. Crakes' assumptions are reasonable given the fact that neither Dr. Wasserstein nor any of Ms. Bolwell's treating doctors made any specific finding (rating) as to the percentage (level) of disability. It is clear, based on Dr. Crakes' testimony that his analysis is only meant to provide a framework for the jury in accessing future lost earnings. Defendants will have ample opportunity to question Dr. Crakes' assumptions at trial if they see fit. Additionally, Defendants' contention that Dr. Crakes' assumptions are unfounded go to the weight not the admissibility of his testimony and should not be excluded. <u>Boucher v. U.S. Suzuki Motor Corp.</u>, 73 F.3d 18, 21 (2nd Cir. 1996).

Defendants conveniently fail to point out that Dr. Crakes' analysis is based on an objective analysis of historical and statistical data. Projections of lost future earnings are admissible where, as here, they are supported by evidence such as wage scales and historical data.

    a.    <u>Life and Work-Life Expectancy</u>

To calculate Tracy Bolwell's life expectancy of 55.16 years and work-life expectancy to age 65, Dr. Crakes referred to the Vital Statistics of the United States, data from the US Department of Health, and the National Centers for Disease Control

and Prevention. Crakes Deposition, at page 55, lines 207. "Statistical charts, such as the mortality tables and the work-life expectancy tables prepared by the United States Department of Labor ... are often deemed authoritative...." <u>Earl v. Bouchard Transp. Co.</u>, 735 F.Supp. 1167, 1175 (E.D.N.Y.). Moreover, at least one court has stated that it will assume, for convenience and in the absence of statistical basis for either plaintiff's or defendant's proffer, that plaintiff would have worked to age 65. <u>Andrulonis v. United States</u>, 724 F.Supp 1421, 1517 & n. 604 (N.D.N.Y 1989).

    b.  <u>Future Lifetime Unimpaired Earnings</u>

To calculate the future lifetime unimpaired earnings of Tracy Bolwell for two earnings alternatives: future lifetime earnings based on the median earnings of females with some college and future lifetime earnings based on the median earnings of females with bachelor's degree, Dr. Crakes referred to the <u>Educational Attainment in the United States: March 1993 and 1992</u>, U.S. Department of Commerce, Economics and Statistics Administration, Bureaus of the Census, published in Ma, 1994 with annual unpublished updates available from 1994 to 2002. See Appraisal of Economic Loss at page 3. In other words, Dr. Crakes' calculations can be supported by statistics from the U.S. Department of Commerce.

    c.  <u>Tax Rates</u>

For deductions for federal and state income taxes, Dr. Crakes relied on the federal and state income tax rates for the calculation of tax liability. Crakes Deposition, at page 46, line 12.

    d.  <u>Fringe Benefits</u>

For the determination of fringe benefits, Dr. Crakes indicated that his calculations were based upon the median or average fringe benefit values for workers in the United States. Crakes Deposition, at page 73, lines 19-23. Dr. Crakes obtained the data for his calculations from the US Chamber of Commerce, the Research Division of the Chamber of Commerce and the Bureaus of Labor and Statistics. Crakes Deposition, at page 72,

lines 16-19. As such, Dr. Crakes' projections based on the median average can be supported by well documented statistics.

e.  Discount Rate

As explained by Dr. Crakes, a discount rate is an:

> ...interest rate used to reduce the present value. If you are expecting to receive a value at some point in the future, that value has a lower value today because if you received that money today, you would have the ability to earn interest on it over time to the point where your payment would be made. That has to be taken into consideration as well as the general pattern that earnings have grown over time for workers in the United States.

Crakes Deposition, at page 65 line 22 to page 66, line 6. In calculating the discount rate, Dr Crakes relied on historical data to compare the interest and growth rates. Crakes Deposition, at page 66, line 11. Specifically, Dr. Crakes relied on data from the post World War II era and its sub-periods. Crakes Deposition, at page 66, lines 17-18. In other words, his calculations are based on objective historical data that can be verified.

Defendants' assertions against Dr. Crakes' analysis are without merit. Dr. Crakes' opinions are based on an objective analysis of historical and statistical data. Dr. Crakes' reliance on this data was proper. As such, the testimony of Dr. Crakes should not be excluded.

V.  Conclusion

For the foregoing reasons, Defendants' motion to exclude the testimony of Plaintiff's expert witnesses must be denied.

                                                Respectfully submitted,

                                                <u>s/Ron Michael Meneo, Esq.</u>

                                                Ron Michael Meneo, Esq.
                                                Of Counsel

                                                <u>s/Brian Kenney, Esq.</u>

                                                Brian Kenney, Esq.

                                                Early, Ludwick & Sweeney, LLC
                                                265 Church Street – 11th Floor
                                                New Haven, Connecticut 06510
                                                203-777-7799
                                                203-785-1671 (fax)
                                                bkenney@elslaw.com
                                                Counsel for the Plaintiff
                                                Tracy Bolwell

## Certificate of Service

I hereby certify that on January 26, 2007, a copy of the foregoing Plaintiff's Reply to Defendants' Motion to Exclude the Testimony of Plaintiff's Case Specific Experts was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

<u>s/Brian P. Kenney, Esq.</u>
Brian P. Kenney, Esq.
Federal Bar # CT 27025
Early, Ludwick & Sweeney, LLC
265 Church Street – 11th Floor
New Haven, Connecticut 06510
203-777-7799
203-785-1671 (fax)
bkenney@elslaw.com
Counsel for the Plaintiff