# EXHIBIT A

FILED ____ ENTERED
____ LODGED ____ RECEIVED

JUN 18 2003

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE: PHENYLPROPANOLAMINE
(PPA) PRODUCTS LIABILITY
LITIGATION,

_____

This document relates to all
actions

MDL NO. 1407

ORDER GRANTING IN PART
AND DENYING IN PART MDL
DEFENDANTS' MOTION TO
PRECLUDE PLAINTIFFS'
EXPERT OPINIONS AS TO
GENERAL CAUSATION
PURSUANT TO FED. R. EVID.
702 AND 703 AND DAUBERT

## I.   INTRODUCTION

Defendants in this multi-district litigation filed a motion to preclude plaintiffs' expert opinions as to general causation pursuant to Federal Rules of Evidence 702 and 703 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  Having reviewed pleadings filed in support of and in opposition to the motion, along with the remainder of the record, and having heard oral argument and expert testimony, and, being fully advised, the court finds and concludes as follows:

## II.   BACKGROUND

### A.   Regulatory History of PPA

Phenylpropanolamine ("PPA") was first synthesized in the early 1900s.  As a sympathomimetic drug, PPA mimics aspects of

ORDER
Page - 1 -



MDL 01-0140" 100001892

1892

1  the sympathetic nervous system.  By the 1970s, PPA was widely

2  used in over-the-counter ("OTC") and prescription cough and cold

3  and appetite suppressant products.

4      Because its commercial use predated the Food and Drug

5  Administration's ("FDA") adoption of rules and procedures govern-

6  ing the sale of OTC products, the FDA "grandfathered" PPA into

7  the system.  Pursuant to a monograph review process initiated in

8  1972, the FDA intended to categorize PPA and other grandfathered

9  drugs as either "generally recognized," "not generally recog-

10  nized," or "insufficient data to permit classification" - as safe

11  and effective.  The FDA allowed grandfathered drugs to remain on

12  the market until a final rule issued.

13      In 1976, an FDA advisory review panel recommended the

14  categorization of PPA-containing cough and cold products as

15  generally recognized as safe and effective.  A similar recommen-

16  dation for PPA-containing appetite suppressant products followed

17  in 1982.  However, despite ongoing consideration of the safety of

18  these products, the FDA never formally categorized PPA.

19  B.    Reports and Studies Addressing Safety of PPA

20      1.    Early Reports and Studies:

21      From the 1970s on, case reports, case series, and medical

22  literature addressed adverse effects purportedly associated with

23  PPA.  Beginning in 1979, more than thirty published case reports

24  described the occurrence of hemorrhagic stroke following the

25  ingestion of PPA.  Many of these reports involved adolescent

26  girls and women utilizing PPA-containing appetite suppressants.

ORDER
Page - 2 -

1  Also, some animal studies and human clinical trials demonstrated
2  sudden increases in blood pressure in response to PPA.
3       2.   Early Epidemiological Studies:
4       A 1984 epidemiological study examined the occurrence of
5  cerebral hemorrhage in patients filling a PPA prescription.  The
6  "Jick study," the results of which were published in a letter to
7  the editor, did not find a significant association between PPA
8  and hemorrhage stroke.  The "O'Neill and Van de Carr study," an
9  unpublished study also conducted in the mid-1980s, reached a
10 similar conclusion based on analysis of computer profiles in two
11 states' medicaid databases.
12      3.   Review of FDA's Spontaneous Reporting System:
13      In 1991, Dr. Heidi Jolson, an FDA epidemiologist, reviewed
14 the FDA's Spontaneous Reporting System ("SRS") database for
15 cerebrovascular accidents and hypertensive episodes reported in
16 association with PPA ingestion.  Jolson found that, between 1969
17 and 1991, the FDA received twenty-nine spontaneous reports of
18 cerebrovascular accidents associated with PPA, twenty-two of
19 which involved hemorrhagic stroke associated with PPA in appetite
20 suppressants (16 cases) and cough and cold products (6 cases).
21 She found the data suggested that PPA-containing diet pills
22 increase the risk of cerebrovascular accidents.
23      4.   The Yale Hemorrhagic Stroke Project:
24      Following Dr. Jolson's SRS study, the Nonprescription Drug
25 Manufacturers Association ("NDMA") and several drug manufacturers
26 initiated discussions with scientists from Yale University

