Taking into consideration all of the lines of evidence upon which plaintiffs' experts rely, including the HSP, expert opinions associating PPA with hemorrhagic stroke in women above the age of eighteen and below the age of forty-nine clearly satisfy Daubert's reliability prong.[13]

c.  Recent Article on Aneurysmal SAH:

During the final day of the Daubert proceedings, defendants raised challenges relating to a new article by the HSP investigators to be published in the June 2003 issue of the journal "Stroke." See Joseph P. Broderick et al., Major Risk Factors for Aneurysmal Subarachnoid Hemorrhage in the Young are Modifiable, Stroke (2003) (hereinafter "Stroke Article"). Defendants assert that this article demonstrates the lack of an association between PPA and SAHs resulting from the rupture of an aneurysm ("aneurysmal SAH"). The court finds that defendants distort and misinterpret the Stroke Article.

The HSP investigators structured the HSP to study hemorrhagic stroke as a single entity. They did not collect enough data or enroll enough subjects to study PPA in relation to SAH or ICH, let alone a particular type of SAH or ICH.[14] In the Stroke

---

[13] The court does not find discussion of the so-called "Bradford Hill" criteria, sometimes utilized by scientists in considering questions of causation, necessary or helpful.

[14] All entities involved in designing the HSP approved the joint consideration of ICH and SAH in approving the design of the study. Moreover, both scientific literature and other studies, including the Jick study, support consideration of hemorrhagic stroke as a single entity.

ORDER
Page - 21 -

Article, the HSP investigators look at the HSP data to identify general risk factors for aneurysmal SAH - a subset of a subset of hemorrhagic stroke. They do not proffer a new epidemiological study on PPA and aneurysmal SAH. Instead, they include in a table, without any corresponding substantive discussion, an odds ratio (1.15) and p-value (0.87) for PPA in relation to aneurysmal stroke.

Contrary to defendants' assertion, the PPA odds ratio reported in the Stroke Article, standing alone, is not inconsistent with the results of the HSP. The article reports a single PPA index for "any use" of PPA. The resulting 1.15 odds ratio does not differ significantly from the HSP's 1.49 odds ratio for any use of PPA. The article does not look at "first use" of PPA or PPA use in connection with appetite suppression - the two most significant findings of the HSP (3.13 and 16.58 odds ratios respectively) and the two findings upon which plaintiffs' experts primarily based their opinions.

Nor does the associated p-value identified for any use of PPA demonstrate the lack of an association. Defendants point to the 0.87 p-value as indicating that the difference between the 1.15 odds ratio and the 1.00 null hypothesis value (i.e., no true association between PPA and stroke) is attributable to chance alone. However, plaintiffs' expert, Dr. Kenneth Rothman, explained that a p-value cannot provide evidence of lack of an effect. See Rothman Aff., ¶ 7; Kenneth J. Rothman, Epidemiology, An Introduction at 117 (Oxford Univ. Press 2002). Dr. Rothman

clarified that statistical reassurance as to lack of an effect would require an upper bound of a reasonable confidence interval close to the null value. See Rothman Aff., ¶ 7. Calculating a 95% confidence interval with a lower bound of 0.5 and an upper bound of 2.6, Dr. Rothman concluded that the data does not provide reassurance about the absence of an association. Id. at ¶ 8.

For all of these reasons, the court finds nothing in the Stroke Article undermining the admissibility of plaintiffs' expert opinions associating PPA with aneurysmal SAH.[15]

3.  **Hemorrhagic Stroke in the Various "Sub-Populations":**

The HSP focused on men and women between the ages of eighteen and forty-nine. It did not offer any conclusions as to individuals outside of that age range, and the results were inconclusive as to men. The lack of epidemiological evidence directly associated with men, children, and individuals above the age of forty-nine is not fatal under Daubert. See, e.g., Ken-

---

[15] The court also finds defendants' purported surprise at their May 2003 discovery of the Stroke Article disingenuous. Defendants fail to mention that several of their experts were present for a February 2003 American Stroke Association meeting at which the abstract for the article and the data were presented. See Feldmann Aff., ¶ 3. The court similarly rejects defendants' accusation that Dr. Feldmann denied knowledge of the analysis underlying the Stroke Article in his November 2002 deposition. A full reading of Dr. Feldmann's testimony exposes no such subterfuge. Given that defendants have since extensively questioned Dr. Feldmann under oath about the article, and given the above-described conclusion as to the article's lack of significance, the court denies defendants' request for additional discovery on this subject.

