UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **TRACY BOLWELL,** | : | CIVIL ACTION NO: 302CV01001AWT |
| | : | |
| Plaintiff, | : | JUDGE ALVIN W. THOMPSON |
| | : | |
| vs. | : | MAG. JUDGE DONNA F. MARTINEZ |
| | : | |
| DURAMED PHARMACEUTICALS, INC., BARR LABORATORIES, INC., | : | |
| | : | |
| Defendants. | : | February 9, 2007 |
| | : | |

**REPLY IN SUPPORT OF DEFENDANTS DURAMED PHARMACEUTICALS, INC., AND BARR LABORATORIES, INC.'S MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S CASE SPECIFIC EXPERTS**

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................... 1

II. LAW AND ARGUMENT .......................................................................................... 1

    A. Dr. Tuhrim's Opinions Are Unreliable .............................................................. 1

        1. Plaintiff's Miscarriage ................................................................................ 2

        2. Benign Angiopathy of the Central Nervous System ............................. 4

        3. Smoking ..................................................................................................... 4

    B. Dr. Wasserstein's Best Performance Methodology Is Not Reliable ............... 6

    C. Dr. Crakes' Reliance on Assumptions Regarding Plaintiff's Level of Impairment Is Not a Reliable Methodology ...................................................... 7

III. CONCLUSION ........................................................................................................... 9

NOW COME defendants, Duramed Pharmaceuticals, Inc., and Barr Laboratories, Inc., by and through counsel, and hereby file their reply to plaintiff's memorandum in opposition to defendants' motion to exclude the testimony of plaintiff's case specific experts and would show the Court as follows:

## I. INTRODUCTION

Plaintiff's opposition only verifies that her experts' opinions are inadmissible. Instead of providing the Court with some assurance of the reliability of Drs. Tuhrim, Wasserstein, and Crakes' opinions, plaintiff's argument confirms that those experts' opinions are unreliable. Plaintiff's opposition is replete with attempts to offer her own inadmissible expert testimony to fill in the gaps in her experts' opinions. However, plaintiff only succeeds in demonstrating that Dr. Tuhrim has not considered or ruled out all potential causes of plaintiff's stroke, Dr. Wasserstein's methodology for measuring plaintiff's alleged deficits is unreliable, and Dr. Crakes has no evidence that plaintiff has any impairment upon which to base his opinions. In sum, plaintiff highlights that her experts have employed an impermissible pick and chose methodology to formulate their opinions in order to reach pre-determined conclusions. That methodology is not reliable, and as such, all plaintiff's case specific experts should be excluded.

## II. LAW AND ARGUMENT

### A. DR. TUHRIM'S OPINIONS ARE UNRELIABLE

Dr. Tuhrim did not perform a reliable differential diagnosis in concluding that plaintiff's stroke was caused by the product at issue, and plaintiff's opposition does not establish otherwise. Dr. Tuhrim's differential diagnosis employs an unreliable pick and chose methodology. Contrary to plaintiff's claim that he "bases his opinions and testimony on documented facts, the

results of diagnostic testing and the findings of the plaintiff's treating physicians," it is more accurate to say he bases his opinions on facts he likes, and ignores those he does not.

As she has done in her other memoranda filed with this Court, plaintiff attempts to fill the gaps in Dr. Tuhrim's unreliable differential diagnosis and bolster his unreliable opinions by offering her own opinions as "expert testimony." Those attempts, however, prove too much.

### 1. Plaintiff's Miscarriage

The gaps in Dr. Tuhrim's methodology are crystalized in plaintiff's attempt to justify Dr. Tuhrim's failure to consider plaintiff's miscarriage. It is well-accepted, and plaintiff does not dispute, that a woman is at an increased risk of stroke in the postpartum period. It also is undisputed that on or about November 10, 1996, plaintiff had a miscarriage, and her medical records document that she retained the products of conception for several days thereafter. (*See* Northern Duchess OBGYN Associates ("ND OBGYN") Record, Bates No. 6TRACY00002-4, Ex. H.)[1] Additionally, plaintiff experienced continued hormonal issues through December 30, 1996, including abnormal menstrual cycles.[2] (*See id.*, Bates No. 6TRACY00005.)

Dr. Tuhrim admits he was unaware of plaintiff's miscarriage and its aftermath when he formulated his opinions and did not review plaintiff's medical records relating to her miscarriage. (*See* Deposition of Stanley Tuhrim, M.D. ("Tuhrim Dep."), p. 61, Ex. S.) Plaintiff argues that, despite Dr. Tuhrim's failure to review plaintiff's medical records and consider plaintiff's miscarriage and its aftermath in his differential diagnosis, Dr. Tuhrim's opinions are reliable. (*See* Plaintiff's Reply to Defendants' Motion to Exclude the Testimony of Plaintiff's

---

[1] Hereinafter, references to exhibits, unless specifically noted otherwise, are to the exhibits attached to the Affidavit of Jeffrey D. Geoppinger, filed in support of defendants' motion to exclude plaintiff's case specific experts.