ORDER
Page - 3 -

1  regarding an epidemiological study investigating links between
2  PPA and hemorrhagic stroke.  In 1992, the FDA, NDMA, Yale scien-
3  tists, and two PPA product manufacturers who agreed to sponsor
4  the study collaborated in the design of the Hemorrhagic Stroke
5  Project ("HSP").  A Scientific Advisory Group ("SAG") operated
6  autonomously from the investigators and sponsors to provide
7  general oversight throughout the study.  In 1994, all involved
8  entities approved the study protocol.

9       As a "case-control" study, the HSP sought to compare PPA
10  exposure in individuals who suffered hemorrhagic strokes (the
11  "cases") and those who did not suffer hemorrhagic strokes (the
12  "controls").  The study limited itself to men and women between
13  the ages of eighteen and forty-nine.

14      The HSP aimed to estimate: (1) among men and women, the
15  association between "any use" of PPA and hemorrhagic stroke; (2)
16  among men and women, the association between PPA and hemorrhagic
17  stroke by type of exposure (cough/cold or appetite suppression);
18  and (3) among women (a) the association between "first use" of
19  PPA and hemorrhagic stroke and (b) the association between PPA in
20  appetite suppressants and hemorrhagic stroke.  "Any use" included
21  use within the three days preceding the "focal time," defined as
22  the onset of symptoms plausibly related to the stroke and causing
23  the patient to seek medical attention.  "First use" meant that an
24  individual consumed the product within twenty-four hours before
25  the focal time, with no other use in the preceding two weeks.

26      The HSP issued its final report in May 2000.  The HSP

ORDER
Page - 4 -

1   investigators construed the results of the study to suggest that
2   PPA increases the risk of hemorrhagic stroke.  Among other
3   findings, the investigators found that, for women, the use of a
4   PPA-containing appetite suppressant was associated with an
5   increased risk of hemorrhagic stroke (16.58 odds ratio, lower
6   limit of one-sided 95% confidence interval ("LCL") = 2.22, p-
7   value = 0.011).[1]  The investigators also found a suggestion of an
8   association in women with any first use of PPA, all of which
9   involved cough or cold products (3.13 odds ratio, LCL = 1.05, p-
10  value = 0.042).  Because no men reported use of appetite suppres-
11  sants and only two reported first use of a PPA-containing prod-
12  uct, the investigators could not determine whether PPA posed an
13  increased risk for hemorrhagic stroke in men.

14  C.   Withdrawal of PPA from the Market

15       In October 2000, the FDA convened a meeting of the Non-
16  prescription Drug Advisory Committee ("NDAC") to consider the
17  impact of the HSP.  The NDAC recommended that PPA-containing
18  products no longer be available for OTC use.

19       On November 6, 2000, the FDA requested voluntary removal of
20  PPA-containing products from the market and issued a public
21  health advisory.  Entities responsible for manufacturing and
22  marketing these products withdrew them from the market.  In

23  _____

24       [1] The odds ratio reflects the odds that a case was exposed to
    the odds that a control was exposed.  P-values measure the
25  probability that the reported association was due to chance,
    while confidence intervals indicate the range of values within
26  which the true odds ratio is likely to fall.

ORDER
Page - 5 -

1  December 2000, the New England Journal of Medicine ("NEJM")

2  published the HSP results in a lead article.  See Walter N.