ORDER
Page - 23 -

nedy, 161 F.3d at 1229-30. See also In re Berg Litig., 293 F.3d 1127, 1130 (9th Cir. 2002). As discussed below, plaintiffs' experts demonstrate that it is scientifically acceptable to extrapolate the conclusions of the HSP to these sub-populations.

    a.   Hemorrhagic stroke in individuals above the age of forty-nine:

Defendants generally dispute whether extrapolation to a different age group is good science. However, in arguing against extrapolation to individuals above the age of forty-nine, defendants' experts primarily point to the fact that the risk of stroke increases as age increases. The court sees no reason why the increasing risk of stroke would render the HSP and the non-epidemiological lines of evidence unreliable as applied to this age group. See Dep. of Dr. Jerome Avorn, Defs.' Ex. E-1 at 363 ("[A]ll of the evidence we have is that risks only go up in the elderly. . . . [T]here are no drugs I'm aware of that get safer the older you get.") As such, the court finds testimony associating PPA with hemorrhagic stroke in individuals above the age of forty-nine reliable and, thus, admissible under Daubert.

    b.   Hemorrhagic stroke in children and men:

Defendants accurately note that, in addition to the absence of supportive epidemiological evidence, plaintiffs rely on a smaller number of case reports directly relating to children and men. Also, in disputing the propriety of extrapolating evidence from women to men, and from adults to children, defendants and their experts go to great lengths to highlight differences

ORDER
Page - 24 -

between these sub-populations.

Plaintiffs' experts assert that the weight of the evidence, including that obtained through extrapolation, supports the opinion that PPA can cause stroke in children and men.[16] The court must address whether this extrapolation constitutes good science. See, e.g., Domingo, 289 F.3d at 606 ("[S]tudies involving similar but not identical situations may be helpful, [so long as] an expert [] set[s] forth the steps used to reach the conclusion that the research is applicable.")

It is axiomatic that children differ from adults in various ways, just as younger children differ from older children, and younger adults differ from the elderly. Men and women, likewise, differ in some respects. As might be expected, the incidence rates of stroke, types of stroke, and some of the risk factors for stroke vary between these groups. Plaintiffs' experts concede these differences, but maintain that these sub-populations share far more similarities than differences. After considering all possible differences, plaintiffs' experts find no basis for concluding that PPA poses a risk exclusive to adult females.[17]

---

[16] In proffering evidence directly relevant to these sub-populations, plaintiffs point to most of the same non-epidemiological types of evidence discussed above, including, inter alia, case reports, textbooks and other medical literature, and biological plausibility arguments.

[17] Similarly, the FDA did not differentiate between men and women, and found no reason to believe the risks posed by PPA were limited to individuals within the age range studied in the HSP.

ORDER
Page - 25 -

1   Because of the many barriers to including children in
2   studies, scientists and medical practitioners routinely extrapo-
3   late study results and data on adults to children.  This prac-
4   tice, despite its limitations, finds wide support in reputable
5   sources.  See, e.g., Robert M. Ward, Adverse Effects of Drugs in
6   the Newborn, in Rudolph's Pediatrics 146 (Colin D. Rudolph et al.
7   eds. 21st ed., 2001) ("Children continue to be excluded from
8   studies of most new drugs, so that drug therapy of those patients
9   is seldom guided by large controlled trials."); George C.
10  Rodgers, Jr. & Nancy J. Matyunas, Oski's Pediatrics 61-62 (Julia
11  A. McMillan et al. eds. 3d ed., 1999) ("In the absence of con-
12  trolled, randomized clinical trials in children, pediatricians
13  must either extrapolate information from adult studies or use
14  uncontrolled reports of clinical experience in children, both of
15  which have major flaws.")[16]  Plaintiffs' experts also point to
16  the presumption in pediatric toxicology that toxic effects seen
17  in adults will be as great, if not greater, in children.  See
18  Michael J. Rieder, Adverse Drug Reactions in Neonates, Infants,

---

See FDA Proposal to Withdraw Approval of New Drug Applications, 66 Fed. Reg. 42670 (proposed Aug. 14, 2000) ("Although the Yale study focused on men and women 18 to 49 years of age, the agency has no reason to believe that the increased risk of hemorrhagic stroke is limited to this population.")