[2] Plaintiff's opposition again argues that defendants have improperly referenced plaintiff's documented abnormal menstrual cycles following her miscarriage as evidence of continued hormonal issues indicative of the postpartum period. Plaintiff based her argument on the entry in her medical records which notes that "irregular periods are not unusual" after a miscarriage. Plaintiff confuses the reference to "not unusual." "Irregular periods" is synonymous with "abnormal menstrual cycles." The fact that her providers note that such occurrences are not unexpected after a miscarriage does not mean that they are normal and not associated with the postpartum.

Case Specific Experts ("Plaintiff's Reply"), pp. 11-13.) However, plaintiff fails to explain how Dr. Tuhrim's incomplete differential diagnosis meets the reliability standard required by Federal Rule of Evidence 702.

Apparently recognizing she has no expert qualified to offer opinions regarding those records, plaintiff attempts to do so herself by asserting the records do not establish that she was in the postpartum period as of January 21, 1997, and at an increased risk of stroke. (*See id.*) Surely, neither plaintiff nor her counsel is qualified to offer those opinions. Her attempts to supplement the incomplete differential diagnosis of Dr. Tuhrim with her own unqualified expert testimony must be seen for what they are – proof that Dr. Tuhrim's opinions are unreliable and inadmissible.

Plaintiff also attacks the opinions of defendants' rebuttal expert Dr. McCullough in an effort to justify Dr. Tuhrim's failure to consider plaintiff's miscarriage. (*See id.*) However, plaintiff misses the point entirely. Defendants' challenge is to Dr. Tuhrim's methodology in formulating his opinions. By his own admission, Dr. Tuhrim ignored evidence of plaintiff's relevant risk factors for stroke in reaching his conclusion that PPA was the cause of plaintiff's stroke. Dr. McCullough's testimony is not at issue in defendants' motion to exclude plaintiff's case specific experts. Neither defendants nor the Court need rely on Dr. McCullough's opinion to determine Dr. Tuhrim's methodology is flawed. Dr. Tuhrim failed to consider numerous risk factors for plaintiff's stroke, including the postpartum risk, before formulating his opinions. That failure renders his differential diagnosis incomplete and unreliable.

Indeed, by railing against Dr. McCullough's opinions rather than providing evidence that Dr. Tuhrim considered plaintiff's miscarriage and other risk factors for stroke, plaintiff verifies the flaws in Dr. Tuhrim's differential diagnosis. Pursuant to the holdings of this Court, his

testimony should be excluded. *See Perkins v. Original Medsystems, Inc.*, 299 F. Supp. 2d 45, 52 (D. Conn. 2004) (holding a reliable differential diagnosis requires the expert "take serious account of other potential causes" of the condition).

### 2. Benign Angiopathy of the Central Nervous System

Plaintiff also attempts to argue that Dr. Tuhrim "considered the medical condition represented by BACNS [benign angiopathy of the central nervous system] in arriving at his conclusions." (*See* Plaintiff's Reply, pp. 7-10.) However, the evidence cited by plaintiff does not support her contention.

Plaintiff cites to Dr. Tuhrim's testimony where he states, unequivocally, that he is unaware of BACNS, and he cannot state that the general clinical picture for PACNS is the same as for BACNS. (*See id.*, pp. 9-10.) Notwithstanding Dr. Tuhrim's admission, plaintiff contends Dr. Tuhrim did consider BACNS by inferring the clinical picture for a patient with BACNS is identical to Dr. Tuhrim's understanding of the clinical picture for patients with PACNS generally. (*See id.*, pp. 8-10.) However, neither Dr. Tuhrim nor any other expert offered any such testimony. Indeed, Dr. Tuhrim could not have done so given his admitted unfamiliarity with BACNS altogether. Furthermore, plaintiff confirms that BACNS is a distinct subset of a form of vasculitis known as primary angiitis of the central nervous system (PACNS). (*See id.*, p. 8.) It is not merely another term for PACNS. In attempting to justify Dr. Tuhrim's failure to consider BACNS, plaintiff succeeds in pointing out that he did not consider it and his methodology is flawed.