3  Kernan et al., Phenylpropanolamine and the Risk of Hemorrhagic

4  Stroke, 343 New Eng. J. Med. 1826 (2000) (hereinafter "NEJM

5  Article").

## III.  DISCUSSION

7  Plaintiffs' Steering Committee ("PSC") proffer fourteen

8  experts endorsing their general causation theory, including

9  experts in pharmacology, epidemiology, neurology, toxicology, and

10  pediatrics.[2]  Defendants challenge the reliability of all of

11  plaintiffs' general causation expert opinions.  They assert the

12  inadmissibility of these opinions to support a conclusion that

13  PPA can cause hemorrhagic stroke, ischemic stroke, cardiac

14  injuries, or, to the extent claims of this nature may exist,

15  seizures or psychoses.  Defendants also focus on the parameters

---

[2] The PSC-identified experts include: Dr. Jerome Avorn; Dr
Rubin Richard Clapp; Dr. Robert A. Egan; Dr. Edward Feldmann; Dr.
Steven J. Kittner; Dr. Raymond C. Lake; Dr. James R. McDowell;
Dr. Walter Molofsky; Dr  Paul R. Pentel; Dr. George Ricaurte; Dr.
Stanley Turhim; Dr. Alan Woolf; and Dr. Gary P. Zaloga.  Also,
although not originally designated as a PSC witness, the court
allowed Dr. Steven R. Levine to testify as to ischemic stroke
injuries.  Individual plaintiffs also offer additional experts in
accordance with an order allowing designation of additional
general causation experts so long as their "opinions, evidence
and/or theories have not previously been determined by the Court
to be scientifically unreliable or otherwise inadmissible."
Stip. and Order Re: Expert Disclosures at 2 (Sept. 9, 2002).  As
this order will control the scope of general causation testimony
permitted by any expert witness offered in any federal PPA
litigation, the court denies the motion, filed on behalf of
certain plaintiffs, to deem the Daubert objections waived as to
Dr. Donald Marks.

ORDER
Page - 6 -

1  and results of the HSP, arguing that the study lacks reliability

2  as to certain "sub-populations," including men, individuals below

3  age eighteen and above age forty-nine, and individuals suffering

4  strokes more than three days after ingestion of PPA.

5  A.    The Daubert Standard

6        Federal Rule of Evidence 702 governs the admissibility of

7  expert testimony.  Pursuant to this rule, a witness qualified as

8  an expert in "scientific . . . knowledge" may testify thereto if

9  "(1) the testimony is based upon sufficient facts or data, (2)

10  the testimony is the product of reliable principles and methods,

11  and (3) the witness has applied the principles and methods

12  reliably to the facts of the case."  Fed. R. Evid. 702.

13        As established by the Supreme Court in Daubert v. Merrell

14  Dow Pharms., Inc., 509 U.S. 579 (1993), a trial court acts as a

15  "gatekeeper" to the admission of expert scientific testimony

16  under Rule 702.  The court must conduct a preliminary assessment

17  to "ensure that any and all scientific testimony or evidence

18  admitted is not only relevant, but reliable."  Id. at 589.  This

19  two-step assessment requires consideration of whether (1) the

20  reasoning or methodology underlying the testimony is scientifi-

21  cally valid (the "reliability" prong); and (2) whether that

22  reasoning or methodology properly can be applied to the facts in

23  issue (the "relevancy" prong).  Id. at 592-93; Kennedy v.

24  Collagen Corp., 161 F.3d 1226, 1228 (9th Cir. 1998).

25        Reliable testimony must reflect "scientific knowledge" -

26  implying a "grounding in the methods and procedures of sci-

ORDER
Page - 7 -

1   ence[,]" and signifying something beyond "subjective belief or

2   unsupported speculation." Daubert, 509 U.S. at 590.  The infer-

3   ences or assertions drawn by the expert must be "derived by the

4   scientific method." Id.  In essence, the court must determine

5   whether the expert's work product amounts to "'good science.'"

6   Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1315 (9th

7   Cir. 1995) ("Daubert II") (quoting Daubert, 509 U.S. at 593)

8   The relevancy, or "fit," prong requires that the testimony be

9   "'relevant to the task at hand,' . . . i.e., that it logically

10  advances a material aspect of the proposing party's case." Id.

11  (quoting Daubert, 509 U.S. at 597).[3]

12      In Daubert, the Supreme Court outlined factors relevant to

13  the reliability prong, including: (1) whether the theory can be

14  and has been tested; (2) whether it has been subjected to peer

15  review; (3) the known or potential rate of error; and (4) whether

16  the theory or methodology employed is generally accepted in the

17  relevant scientific community.  509 U.S. at 593-94.  The Court

18  emphasized the "flexible" nature of this inquiry.  Id. at 594.