[16] See also Gabrielle de Veber, Cerebrovascular Disease in Children, in 2 Pediatric Neurology, Principles & Practice 1099 (Kenneth F. Swaiman & Stephen Ashwal eds. 3d ed., 2000) ("[T]here has been no research studying medical therapy for childhood stroke.  Current treatments are therefore, of necessity, based on therapies proven in adult stroke patients with biologic plausibility and safety data in pediatric patients when available.")

ORDER
Page - 26 -

1   <u>Children, and Adolescents</u>, in Problems in Pediatric Drug Therapy
2   285 (Louis A. Pagliaro & Ann Marie Pagliaro eds. 4th ed., 2002)
3   ("Neonates, infants, and young children are at substantially
4   increased risk for [adverse drug reactions], primarily because of
5   their immature drug elimination organ function, but also due to
6   differences in other pharmacokinetic factors (i.e. volume of
7   distribution).")

8       Plaintiffs' experts attest to the equally commonplace
9   practice of extrapolation between the genders, based on, in
10 significant part, the historical exclusion of women from scien-
11 tific studies. Defendants' experts note current studies account-
12 ing for the differences between men and women, but do not estab-
13 lish that this very recent shift has yet effectuated a change in
14 the practice of extrapolation. See <u>Daubert</u> Hearing Record (Apr.
15 28-30, 2003) at 427-30 (hereinafter "Record"). Until such a
16 change occurs, the court will not deem this practice scientifi-
17 cally unreliable. See <u>Rider</u>, 295 F.3d at 1202 ("Given time,
18 information, and resources, courts may only admit the state of
19 science as it is.")[19]

20       Plaintiffs' experts clearly set forth the steps followed in
21 extrapolating this evidence. See <u>Domingo</u>, 289 F.3d at 606.

---

[19] Additionally, plaintiffs' experts do not dispute that women may be at a greater risk from PPA than men, and stress that, in either gender, strokes are an "uncommon adverse reaction"; that only the "outliers" in the population are at risk. <u>See</u> Record at 132-33, 207-08, 297. They maintain the need for extrapolation given the unsurprisingly smaller amount of evidence directly relating to the male outliers.

ORDER
Page - 27 -

While defendants demonstrate some of the problems posed by extrapolation and dispute the conclusions reached, they do not establish that plaintiffs' experts utilized scientifically unreliable methodologies. See Kennedy, 161 F.3d at 1230-31 (noting that defendant failed to introduce any evidence that expert's reasoning was not scientifically valid). The court finds the direct and extrapolated evidence sufficiently reliable evidence upon which to base expert opinion. As such, it also finds opinions as to these sub-populations admissible under Daubert.

    4.   Ischemic Stroke:

Ischemic stroke results from the blocking of blood flow in a cerebral vessel, depriving brain tissue beyond the blockage of oxygen. The vast majority of strokes are ischemic.

Defendants assert that plaintiffs lack scientific evidence and general acceptance in the medical community as to a causative relationship between PPA and ischemic stroke. Plaintiffs' experts, represented by Dr. Steven Levine at the Daubert hearing, opine that PPA, on rare occasions and in some people, can trigger an ischemic stroke.

Dr. Levine's opinion rests on case and adverse drug reports, biological plausibility, comparison to other sympathomimetics and naturally occurring conditions with altered sympathetic tone, PPA blood pressure studies, textbook and other references, and both his own and others' clinical experience. As noted above, the lack of epidemiological evidence does not render expert opinions

ORDER
Page - 28 -

on this issue unreliable. See, e.g., Kennedy, 161 F.3d at 1229-30. However, in comparison to hemorrhagic stroke, plaintiffs' experts on ischemic stroke unquestionably rely on a smaller volume of evidence directly relating to PPA. For example, while numerous textbooks and treatises associate PPA with ischemic stroke, only a few published case reports and only some twenty-five percent of the stroke cases in the FDA SRS database involved ischemic injuries associated with PPA. As such, the court finds a more detailed analysis of the expert testimony and various lines of evidence appropriate.