### 3. Smoking

Plaintiff also contends Dr. Tuhrim appropriately ruled out smoking as a risk factor for plaintiff's stroke. (*See id.*, p. 11.) In support of her contention, plaintiff cites to Dr. Tuhrim's deposition testimony in which he states, "[t]here have been a couple of reports that suggest some

4

increased risk of intracerebral hemorrhage associated with cigarette smoking, but the preponderance of the epidemiologic data would suggest that the association, if it exists at all, is quite weak." (*See id*., p. 10.)   However, plaintiff conveniently ignores Dr. Tuhrim's testimony from the PPA MDL in which he identified smoking as a risk factor for intracerebral hemorrhage. (*See* Deposition of Stanley Tuhrim, M.D., in PPA MDL ("Tuhrim MDL Dep."), p. 99, Ex. P.)  In his MDL deposition, Dr. Tuhrim did not qualify his opinion that smoking was a risk factor for ICH or indicate that he considered the scientific evidence to be "quite weak." (*See id*.)

Nevertheless, plaintiff claims that Dr. Tuhrim's considered the scientific literature on smoking and was able to rule it out as a possible cause of plaintiff's stroke because he testified case reports of smoking associated with intracerebral hemorrhage are "weak" evidence of causation.  (*See* Plaintiff's Reply, p. 11.)  However, plaintiff fails to address how Dr. Tuhrim's dismissal of those case reports as weak evidence of an association between smoking and intracerebral hemorrhage squares with his reliance on case reports to conclude PPA causes stroke.  Indeed, in his PPA MDL expert report, which he incorporated by reference in this matter, Dr. Tuhrim proclaims that case reports of all kinds, including case reports of stroke associated with compounds other than PPA, are one of the "lines of medical evidence demonstrating the relationship between PPA and stroke." (*See* PPA MDL Report of Stanley Tuhrim, M.D. ("Tuhrim MDL Report"), p. 8, Ex. O.)  As per his pick and chose methodology, Dr. Tuhrim regards case reports as strong evidence of causation when they assist in attributing causation to PPA and disregards the same types of case reports when they contradict the conclusion he wishes to reach.

Dr. Tuhrim's inconsistent testimony shows that he considers smoking in his differential diagnosis for stroke when it suits his purposes, and ignores it when it does not.  His hypocrisy

5

concerning the value of case reports further highlights his pick and chose methodology – a methodology that is not reliable. Quite simply, Dr. Tuhrim's opinions premised on that methodology are not admissible.

### B.    DR. WASSERSTEIN'S BEST PERFORMANCE METHODOLOGY IS NOT RELIABLE

Plaintiff's argument regarding the opinions of Dr. Wasserstein is similarly unavailing. While plaintiff claims defendants' criticisms of Dr. Wasserstein are "simply wrong," plaintiff fails to show how Dr. Wasserstein's methodology, which ignores relevant evidence in order to reach the conclusion she was hired to provide, is reliable. Plaintiff summarily claims that "Dr. Wasserstein looked at how [plaintiff] performed pre-morbidly and compared that to her post-stroke performance to arrive at her findings." (*See* Plaintiff's Reply, p. 16.) That contention is simply not true.

Dr. Wasserstein's entire opinion is premised on her "best performance" methodology. Purportedly following that methodology, Dr. Wasserstein interviewed plaintiff and administered a battery of tests more than six years after plaintiff's stroke. Based on those results, Dr. Wasserstein concluded that plaintiff's cognitive functioning has been adversely affected by her stroke. (*See* Report of Jeanette Wasserstein, Ph.D. ("Wasserstein Report"), p. 9, Ex. V.)

Dr. Wasserstein did not take into account any objective evidence of Ms. Bolwell's pre-stroke level of functioning before issuing her opinion. She did not review any of plaintiff's academic or employment records or interview anyone concerning plaintiff and her pre-stroke condition. Dr. Wasserstein's failure to consider pre-stroke objective evidence of plaintiff's level of functioning, despite its availability, renders Dr. Wasserstein's opinions unreliable, even by her own standards.

The same text Dr. Wasserstein relies upon as support for the reliability of her "best performance" methodology criticizes her methods. Lezak, in his textbook *Neuropsychological*

*Assessment*, recognizes that a "best performance" methodology that relies solely upon post-injury test results may "systematically produce overestimates of pre-morbid ability" and "result in spurious estimates." (*See* M. Lezak, et al., Neuropsychological Assessment, 4th Ed., p. 99, Ex. AA.) Further, Lezak states that when identifying a patient's "best performance," it is important that the clinician's estimate of pre-morbid function "take into account as much information as possible about the patient and not rely on test scores alone." (*Id.*) Yet, Dr. Wasserstein has not done so.