19  As later confirmed in Kumho Tire Co. v. Carmichael, 526 U.S. 137,

20  141-42 (1999): "Daubert's list of specific factors neither

21  necessarily nor exclusively applies to all experts or in every

22  case.  Rather, the law grants a district court the same broad

23  _____

24      [3] Defendants appear to focus exclusively on Daubert's
    reliability prong.  Given that each of plaintiffs' expert
25  opinions would assist the trier of fact in reaching a conclusion
    as to general causation, the court finds the relevancy prong of
26  Daubert satisfied.  See, e.g., Kennedy, 161 F.3d at 1230.

    ORDER
    Page - 8 -

1  latitude when it decides *how* to determine reliability as it

2  enjoys in respect to its ultimate reliability determination."

3  Accord Daubert II, 43 F.3d at 1317 ("[W]e read the Supreme Court

4  as instructing us to determine whether the analysis undergirding

5  the experts' testimony falls within the range of accepted stan-

6  dards governing how scientists conduct their research and reach

7  their conclusions.")

8       The Daubert analysis focuses on the principles and methodol-

9  ogy underlying an expert's testimony, not on the expert's conclu-

10  sions.  509 U.S. at 595.  However, the Supreme Court later

11  cautioned that "conclusions and methodology are not entirely

12  distinct from one another."  General Elec. Co. v. Joiner, 522

13  U.S. 136, 146 (1997).  As such, "[a] court may conclude that

14  there is simply too great an analytical gap between the data and

15  the opinion proffered."  Id.  (finding nothing in either Daubert

16  or the Federal Rules of Evidence requiring the admission of

17  opinion evidence connected to existing data "only by the *ipse*

18  *dixit* of the expert.")

19       Upon remand of Daubert, the Ninth Circuit added that expert

20  testimony "based directly on legitimate, preexisting research

21  unrelated to the litigation provides the most persuasive basis

22  for concluding that the opinions[] expresse[d] were 'derived by

23  the scientific method.'"  Daubert II, 43 F.3d at 1317.  Where not

24  based on independent research, the testimony must be supported by

25  objective, verifiable evidence that it rests on scientifically

26  valid principles, such as peer review and publication in a

ORDER
Page - 9 -

1 reputable scientific journal.  Id. at 1317-18.  In the absence of
2 independent research or peer review, experts must explain the
3 process by which they reached their conclusions and identify some
4 type of objective source demonstrating their adherence to the
5 scientific method.  Id. at 1318-19; Domingo v. T.K., 289 F.3d
6 600, 605-06 (9th Cir. 2002).

7 B.   Defendants' Daubert Challenges

8    1.   Seizures, Psychoses, and Injuries Occurring More than
9         Three Days After Ingestion of PPA:

10      The court held a one-day informational hearing in which the
11 parties presented their arguments on defendants' motion.  Follow-
12 ing that hearing, the court issued preliminary rulings, narrowing
13 the scope of the subsequent Daubert hearings.  See Prelim. Ruling
14 on Defs.' Mot. to Preclude Pls.' Ex. Op's (Apr. 4, 2003); Order
15 Re: Apr. 7, 2003 Status Conf. (Apr. 8, 2003).

16      The court found insufficient basis to support expert testi-
17 mony as to injuries occurring more than three days after inges-
18 tion of PPA.  All of the evidence and expert opinions proffered
19 support the HSP's three day window and plaintiffs did not inform
20 the court of an injury occurring outside that time frame.[4]  The
21 court finds the lack of supportive scientific evidence and
22 testimony dispositive.

23      The court also concluded that plaintiffs offered no scien-
24 tific basis for admitting expert opinions on seizures or psycho-

25

26    [4] All plaintiffs were on notice that the court would
consider this and all of defendants' other Daubert challenges.

ORDER
Page - 10 -

1  ses attributed to PPA.  Again, no plaintiff pursued such a claim.
2  Also, the few expert opinions proffered with respect to these
3  injuries were no more than conclusory.  Given the dearth of
4  supportive evidence, the court finds any opinions as to these
5  injuries scientifically unreliable.[5]

6      2.   Hemorrhagic Stroke in Women Between the Ages of
7           Eighteen and Forty-Nine:

8  Hemorrhagic stroke results from the rupturing of a blood
9  vessel in the brain.  The hemorrhage may be either intracerebral
10  (within the brain itself) or subarachnoid (within the fluid-
11  filled space surrounding the brain) (hereinafter "ICH" and "SAH"
12  respectively).  Approximately fifteen to twenty percent of
13  strokes fall into the hemorrhagic category.