Dr. Levine testified as to scientific cause and effect between PPA and ischemic stroke, looking to biological plausibility, temporal association, and dose response. He found temporal association demonstrated by the case and adverse drug reports, clinical experience, and textbooks, and pointed to evidence establishing that higher doses of PPA were more likely to cause an adverse response. In addressing biological plausibility, Dr. Levine identified the very same mechanisms postulated as triggers for PPA-induced hemorrhagic stroke, including an acute rise in blood pressure, vasoconstriction or vasospasm, and, in some cases, vasculitis. He maintained that an acute PPA-induced blood pressure increase can in some individuals disrupt the brain's autoregulation process, causing reactive vasoconstriction in blood vessels and leading to an ischemic stroke. He illustrates PPA's vasoconstrictive effect in its role as a nasal mucosa vasoconstrictor, constricting blood vessels and reducing blood

ORDER
Page - 29 -

flow in order to treat nasal symptoms.

Dr. Levine supplements this theory by comparing PPA to other sympathomimetics, including amphetamine, cocaine, and ephedrine. He maintains that these agents share similar chemical structure, function, and effects, and can cause both ischemic and hemorrhagic stroke. Dr. Levine points to scientific literature and animal studies indicating that these other sympathomimetics both increase blood pressure and induce vasoconstriction,[20] and epidemiologic data demonstrating an ischemic stroke association to both amphetamines and cocaine. Plaintiffs also point to the American Heart Association's recent recommendation that ephedrine - which, according to Dr. Levine, has a lesser vasoconstrictive action than PPA - be removed from the market given its adverse cardiovascular effects.[21]

---

[20] See, e.g., Harold P. Adams, Jr. et al., Ischemic Cerebrovascular Disease 295-96 (2001) (the most commonly implicated drugs with respect to ischemic stroke, cocaine and amphetamines, are "both potent vasoconstrictors that lead to increased blood pressure"; "Narrowing (vasoconstriction) of the intracranial arteries has been found in persons with ischemic stroke following abuse of cocaine or methamphetamines.")

[21] See American Heart Association Urges Ban on Ephedra-based Supplements, at http://www.americanheart.org (May 14, 2003) ("The side-effects associated with [OTC ephedra-based dietary supplements] are primarily cardiovascular-related. A review of FDA data on reported events indicated high blood pressure, stroke, heart attacks and death linked to ephedra use. The American Heart Association believes that these reported events are the tip of the iceberg.") As noted, Dr. Levine also analogizes the effect of PPA to naturally occurring conditions with altered sympathetic tone, describing eclamptic and pre-eclamptic women suffering episodes of cerebral vasoconstriction and vasospasm resulting in ischemic and hemorrhagic stroke.

ORDER
Page - 30 -

The fact that the mechanism remains unclear does not call the reliability of the opinion into question: "Not knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim. Causation can be proved even when we don't know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage *somehow*." Daubert II, 43 F.3d at 1314. See also Daubert, 509 U.S. at 590 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science.")

Plaintiffs bolster their theory on the mechanism behind PPA-induced ischemic stroke. The above-described human clinical trials and animal studies demonstrate PPA's effect on blood pressure. PPA's vasoconstrictive effect and ischemic stroke association finds support in scientific literature. See, e.g., Rashmi Kothari & William G. Barsan, Stroke, in Rosen's Emergency Medicine: Concepts and Clinical Practice at 1435 (John A. Marx et al. eds. 5th ed., 2002) ("Recreational drugs such as cocaine, [PPA], and amphetamines are potent vasoconstrictors associated with both ischemic and hemorrhagic stroke."); Harold P. Adams, Jr. et al., Ischemic Cerebrovascular Disease 297 (2001) (naming PPA as a medication with vasoconstrictive properties implicated as leading to stroke); Michael A. Sloan, Toxicity/Substance Abuse, in Primer on Cerebrovascular Diseases at 413 (K.M.A. Welch et al. eds., 1997) (associating PPA with vasospasm and beading).

See also Record at 631, 637-38 (although denying that PPA causes vasospasm, defense expert Dr. Brian Hoffman conceded PPA's vasoconstrictive effect).