Plaintiff has the burden of proof, which includes proving that she has suffered damages. In her report, Dr. Wasserstein attempts to provide evidence in support of those claims of damages. However, the "best performance" methodology used by Dr. Wasserstein to formulate her opinions is not reliable because it ignores objective evidence that contradicts the result she wants to reach. Moreover, plaintiff cannot show Dr. Wasserstein's opinions are reliable in the face of her intentional ignorance of relevant information.

Nor does defendant's designation of Dr. Westerveld's somehow validate the reliability of Dr. Wasserstein's methodology or automatically render her opinions relevant and helpful to the jury. Dr. Wasserstein ignored objective evidence of plaintiff's pre-morbid function despite its availability. The very authority she cites for support of her methodology unequivocally states that method is unsound and unreliable. Without any scientific support for her methodology, Dr. Wasserstein's opinions must be excluded.

### C. DR. CRAKES' RELIANCE ON ASSUMPTIONS REGARDING PLAINTIFF'S LEVEL OF IMPAIRMENT IS NOT A RELIABLE METHODOLOGY

In opposing defendants' motion to exclude the opinions of her economist Dr. Crakes, plaintiff fills four pages with a rendition of Dr. Crakes' qualifications and his expert report. (*See* Plaintiff's Reply, pp. 17-20.) What plaintiff fails to do in those four pages, however, is address

the issues raised by defendants. Nowhere in her opposition does plaintiff provide evidence (most likely because none exists) that Dr. Crakes' methodology of relying on plaintiff's counsel to measure the level of plaintiff's impairment for the purposes of his calculations and opinions is reliable.[3]

Strikingly, plaintiff admits that neither her experts, treating physicians, or anyone else qualified to offer an opinion has determined that she has any quantifiable level of impairment from her stroke that affects her earning capacity. (*See id*., p. 18.) Due to the absence of evidence of impairment, plaintiff, incredibly, claims it is permissible for Dr. Crakes to assume she is either 25% or 50% disabled as instructed by her attorney. (*See id*.) Then, plaintiff goes a step further and claims Dr. Crakes' opinions are admissible because they provide a "framework for the jury in accessing future lost earnings." (*Id*.)

Plaintiff's argument is unbelievable. Dr. Crakes has no support for his opinion that plaintiff's future earnings are impaired. In fact, there is absolutely no objective evidence that plaintiff has any impairment at all. Dr. Crakes' opinion is complete conjecture. Plaintiff is asking this Court to allow Dr. Crakes to take the stand and testify about some theoretical person with an "assumed" level of disability, and then allow the jury to award plaintiff that theoretical person's damages. Even if Dr. Crakes is a qualified economist, Alan Greenspan, an eminently qualified economist, would never be permitted to offer such an unfounded opinion in a court of law. The trial in this case is about the plaintiff and her level of disability, if any. It is not about an unknown person with an assumed level of disability. Since Dr. Crakes does not have any

---

[3]Of note, Dr. Crakes repeatedly states in his deposition that he is not qualified to make an independent determination of plaintiff's level of disability. However, given his reliance on plaintiff's counsel to instruct him on plaintiff's level of disability for the purposes of formulating his opinions, he apparently considers plaintiff's counsel qualified to make that determination.

opinions about the future impaired earnings of the plaintiff in this case, his testimony must be excluded.

### III.  CONCLUSION

For all the foregoing reasons, defendants' motion to exclude the testimony of plaintiffs' expert witnesses must be granted.

Respectfully submitted,

/s/ Jeffrey D. Geoppinger
Joseph P. Thomas
CT Fed. Bar No. phv0382
Jennifer Hageman
CT Fed. Bar No. phv0937
Jeffrey D. Geoppinger
CT Fed. Bar No. phv0382
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, OH  45202-2409
(513) 698-5000
(513) 698-5001 FAX
jthomas@ulmer.com
jhageman@ulmer.com
jgeoppinger@ulmer.com

Thomas H. Winslow
The Law Office of Thomas H. Winslow, LLC
321 Main Street
Farmington, CT  06032-2976
(860) 678-4425
(860) 678-4427 FAX

**Counsel for Defendants**
**Duramed Pharmaceuticals, Inc., and**
**Barr Laboratories, Inc.**

9

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served via the Court's electronic filing system and facsimile, Federal Express, and/or U.S. mail on the 9th day of February, 2007, on:

Ron Michael Meneo, Esq.
Brian P. Kenney, Esq.
Early, Ludwick & Sweeney, L.L.C.
265 Church Street, 11th Floor
P.O. Box 1866
New Haven, CT  06508-1866

**Attorneys for Plaintiff**

/s/ Jeffrey D. Geoppinger

412960.2
2/9/2007 4:18 PM