14  In supporting general causation between PPA and hemorrhagic
15  stroke, plaintiffs' experts base their opinions on several lines
16  of evidence, including: (1) the HSP; (2) the biological plausi-
17  bility for PPA to cause stroke, including evidence that PPA
18  causes (a) narrowing of cerebral blood vessels; (b) sudden spikes
19  in blood pressure; and (c) "beading" of arteries in the brain
20  (including the similarity of PPA to other drugs in the same class
21  known to have the same effect); (3) animal studies, (4) human
22  clinical studies; (5) case reports and case series; (6) medical
23  textbooks and other treatises; and (7) the SRS study.

24  _____

25      [5] For the reasons described below, the court also issued a
    preliminary ruling finding admissible the expert testimony based
26  on the HSP and related to hemorrhagic stroke in women from age
    eighteen and above.

ORDER
Page - 11 -

1          a.    The HSP:

2          The HSP found an association between PPA and hemorrhagic

3    stroke in women between the ages of eighteen and forty-nine.

4    Defendants describe the HSP investigators' use of a one-tailed

5    statistical analysis[6] as unconventional, and identify numerous

6    perceived flaws, many of which they maintain were unknown to the

7    FDA and/or NEJM.[7]  They identify the finding relating to women

8    and appetite suppressants as the only statistically significant

9    result after peer review, and note that even that number resulted

10   from a mere six cases in comparison to one control.  Defendants

11   maintain the insufficiency of a "suggestion of an association"

12   for first use/cough and cold products in women, and note that

13   this finding similarly rests on small numbers, including no more

14   than seven cases and four controls.

15         Courts frequently depend on epidemiologic studies in deter-

16   mining the reliability of expert testimony.  See 2 Modern Scien-

17   tific Evidence: The Law and Science of Expert Testimony $ 28-1.1,

18   at 302-03 (David L. Faigman et al. eds., 1997) ("Epidemiologic

19   studies have been well received by courts trying mass tort suits.

20   Well-conducted studies are uniformly admitted.  The widespread

21   ─────────────────────

22         [6]A one-tailed test looks only to whether an agent increases
     the risk, while a two-tailed test also looks to whether an agent
23   protects against the risk.

24         [7]Those flaws include fragile data, improper use of random
     digit dialing, low participation by eligible controls, chance,
25   temporal precedence bias, misclassification bias, selection bias,
     inadequate adjustments for confounding, the combination of ICH
26   and SAH, and various protocol violations and errors.

ORDER
Page - 12 -

1  acceptance of epidemiology is based in large part on the belief
2  that the general techniques are valid.")  See also Daubert, 509
3  U.S. at 593 ("Ordinarily, a key question to be answered in
4  determining whether a theory or technique is scientific knowledge
5  that will assist the trier of fact will be whether it can be (and
6  has been) tested.")  Despite the many and varied concerns raised
7  by defendants in regard to the HSP, the court finds, pursuant to
8  Daubert, testimony relying on this study reliable, especially
9  when taken in conjunction with the additional lines of evidence
10  addressed below.

11      Significantly, the HSP grew out of pre-litigation research
12  and was subjected to peer review.  Daubert II, 43 F.3d at 1318
13  ("Establishing that an expert's proffered testimony grows out of
14  pre-litigation research or that the expert's research has been
15  subjected to peer review are the two principal ways the proponent
16  of expert testimony can show that the evidence satisfies the
17  first prong of Rule 702.")  Plaintiffs' roster of experts include
18  a co-investigator/co-author of the HSP, as well as a participant
19  in the October 2000 FDA NDAC meeting convened to consider the
20  impact of the study.  See Defs.' Exs. A-5 and A-6 (expert reports
21  of Drs. Edward Feldmann and Steven J. Kittner).  The prestigious
22  NEJM published the HSP results, further substantiating that the
23  research bears the indicia of good science.  See Daubert II, 43
24  F.3d at 1318 ("That the research is accepted for publication in a
25  reputable scientific journal after being subjected to the usual
26  rigors of peer review is a significant indication that it is

ORDER
Page - 13 -

1  taken seriously by other scientists, i.e., that it meets at least

2  the minimal criteria of good science.")  (citing Daubert, 509

3  U.S. at 593 ("[S]crutiny of the scientific community is a compo-

4  nent of 'good science[.]'"))