Scientific literature also supports the practice of comparing PPA to other sympathomimetics. See, e.g., John C.M. Brust, Stroke and Substance Abuse, in Uncommon Causes of Stroke 133 (Julian Bogousslavsky & Louis R. Caplan eds., 2001) (describing PPA as an "amphetamine-like drug" and one of a group of psychostimulants with "well-recognized" ischemic or hemorrhagic stroke complications). Dr. Levine outlined the steps he utilized in applying evidence and research relating to these other agents to PPA. See Domingo, 289 F.3d at 606-07.[22] Just as with extrapolation between the sub-populations, defendants identify some of the problems in comparing PPA with other sympathomimetics. However, again, they do not demonstrate that this practice fails to accord with acceptable methods and procedures of science. See Kennedy,

---

[22] The court finds the Ninth Circuit cases excluding testimony relying on "similar but not identical" studies and evidence distinguishable. See, e.g., Domingo, 289 F.3d at 606-07 (expert's theory had never been published, and expert did not set forth the steps utilized in reaching a conclusion based on animal studies or point to studies supporting every necessary link in the theory of causation); Schudel, 120 F.3d at 997 (court found "no showing that necessary extrapolation [from studies involving either different agents or different types of exposure] was scientifically acceptable."); see also Rider, 295 F.3d at 1202 (expert relied on evidence that agent could cause ischemic stroke to prove it could cause hemorrhagic stroke).

ORDER
Page - 32 -

161 F.3d at 1230.[23]

The expert opinions offered on the PPA/ischemic stroke association rest on more than simply the "*ipse dixit*" of the experts. Joiner, 522 U.S. at 146. In addition to the evidence proffered as to biological plausibility and through comparison to like agents, plaintiffs' experts rely on case and adverse drug reports, textbooks and treatises, and the clinical experience of several experts and other scientists. The court again finds that the cumulative effect of this evidence satisfies the mandate of Daubert. See, e.g., Kennedy, 161 F.3d at 1228-31; Hopkins, 33 F.3d at 1124-25 (finding expert testimony relying on, inter alia, clinical experience and studies, medical literature, and general scientific knowledge about a drug's properties based "on the types of scientific data and utiliz[ing] the types of scientific techniques relied upon by medical experts in making determina-

---

[23] Upon being asked what inferences were permissible in considering scientific evidence, defense expert Dr. Gregory Albers testified that, in the absence of high quality data, inferences could be made by looking to "biological plausibility, temporal associations, [and] wealth of anecdotal data." Record at 589. Dr. Levine followed this precise formula. Dr. Albers also agreed that there was "quite a bit of suspicion" as to the association between ischemic stroke and cocaine/amphetamines, and noted that he performed drug screens on his ischemic stroke patients Id. at 594-96. Additionally, in arguing against general acceptance, Dr. Albers pointed to a "strong scientific statement[,]" put out by the "very discerning" American Heart Association ("AHA"), not mentioning PPA as a risk factor for ischemic stroke. Id. at 581. He later opined that ephedrine, also not included in the aforementioned statement, has not been a well-accepted cause of ischemic stroke, just prior to learning that the AHA recently recommended its removal from the market. Id. at 584-85.

ORDER
Page - 33 -

tions regarding toxic causation where there is no solid body of epidemiological data to review.") See also Glaser v. Thompson Med. Co., 32 F.3d 969, 972-75 (6th Cir. 1994) (finding scientifically reliable Dr. Zaloga's opinion that PPA-containing Dexatrim can cause severe hypertension, based on five of his own published studies, the published articles of other medical researchers, case reports, and his own clinical experience.")[24]

Admittedly, the purported PPA-ischemic stroke association poses a far more difficult question under Daubert than that presented by hemorrhagic stroke. Indeed, while Dr. Levine found "grade B" evidence for causality between PPA and hemorrhagic stroke, the evidence associating PPA with ischemic stroke, just as with hemorrhagic stroke in children and men, fell somewhere