5      Even prior to submission to the NEJM, the HSP underwent

6  multiple layers of review.  In addition to the FDA and the

7  autonomous SAG, the HSP involved, from its inception, both the

8  NDMA and two defendant-manufacturers.  This involvement included

9  approval of the investigators selected, the SAG members, and the

10  study protocol, as well as an opportunity to challenge the study.

11      In fact, in reviewing the study and industry criticisms, the

12  FDA considered many of the same challenges raised here.  In

13  rejecting these criticisms, the FDA epidemiologic and statistical

14  reviewers found the study "well designed and executed."  See FDA

15  Epid. Rev. (Sept. 27, 2000), Pls.' Ex. D-9 at 1, 9; accord FDA

16  Stat. Rev. (Sept. 26, 2000), Pls.' Ex. D-8 at 16.[8]  The

17  epidemiologists found the study's strengths to include: "the

18  clarity of its objectives, the meticulous adherence to sound

19  epidemiology practices in its design and execution, and the

20  consistency of the findings, regardless of the analytic methods."

21  See FDA Epid. Rev. at 9.  Indeed, far from finding the study

22

23  _____

24      [8] The reviewers considered, inter alia, selection bias,
    temporal precedence bias, misclassification bias, small sample
25  size and recruitment of controls, confounding, statistical
    methodology, and "sparse data" bias.  In rejecting these
26  concerns, the reviewers found that "[a]ll reasonable steps were
    taken to minimize bias and confounding."  See FDA Epid. Rev. at 1.

ORDER
Page - 14 -

1  flawed, the FDA's statistician found the HSP "one of the best

2  planned, conducted and most thoroughly analyzed studies reviewed

3  in the last ten years." See FDA Stat. Rev. at 16.

4      Defendants' ex post facto dissection of the HSP fails to

5  undermine its reliability.   Scientific studies almost invariably

6  contain flaws.   See Federal Judicial Center, Reference Manual on

7  Scientific Evidence 337 (2d ed. 2000) (hereinafter "Ref. Manual")

8  ("It is important to recognize that most studies have flaws.

9  Some flaws are inevitable given the limits of technology and

10  resources.")   See also In re Orthopedic Bone Screw Prods. Liab.

11  Litig., MDL No. 1014, 1997 U.S. Dist. LEXIS 6441, at *26-28 (E.D.

12  Pa. May 5, 1997) ("[T]here is no such thing as a perfect epidemi-

13  ological study."; despite weaknesses, court found study suffi-

14  ciently reliable to be admissible)   When faced with epidemiolog-

15  ical evidence, the court must determine whether the flaws compro-

16  mise the study's findings. See Ref. Manual at 337.

17      Upon close examination of the arguments and supporting

18  evidence, the court finds the HSP's "flaws" (including any

19  unknown to the FDA and/or NEJM) either inaccurately identified as

20  flaws or inconsequential to the reliability of the study as a

21  whole.   The HSP investigators utilized widely accepted and

22  reliable scientific and epidemiological procedures in conducting

23  this study.   Because the court finds the methodology scientifi-

24  cally sound, any flaws that might exist go to the weight afforded

25  the HSP, not its admissibility. See Kennedy, 161 F.3d at 1230-31

26  (so long as the court finds the expert's reasoning scientific and

ORDER
Page - 15 -

1  useful to the jury, opposing opinions and evidence go to the

2  weight afforded an expert's opinion, not to admissibility).  See

3  also Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1188 (9th Cir.

4  2002) ("[I]n most cases, objections to the inadequacies of a

5  study are more appropriately considered an objection going to the

6  weight of the evidence rather than its admissibility.  Vigorous

7  cross-examination of a study's inadequacies allows the jury to

8  appropriately weigh the alleged defects and reduces the possibil-

9  ity of prejudice.") (internal citation omitted), cert. denied,

10  ___ U.S. ___, 123 S.Ct. 854 (2003).