---

[24] Contrary to defendants' assertion, the court finds nothing in the Glaser decision incompatible with the Daubert trilogy of cases. Defendants also point to circuit court decisions affirming exclusion of expert testimony relating to the drug "Parlodel." See Rider, 295 F.3d 1194 (11th Cir. 2002); Hollander v. Sandoz Pharms. Corp., 289 F.3d 1193 (10th Cir. 2002); Glastetter, 252 F.3d 986 (8th Cir. 2001). These decisions are not binding on this court and involved an entirely different drug. Moreover, no circuit court has yet reviewed any of the several different district court decisions finding Parlodel causation evidence scientifically reliable. As stated by the Tenth Circuit in Hollander: "[W]hen coupled with th[e] deferential [abuse of discretion] standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the [sic] same science may reach different results." 289 F.3d at 1206-07 (citing Ref. Manual at 27 and Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291, 1299 n.17 (N.D. Ala. 2001) (observing that the Eighth Circuit's decision in Glastetter "does not necessarily [establish] that an inconsistent holding by this court would constitute an abuse of discretion."))

ORDER
Page - 34 -

below a "grade C," with "associated grade B" evidence from the class of like agents.

However, the court need not determine the accuracy of plaintiffs' experts' conclusions. As stated by the Ninth Circuit:

> Judges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert. The *Daubert* duty is to judge the reasoning used in forming an expert conclusion. The test is whether or not the reasoning is scientific and will assist the jury. If it satisfies these two requirements, then it is a matter for the finder of fact to decide what weight to accord the expert's testimony. In arriving at a conclusion, the factfinder may be confronted with opposing experts, additional tests, experiments, and publications, all of which may increase or lessen the value of the expert's testimony. But their presence should not preclude the admission of the expert's testimony - they go to the weight, not the admissibility.

Kennedy, 161 F.3d at 1230-31. See also *Daubert*, 509 U.S at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (citing Rock v. Arkansas, 483 U.S. 44, 61 (1987)). Here, for the reasons described above, the court finds that plaintiffs' experts employed good science in reaching their conclusions. As such, the court finds plaintiffs' expert opinions on ischemic stroke admissible under *Daubert*.

5. Cardiac Injuries:

Plaintiffs also posit a causal relationship between PPA and cardiac injuries. The myocardial injuries identified include myocardial ischemia (angina; insufficient blood flow to heart

ORDER
Page - 35 -

muscle tissue), myocardial infarction (heart attack), myocardial necrosis (destruction of heart muscle cells), myocarditis (inflammation of heart muscle walls), and cardiomyopathy (primary heart muscle mass disease). Plaintiffs also implicate some twelve different types of cardiac arrhythmias, including ventricular tachycardia (accelerated ventricular rhythm), ventricular fibrillation (contraction of ventricle), and bradyarrhythmia (deceleration of heart's rhythm).

Plaintiffs' expert, Dr. Irvin Goldenberg, attested to the relationship between PPA and cardiac injuries at the <u>Daubert</u> hearing. Lacking epidemiological evidence, Dr. Goldenberg drew upon animal studies, human clinical trials, case reports, clinical experience, comparison to other sympathomimetics, and textbook references. He testified as to, inter alia, biological plausibility, temporal association, and dose response. Thus, at first glance, Dr. Goldenberg's methodology mirrors that employed by Dr. Levine. However, upon closer analysis, the court finds critical distinctions between these expert opinions.

Applied across the broad spectrum of cardiac injuries, the evidence proffered by Dr. Goldenberg spreads far too thin to reliably support expert scientific testimony. See <u>Joiner</u>, 522 U.S. at 146 (court may conclude that there is simply too great an analytical gap between the data and the opinion proffered). For example, most of the myocardial injury case reports involved what Dr. Goldenberg referred to as "small heart attacks," while the textbooks he identified associate PPA with cardiomyopathy and

ORDER
Page - 36 -

coronary artery disease. See Daubert Hearing Record (May 29, 2003) at 38-40, 43-44 (hereinafter "Record II"). The arrhythmia case reports similarly do not represent a preponderance of any particular type(s) of arrhythmia. The remaining lines of evidence, including several animal studies, human clinical trials, three cases recalled from Dr. Goldenberg's clinical experience, and a comparison to like agents, do not otherwise account for the breadth of injuries at issue.[25]

The evidence also fails to account for the incredible variety of proposed mechanisms. In comparison to the consistent explanations of proposed mechanisms for hemorrhagic and ischemic stroke, Dr. Goldenberg identified, by defendants' count, some thirty-five different biological mechanisms for the association between PPA and the various cardiac injuries. Dr. Goldenberg did not proffer support for his opinions as to the bulk of these mechanisms.