11       The court finds similarly unavailing defendants' arguments

12  as to the significance of the various HSP results and the small

13  numbers upon which they are based.  Defendants warn of the

14  consequences of "data fragility," in that small errors or adjust-

15  ments can implicate dramatically different results.  Yet, despite

16  the small numbers, the investigators concluded: "Our study

17  provides strong epidemiological evidence of the association

18  between the use of [PPA] and the risk of hemorrhagic stroke."

19  NEJM Article at 1831.  Moreover, after conducting three sensitiv-

20  ity analyses because of the "sparse data," the FDA epidemiolo-

21  gists found the association for both appetite suppressants and

22  first use of cough and cold products remained.  See FDA Epid.

23  Rev. at 8-9.  Because the court finds the methodology reliable,

24  the mere fact that the findings resulted from small numbers does

25  not impact the study's admissibility.

26       That the finding as to cough and cold products reported in

ORDER
Page - 16 -

1  the NEJM was not statistically significant by "conventional

2  criteria" also does not detract from the reliability of the

3  study   See NEJM Article at 1831 (maintaining that the finding

4  nonetheless "arouse[d] concern regarding safety.")  The HSP's one

5  -tailed test looked only to whether PPA increases the hemorrhagic

6  stroke risk, while a two-tailed test also looks to whether an

7  agent protects against the risk.  In order to comply with NEJM

8  publication requirements, two-sided results were presented in the

9  published article, altering the p-values and associated confi-

10  dence intervals assigned to the results.  Despite this alteration

11  for publication purposes, the HSP final report "demonstrated a

12  statistically significant increased risk of hemorrhagic stroke

13  among both appetite suppressant users and first time users of PPA

14  as a cough/cold remedy."  FDA Epid. Rev. at 1-2, 10 (finding the

15  HSP result relating to first use of cough and cold remedies to be

16  as important as the appetite suppressant finding).  The court

17  finds that the HSP's one-tailed statistical analysis complies

18  with proper scientific methodology, and concludes that the

19  difference in the expression of the HSP's findings falls far

20  short of impugning the study's reliability.  See Ref. Manual at

21  126-27, 358 n.69 ("Since most investigators of toxic substances

22  are only interested in whether the agent increases the incidence

23  of disease (as distinguished from providing protection from the

24  disease), a one-tailed test is often viewed as appropriate."; "a

25  rigid rule [requiring a two-tailed test] is not required if p-

26  values and significance levels are used as clues rather than as

ORDER
Page - 17 -

1  mechanical rules for statistical proof.")[9]

2      Finally, the HSP investigators and plaintiffs' witnesses

3  accurately noted the limitations of the previous epidemiological

4  studies on PPA.  For example, the Jick study did not consider OTC

5  medication and allowed for a thirty-day interval between the time

6  a patient filled a prescription and suffered a stroke.  The court

7  finds that, given these and other limitations, both the Jick and

8  the unpublished O'Neill and Van de Carr study carry little weight

9  in comparison to the HSP.  See FDA Stat. Rev. at 5 ("Because of

10 bias involved with the earlier studies, the findings of th[e]

11 carefully planned and conducted [HSP] should be given greater

12 weight as confirmatory safety evidence[.]")

13     For all of these reasons, the court finds the HSP scientifi-

14 cally reliable evidence upon which to base expert opinion and,

15 therefore, evidence that should not be excluded.

16         b.  Non-Epidemiological Lines of Evidence:

17     Plaintiffs' experts supplement the HSP results with non-

18 epidemiological lines of evidence, including case reports,

19 textbooks and treatises, adverse drug reports, animal studies,

20 and drug analogies.  In response, defendants cite to numerous

21

---

22     [9] All parties involved in designing the HSP were interested
23 solely in testing whether PPA increased the risk of stroke.  See
   Dep. of HSP Investigator Ralph Horowitz, Defs.' Ex. E-7 at 25-27.
24 Cf. Good v. Fluor Daniel Corp., 222 F. Supp. 2d 1236, 1242-43
   (E.D. Wash. 2002) (finding one-sided method inappropriate where
25 that analysis assumed the very fact in dispute, that is, whether
   there was any exposure to radiation in excess of limits
26 established by federal regulation).