To the contrary, Dr. Goldenberg's primary explanation relied on PPA's vasoconstrictive effect. However, defendants' expert, Dr. Thomas Michel, testified that PPA's vasoconstrictive effect on coronary arteries was extremely limited. Id. at 84-86; 90-92. Dr. Michel testified that PPA's primary mechanism of action was

---

[25] The court is mindful of the fact that strokes may be broken down into numerous categories and sub-categories. However, in contrast to the experts on stroke, Dr. Goldenberg failed to provide comprehensive support for the various cardiac injuries or to demonstrate the propriety of considering cardiac injuries as a whole in relation to PPA.

ORDER
Page - 37 -

its stimulation of alpha adrenergic receptors, resulting in PPA binding to those receptors and eliciting vasoconstriction. Because of the notably lower density of alpha receptors in coronary arteries, PPA was less likely to cause vasoconstriction in coronary arteries than in other vascular beds. This testimony calls into question Dr. Goldenberg's opinion on the proposed vasoconstrictive mechanism for cardiac injuries attributed to PPA. Yet, neither Dr. Goldenberg, nor plaintiffs' counsel addressed this distinction during the Daubert hearing.[26]

Finally, deficiencies in the assorted lines of evidence further exacerbate the gap between Dr. Goldenberg's opinion and the evidence relied upon. For instance, while Dr. Goldenberg testified as to severe cardiac injuries stemming from PPA consumption, the case reports showed, in general, no long term adverse effects associated with PPA. See Record II at 36 (Dr. Goldenberg testified: "[A]ll these [myocardial injury] cases I'm going to tell you, they took the drug, they came in within a couple hours afterwards[.] When the drug was withdrawn, they had no problems that we know of.") and 60-62 (defendants' expert

---

[26] Plaintiffs later pointed to a single textbook only indirectly supporting their assertion that coronary arterial beds are as responsive to PPA's vasoconstrictive effect as cerebral arteries. See Brian B. Hoffman, Catecholamines, Sympathomimetic Drugs, and Adrenergic Receptor Antagonists, in Goodman & Gilman's: The Pharmacological Basis of Therapeutics at 222, table 10-2 (McGraw-Hill 10th ed., 2001) (showing that norepinephrine, which plaintiffs maintain PPA releases from nerve terminals as an indirect effect, has a greater effect on coronary blood flow than it does on cerebral blood flow).

ORDER
Page - 38 -

testified that seven out of twenty arrhythmia case report patients spontaneously recovered without any treatment, while seven others recovered completely with treatment). Similarly, while Dr. Goldenberg presented testimony as to individuals consuming human therapeutic doses of PPA, three of the animal studies found no pathology at doses significantly beyond human therapeutic dose, including doses 1000 and 235 times that level. Id. at 75-76, 83-84. Also, beyond offering a few isolated examples, Dr. Goldenberg only alluded to the existence of numerous textbooks and treatises supporting his opinion.

Dr Goldenberg's scattershot expert testimony lacks both the cumulative evidentiary support and the thoroughness the court found reliable with respect to both hemorrhagic and ischemic stroke. Simply put, the evidence proffered by Dr. Goldenberg fails to reliably support his ultimate opinion. See Joiner, 522 U.S. at 146. As such, the court finds expert opinions as to a relationship between PPA and cardiac injuries inadmissible under Daubert.

## IV. CONCLUSION

For the reasons described above, the court GRANTS in part and DENIES in part defendants' motion to preclude plaintiffs' expert opinions as to general causation. The court finds expert testimony as to an association between PPA and hemorrhagic or ischemic stroke, in either gender and any age group, admissible. The court finds expert testimony associated with seizures, psychoses, injuries occurring more than three days after inges-

ORDER
Page - 39 -

1  tion of a PPA-containing product, and cardiac injuries inadmissi-
2  ble.
3      DATED at Seattle, Washington this 18th day of June, 2003.

         *[signature]*
         BARBARA JACOBS ROTHSTEIN
         UNITED STATES DISTRICT JUDGE