ORDER
Page - 18 -

1  decisions describing the limitations of this non-epidemiological

2  evidence.[10]

3      Defendants isolate these sources, rather than considering

4  the whole.  Non-epidemiological sources are frequently utilized

5  by experts in rendering scientific opinions and, under Daubert,

6  should be considered by the court in assessing the reliability of

7  those opinions.  See, e.g., Kennedy, 161 F.3d at 1228-31 (finding

8  trial court abused its discretion by excluding expert testimony

9  based on, inter alia, peer-reviewed articles, clinical trials and

10 product studies conducted by the manufacturer, and a state health

11 department's review of reported cases of adverse reactions);

12 Hopkins v. Dow Corning Corp., 33 F.3d 1116, 1124-25 (9th Cir.

13 1994) (upholding trial court's admission of expert testimony

14 based on, inter alia, clinical experience and studies, medical

15 literature, and general scientific knowledge about drug's proper-

16 ties established by animal studies and biophysical data).

17     In considering the non-epidemiological evidence relied upon

18 by plaintiffs' experts, the court finds significant the sheer

19

20     [10] See, e.g., Schudel v. General Electric, 120 F.3d 991, 996-
21 97 (9th Cir. 1997) (noting testimony that small differences in
   molecular structure of different agents often have significant
22 consequences); Glastetter v. Novartis Pharms. Corp., 252 F.3d
   986, 989-90 (8th Cir. 2001) (stating that case reports are not
23 scientifically valid proof of causation); Glastetter v. Novartis
   Pharms. Corp., 107 F. Supp. 2d 1015, 1034 & n.18 (E.D Mo. 2000)
24 (finding textbook and treatise conclusions no more reliable than
   the case reports on which they were based); Sanderson v. Int'l
25 Flavors and Fragrances, Inc., 950 F. Supp. 981, 997 (C.D. Cal.
   1996) (a party proffering animal studies must provide good
26 grounds for extrapolating from animals to humans).

ORDER
Page - 19 -

1  volume of case reports, case series, and spontaneous reports

2  associating PPA with hemorrhagic stroke in women.  See, e.g.,

3  Rider v. Sandoz Pharms. Corp., 295 F.3d 1194, 1202 (11th Cir.

4  2002) (noting that the district court identified the types of

5  evidence that would have been considered reliable, including,

6  inter alia, "a very large number of case reports.")  While not

7  conclusive, the multitude of textbooks and treatises including

8  PPA as a risk factor for stroke adds to the reliability of

9  plaintiffs' experts' opinions.[11]  See Daubert, 509 U.S. at 594

10 ("Widespread acceptance can be an important factor in ruling

11 particular evidence admissible[.]"}  The non-epidemiological

12 evidence also gains added legitimacy from the fact that several

13 of plaintiffs' experts base their opinions, in part, on independ-

14 ent PPA-related research.  See Daubert II, 43 F.3d at 1317.[12]

15

---

16     [11] Plaintiffs list over a dozen medical textbooks associating
17 PPA with high blood pressure and stroke.  See, e.g., John C.M.
   Brust, Stroke and Substance Abuse, in Uncommon Causes of Stroke
18 132, 133 (Julian Bogousslavsky & Louis R. Caplan eds., 2001); The
   Little Black Book of Neurology 170-72 (Bonner, James S. & Jo
19 Jaeger Bonner eds. 2d ed., 1991).

20     [12] Drs. Fentel, Zaloga, and Lake conducted human clinical and
21 animal studies on PPA  See also Glaser v. Thompson Med. Co., 32
   F.3d 969, 972-75 (6th Cir. 1994) (finding scientifically reliable
22 Dr. Zaloga's opinion that PPA-containing Dexatrim can cause
   severe hypertension).  The remaining PSC-identified experts base
23 their opinions on their clinical experience and training, review
   of the documents and literature, and/or studies and publications
24 on stroke and other toxic substances.  For each, the court has
   "plumbed the depths" between their citations and conclusions and
25 found their opinions sufficiently grounded in the scientific
   method.  See Metabolife Intern., Inc. v. Wornick, 264 F.3d 832,
26 845 (9th Cir. 2001).

ORDER
Page - 20 -